UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X
                                         x
IN MARSH & McLENNAN COMPANIES, INC.      x     MDL No. 1744
SECURITIES LITIGATION                    x     Master File No.
                                         x     04 Civ. 8144 (SWK)
----------------------------------------X
                                         x
THIS DOCUMENT RELATES TO:                x     **OPINION AND ORDER**
ALL ACTIONS                              x
                                         x
----------------------------------------X


**SHIRLEY WOHL KRAM, U.S.D.J.**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................... 1

II.    BACKGROUND ..................................... 2

  A.  The Parties .................................... 2

  B.  The Factual Allegations ....................... 5

  C.  The Legal Claims ............................. 14

III.  LEGAL STANDARDS FOR DISMISSAL ................ 17

  A.  Motion to Dismiss Pursuant to Rule 12(b)(6).. 17

  B.  Pleading under Federal Rules of Civil
      Procedure 8 and 9(b), and the PSLRA .......... 19

IV.    DISCUSSION .................................... 20

  A.  Section 10(b) and Rule 10b-5 Claims .......... 20

     1.  Liability for Misstatements and Omissions .. 21

        i.   The Alleged Misrepresentations........... 22

          a.  Materiality.............................. 22

          b.  The Duty to Disclose.................... 24

            (1)  MMC's Reported Earnings ............. 26

            (2)  MMC's Risk Disclosures ............. 30

            (3)  MMC's Contingent Loss Reserves ...... 32

            (4)  The Magnitude of Contingent
                 Commissions and Their Materiality
                 to MMC's Earnings ................... 34

            (5)  Statements Pertaining to MMC's
                 Business Practices ................. 37

            (6)  Fraudulent Accounting ............... 45

          c.  Misstatements Attributable to
            Defendants ............................. 48

        ii.  Scienter................................. 54

        a.   MMC and Marsh............................ 55

        b.   The Individual Defendants................ 61

          (1)    The Senior Management Defendants .... 63

          (2)    The Audit Committee Defendants ...... 70

        c.   D&T..................................... 75

      iii.   Reliance................................ 78

      iv.   Loss Causation.......................... 79

   2.    Market Manipulation ...................... 80

B.    Section 11 Claims ........................... 81

C.    Section 18 Claims ........................... 86

D.    Control Person Claims: Section 15 and Section 20(a) ............................... 87

E.    State Law Claims ............................ 91

   1.    Common Law Fraud and Deceit ............... 91

   2.    Negligent Misrepresentation ............... 92

   3.    State Securities Laws ..................... 93

V.     CONCLUSION .................................. 94

## I.   INTRODUCTION

On October 14, 2004, New York State Attorney General Eliot Spitzer (the "NYAG") filed a civil complaint in New York State Supreme Court against Marsh & McClennan Companies, Inc. ("MMC" or the "Company") alleging that the Company "steered unsuspecting clients to insurers with whom it had lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts." Press Release, Office of New York State Attorney General Eliot Spitzer, Investigation Reveals Widespread Corruption in Insurance Industry (Oct. 14, 2004), <u>available at</u> http://www.oag.state.ny.us/press/2004/oct/oct14a_04.html.    The following day, the first of approximately a dozen class action securities complaints was filed in federal court. Each complaint alleges that MMC, its subsidiary, Marsh Inc. ("Marsh"), its auditor, Deloitte & Touch LLP ("D&T"), and nearly two dozen directors and officers of MMC and Marsh are liable for numerous violations of the federal securities laws and assorted state laws.[1]

---

[1]  Plaintiffs name both parent corporation Marsh & McClennan Companies, Inc. and its wholly owned subsidiary, Marsh, Inc., as defendants. For clarity, these entities will be referred to as MMC and Marsh, respectively. Because the Complaint often refers to the parent and its subsidiary collectively, the Court attempted to distinguish between the two in the context of the specific allegations of the Complaint. Where the Court was unable to determine which entity a specific allegation referred to, the two entities are collectively referred to as MMC. Upon

Upon plaintiffs' motions, the Court consolidated these complaints and appointed The Public Employees' Retirement System of Ohio, State Teachers' Retirement System of Ohio, Ohio Bureau of Workers' Compensation, and the State of New Jersey, Department of Treasury, Division of Investment as co-lead plaintiffs ("Plaintiffs"). Plaintiffs filed the Consolidated Class Action Amended Complaint shortly thereafter (the "Complaint"). In eight separate filings, the defendants now move to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), and failure to plead fraud with particularity, pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the reasons stated below, the motion is granted in part and denied in part.

## II.  BACKGROUND

### A. The Parties

This lawsuit has been brought as a class action on behalf of all persons that, between and including October 14, 1999 and October 13, 2004 (the "Class Period"), purchased or otherwise

---

amending their Complaint, Plaintiffs are ordered to appropriately distinguish between the two entities wherever feasible. For instance, Plaintiffs commonly refer to the Global Broking division as being a segment of the collective Company, when it is clearly a division of the Marsh subsidiary. On amendment, the division is to be properly identified.

acquired securities issued by MMC (the "Class"). The co-lead plaintiffs are large, institutional investors with billions of dollars in assets and tens of millions of dollars of estimated losses. Plaintiffs allege that the members of the Class collectively lost "nearly $12 billion in market capitalization." (Compl. ¶ 27.) In addition, Plaintiffs bring claims under state law on behalf of a subclass of state and municipal pension plans that purchased MMC securities during the Class Period (the "Pension Fund Subclass").

Plaintiffs name both corporate and individual defendants. MMC and Marsh are the primary corporate defendants. MMC is a public company providing professional services in the fields of risk and insurance, investment management, and consulting and human resources. Marsh, MMC's principal subsidiary, provides risk and insurance services to clients. The Marsh subsidiary is wholly owned by MMC, generating approximately 60% of the parent corporation's revenues. (Compl. ¶ 118.) Plaintiffs also name MMC's independent auditing firm, D&T, which audited MMC's financial statements throughout the Class Period.

Plaintiffs name twenty individual defendants, most of them former or current directors and officers of MMC and Marsh: Jeffrey Greenberg, former Chief Executive Officer ("CEO") and Chairman of MMC ("Greenberg"); Mathis Cabiallavetta, former Vice Chairman of MMC ("Cabiallavetta"); Roger E. Egan, former

President and Chief Operating Officer of Marsh ("Egan"); Lewis W. Bernard, a director of MMC ("Bernard"); Peter Coster, former President of Mercer and a former director of MMC ("Coster"); Robert Erburu, a director of MMC ("Erburu"); Lawrence Lasser, former President and CEO of Putnam and a former director of MMC ("Lasser"); Oscar Fanjul, a director of MMC ("Fanjul"); Ray J. Groves, former Chairman and CEO of Marsh and a director of MMC ("Groves"); Stephen R. Hardis, a director of MMC ("Hardis"); Gwendolyn S. King, a director of MMC ("King"); Right Honorable Lord Ian Bruce Lang of Monkton, a director of MMC ("Lang"); David A. Olsen, a director of MMC ("Olsen"); Robert J. Rapport, MMC's Vice President, Chief Accounting Officer, and Controller during the Class Period ("Rapport"); Morton O. Schapiro, a director of MMC ("Schapiro"); Adele Simmons, a director of MMC ("Simmons"); John T. Sinnott, former Chairman and CEO of Marsh and a former director of MMC ("Sinnott"); A.J.C. Smith, a former director of MMC, and the pre-Class Period Chairman and CEO of MMC ("Smith"); Sandra S. Wijnberg, a senior Vice President and Chief Financial Officer of MMC ("Wijnberg"); and Michael Bischoff, a senior Vice President and head of Investor Relations during the Class Period ("Bischoff").[2]

---

[2] Plaintiffs premise Defendant Bischoff's liability on a single statement allegedly made by Bischoff during the Class Period. (Compl. ¶ 629.) In his motion to dismiss, Defendant Egan takes

For pleading purposes, Plaintiffs commonly refer to the individual defendants by reference to various group aliases. The following groups are referenced in the Complaint: (1) Defendants Greenberg, Cabiallavetta, Groves, Smith, Sinnott, Egan, Wijnberg, and Rapport (the "Senior Management Defendants"); (2) Defendants Fanjul, Hardis, King, Lang, Olsen, Schapiro, and Simmons (the "Audit Committee Defendants"); and (3) Defendants Greenberg, Wijnberg, Rapport, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Simmons, Sinnott, Smith, and Schapiro (the "Individual Section 11 Defendants"). The corporate and individual defendants will be referred to collectively as "Defendants."

**B. The Factual Allegations**

Plaintiffs' principal material allegations are summarized below. This summary takes as true Plaintiffs' allegations and factual assertions, but in no way constitutes factual findings by the Court.

The global insurance marketplace consists of four primary entities: (1) insurance companies that provide insurance; (2) clients in need of various types of liability and casualty insurance; (3) risk managers who evaluate clients' loss exposure

---

responsibility for the statement falsely attributed to Bischoff. (Egan Mot. to Dismiss 9 & n.11.) The Court credits this affirmation by Egan and dismisses all claims against Bischoff. Consequently, Bischoff is omitted from the following discussion.

and advise them on the type of insurance needed; and (4) brokers that match clients with insurance providers on the basis of the clients' needs and the nuances of the insurance marketplace. MMC is the world's largest insurance broker, providing risk and insurance brokerage services to a predominately corporate clientele worldwide. (Compl. ¶¶ 112-18.) Throughout the Class Period, MMC marketed itself as a client-focused brokerage, emphasizing its establishment of a "level playing field" for insurance providers, "completeness" in its disclosure of bids to clients, and commitment to "bidding integrity" between insurers. (Compl. ¶ 122.)

Clients pay brokers a commission for locating the best insurer for their needs. (Compl. ¶ 117.) In addition, many brokers, including MMC, receive additional, "contingent commissions" directly from insurance companies, pursuant to "placement service agreements" ("PSAs") and "market service agreements" ("MSAs"). These contingent commissions are typically based on an insurance company's book of business with the broker, renewal rates, and the profitability of the business placed by the broker. Because brokers have a fiduciary duty to serve their client's best interests, contingent commission agreements collected from insurance providers present them with a direct conflict of interest. Accordingly, state insurance agencies, such as the New York State Insurance Department

("NYSID"), have established guidelines to regulate brokers' disclosure of the contingent commissions they receive from insurance companies. Though contingent commission agreements have always existed within the insurance industry, MMC pioneered the manipulation of such agreements to drive increasingly higher revenues. (Compl. ¶¶ 123–30.)

MMC's manipulation of contingent commission agreements was exemplified by the formation of Marsh's "Global Broking" division, which was formed in order to control business placement and maximize the Company's receipt of contingent commissions. By centralizing the negotiation of contingent commission agreements in one department, MMC enhanced its ability to steer business to those insurance providers that paid the Company the highest contingent commissions and used the Company's size as leverage to force insurance companies to pay greater contingent commissions in exchange for MMC's placement of business. MMC management mandated that all negotiation of contingent commission agreements be routed through Global Broking. (Compl. ¶¶ 131–40.)

A central part of MMC's business plan throughout the Class Period was to raise the Company's revenues by promoting the interests of the insurance providers with which it had contingent commission agreements. By steering business to the insurance providers offering the most lucrative contingent

commissions, MMC collected higher fees. For example, one PSA between MMC and insurance provider American Insurance Group, Corp. ("AIG") provided MMC with a bonus of 1% of all renewal premiums if clients renewed with AIG at rate of 85% of higher. MMC would receive greater percentage bonuses based on higher renewal rates, e.g., a 2% bonus for a 90% rate or a 3% bonus for a 95% rate. Global Broking and Company executives emphasized the importance of PSAs and MSAs to employees and directed brokers to steer clients to insurers paying the highest contingent commissions. (Compl. ¶¶ 141-56.)

MMC employed a variety of techniques to steer clients to specific insurance providers. For instance, MMC began rating insurance companies based on how advantageous their contingent commission agreements were to the Company, rather than on the quality of the insurer's services or the price competitiveness of its policies. These ratings were compiled into tiering reports, which were then used by Global Broking executives to ensure that Marsh focused its broking business on the insurance companies with which it had the most favorable contingent commission agreements. (Compl. ¶¶ 157-61.) In addition to rating carriers based on how lucrative the contingent commission contracts were for MMC, the Company also instituted a "pay-to-play" system through which Marsh would refuse to place business with a provider unless it entered a contingent commission

agreement. (Compl. ¶¶ 162-69.) Internally, Marsh encouraged its employees to place contracts with friendly insurance carriers by praising and promoting employees who placed business with those providers that had entered into the most favorable contingent commission agreements with MMC. (Compl. ¶¶ 170-78.)

MMC even engineered a system of bid-rigging, steering business to preferred insurers in order to maximize the Company's contingent commission revenues. In one example of bid manipulation, Marsh created three types of quotes, known as "A," "B," and "C" quotes. When an insurance provider's existing coverage of a MMC client was up for renewal, Marsh would solicit an "A" quote from that provider, informing the provider of the target premium and policy terms for the quote. If the incumbent provider agreed to bid the "A" quote, it would keep the business, regardless of whether it was capable of providing more favorable terms. Marsh would then create the appearance of a competitive bidding process by soliciting higher, "B" or "C" quotes from competing insurance providers. By agreeing to provide less favorable quotes to Marsh, the other providers would receive assurances that they would be protected by the Company when they were the incumbent provider. (Compl. ¶¶ 179-215, 226-31.)

MMC's disclosure of its contingent commission agreements was subject to regulation by the NYSID. Under a NYSID regulatory

order promulgated in 1998, known as Circular Letter 22, brokers were required to disclose to their clients the existence and amount of contingent commissions and the reasons for such payments. (Compl. ¶¶ 126, 232.) MMC's disclosure to clients, however, was often misleading. (Compl. ¶ 244.)

The reticence with which MMC revealed the nature of its contingent commissions was compounded by its insufficient disclosure of the importance of contingent commissions to MMC's revenues. Under an agreement entered into with the Risk and Insurance Management Society ("RIMS"), MMC was required to provide its clients with a calculation (called an "average contingency factor" or "ACF") that reflected the amount that MMC received from contingent commissions, in comparison to all premiums placed by MMC in a given year. (Compl. ¶¶ 126, 242-43.) Under the agreement, however, MMC often provided its clients with "technically accurate, but potentially misleading" responses to relevant inquiries. (Compl. ¶ 244.)

MMC's financial statements during the Class Period reveal that the nature of contingent commissions was insufficiently disclosed to investors as well, touting the provision of services for contingent commissions, rather than revealing that contingent commissions were in fact kick-backs for improper steering agreements. The following explanation of contingent commissions in MMC's 2003 Annual Report is illustrative:

> Market services revenue is derived from agreements
> Marsh has with most of its principal insurance
> markets. Under these agreements, Marsh is paid for
> services provided to the market, including: access to
> a global distribution network that fosters revenue
> generation and operating efficiencies; intellectual
> capital in the form of new products, solutions and
> general information on emerging developments in the
> insurance marketplace; the development and provision
> of technology systems and services that create
> efficiencies in doing business; and a wide range of
> administrative services. Payments under market service
> agreements are based upon such factors as the overall
> volume, growth, and in limited cases profitability, of
> the total business placed by Marsh with a given
> insurer.

(Compl. ¶ 575.) Similar descriptions of contingent commissions are contained in MMC's SEC filings throughout the class period. (Compl. ¶¶ 232-41.)

MMC's improprieties during the Class Period were not limited to Marsh's insurance business, but were widespread throughout the Company. Mercer, MMC's consulting and human resources subsidiary, entered into secretive arrangements with employee benefit vendors and insurers which provided it with incentives to steer its clients to the vendors and insurers that gave it the most lucrative kickbacks. (Compl. ¶¶ 251, 254-63.) Putnam, MMC's mutual fund business, engaged in illicit market-timing and late-trading activities for the benefit of favored investors at the expense of the rest of its clients. As a result of these activities, Putnam paid $111 million to settle regulatory actions against it. (Compl. ¶¶ 252, 275-76.)

Additionally, Trident, an investment partnership between MMC and its senior officers and directors, is currently under investigation by the SEC with respect to the propriety of potentially conflict-ridden related-party transactions. (Compl. ¶¶ 253, 277-83.)

On October 14, 2004, the NYAG filed a civil complaint against MMC and Marsh, alleging that the Company was engaged in improper steering and bid-rigging activities. Additionally, the NYAG announced that two of AIG's employees had pleaded guilty to criminal charges in connection with their dealings with MMC. MMC immediately issued a press release announcing that it took the NYAG's allegations seriously and had been cooperating with the NYAG investigation since it began in the spring. Nevertheless, the share price of MMC common stock dropped from $46.13 to $34.85 that same day. (Compl. ¶¶ 284-88.) The following day, MMC announced its suspension of MSAs and the resignation of Marsh's CEO, Defendant Groves. The share price of MMC common stock further dropped from its October 14 close to $29.20. (Compl. ¶¶ 289-93.)

On October 18, 2004, MMC issued a press release regarding the effect of MSAs on MMC revenue, indicating that MMC collected $845 million in MSA revenue in 2003, representing 12% of MMC's $6.9 billion risk and insurance services revenue and 7% of the Company's $11.6 billion total revenue. (Compl. ¶ 294.) In the

following months, the Company announced the resignation of Defendants Greenberg and Egan, ethical reforms pertaining to its insurance brokerage transactions, the restructuring of the MMC Board of Directors, and the creation of an $850 million restitution fund to settle the NYAG's civil complaint. (Compl. ¶¶ 301-14.) Also during this time, various MMC employees faced criminal liability in New York, and the Company was subjected to additional regulatory action outside that state. (Compl. ¶¶ 316-18.)

Over the course of approximately one-hundred pages and three-hundred paragraphs of the Complaint, Plaintiffs allege that Defendants made public statements misstating MMC's financial results, omitting material facts, and misrepresenting the Company's business practices. (Compl. ¶¶ 323-646.) The alleged misstatements and omissions fall into seven general categories: (1) MMC misstated its earnings by failing to disclose that contingent commission revenues were derived from improper steering and bid manipulation; (2) MMC misstated its earnings by failing to reserve for contingent losses from its steering and bid manipulation; (3) MMC failed to disclose the magnitude of contingent commissions and their materiality to the Company's revenue; (4) MMC failed to disclose the risks that contingent commissions might be discontinued or that MMC would face litigation or regulatory action; (5) MMC misrepresented the

true nature of the services provided in exchange for contingent commissions; (6) MMC made material misrepresentations regarding its commitment to clients and adherence to ethical practices; and (7) MMC falsely represented that Marsh's clients were fully apprised of contingent commissions. In addition, Plaintiffs allege that MMC engaged in fraudulent accounting by failing to comply with GAAP and SEC regulations, thus MMC is liable for issuing, and D&T is liable for certifying, MMC's misleading financial statements. (Compl. ¶¶ 647-746.) Without exception, Plaintiffs' allegations of securities fraud derive from the steering and bid manipulation scheme.

### C. The Legal Claims

Count I alleges that Defendants MMC, Marsh, D&T, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, and Wijnberg made materially misleading statements and omissions throughout the class period and engaged in a scheme to manipulate the market for MMC securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

Count II alleges that Defendants MMC, Marsh, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, and Wijnberg

controlled primary violators of the securities laws in violation of Section 20(a) of the Exchange Act.

Count III alleges that Defendants MMC, D&T, Greenberg, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable for materially untrue statements and omissions contained in MMC's February 13, 2003 prospectus supplement, filed in connection with its 4.850% bond offering under an earlier registration statement, in violation of Section 11 of the Securities Act of 1933 ("Securities Act").[3]

Count IV alleges that Defendants Greenberg, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Schapiro, Simmons, Sinnott, Smith, Bernard, Coster, Erburu, and Lasser controlled

---

[3] The Complaint alleges that a previously unidentified Defendant "Davis" is liable on Counts III, IV, and V. (Compl. 270, 272, 274.) As Defendant Davis is not identified elsewhere in the Complaint or referred to in any of Plaintiffs' opposition briefs, the allegations against Davis are not pleaded with sufficient particularity, thus all claims against that defendant are dismissed.

Further, the Complaint omits Defendants Rapport and Wijnberg from the list of Defendants liable on Count III, yet includes those defendants in its list of Individual Section 11 Defendants. (Compare Compl. ¶ 73, with Compl. 270.) Reading the Complaint in the light most favorable to the plaintiffs, the Court will assume that Plaintiffs intended to allege that Defendants Rapport and Wijnberg are liable on Count III. This and other errors identified in the following footnotes are to be corrected on amendment of the Complaint if Plaintiffs wish to replead their claims against these defendants.

primary violators of Section 11 of the Securities Act, in violation of Section 15 of the Securities Act.[4]

Count V alleges that Defendants MMC, D&T, Greenberg, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable for materially false or misleading statements or omissions contained in MMC's Exchange Act filings, in violation of Section 18 of the Exchange Act.[5]

Count VI alleges that Defendants MMC, D&T, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, and Wijnberg are liable to the Pension Fund Subclass for common law fraud and deceit.

Count VII alleges that Defendants MMC, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard,

---

[4] The Complaint lists Defendant Groves as liable on Count IV, while Plaintiffs' opposition briefs specifically omit Groves from the list of defendants liable on Count IV. (Compl. 272; Pls.' Omnibus Opposition 23.) As Count IV is dismissed against all individual defendants, see infra Part IV.D, the discrepancy is irrelevant to this Opinion.

[5] The Complaint alleges that MMC is liable on Counts V, VI, VII, and VIII, while Plaintiffs' opposition brief ambiguously omit the corporate defendant from these counts. (Pls.' Omnibus Opposition 23-24.) Reading the Complaint in the light most favorable to the plaintiffs, the Court will assume that Plaintiffs intended to state a claim against MMC for Counts V, VI, VII, and VIII.

Coster, Erburu, and Lasser are liable to the Pension Fund Subclass for negligent misrepresentation.

Count VIII alleges that Defendants MMC, D&T, Greenberg, Cabiallavetta, Egan, Fanjul, Groves, Hardis, King, Lang, Olsen, Rapport, Schapiro, Simmons, Sinnott, Smith, Wijnberg, Bernard, Coster, Erburu, and Lasser are liable to the Pension Fund Subclass for violations of state securities laws.

Defendants have filed eight separate motions to dismiss the Complaint for failure to state a claim upon which relief can be granted and failure to plead with particularity. The moving papers of the Defendants will be referred to by the following aliases: (1) Defendants MMC, Marsh, Cabiallavetta, Coster, Rapport, Smith, Wijnberg, and Bischoff ("Corporate"); (2) Defendant Greenberg ("Greenberg"); (3) Defendant Egan ("Egan"); (4) Defendants Bernard, Erburu, Fanjul, Hardis, King, Lang, Olsen, Schapiro, and Simmons ("Independent Directors"); (5) Defendant Lasser ("Lasser"); (6) Defendant Groves ("Groves"); (7) Defendant Sinnott ("Sinnott"); (8) Defendant D&T ("D&T").

## III. LEGAL STANDARDS FOR DISMISSAL

### A. Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), <u>cited in</u> <u>Shah v. Meeker</u>, 435 F.3d 244, 246 (2d Cir. 2006). The role of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." <u>Levitt v. Bear Stearns & Co.</u>, 340 F.3d 94, 101 (2d Cir. 2003) (internal citations omitted). Accordingly, courts should not dismiss a claim unless, "after accepting all the allegations in the Complaint as true and drawing all reasonable inferences in [the plaintiffs'] favor, the Complaint fails to allege any set of facts that would entitle [them] to relief." <u>Caiola v. Citibank, N.A.</u>, 295 F.3d 312, 321 (2d Cir. 2002).

In considering a motion to dismiss, the "court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." <u>Kramer v. Time Warner Inc.</u>, 937 F.2d 767, 773 (2d Cir. 1991); <u>see also</u> <u>San Leandro Emergency Medical Group Profit</u> <u>Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 808-09 (2d Cir. 1996) (holding that documents "integral" to the complaint are properly considered on a motion to dismiss). In addition, "[o]n a motion to dismiss a securities action, a district court may consider documents required to be publicly filed with the S.E.C. that bear on the adequacy of disclosure." <u>City of Sterling</u> <u>Heights Police and Fire Ret. Sys. v. Abbey Nat'l, PLC</u>, 423 F.

Supp. 2d 348, 355 (S.D.N.Y. 2006) (citing <u>Kramer</u>, 937 F.2d at 773-74). Accordingly, the Court considers the allegations of the Complaint, documents incorporated therein, and any "publicly filed documents appended to" Defendants' motions to dismiss. <u>Id.</u> (citation omitted).

## B. Pleading under Federal Rules of Civil Procedure 8 and 9(b), and the PSLRA

While the rules of pleading in federal court generally require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. Proc. 8, averments of fraud must be "stated with particularity." Fed. R. Civ. Proc. 9(b). The PSLRA has expanded on Rule 9(b)'s pleading requirements in the context of securities fraud allegations. "That statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

The Second Circuit evaluates a securities complaint's compliance with Rule 9(b) and the PSLRA by means of a common formulation. "A complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citations omitted). Failure to plead with the requisite particularity is a ground for dismissal.

## IV.  DISCUSSION

### A. Section 10(b) and Rule 10b-5 Claims

Count I of the Complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) prohibits conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000) (quoting Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988)). Rule 10b-5 uses similar language to describe the unlawful behavior proscribed by Section 10(b), making it illegal,

> (a)  To employ any device, scheme, or artifice to defraud,

> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of
> business which operates or would operate as a
> fraud or deceit upon any person,
>
> in connection with the purchase or sale of any
> security.

17 C.F.R § 240.10b-5.

Plaintiffs allege that Defendants deceived investors by making various misstatements and omissions during the Class Period in violation of Rule 10b-5(b), and, in less detail, that Defendants are liable for their scheme to manipulate the market for MMC securities in violation of Rule 10b-5(a) & (c).

## 1. Liability for Misstatements and Omissions

Plaintiffs claim that Defendants made misstatements and omissions concerning MMC's allegedly improper collection of contingent commissions and the nature of the Company's business practices. A claim for relief under the deception branch of Section 10(b) and Rule 10b-5 may only be sustained where plaintiffs allege that the defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)). Plaintiffs are required to adequately allege each of these elements--material

misrepresentations, scienter, connection, reliance, and loss causation--in order to sustain a claim.

Defendants move to dismiss the Rule 10b-5(b) claims on the grounds that Plaintiffs fail to plead (1) any actionable misrepresentations, (2) facts supporting a strong inference of scienter, (3) reliance, or (4) loss causation.

### i. The Alleged Misrepresentations

The allegations of the Complaint focus predominantly on MMC's collection of contingent commissions. Plaintiffs do not allege that contingent commissions are per se illegal, nor that contingent commissions constitute fictional revenue, only that MMC maximized contingent commission revenues by engaging in improper behavior (i.e., steering and bid manipulation) and then misled the investing public by making affirmative misstatements and failing to disclose this behavior. Defendants argue that Plaintiffs allege mere corporate mismanagement, which there is no duty to disclose, and that they fail to state any materially misleading statements.

### a. Materiality

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at 161 (citations omitted). The Second Circuit has "consistently

rejected a formulaic approach to assessing the materiality of an alleged misrepresentation," but has advised that, "when presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Id. at 162 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)). In the context of alleged omissions, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Plaintiffs argue that Defendants' failure to disclose the alleged misconduct at Marsh constitutes a material omission. The Complaint alleges that contingent commissions comprised more than 16% of MMC's risk and insurance revenues, and over 50% of the Company's total profits, by 2003. (Compl. ¶ 104.) Further, Plaintiffs allege that MMC claimed to be a client-focused company and that it derived the majority of its revenue from its provision of risk and insurance services to its clients. (Compl. ¶¶ 3, 102.) Despite MMC's representations and the importance of

its provision of client services to the Company's revenues, the steering and bid manipulation at Marsh was widespread. This contention is supported by specific factual allegations of systemic steering within Marsh's Global Broking division and MMC's abrupt elimination of all such agreements immediately after the NYAG complaint was filed. (Compl. ¶¶ 226, 26.)

Taking the allegations of the Complaint as true, the Court finds that Plaintiffs have sufficiently alleged the materiality of the undisclosed misconduct to MMC's bottom line. A rational jury could conclude that a reasonable investor would find it significant that MMC was generating substantial earnings from its improper business practices and jeopardizing the client relationships central to its largest business segment by placing insurance business with the insurance providers offering MMC the highest commissions, rather than those providers offering the insurance packages best suited to the clients' needs. The Complaint sufficiently alleges the nondisclosure of material information.

### b. The Duty to Disclose

Simply alleging the nondisclosure of material information, however, is insufficient to state an actionable misrepresentation absent a duty to disclose. "As the Supreme Court has made clear[,] . . . the concepts of materiality and duty to disclose are different." Glazer v. Formica Corp., 964

F.2d 149, 156 (2d Cir. 1992) (citations omitted); see also In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." Chiarella v. United States, 445 U.S. 222, 235 (1980). This "duty to speak" arises in only limited situations.

Of course, specific statutes and regulations create affirmative duties to disclose information, but another duty arises more generally. "When a corporation does make a disclosure--whether it be voluntary or required--there is a duty to make it complete and accurate." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987), cited in Glazer, 964 F.2d at 157. In other words, corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements. Thus, with respect to allegations of corporate mismanagement, disclosure is required where "a failure to disclose facts that amount to mismanagement may render other statements misleading." In re NTL Inc. Sec. Litig., 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004); see also In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 617 (S.D.N.Y. 2005); In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 494 n.11 (S.D.N.Y. 2004).

The same proposition holds true for allegations of uncharged criminal conduct. Though courts have held that the

securities laws do not impose a duty to disclose uncharged criminal conduct, see United States v. Matthews, 787 F.2d 38, 49 (2d Cir. 1986); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), corporations are obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of criminal conduct to the same extent it applies to the disclosure of any other material information. See Menkes v. Stolt-Nielsen S.A., No. 3:03CV409(DJS), 2005 WL 3050970, at *7 (D. Conn. Nov. 10, 2005); In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 675 (S.D.N.Y. 1990).

In light of these principles, the key considerations of the Court's inquiry are whether (a) the alleged omissions, even if grounded in corporate mismanagement or criminal conduct, are sufficiently connected to Defendants' existing disclosures to make those public statements misleading, or (b) the Defendants failed to disclose material information required by specific regulations and statutes. Each of the alleged misrepresentations must be analyzed with these considerations in mind.

### (1) MMC's Reported Earnings

Because the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct, the allegation that MMC misstated its earnings merely by failing to disclose the misconduct at its Marsh subsidiary is not

actionable. Plaintiffs do not allege that MMC failed to fully and accurately report the Company's income from contingent commissions. There is no allegation that MMC misstated the amount of revenue received from specific transactions or that it reported phantom or untimely profits. Absent an allegation that MMC reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability. See In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 & n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); Greenstone v. Cambex Corp., 777 F. Supp. 88, 91 (D. Mass. 1991) (dismissing securities claim because the plaintiff did "not allege that the revenues actually received by Cambex differed from those reported to the SEC," but argued "instead that the reports would have been more accurate and complete if the defendants had revealed their improper activities because such activities allegedly influenced the financial success of Cambex"), aff'd 975 F.2d 22 (1st Cir. 1992).

A court in this District recently considered the motion to dismiss of a company that was sued after investors learned that a significant portion of its revenues were derived from illegal

practices. <u>See</u> <u>In re Van der Moolen Holding N.V. Sec. Litig.</u>, 405 F. Supp. 2d 388, 392 (S.D.N.Y. 2005). The court held that statements which "put the sources of [the defendant's] revenue at issue" were sufficient to give rise to Section 10(b) liability because the company failed to disclose the role of improper conduct in generating that revenue. <u>Id.</u> at 401. This proposition is reasonable, as statements falsely attributing the company's success to factors other than the improper conduct may be regarded as misleading by virtue of what is not disclosed. However, <u>In re Van der Moolen</u> may be interpreted to hold that the statements which put the sources of revenue at issue triggered a general duty to disclose, thereby rendering all of the company's statements of its revenue figures misleading. <u>Id.</u> at 413-27 (including revenue figures and financial statements in an appendix of alleged false and misleading statements). According to this theory of liability, a single misstatement regarding a company's revenues could conceivably create liability for the company's revenue disclosures throughout the Class Period.

This Court is of the opinion that a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves. If actual revenues derived from improper conduct were a sufficient

basis of Section 10(b) liability, then the statement of those revenues should be actionable without requiring that plaintiffs point to a statement putting the source of those revenues at issue. As noted above, however, the isolated statement of actual revenues allegedly generated by improper activities does not create Section 10(b) liability. See In re Sofamor Danek Group, 123 F.3d at 401.

Holding that accurate revenue figures are misstated by virtue of a company's misleading statements about the business practices generating that revenue, while withholding liability for revenue figures unaccompanied by misleading statements would lead to inequitable results. Imagine that Company A and Company B each engage in improper business practices, but properly report their revenue from those activities. Company A, which states its revenue without issuing misleading companion statements that put the sources of the revenue at issue, would be sheltered from liability. Meanwhile Company B, which issues misleading statements regarding its revenue, would be liable not only for those misleading statements, but for the misstatement of its revenue figures as well. The only difference between the actions of these companies is the existence of misleading statements putting the sources of their revenues at issue. Therein lies the deception; thus, liability properly attaches solely to the misleading statements. See In re Par Pharm., 733

F. Supp. at 678 (limiting liability to statements in which the subject matter of the statement is sufficiently connected to the undisclosed misconduct); <u>Menkes</u>, 2005 WL 3050970, at *7-8 (same). Consequently, Plaintiffs' allegation that MMC misstated its earnings by failing to disclose the existence of steering and bid manipulation is insufficient to state a claim under Section 10(b).

### (2) MMC's Risk Disclosures

Plaintiffs also allege that MMC failed to disclose the risk that contingent commissions might be discontinued or that the Company would be subject to litigation, regulatory action, or other penalties. Nearly identical allegations were held insufficient to state a claim in <u>In re Citigroup</u>. The reasoning of that case applies equally here.

With respect to a company's failure to disclose impending litigation, there is no requirement "to make disclosures predicting such litigation," absent an allegation that the litigation "was substantially certain to occur during the relevant period." <u>In re Citigroup</u>, 330 F. Supp. 2d at 377; <u>see also</u> <u>In re Par Pharm.</u>, 733 F. Supp. at 678; <u>Ballan v. Wilfred American Educ. Corp.</u>, 720 F. Supp. 241, 248 (E.D.N.Y. 1989). Plaintiffs do not adequately allege that MMC was likely to be subjected to litigation during the Class Period for the misconduct alleged in the Complaint. Furthermore, once the NYAG

investigation began in the spring of 2004, MMC disclosed its existence in the relevant SEC filings and discussed the changing regulatory environment in the media. (Compl. ¶¶ 608, 620, 637.)

As for the allegation that Defendants failed to disclose the risk that contingent commitments might be discontinued, Plaintiffs fail to allege that MMC made any "projections or future predictions in the challenged documents" that it would continue to collect contingent commissions. In re Citigroup, 330 F. Supp. 2d at 378. Nor did Defendants have "a duty to speculate about the effects of discovery of the [steering] scheme on the company's future prospects." Id. (citing In re Par Pharm., 773 F. Supp. at 678); see also In re Par Pharm., 773 F. Supp. at 678 (defendants were "not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the [unlawful] scheme was discovered, disclosed or terminated"). Defendants can not be held liable for failing to make similarly speculative disclosures regarding the possibility that its contingent commission revenues may some day be discontinued.

Plaintiffs essentially allege that Defendants had a duty to disclose the existence of improper business practices prior to any indication that those practices were under scrutiny. Such a general duty to disclose corporate mismanagement or uncharged criminal conduct has been rejected. Furthermore, to the extent

31

that Defendants were aware of the shifting regulatory landscape and the potential effects on the collection of contingent commissions, Defendants' public disclosures were adequate.

### (3) MMC's Contingent Loss Reserves

In an attempt to tie Marsh's undisclosed misconduct to a specific regulatory disclosure requirement, Plaintiffs allege that MMC misstated its earnings during the Class Period by failing to reserve for contingent losses stemming from Marsh's improper steering and bid manipulation. (<u>See, e.g.</u>, Compl. ¶¶ 324-25, 331-32, 333-34.) The duty to reserve for contingent losses arises under the Financial Accounting Standards Board's Statement No. 5 ("FASB No. 5"):

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.  Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.  The amount of the loss can be reasonably estimated.

<u>Id.</u> ¶ 8. Plaintiffs fail to properly allege that MMC violated either the accrual or reporting duty imposed by FASB No. 5.

MMC eventually incurred a loss in the form of an $850 million restitution fund established pursuant to the settlement of the NYAG lawsuit, which was filed after the close of the

Class Period and settled after the Company installed a new management structure. The investigation leading to the lawsuit did not begin until spring 2004, and the existence of the investigation was disclosed in all of MMC's SEC filings subsequent to its commencement. (Compl. ¶¶ 608, 637.)

Considering the longstanding industry practice of collecting contingent commissions, the lack of regulatory scrutiny during the Class Period, and the turnover in management prior to the settlement, the Complaint does not adequately allege that MMC should have reported a *probability* of litigation losses with respect to their collection of contingent commissions. See FASB No. 5, ¶ 36 (instructing corporations analyzing the application of FASB No. 5 to consider various factors such as "the progress of the case," "the experience of the enterprise in similar cases, the experience of other enterprises, and any decision of the enterprise's management as to how the enterprise intends to respond to the lawsuit"). Even if MMC had a duty to disclose the existence of an unasserted claim, the Company's quarterly disclosures of the NYAG investigation were adequate. (Compl. ¶¶ 608, 637.)

Furthermore, the allegations of the Complaint are insufficient to explain how MMC could have reasonably estimated and accrued the loss amount at the time the financial statements were issued or at any time prior to settlement negotiations. See

In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 893 (8th Cir. 2002) (dismissing complaint under FASB No. 5 because the plaintiffs failed "to provide any basis for the allegations or sources for the amounts, other than *later financial disclosure* made by [the defendant]") (emphasis added). Accordingly, the allegations of the Complaint are insufficient to state a Section 10(b) claim that MMC breached its duty to reserve for contingent losses.

### (4) The Magnitude of Contingent Commissions and Their Materiality to MMC's Earnings

Plaintiffs cite a number of general regulatory provisions to support their argument that MMC had a duty to distinguish its contingent commission revenue from the rest of its risk and insurance services revenue because of its magnitude and materiality to MMC's earnings. Yet Plaintiffs fail to identify any specific accounting standard or other authority requiring that a corporation's financial statements separately report a particular type of its subsidiary's revenue. Without exception, the rules invoked by plaintiffs are either beyond the scope of the misconduct alleged in the Complaint or insufficient to establish liability under Section 10(b).

Contingent commissions were a consistent source of income prior to and throughout the Class Period. They did not constitute an "unusual or infrequent" revenue source, nor are

there sufficient allegations that MMC should have expected that revenue source to change in some way that would require its disclosure under Regulation S-K, Item 303. Nevertheless, even if the Complaint's allegations were sufficient to establish a violation of that regulation, the violation alone would be insufficient to establish Defendants' liability under Section 10(b) and Rule 10b-5. See Oran v. Stafford, 226 F.3d 275, 288 (3d Cir. 2000) (holding that "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" because the materiality standards of the regulation and the rule differ substantially).

Similarly, the revenue recognition requirements of SEC Staff Accounting Bulletin No. 101 do not demand that MMC separately identify contingent commission revenue apart from the rest of its risk and insurance services revenue. See SEC Staff Accounting Bulletin No. 101, 64 Fed. Reg. 68936 (1999). Nor do Plaintiffs allege that MMC failed to recognize its contingent commission revenue. The Plaintiffs fail to explain how an SEC Bulletin concerned with the timing of revenue recognition in financial statements implicates MMC's duty to account for its risk and insurance services revenue any differently than it did throughout the Class Period.

Plaintiffs also rely on SEC Staff Accounting Bulletin No. 99 ("SAB No. 99") for the proposition that MMC had a duty to

disclose the materiality of contingent commissions to MMC's earnings. This reliance is misplaced. SAB No. 99 advises that quantity is not dispositive when determining whether a misstatement or omission of an item in a financial statement is material. See SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999). As discussed above, however, MMC's failure to disclose the existence of the alleged misconduct did not amount to a misstatement of its earnings, and, regardless of how contingent commission revenue might have been obtained, Plaintiffs do not allege that MMC omitted such revenue from its financial reports. Nor do Plaintiffs present authority establishing that SAB No. 99 creates a line-item disclosure requirement. Plaintiffs may not avoid their obligation to allege an actionable misstatement simply by arguing that a misstatement follows from materiality.

Absent some indication that a directly relevant regulatory disclosure requirement was violated and specific allegations of how the requirement was violated, Plaintiffs can not state a claim under Section 10(b) for MMC's alleged failure to disclose the magnitude of contingent commissions and their materiality to earnings. See Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., ___ F. Supp. 2d ___, No. Civ.A. 1:05-735, 2006 WL 1117814, at *10 (E.D. Va. Apr. 24, 2006) (dismissing a similar claim because plaintiffs "failed to establish that Defendants

had a duty to disclose non-standard commissions on a line item basis").

### (5) Statements Pertaining to MMC's Business Practices

Although the allegations regarding MMC's earnings figures, risk disclosures, and regulatory violations fail to plead actionable omissions, certain statements regarding MMC's business practices are adequately connected to the nondisclosure of steering and bid manipulation to state a claim under Section 10(b). Plaintiffs allege several distinct categories of statements pertinent to MMC's business practices: (1) disclosures regarding the nature of the services provided in exchange for contingent commissions; (2) disclosures about MMC's commitment to clients and adherence to ethical practices; and (3) disclosures that Marsh's clients were fully apprised of contingent commissions. Certain statements within these categories are materially misleading by virtue of the undisclosed steering and bid manipulation employed by Marsh to maximize the Company's contingent commissions.

MMC's 2003 10-K describes the source of contingent commission revenues as follows:

> Under these agreements, Marsh is paid for services provided to the markets, including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions and general information on emerging developments in the insurance

> marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services. Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.

(Compl. ¶ 575.)[6] The truthfulness of this and similar statements describing the services provided for contingent commissions is brought into question by Plaintiffs' allegations that MMC actually received contingent commissions as kickbacks for steering business to the companies with which it had contingent commission agreements. (Compl. ¶¶ 232-41.) These statements put the source of contingent commission revenues at issue without disclosing information necessary to explain the true nature of the business practices employed to enhance those revenues.

---

[6] Similar descriptions are contained in MMC's 2000, 2001, and 2002 10-Ks and its 2002 and 2003 Annual Reports. (Compl. ¶¶ 391, 438, 491, 508, 587.) However, Plaintiffs do not adequately explain how MMC's description of contingent commissions in the 1999 10-K is misleading. That statement focuses *solely* on the calculation of contingent commissions, asserting that they are based on "the overall volume of business placed by the broker with [an] insurer, the aggregate commissions paid by the insurer during specific periods, or the loss performance to the insurer of that business." (Compl. ¶ 349.) This description of how contingent commissions are calculated is not substantially different from what Plaintiffs allege. Plaintiffs argue that MMC's later disclosures are misleading because the services allegedly provided in return for contingent commissions were nonexistent, concealing the fact that the commissions were "kickbacks" for steering business. This rationale does not apply to the description of contingent commissions in the 1999 10-K.

Defendants argue that these allegations are not pleaded with sufficient particularity. Yet Plaintiffs state precisely which entities made the statements and the context of those statements: MMC made the misleading statements in the Company's Annual Reports and its 10-K filings from 2000 to 2003. Plaintiffs also explain why these statements were misleading: because MMC collected the commissions in return for steering business to insurance providers, rather than for the general market services that they purported to provide. This level of specificity is sufficient to allege an actionable misrepresentation.[7]

MMC also argues that it "performed services that benefited both insurers and insureds," thus the statements regarding the services provided for contingent commissions are not false. (Corporate Reply Br. 19.) However, taking as true Plaintiffs' allegations that contingent commissions were collected in exchange for the provision of steering and bid manipulation, Plaintiffs have properly alleged that MMC's disclosures concealed the true nature of its collection of contingent commissions, thus violated Section 10(b). See In re JP Morgan Chase, 363 F. Supp. 2d at 618 (allegation that defendants made

---

[7] Of course, Rule 9(b) and the PSLRA also require that plaintiffs plead a strong inference of fraudulent intent. The Court discusses the scienter requirement below. See infra Part IV.A.1.ii.

"misrepresentations and omissions that concealed the nature of the transactions the bank had conducted . . . . is precisely the type of deception that Section 10(b) prohibits"). The Court will not dismiss the Complaint merely because MMC contests a factual allegation that, if true, would be actionable. MMC will have the opportunity to rebut Plaintiffs' contentions at trial or on summary judgment, but factual disputes are not properly decided at this stage of the proceedings.

Even if the Court credited Defendants' assertion that MMC truly did provide general market services in return for contingent commissions, the Complaint sufficiently alleges that contingent commissions and the services for which they were received could not be accurately described without reference to the widespread steering and bid manipulation employed to enhance those revenues. This argument is supported by ample allegations of the elaborate steering schemes utilized at Marsh and their centrality to Marsh's collection of contingent commissions. (Compl. ¶¶ 141-225.) In short, this category of misrepresentations is pleaded with sufficient specificity to conclude that MMC's descriptions of the services provided for contingent commissions materially misled investors about the nature of the Company's contingent commission revenues.

Plaintiffs also allege that MMC misrepresented its commitment to clients and adherence to ethical practices

throughout the Class Period. Certain misrepresentations alleged in this category, such as those regarding MMC's "culture of excellence," its "independence of thought and objective advice," and the Company's "dedicat[ion] to client service" and "commit[tment] to building value for shareholders" amount to no more than puffery. (Compl. ¶¶ 543, 347, 417.) Broad, general statements such as these are insufficient to state a claim for securities fraud. See Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) (per curiam); In re JP Morgan Chase, 363 F. Supp. 2d at 633.

Certain related statements, however, are sufficiently connected to the allegations of steering and pleaded with adequate particularity to withstand a motion to dismiss. MMC made a number of statements regarding the criteria brokers consider when placing insurance business for the Company's clients. These representations are directly contradicted by the Complaint's allegations of steering and bid manipulation. For instance, an April 2001 press release asserted that "[i]n a market where insurance rates are rising and coverage is more difficult to obtain, Marsh provides value to clients by developing *the most cost-effective responses* to the risks they face." (Compl. ¶ 409 (emphasis added).) In addition, MMC repeatedly stated that the Company created insurance programs for its clients "that vary according to the risk profiles,

requirements and preferences of clients." (Compl. ¶¶ 452, 462, 489, 506, 573.) Defendants Groves and Egan's comments in the 2003 Annual Report also speak directly to the reasons for the Company's successful insurance placement: "We reach across markets to tap into risk capital wherever it exists, *seeking the best terms, conditions, and prices*. Our brokers' knowledge of the interests of insurers for different types of risk and their relationships with senior underwriters are *an advantage for clients* as well as underwriters." (Compl. ¶ 584 (emphasis added).)[8]

Each of these statements refers to the method by which Marsh makes insurance placements, asserting that Marsh tailors insurance packages for its clients according to the clients' coverage requirements and financial needs. Plaintiffs specifically allege that these statements were made materially misleading by MMC's failure to disclose that it directed clients to insurers to maximize the Company's revenues under contingent commission agreements, rather than to serve the clients' best interests or obtain the most cost-effective coverage options. (Compl. ¶ 8.) These allegations are sufficient to plead actionable misrepresentations. Cf. In re Sotheby's Holdings,

---

[8] Similar representations regarding Marsh's purportedly cost-effective, client-focused insurance placement are scattered throughout the Complaint. (See Compl. ¶¶ 476, 502, 577, 618, 620, 624.)

Inc. Sec. Litig., No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000) (statements about "intense" competition could be misleading where Sotheby's had eliminated price competition with its primary competitor).

Finally, Plaintiffs allege that Defendants falsely represented that MMC's clients were fully apprised of contingent commissions. Many statements within this category are not actionable. For instance, Plaintiffs do not adequately plead the falsity of certain vague statements, such as a Marsh spokeswoman's statement that "Marsh has made considerable effort to ensure its clients are well informed about [contingent commission] agreements" and Sinnott's statement that "brokers are fine-tuning their transparency as their role becomes increasingly important." (Compl. ¶¶ 343, 616.) To support their argument that MMC's disclosures were misleading, Plaintiffs rely in large part on the DPW Report issued by MMC's legal counsel in January 2005. (Compl. ¶ 315.) Yet that Report states that MMC's contingent commission disclosures were "performed pursuant to the protocol" established by the RIMS agreement and merely that they were sometimes "technically accurate, but potentially misleading." (Compl. ¶ 244.) In this context, statements that Marsh made "efforts" with respect to its disclosure obligations or that unspecified brokers were "fine-tuning" their transparency cannot be said to be false. In addition, the latter

43

statement was made by Sinnott, who was no longer employed by Marsh and was speaking in reference to the insurance industry generally.

Certain statements made towards the end of the Class Period, however, have been adequately pleaded. Shortly after the NYAG had begun its investigation of MMC, Defendant Egan is quoted as stating that "Marsh has led the industry in terms of disclosure, and we think we will continue to lead the industry in terms of disclosure." (Compl. ¶ 629.)[9] Defendant Egan also asserted that MMC "continued to disclose to clients when they ask as much information as they need to know about these agreements." (Compl. ¶ 631.) In light of the timing of these comments and the facts underlying Plaintiffs' allegations that "Marsh actively sought to prevent its clients from discovering how [] contingent commissions were obtained" (Compl. ¶ 242-49), the materially misleading nature of these statements is also pleaded with sufficient specificity.

In sum, certain statements regarding MMC's business practices--in particular the services provided for contingent commissions, the criteria considered when placing client insurance business, and the disclosure of contingent commissions

---

[9] Although Plaintiffs attribute this statement to Defendant Bischoff, Defendant Egan has taken responsibility for the statement. (Egan Mot. to Dismiss 9 n.11.) See supra note 2.

to clients--have been alleged with sufficient particularity to plead actionable misrepresentations. The rest of the alleged false and misleading statements are too attenuated from the alleged misconduct to create liability under Section 10(b).

### (6)  Fraudulent Accounting

Defendants supplement their lengthy allegations of misrepresentations with forty pages of allegations that MMC engaged in fraudulent accounting throughout the Class Period. (Compl. ¶¶ 647-747.) The allegations underlying this fraudulent accounting theory, however, are a carbon copy of the alleged misrepresentations that the Court addressed above. <u>See</u> <u>supra</u> Parts IV.A.1.i.b(1)-(5).[10] Plaintiffs simply attempt to cast these same allegations as evidence of fraudulent accounting by alleging that the failure to disclose the existence of steering and bid manipulation was in violation of Generally Accepted Accounting Practices ("GAAP"). Despite over one-hundred paragraphs of allegations, Plaintiffs fail to sufficiently plead a violation of GAAP or the existence of accounting fraud.

---

[10] Although the statements in the unaudited sections of Marsh's 10-K filings regarding the services provided for contingent commissions plead actionable misstatements, Plaintiffs do not adequately allege that these misstatements are evidence that MMC engaged in fraudulent accounting. The Complaint is devoid of allegations that MMC's financial statements misreported the collection of contingent commissions or the existence of expenses associated with MMC's purported market services.

Plaintiffs attempt to prove violations of GAAP by reference to various SEC Releases, Accounting Principle Board Opinions, and FASB Statements of Financial Accounting Concepts. (Compl. ¶¶ 649-63.) The gravamen of these allegations is that MMC engaged in accounting fraud, violating GAAP, by failing to present a true representation of the Company's operations. Notably missing are specific examples of fraudulent accounting practices utilized by MMC, citations to GAAP provisions prohibiting MMC's accounting practices, or reference to any cases finding violations of GAAP on the basis of actions similar to those alleged by Plaintiffs. On the contrary, Plaintiffs cite regulatory language describing management's general duty to provide a clear picture of the corporation's financial condition from the perspective of management. While Plaintiffs have adequately alleged the existence of statements regarding MMC's business practices that were made misleading by the failure to disclose internal misconduct, Plaintiffs fail to allege facts indicating that MMC's financial statements misstated the Company's financial condition throughout the Class Period.

Plaintiffs' argument stretches the definition of accounting fraud to its breaking point, as none of the hallmarks of accounting fraud are present here. For example, there was no restatement of earnings or external investigation of MMC's accounting practices. Plaintiffs do not allege that MMC harbored

non-existent assets on its books, made undisclosed payments, improperly recognized revenue, or engaged in sham transactions creating the illusion of revenue. In fact, none of the legal authorities Plaintiffs present to support their allegations of fraudulent accounting are factually similar to the allegations of the Complaint. See, e.g., In re Royal Dutch/Shell Transp. Sec. Litig., 380 F. Supp. 2d 509, 515-16 (D.N.J. 2005) (overstating natural resource reserves and future cash flows); In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 477 (S.D.N.Y. 2005) (illegally capitalizing expenses); In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 381 F. Supp. 2d 215, 216 (S.D.N.Y. 2004) (improperly reporting revenue from sham transactions); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 325-326 (S.D.N.Y. 2004) (reporting revenues from purchases while amortizing off-setting costs; reporting income from revenue-neutral swap transactions); In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 241 (D.N.J. 2000) (manipulating reserves; irregular revenue recognition practices; improperly accounting for lost revenues).

On the contrary, Plaintiffs allege that MMC brokered agreements between clients and insurance providers and received payments from both the clients and the providers. It is undisputed that payments from both parties were recognized and reported, and that the simple practice of collecting contingent

commissions was legal. Indeed, even after the NYAG investigation, MMC announced that it "intend[ed] to collect market services revenue earned prior to October 1, 2004." MMC Annual Report (Form 10-K), at 28 (March 8, 2005). The allegation that Marsh engaged in improper business practices to maximize contingent commission revenue rather than acting in the best interests of its clients has little to do with the financial accounting of that revenue. MMC's alleged nondisclosure of improper steering activities violates Section 10(b) to the extent that MMC made misleading statements regarding the source of that revenue or the business practices employed to generate that revenue, but the accurate reporting of that revenue does not amount to accounting fraud.

### c. Misstatements Attributable to Defendants

Although Plaintiffs adequately allege certain misrepresentations, the Complaint does not allege personal statements by every defendant nor can the allegations of group-published misstatements be attributed to every defendant listed in the Complaint. Most significantly, D&T argues that Plaintiffs' attempt to hold it responsible for MMC's statements violates the prohibition on secondary liability. In addition, several individual defendants argue that group pleading was abolished by the PSLRA, thus Plaintiffs may not attribute the

48

Company's public statements to individual defendants that did not personally make misleading statements.

Plaintiffs concede that "D&T's liability in this case is based upon the falsity of its audit opinions." (Pls.' Opp. to D&T 12.) As noted above, however, Plaintiffs fail to state a claim for accounting fraud. In the absence of adequate allegations that MMC engaged in fraudulent accounting that would render the certification of MMC's financial statements false, Plaintiffs may not premise D&T's liability on its audit opinions. Accordingly, the allegations of D&T's allegedly false audit opinions fail to state a claim against D&T under Section 10(b).

Plaintiffs also attempt to predicate D&T's liability on statements in the unaudited sections of MMC's SEC filings. To the extent that certain statements in the unaudited portions of MMC's 10-K filings are misleading, <u>see</u> <u>supra</u> Part IV.A.1.i.b(5), those statements are not attributable to the Company's auditor. D&T's audit opinions were explicitly limited to the financial statements included in MMC's annual 10-K filings. (Compl. ¶¶ 694-98.) 10-K filings are comprised of various components, including audited financial statements, the audit opinions themselves, and unaudited sections such as annual reports and management's discussion and analysis. Misrepresentations in these unaudited sections are not attributable to D&T. <u>See</u> <u>In re</u>

The Warnaco Group, Inc. Sec. Litig., 388 F. Supp. 2d 307, 314 (S.D.N.Y. 2005) ("liability may not generally attach to a public auditor for unaudited public statements the company made") (citing Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998)); In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 472 n.5 (S.D.N.Y. 2004) (auditor "can be held liable under Section 10(b) only for its own misrepresentations concerning [the defendant's] financial statements").

Even assuming that liability could attach to accountants for unaudited statements, Plaintiffs fail to allege that D&T participated in the preparation of those statements at a level "sufficient for primary liability under § 10(b)." In re The Warnaco Group, 388 F. Supp. 2d at 314 (comparing the insufficient examination and review of statements in that case to the material assistance and creation of statements present in In re Global Crossing, 322 F. Supp. 2d at 333-34).[11] Because the

---

[11] Plaintiffs' argument that D&T breached its obligation to ensure the "overall accuracy" of unaudited documents in MMC's SEC filings is similarly unpersuasive. (Pls.' Opp. to D&T 15.) The provision on which Plaintiffs rely specifically notes that "the auditor has *no obligation* to perform any procedures to corroborate other information contained in a document," but that the auditor "should read the other information and consider whether such information is . . . materially inconsistent with information . . . appearing in the financial statements." AU § 550.04 (emphasis added). Plaintiffs do not allege that any of the statements in the unaudited portions of MMC's 10-K filings were materially inconsistent with any specific parts of MMC's audited financial statements. Further, even if Plaintiffs had

allegations are insufficient to attach primary liability to D&T, the Section 10(b) count against that company is dismissed.

Defendants' argument that group pleading is no longer permissible under the PSLRA is rejected. As several courts, including this one, have recently noted, "[t]he majority rule in this district is that the group pleading doctrine has survived the PSLRA." In re Van der Moolen, 405 F. Supp. 2d at 399; see also In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 438-40 (S.D.N.Y. 2005) (providing a thorough explanation for the continued viability of the group pleading doctrine following the PSLRA); In re AOL Time Warner, 381 F. Supp. 2d at 220. Group pleading allows the court to presume that statements in certain group-published documents (i.e. registration statements, annual reports, prospectuses) are the collective work of certain individuals. In re AOL Time Warner, 381 F. Supp. 2d at 220. However, "[a] plaintiff may invoke the group pleading doctrine against a defendant only if the plaintiff has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company." In re BISYS, 397 F. Supp. 2d at 440 (citation omitted).

---

sufficiently pleaded a violation of this provision, <u>Wright</u> specifically prohibits Section 10(b) liability for accountants absent an affirmative misstatement.

The Independent Directors argue that they had insufficient control over MMC to be held liable under the group pleading doctrine. Plaintiffs fail to allege with particularity that the Independent Directors were sufficiently involved in the day-to-day operations of MMC or drafting of company statements to attribute statements in unsigned documents to the Independent Directors. See JHW Greentree Capital, L.P., No. 05 Civ. 2985 HB, 2005 WL 3008452, at *6 (S.D.N.Y. Nov. 10, 2005). Accordingly, allegations against the Independent Directors that are grounded on unsigned documents are dismissed against those defendants. Yet Plaintiffs allege that all of the defendants on MMC's board of directors, including the Independent Directors, signed SEC Filings containing misleading statements. (See, e.g., Compl. ¶¶ 489, 560, 573.) The statements in those signed documents are properly attributed to the Independent Directors. See JHW Greentree Capital, 2005 WL 3008452, at *6; In re JWP Inc. Sec. Litig., 928 F. Supp. 1239, 1256 (S.D.N.Y. 1996). Consequently, Plaintiffs need not rely on group pleading to attribute actionable misrepresentations to the Independent Directors.

On the other hand, Plaintiffs do not allege that Defendant Egan signed any of the SEC filings that contain misleading statements. Egan argues that the group pleading doctrine does not extend to individuals in his position, officers of a subsidiary to a parent company that is responsible for making

52

public statements. However, courts in this District have recognized that subsidiaries may be held responsible for the statements of their parent companies that are uniquely within the subsidiary's knowledge and control. See In re LaBranche Sec. Litig., 405 F. Supp. 2d 333, 351 (S.D.N.Y. 2005); In re Van der Moolen, 405 F. Supp. 2d at 403. This is the flip side of the coin that excuses D&T from liability for MMC's misstatements because of the auditor's lack of control over unaudited sections of MMC's 10-K Filings. Compare In re Warnaco, 388 F. Supp. 2d at 314 (failing to find liability where auditor merely "examined and reviewed" the direct violator's statements), with In re Global Crossing, 322 F. Supp. 2d at 333-34 (finding liability where plaintiffs alleged that auditors "prepared, directed or controlled," "helped created," and "materially assisted" the preparation of a direct violator's false statements).

Here, Plaintiffs allege that the Senior Management Defendants of both MMC *and* Marsh "participated in drafting, preparation and/or approval" of misstatements, and that they "control[led] the context of the various SEC filings" containing misstatements. (Compl. ¶¶ 70-71.) These allegations are sufficient to attribute misstatements to Marsh and the Senior Management Defendants, such as Egan, who did not sign the SEC filings. In addition, the Court has already determined that certain statements made by Egan regarding Marsh's insurance

placements and client disclosures were sufficiently pleaded to allege actionable misrepresentations. On account of both classes of statements, Plaintiffs have adequately alleged that Egan made false and misleading statements.

### ii. Scienter

The PSLRA mandates that plaintiffs alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite state of mind in an action under Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate, or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted). The Second Circuit has indicated that plaintiffs may establish this intent "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. (internal quotation marks and citations omitted). With one exception,[12] the parties' moving papers are wholly concerned with the latter method of establishing scienter.

To establish strong circumstantial evidence of scienter, a plaintiff must allege facts showing "conduct which is highly

---

[12] D&T briefly address Plaintiffs' allegations of motive and opportunity. See infra Part IV.A.1.ii.c.

unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). This high standard may be met where plaintiffs allege that defendants (1) "engaged in deliberately illegal behavior;" (2) "knew facts or had access to information suggesting that their public statements were not accurate;" or (3) "failed to check information they had a duty to monitor." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000) (citations omitted). Even so, "the strength of the circumstantial allegations must be correspondingly greater" than allegations of motive and opportunity. Kalnit, 264 F.3d at 142 (citation omitted).

### a. MMC and Marsh

A corporate defendant's scienter is necessarily derived from its employees. See Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001). While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants. See e.g., In re BISYS, 397 F. Supp. 2d at 442-43 (inferring a corporation's scienter from the intentional misbehavior of its regional vice president and vice president of

corporate finance); In re JP Morgan, 363 F. Supp. 2d at 627 (attributing the knowledge of a vice chairman, vice president, and managing director to the corporate defendant).

Defendants concede that a corporation's scienter may be inferred from its employees, but argue that plaintiffs must allege that an employee with scienter was also responsible for an underlying misstatement. Yet Defendants point to no controlling authority for this position. In fact, courts in this District have recently emphasized that there is no requirement "that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." In re JP Morgan, 363 F. Supp. 2d at 627; see also In re BISYS, 397 F. Supp. 2d at 443, 449.

The Court is in accord with this position. Confining the pool of employees from which a corporation's scienter may be inferred to those that made an underlying misstatement, as Defendants suggest, is unduly limiting. This framework forecloses liability in situations where institutional fraud is readily perceivable but plaintiffs have yet to match a culpable employee with a public misstatement. Cf. Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999) (unduly stringent pleading requirements "would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did

not involve specifically greedy comments from an authorized corporate individual"). Imposing this limitation at the pleading stage would doom the long-recognized concept of primary entity liability to irrelevancy, effectively limiting the liability of corporate defendants to secondary liability under Section 20(a).

Plaintiffs interpret the pleading standards for corporate scienter even more liberally than In re JP Morgan and In re BISYS, arguing that corporate scienter may be properly alleged from the corporation's collective knowledge, without evidence of any particular employee's scienter. See, e.g., In re Worldcom, 352 F. Supp. 2d at 497; In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897(HB), 2006 WL 314524, at *9-10 (S.D.N.Y. Feb. 10, 2006). In fact, Judge Baer recently certified this very question for interlocutory appeal. See In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897(HB), 2006 WL 1517580 (S.D.N.Y. June 2, 2006). The Court supports the proposition stated in those cases, as the collective knowledge doctrine serves an important function in situations where widespread corporate fraud cannot be connected to individual defendants at the pleading stage. Here, however, Marsh and MMC's scienter is just as easily inferred from the conscious misbehavior and recklessness of particular management-level employees identified in the Complaint as it is from the collective knowledge of the corporate entities.

Plaintiffs allege that MMC and Marsh had notice of the potential conflicts of interest posed by contingent commission agreements and the need for oversight of that business practice. (Compl. ¶ 125.) Nevertheless, the Company's employees are alleged to have been widely engaged in the improper collection of contingent commissions. For instance, Plaintiffs allege that The DPW Report revealed "widespread instances" of bid manipulation at Marsh during the Class Period (Compl. ¶¶ 226-29, 762), and several management-level employees have pleaded guilty to criminal charges for their involvement in bid-rigging at the Company. (Compl. ¶¶ 230-31, 316, 318.) Further, confidential witnesses assert that contingent commission agreements were centralized within Marsh's Global Broking division to maximize the collection of those revenues (Compl. ¶¶ 131-41), that employees openly discussed steering at company meetings (Compl. ¶¶ 144-46), and that managers encouraged steering in company emails. (Compl. ¶¶ 147-48, 160.)[13]

---

[13] Defendants contest the Complaint's reliance on the statements of confidential witnesses. While not all of the allegations based on confidential witness statements here are pleaded with particularity (e.g., allegations of vague "complaints made to Marsh's senior management" (Compl. ¶¶ 79, 92)), others, especially concerning general communication within the Global Broking division about steering (see, e.g., Compl. ¶¶ 81, 84), provide "a sufficient general description of the personal sources of the plaintiffs' beliefs" to be considered at the pleading stage. Novak, 216 F.3d at 314.

The Complaint also alleges that Marsh managers personally directed the steering of insurance business to insurance providers with which the Company had the most lucrative contingent commission agreements. Marsh's Executive Director of Marketing in the Global Broking division is alleged to have demanded that insurance providers help Marsh manipulate bids by providing the Company with above-market "B" quotes. (Compl. ¶ 769.) Further, Plaintiffs allege that Global Broking prepared a "Tiering Report," which classified insurance companies by the value of their contingent commission agreements with Marsh. This report was then distributed to senior executives and Managing Directors instructed their subordinates that the report would provide "clear direction on who [we] are steering business to and who we are steering business from." (Compl. ¶ 772.) The Complaint specifically alleges that at least two senior executives at Marsh--Christopher Treanor, the head of the Global Broking division (Compl. ¶¶ 145-46, 305), and Robert J. Stearns, a Senior Vice President (Compl. ¶ 309)--were directly involved in, or aware of, Marsh's steering practices throughout the Class Period. These allegations are more than adequate to raise an inference of conscious misbehavior or recklessness.

Defendants rely on the Second Circuit's opinion in <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263 (2d Cir. 1996), to argue that MMC, as Marsh's parent corporation, cannot be responsible for the

misconduct at its subsidiary. In <u>Chill</u>, the court declined to hold the General Electric Company ("GE") responsible for the fraudulent acts of a single employee at Kidder, Peabody & Co., Inc., which was one of twenty-four subsidiaries of GE Capital Services, itself one of twelve GE subsidiaries. <u>Id.</u> at 264-65, 271. Chill affirmed that parent corporations may not be held liable for reliance on their subsidiaries' internal controls. <u>Id.</u> at 271. Plaintiffs, however, allege more than MMC's mere reliance on Marsh's financial controls; they allege MMC's awareness, reckless disregard, and complicity in the misbehavior at Marsh and a breakdown in MMC's own internal controls.

Unlike <u>Chill</u>, the Complaint does not simply allege that MMC published faulty financial results derived from its subsidiary's accounting practices, but that MMC issued misleading statements regarding the Company's business practices in the insurance industry after being put on notice of the conflicts of interest inherent in the receipt of contingent commissions. Further, that Marsh is the largest and most prominent of MMC's businesses, generating approximately sixty percent of the Company's revenues, undermines MMC's attempt to detach itself from its subsidiary. (Compl. ¶¶ 11, 99.) The factual allegations underlying MMC's integration with Marsh demonstrate the parent company's familiarity with the subsidiary's operations and, ultimately, its misconduct. The Complaint alleges that MMC

employees attended meetings of the Global Broking division in which steering was discussed. (Compl. ¶ 84.) In addition, Defendant Greenberg, CEO of MMC, is alleged to have described the collection of contingent commissions as a "part of [MMC's] business model." (Compl. ¶ 20.) When attempting to calm the investment community's anxiety following the announcement of the NYAG investigation, Greenberg explained that MMC was "knowledgeable about how our business works, what our model is." (Compl. ¶ 627.)

In sum, Plaintiffs allege that both MMC and Marsh actively oversaw a "business model based on unsustainable and improper business practices." (Compl. ¶ 9.) There are sufficient allegations regarding the pervasiveness of the fraud, the conscious misbehavior of particular corporate employees, and the complicity of the corporate entities to find that MMC was aware of or recklessly disregarded the intentional misconduct at Marsh. Consequently, the allegations of the Complaint sufficiently plead the scienter of both corporate defendants.

### b. The Individual Defendants

Scienter of the individual defendants--directors and officers of MMC, and officers of Marsh--is not so easily alleged. Courts in this District have recognized that, by themselves, general allegations regarding the magnitude of the fraud or the organizational role of a defendant are insufficient

to raise a strong inference of a defendant's scienter. <u>See</u> <u>In re</u> <u>Worldcom, Inc. Sec. Litig.</u>, 294 F. Supp. 2d 392, 418 (S.D.N.Y. 2003); <u>In re LaBranche</u>, 405 F. Supp. 2d at 361; <u>In re AOL Time Warner</u>, 381 F. Supp. 2d at 222 n.30. Rather, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." <u>Novak</u>, 216 F.3d at 308.

Thus, the Second Circuit's recent scienter jurisprudence has consistently found the requisite inference of scienter where defendants have been exposed to information contrary to their public statements. <u>See</u> <u>Cosmas v. Hassett</u>, 886 F.2d 8, 10, 13 (2d Cir. 1989) (defendants' knowledge that their company derived a significant portion of its revenues from Chinese imports, coupled with the existence of public information regarding Chinese import restrictions, gave rise to a strong inference of scienter); <u>Novak</u>, 216 F.3d at 304, 311 (in light of particularized allegations that the defendants had access to documents directly relevant to the subject of their misstatements, the court reasoned that the defendants knowingly made the misstatements); <u>Rothman v. Gregor</u>, 220 F.3d 81, 91-92 (2d Cir. 2000) (defendants who failed to expense irrecoverable royalty advances must have known that they would not recoup the

cost of the advances during the class period because they sued to recover those advances).

These Second Circuit cases uniformly rely on allegations that specific contradictory information was available to the defendants at the same time they made their misleading statements. See also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (plaintiff failed to plead scienter where the plaintiff did "not allege that the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made"). The Complaint must allege equally compelling information available to the individual defendants at the time of their public statements in order to plead their scienter.

### (1) The Senior Management Defendants

Plaintiffs attempt to establish the Senior Management Defendants' scienter with several general allegations that they attribute to these defendants as a group. However, neither alone, nor collectively, are these general allegations sufficient to raise the strong inference of scienter required by the PSLRA.

Many of Plaintiffs' general allegations have a common flaw. Plaintiffs rarely distinguish between Defendants' knowledge of contingent commissions and knowledge of the misconduct intended to maximize those commissions. Where the Complaint does include

specific allegations regarding misconduct, it alleges that certain managers and brokers at Marsh were involved in the misconduct, formulated the business strategies, and were privy to conversations in which steering and bid manipulation were discussed. But Plaintiffs fail to connect the misconduct or knowledge of the misconduct to any of the individual named defendants. Simply arguing that specific high level employees must have known what was taking place at Marsh because certain subordinate employees were later implicated in the fraud is insufficient to give rise to the strong inference of scienter required to state a claim under Section 10(b).

Nor do the problems at other MMC subsidiaries provide a strong inference of recklessness with regard to misconduct at Marsh, a wholly separate subsidiary. Cf. In re Worldcom, 294 F. Supp. 2d at 418 (particularized allegations of misconduct at one office were "too far removed from the fraud underlying the false statements in the SEC filings to put [the] defendants on notice of those frauds"). Insider trading scandals at Putnam, MMC's investment management business, and the SEC investigation into conflicts of interest at Mercer, MMC's consulting and human resources subsidiary, may provide some evidence that the MMC directors should have been more proactive about the potential for misconduct in the Company's other business divisions, but

are insufficient on their own to put MMC directors or Marsh officers on notice of steering and bid-rigging at Marsh.[14]

Plaintiffs also allege that the evolving disclosure language regarding contingent commissions in MMC's 10-K filings and Annual Reports is evidence of the Senior Management Defendants' scienter. Yet the language regarding the services supplied for contingent commissions is consistent, if increasingly more ornate, after being introduced in the 2000 10-K.[15] The mere existence of allegedly misleading language in a group-published document does not compel a conclusion that all

---

[14] Although the allegations of misconduct at MMC's other subsidiaries do not establish the individual defendants' scienter, the allegations of misconduct at those subsidiaries is not so irrelevant, duplicative, or prejudicial that it need be stricken from the Complaint. In fact, as pleaded, the fraud at Mercer bears some resemblance to the fraud that allegedly took place at Marsh. See In re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 398-99 (D. Md. 2004) (denying motion to strike allegations about similar fraudulent schemes at the parent company's other subsidiaries). In addition, joined with the Complaint's other scienter allegations, the fraud at Mercer and Putnam bears on Defendants' awareness or reckless disregard of a breakdown in MMC's internal controls. It should be noted, however, that the decision to allow these allegations neither undermines the need for Plaintiffs to provide sufficient allegations of Defendants' scienter with respect to the fraud at Marsh, nor does it bear on the scope of discovery that should be allowed with respect to these allegations, any limits that may be placed on such discovery, or any limiting instructions that would be required at trial.

[15] In MMC's 10-K filings and Annual Reports from 2000 to 2003, the Company represents that it received contingent commissions in return for various market services. Though the language used to describe these services differs, MMC consistently refers to new product development, access to the global insurance market, new technology, and administrative services.

of the signatories were aware that it was misleading. <u>See</u> <u>Citigroup</u>, 330 F. Supp. 2d at 381-82. To hold otherwise would allow plaintiffs to plead the scienter of whole classes of defendants solely by alleging a misstatement.

Other general allegations, such as that the Senior Management Defendants concealed their improper activities (Compl. ¶¶ 780-85) or actively made false disclosures regarding their fiduciary duties (Compl. ¶ 809), are similarly insufficient. Plaintiffs adequately allege that certain non-defendant employees engaged in misconduct and that the existence of improper conduct within the Company made certain public disclosures false. But Plaintiffs can not use this information to allege the Senior Management Defendants' scienter without adequate factual allegations that *those* defendants *engaged* in misconduct or *knew* that their disclosures were false. These types of conclusory allegations beg the question.

Ultimately, while some of the Complaint's general allegations (e.g., the magnitude of the fraud, the awareness of similar misconduct at other MMC subsidiaries), provide some evidence of the Senior Management Defendant's scienter, the general allegations are insufficient to raise a strong inference of their scienter. Even collectively, these general allegations are weaker than the collective allegations that have supported a strong inference of scienter in the cases cited by Plaintiffs.

66

See, e.g., In re Cosmas, 886 F.2d at 10, 13 (relying on allegations that defendants made statements contrary to publicly available information); In re Atlas Air, 324 F. Supp. 2d at 492 (noting that senior managers had access to reports detailing the poor inventory situation underlying the company's fraudulent accounting).

Plaintiffs supplement their general allegations with limited individual allegations of each Senior Management Defendant's scienter. For many of the Senior Management Defendants, these particularized allegations are limited to allegations of the individual defendant's position at the Company,[16] general awareness of contingent commissions, access to corporate information, responsibility for the financial accounting process, and signing of public documents. As noted above, these types of allegations may provide some evidence of scienter, but are insufficient to raise a strong inference of scienter absent allegations that they were exposed to contemporaneous information contradicting their public statements. See supra Part IV.A.1.ii.b. Consequently, the specific allegations against defendants Smith, Groves, Sinnott, Wijnberg, Rapport, and Cabialavetta are insufficient to raise a strong inference of scienter.

---

[16] See supra Part II.A for a description of each Senior Management Defendant's position at the Company.

Plaintiffs provide additional specific allegations for Defendants Greenberg and Egan. For instance, Plaintiffs correlate the increased importance of Marsh's Global Broking division with Greenberg's ascension as the CEO of MMC. (Compl. ¶¶ 766, 770.) However, the increased prominence of the Global Broking division and centralization of contingent commissions therein do not raise a strong inference of scienter. There are no particularized allegations that Greenberg personally helped formulate steering policy or that he had direct access to reports or presentations explaining such strategies. On the contrary, Plaintiffs allege that Greenberg attended some Global Broking meetings in which contingent commissions were discussed and that improper steering was discussed at some of the division's other meetings. (Compl. ¶¶ 812, 145-46.) Notably absent are allegations that Greenberg attended the meetings in which steering was discussed. Nor do allegations that Greenberg attended meetings in which contingent commissions were discussed generally raise an inference that steering was discussed in those meetings.

Similarly, allegations that a former Marsh employee "openly criticized Global Broking for not necessarily fulfilling its fiduciary duties," "publicly spoke about his concerns with Global Broking" at a 2002 conference, and "voiced these concerns directly to Defendant Egan" during the Class Period are

insufficient to give rise to a strong inference of Egan's awareness or reckless disregard of steering and bid manipulation. (Compl. ¶¶ 793-94.) The Complaint does not particularize what "concerns" were raised, whether steering was addressed, or how these "concerns" would have put Egan or any of the other defendants on notice of the specific misconduct alleged in the Complaint. The Complaint is laden with allegations that misconduct was occurring at Marsh, particularly in the Global Broking division, but devoid of specific allegations that evidence of this misconduct was brought to the attention of the individual named defendants during the Class Period.

The only allegation that tips the scales in favor of any of the Senior Management Defendants' scienter is the announcement of the NYAG investigation. Plaintiffs do not allege specifically when the NYAG investigation was announced, but it was first disclosed in MMC's 1st quarter 10-Q. The NYAG complaint was then filed and the suit was settled for $850 million within a year of the commencement of the investigation. Meanwhile, the DPW Report commissioned by Defendants following the filing of the NYAG lawsuit revealed widespread instances of steering at the Company. (Compl. ¶ 226.) Added to the allegations that, after the investigation's announcement, Greenberg and Egan personally made misstatements and aggressively supported the Company's

business practices, the existence of the NYAG investigation and the rapid discovery of widespread misconduct at Marsh shortly thereafter constitute strong circumstantial evidence that those defendants either knew or were reckless in not learning of the fraudulent business practices at Marsh. See In re Van der Moolen, 405 F. Supp. 2d at 408-09. Accordingly, a strong inference of scienter arises upon Greenberg and Egan's awareness of the NYAG investigation.

As set forth above, Plaintiffs have adequately alleged scienter for the misleading statements made by Greenberg and Egan after the publication of the 2004 1st Quarter 10-Q on May 10, 2004 until the end of the Class Period. The Section 10(b) and 10b-5 claims against the remainder of the Senior Management Defendants are dismissed for failure to plead scienter with particularity.

### (2) The Audit Committee Defendants

Plaintiffs attempt to plead the scienter of the Audit Committee Defendants through a series of "red flags" that were allegedly ignored by those defendants. Red flag allegations are commonly used to plead the scienter of auditors and audit committees in the context of a company's fraudulent accounting. See, e.g., In re Philip Servs., 383 F. Supp. 2d at 475; In re Worldcom, 294 F. Supp. 2d at 418. Although the Court has rejected Plaintiffs' allegations of fraudulent accounting here,

there is no reason why the red flags pleading paradigm may not be employed in the context of misrepresentations stemming from internal misconduct. See, e.g., In re Van der Moolen, 405 F. Supp. 2d at 406.

Merely labeling allegations as red flags, however, is insufficient to make those allegations relevant to a defendant's scienter. Rather, plaintiffs must plead "facts which come to a defendant's attention that would place a reasonable party in defendant's position on notice that the audited company was engaged in wrongdoing to the detriment of its investors." In re Worldcom, 346 F. Supp. 2d 628, 672 (S.D.N.Y. 2004) (internal quotation marks and citation omitted); see also In re Leslie Fay Cos. Sec. Litig., 871 F. Supp. 686, 699 (S.D.N.Y. 1995) (red flags must "be clearly evident to any auditor performing its duties"). Although the Audit Committee Defendants rebut many of the red flag allegations here, courts must keep in mind that a defendant "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." In re Philip Servs., 383 F. Supp. 2d at 476. Indeed, "multiple allegations of 'red flags,' considered in the aggregate, [may] support an inference of fraudulent intent adequate to survive a motion to dismiss." Id. at 475.

Nevertheless, courts have been hesitant to find a strong inference of audit committee members' scienter in cases

providing general allegations of circumstantial evidence. See, e.g., In re Worldcom, 294 F. Supp. 2d at 418. Even in In re Atlas Air, where the scienter of several corporate officers was adequately pleaded on the basis of the magnitude of the company's restatement of its earnings, improper financial reporting of the company's core operations, and a series of statements by confidential witnesses indicating that senior management was aware of the specific conditions underlying the fraudulent accounting alleged therein, the court dismissed the claim against the single named audit committee member because the plaintiffs failed to plead "that the audit committee was given information that should have alerted [the defendant] to the fact that the company's financials were false." 324 F. Supp. 2d at 497. Plaintiffs' allegations are similarly deficient here.

Many of the alleged red flags overlap with Plaintiffs' arguments for the Senior Management Defendants' scienter, and contain the same defects as those allegations. However, the Complaint also includes a number of distinct red flags that allegedly put the Audit Committee Defendants on notice: (1) conflicts of interest inherent in contingent commission agreements; (2) Circular Letter 22; (3) the RIMS agreement; (4) failure to disclose the materiality of contingent commissions; (5) the lack of costs associated with contingent commissions; (6) the existence of related-party transactions with insurance

providers AIG and ACE; and (7) the ranking and promotion of employees involved in steering.

The first three of these red flags are primarily relevant to the alleged misrepresentations about the Company's misleading client disclosure protocol. However, none of the misrepresentations regarding MMC's disclosure to its clients are attributable to the Audit Committee Defendants. Nor is the Audit Committee Defendants' awareness of regulations and agreements related to brokers' disclosure responsibilities sufficient to allege scienter for the misstatements (regarding the nature of services provided for contingent commissions and the nature of client insurance placements) that are appropriately attributed to these defendants.

Further, Plaintiffs concede that defendants adhered to the disclosure protocol created by the RIMS Agreement, and only allege that the calculations performed pursuant to the protocol could be viewed as inaccurate or misleading. (Compl ¶ 244.) The fact that Defendants adhered to the regulatory agreement, even if that agreement ultimately failed its goal, undermines Plaintiffs' argument that the Audit Committee Defendants breached their duty to monitor regulatory compliance.

To the extent that the Audit Committee had a duty to monitor regulatory and legal compliance, Plaintiffs have not alleged information that reached the Audit Committee and that

they either knew about or were reckless in ignoring. See In re Atlas Air, 324 F. Supp. 2d at 497. Simply stating that a defendant had a duty to monitor is insufficient to raise a strong inference of scienter without allegations of what information was reasonably available to them or how they were reckless in their duties.

Other red flags, such as the failure to disclose the magnitude of contingent commissions and the ranking and promotion of employees involved in steering, are also insufficient to put the Audit Committee Defendants on notice of misconduct at Marsh. Regarding the former of these red flags, the Court has already ascertained that the Company did not have a specific line-item duty to disclose the magnitude of contingent commissions in MMC's financial statements. See supra Part IV.A.1.i.b(4). Accordingly, the alleged failure to disclose does not give rise to an inference of the Audit Committee Defendants' scienter. With respect to the latter red flag, the Plaintiffs do not allege that the Audit Committee Defendants were even involved in the promotion and ranking of employees, let alone that they were aware that any of the individuals being promoted or ranked were involved in steering or that promotion and ranking were based on participation in steering activities.

Nor are the related-party transactions between MMC and underwriters AIG and ACE, where Defendant Greenberg's father and

brother worked, a sufficient red flag to give rise to the Audit Committee Defendants' recklessness. Plaintiffs do not allege that MMC interacted with AIG and ACE any differently than with the other underwriters from which it received contingent commissions. There are no facts alleged to show that closer scrutiny of those transactions would have put any of the defendants on notice of the misconduct at Marsh.

In short, Plaintiffs' allegations of red flags are insufficient to establish the scienter of the Audit Committee Defendants. The Section 10(b) and Rule 10b-5 claims against those defendants are dismissed.

### c. D&T

The standard for pleading auditor scienter is demanding. The scienter of an auditor must "approximate an actual intent to aid in the fraud being perpetrated by the audited company." Rothman, 220 F.3d at 98 (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir. 1982)). Therefore, a plaintiff must prove that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." S.E.C. v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (internal

quotation marks and citations omitted). Although Plaintiffs have failed to adequately plead their theory of fraudulent accounting or allege any actionable misrepresentations by D&T, see supra Part IV.A.1.i.b(6) & c, Plaintiffs' failure to allege scienter is an alternate ground for dismissal against the auditor.

Plaintiffs argue that D&T's receipt of consulting fees during the time that it served as MMC's auditor, coupled with the inferences created by the Complaint's red flag allegations, creates a strong inference of scienter. Although an auditor's receipt of consulting fees inordinately disproportionate to its auditing fees may give rise to a proper inference of motive, see In re Global Crossing, 322 F. Supp. 2d at 346 (finding an inference of motive where an auditor received consulting fees nearly six times greater than its auditing fees), allegations of payment for services rendered are generally inadequate. See In re JP Morgan, 363 F. Supp. 2d at 621 ("Generalized allegations of intent to maintain lucrative business relationships and to establish new ones do not set forth a motive for scienter purposes."). Here, D&T's receipt of consulting fees approximately equal to its auditing fees (Compl. ¶ 690) is insufficient to raise a strong inference of motive.

The red flags that allegedly put D&T on notice of the fraud are mostly derivative of the allegations against the Audit Committee Defendants, and are even less compelling in the

context of D&T's scienter. In addition to their red flag allegations, Plaintiffs argue that D&T was reckless in failing to recognize that MMC was receiving contingent commissions as kickbacks for steering services, rather than in return for the services described in MMC's Annual Reports and 10-K filings. But Plaintiffs do not allege facts demonstrating how MMC's financial statements failed to account for the receipt of contingent commissions or the overhead costs that MMC purported to assign to them. Even if MMC was using the description of services as a smokescreen for its receipt of allegedly "pure profit" contingent commissions, the Plaintiffs do not allege that these generic services (e.g., new product development, access to the global insurance market, new technology, and administrative services) were not covered in other sections of MMC's balance sheet. These general discussions in MMC's Annual Reports and 10-K filings, even if they ultimately prove to be false, are insufficient to demonstrate D&T's recklessness.

Finally, with respect to the RIMS agreement and Circular Letter 22, MMC's regulatory obligations did not create a duty for D&T to monitor the Company's compliance. Nor does the Complaint allege facts that would have put the auditor on notice that MMC was not complying with the Company's regulatory disclosure requirements. Attempting to make the auditor responsible for its client's off-balance sheet misconduct

extends the accountant's responsibility beyond the scope of the auditing relationship.

The Complaint fails to allege adequate circumstantial evidence that D&T was reckless in failing to uncover the internal misconduct at MMC. The Section 10(b) and Rule 10b-5 claim against D&T is dismissed for this further reason.

### iii. Reliance

Defendant Egan contests Plaintiffs' allegations of reliance. Reliance, or transaction causation, "requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" Lentell, 396 F.3d at 172 (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc. 343 F.3d 189, 197 (2d Cir. 2003)).

Although the Complaint properly alleges reliance with its fraud on the market allegations (Compl. ¶¶ 828-36), Egan argues that Plaintiffs fail to allege the purchase or sale of a security after Egan's first direct statement in March of 2004. The Class, however, alleges purchases throughout the Class Period, which extends until October 14, 2004. These allegations are sufficient. The Court is not aware of any case requiring a class to provide proof of purchase for every day of the Class Period at the pleading stage, and will not require such a showing here.

### iv.  Loss Causation

Defendants also challenge Plaintiffs' allegations of loss causation. The Supreme Court recently clarified the pleading requirements for loss causation in the context of alleged violations of Section 10(b). To properly plead loss causation, plaintiffs must provide "the defendants with notice of what the relevant economic loss might be [and] what the causal connection might be between the loss and the [alleged] misrepresentation." Dura Pharm., 544 U.S. at 347. Plaintiffs readily meet this standard.

Defendants argue that the market was aware of the magnitude of contingent commission revenues before MMC's stock price dropped. The magnitude of revenues, however, is not the sole misrepresentation alleged in the Complaint. Here, Plaintiffs allege that MMC's stock price fell significantly after it was revealed that MMC had been misrepresenting its business practices, particularly the nature of services provided for contingent commissions and the criteria for Marsh's insurance placement services. Plaintiffs allege that upon the filing of the NYAG complaint, in which contingent commission revenues were alleged to be the result of improper business practices, MMC's stock price lost a third of its value in two days. That is all that is required at this stage. See Lentell, 396 F.3d at 173 (explaining that the plaintiff must allege "that the

misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security"). Loss causation is properly pleaded.

### 2. Market Manipulation

In addition to their claim that Defendants made misrepresentations during the Class Period, Plaintiffs briefly allege that Defendants violated Rule 10b-5(a) and (c).[17] Because the Court has already found MMC and Marsh liable of false and misleading statements, it need not consider whether they are also liable under the prohibition on fraudulent schemes and acts. See In re Alstom SA, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). Indeed, Plaintiffs fail to argue scheme liability in their primary opposition memorandum. Plaintiffs only elaborate on that theory in their opposition to the Independent Directors' motion to dismiss. (Pls.' Opp. to Independent Directors 23.)

The allegations of the Complaint attempt to connect the individual defendants to the fraud almost exclusively by allegations of misrepresentations or omissions. The closest Plaintiffs come to alleging that the individual defendants, primarily MMC directors, engaged in any acts or schemes to

---

[17] As noted above, see supra Part IV.A, Rule 10b-5(a) & (c) codifies prohibition of the following activities: "(a) To employ any device, scheme, or artifice to defraud;" or "(c) To engage in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 40.10b-5.

mislead investors is to argue that those defendants "helped perpetuate" the systemic fraud at Marsh. (Pls.' Opp. to Independent Directors 23.) However, the Complaint does not include sufficient particularized allegations of the individual defendants' active participation in a scheme to manipulate MMC securities. Rather, the Complaint relies on allegations that the individual defendants made, or allowed to be made, false or misleading statements despite their awareness or reckless disregard of the misconduct at Marsh. This is insufficient to state a claim for scheme liability on behalf of any of the individual defendants. See In re JHW Greentree Capital, 2005 WL 3008452, at *7 n.11.

### B. Section 11 Claims

Plaintiffs allege that MMC, D&T, and the Individual Section 11 Defendants are liable for false or misleading statements contained in Exchange Act documents incorporated by reference into MMC's February 13, 2003 prospectus supplement. Defendants raise three defenses to this charge: (1) Plaintiffs do not have standing to state a Section 11 claim; (2) Section 11 liability may not attach to a prospectus supplement; and (3) Plaintiffs fail to allege Defendants' scienter.

The pleading requirement for Section 11 standing is satisfied by "general allegations that plaintiff purchased 'pursuant to' or traceable to [a] false registration statement."

In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) (citations omitted). Here, Plaintiffs have done precisely that, alleging that "Lead Plaintiffs and other members of the Class acquired the securities in [MMC]'s 4.850% debt offering pursuant to the Registration Statement/Prospectus." (Compl. ¶ 859.) Nothing more is required at this stage of pleading.

Next, Defendants argue that a prospectus supplement may not serve as the basis of Section 11 liability. The language of Section 11 creates liability for false or misleading statements "in any part of the registration statement." 15 U.S.C. § 77k(a). Here, the February 13, 2003 prospectus supplement updated the Company's 1998 shelf registration filed pursuant to Form S-3. Under the provisions of a shelf registration, issuers may omit certain information from the registration statement and original prospectus, and update them at a later date. See Harold S. Bloomenthal, Securities Law Handbook § 6:32 (2006). The prospectus supplement here did exactly that, setting the amount and type of securities that would be issued and explicitly incorporating by reference several Exchange Act filings, including the Annual Report on Form 10-K for the year ended December 31, 2001, to update pertinent company information. (Holton Decl. Ex. R.)

Defendants argue that the SEC's recently adopted Securities Offering Reform ("SOR"), which explicitly recognized prospectus supplements as part of a registration statement for Section 11 liability, indicates that there was no liability for prospectus supplements prior to the SOR's December 1, 2005 effective date. But this argument is rebutted by language in the SOR asserting that, at least since 1998, the SEC believed that "prospectus statements and the information contained in them are subject to liability under Section 11." Securities Offering Reform, 70 Fed. Reg. 44,722, 44,771 n.445 (Aug. 3, 2005) (to be codified at 17 C.F.R. pts. 200, 228, 229, 230, 239, 240, 243, 249 & 274). The SEC's position appears to have been recognized by several courts in this District, which have held that Section 11 claims were properly derived from misstatements incorporated into prospectus supplements. See, e.g., In re Atlas Air, 324 F. Supp. 2d at 502; Nanopierce Techs. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767(LBS), 2003 WL 22882137, at *4 (S.D.N.Y. Dec. 4, 2003). Accordingly, the February 13, 2003 prospectus supplement, and the Exchange Act filings it expressly incorporates, may serve as a basis for Section 11 liability.

Defendants also argue that the Complaint fails to meet the pleading requirements of Rule 9(b). The Second Circuit, in Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004), established "that the heightened pleading standard of Rule 9(b) applies to Section

83

11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." Id. at 171. Rule 9(b) applies even where plaintiffs deny that their claims sound in fraud, so long as "the wording and imputations of the complaint are classically associated with fraud." Id. at 172.

Here, Plaintiffs clearly allege fraud. The exact phrases held to be indicative of fraud allegations in Rombach, "that the Registration Statement was 'inaccurate and misleading;' that it contained 'untrue statements of material facts,'" id., are repeated verbatim in the Complaint. (Compl. ¶ 856.) In fact, prior to the statement of the Section 11 count, the entire Complaint sounds in fraud. Plaintiffs cannot "repeat and reallege each and every allegation contained" in the Complaint (Compl. ¶ 853), and then attempt to disclaim those allegations in the very next paragraph by stating, "[a]ll of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded" from the Section 11 count. (Compl. ¶ 854.)

In requiring heightened pleading for Section 11 claims sounding in fraud, Rombach emphasized the reputational interests Rule 9(b) seeks to protect. 355 F.3d at 171. Allowing plaintiffs to allege fraud over nine-hundred paragraphs and then withdraw those claims for eight paragraphs in order to state a Section 11 claim eviscerates Rule 9(b)'s mandate to "safeguard a

defendant's reputation from improvident charges of wrongdoing." Id. (citing O'Brien v. Nat'l Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)). Plaintiffs must either provide sufficient allegations of the defendants' fraudulent intent, or withdraw allegations of fraud against certain defendants and allege those defendants' negligence.

Because the heightened pleading requirements of Rule 9(b) apply, Plaintiffs must adequately plead that MMC and the Individual Section 11 Defendants were reckless when the misleading statements incorporated into the February 13, 2003 Prospectus Supplement were made. As indicated above, see supra Part IV.A.1.ii, Plaintiffs have only pleaded that MMC and Marsh were reckless at the time the Prospectus Supplement was filed. Because Marsh did not sign the registration statement or the Exchange Act filings incorporated therein, Count III is sustained as to MMC and dismissed against the remaining Individual Section 11 Defendants and D&T.[18]

_____

[18]  Plaintiffs argue that In re Atlas Air sufficiently distinguishes Rombach, and is sufficiently analogous to this case, to militate against dismissal. In re Atlas Air, however, merely recognized that Section 11 claims could be stated against defendants for whom scienter was not adequately pleaded if the plaintiffs "remov[ed] their allegations of scienter with respect to" those defendants. 324 F. Supp. 2d at 503. Here, given the Complaint's pervasive allegations of fraud against over a dozen Individual Section 11 Defendants (Compl. ¶¶ 748, 827), the Court will require Plaintiffs to choose between allegations of fraud or negligence when amending their Complaint, rather than to make

## C. Section 18 Claims

Section 18 provides an alternative to Section 10(b) for plaintiffs seeking to hold defendants liable for Exchange Act filings containing materially false or misleading statements. Unlike Section 10(b)'s relaxed standard for pleading reliance, however, Section 18 requires that plaintiffs allege actual reliance on specific statements in covered Exchange Act filings. See 15 U.S.C. § 78r(a); Heit v. Weitzen, 402 F.2d 909, 916 (2d Cir. 1968) ("Reliance on the actual 10K report is an essential prerequisite for a Section 18 action and constructive reliance is not sufficient.").

Here, Plaintiffs allege, "[i]n connection with the purchase of the Company's securities, Lead Plaintiffs and all other members of the Class, and/or their respective agents, specifically read and relied upon" MMC's Exchange Act filings, "including statements regarding the Company's financial condition and revenue figures." (Compl. ¶871.) The Court, however, has concluded that statements regarding MMC's finances

---

that choice for them. See Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363, 368-69 (5th Cir. 2001), cited in Rombach, 355 F.3d at 176.

The Section 11 claim against D&T is dismissed for the additional reason that Plaintiffs fail to state any actionable misrepresentations in the 2001 10-K that may be attributed to that defendant. Consequently, Plaintiffs may not adequately replead the Section 11 claim against D&T simply by dropping its allegations of the auditor's fraudulent intent.

were not misleading. See supra Part IV.A.1.i.b(1)-(4) & (6).
Plaintiffs do not properly allege that they made purchases or
sales of securities in reliance upon the narrow class of alleged
misstatements that are actionable. Therefore, as pleaded,
Plaintiffs' reliance allegations are insufficient. Pursuant to
the language of Section 18, Plaintiffs must allege that they
personally read specific actionable misstatements in MMC filings
covered by Section 18, and then purchased or sold securities in
reliance on those misstatements. 15 U.S.C. § 78r. As Plaintiffs
fail to make this pleading, the Section 18 claim is dismissed
against all defendants.

### D. Control Person Claims: Section 15 and Section 20(a)

Both Section 20(a) of the Exchange Act and Section 15 of
the Securities Act create secondary liability for persons who
control primary violators of the provisions of those Acts.
Courts in this District routinely examine Section 15 claims
under the standard applied to Section 20(a) claims. See DeMaria
v. Andersen, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001), aff'd 318
F.3d 170 (2d Cir. 2003); In re Am. Bank Note Holographics, Inc.
Sec. Litig., 93 F. Supp. 2d 424, 441 (S.D.N.Y. 2000). On the
face of each statute, Section 20(a) and Section 15 have entirely
different mens rea requirements: Section 20(a) provides a good
faith defense, while Section 15 liability attaches on the basis
of mere negligence. As such, it initially seems counterintuitive

87

to use the same framework to consider the two provisions. Yet, in this case, Plaintiffs' Section 11 claims are premised on allegations of fraud. See supra Part IV.B. It follows from Rombach's heightened pleading requirements for Section 11 violations sounding in fraud that the pleading requirements for the corresponding control person claim are also greater. As such, analysis of the two types of control person claims will proceed in parallel.

To establish a prima facie case of a control person claim, Plaintiffs must allege: (1) an underlying primary violation; (2) the defendant's control over the primary violator; and (3) the defendant's culpable participation in the primary violation. See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)). As discussed above, see supra Parts IV.A.1 & B, Plaintiffs adequately plead primary violations of Section 11 by MMC, and Section 10(b) by MMC, Marsh, and, for a limited period, Greenberg and Egan. Accordingly, the focus is on Defendants' control and culpable participation of these primary violators.

The Second Circuit has only briefly addressed the control and culpable participation prongs, and without distinguishing between its analyses of those two distinct prongs. See Suez Equity Investors, 250 F.3d at 101-02; First Jersey, 101 F.3d at 1472-73. Courts in this District, however, have generally found

that control is adequately alleged with a "short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion." In re Worldcom, 294 F. Supp. 2d at 415-16 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)). The Section 15 defendants include various officers and directors of MMC, while the Section 20(a) defendants include officers and directors of both MMC and Marsh. Only Defendants Egan, Sinnott, and the Independent Directors contest Plaintiffs' allegations of control. As will soon be discussed, Plaintiffs fail to adequately plead the culpable participation of Sinnott or the Independent Directors, thus the Court will only address control with respect to Egan.

Plaintiffs allege that Egan was the Chief Operating Officer of primary violator Marsh during a substantial portion of the Class Period, the supervisor of employees that were directly involved in bid-rigging, and an active participant in the framework for staff performance evaluations, which allegedly took steering into account. (Compl. ¶ 819.) These allegations of daily operational control over Marsh are more than adequate to establish Egan's control for Section 20(a).

The standard of pleading required for culpable participation has been the subject of great debate in this District. One of the more comprehensive discussions in recent

years may be found in In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371 (S.D.N.Y. 2001), in which Judge Marrero surveyed the diverging positions in this District regarding both the existence of the culpable participation prong and the pleading standard required for its satisfaction. Id. at 413-18; see also In re Alstom SA, 406 F. Supp. 2d at 490-92 (Marrero, J.). Judge Marrero ultimately held that plaintiffs must, at a minimum, plead recklessness in the same sense required by Section 10(b). See In re Livent, 151 F. Supp. 2d at 417. This Court has followed a similar approach in recent years, see, e.g., In re AOL Time Warner, 381 F. Supp. 2d at 235, and in the absence of Second Circuit precedent to the contrary, will continue along that course.

Accordingly, per the Court's discussion of scienter above, see supra Part IV.A.1.ii, only MMC, Marsh, Greenberg, and Egan may be considered culpable participants in the fraud for purposes of Section 20(a). As each of these Section 20(a) defendants also had control over primary violators, the Section 20(a) claims are adequately pleaded against them. With respect to the Section 15 claim, the Plaintiffs have not raised a strong inference of scienter for any of the named Section 15 defendants at the time the relevant registration statement was filed. Accordingly, the Section 15 claim is dismissed against all defendants.

**E. State Law Claims**

In addition to their federal securities claims, Plaintiffs assert a handful of state law claims on behalf of the Pension Fund Subclass. As an initial matter, the Court will exercise supplemental jurisdiction over the state law claims. The Plaintiffs have stated valid federal claims, and there is insufficient confusion of issues to persuade the Court to decline jurisdiction of the remaining claims. Specific defenses to each of the state law claims are discussed below.[19]

**1. Common Law Fraud and Deceit**

Despite some similarities between common law fraud and Rule 10b-5 claims, the two actions maintain meaningful distinctions. Pertinent to the instant action, a plaintiff alleging common law fraud may not rely on the fraud on the market presumption, but must demonstrate actual reliance on the alleged misrepresentations. See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 850 F. Supp. 1199, 1221 (S.D.N.Y. 1994) aff'd 57 F.3d 146 (2d Cir. 1995); Kaufman v. i-Stat Corp., 165 N.J. 94, 97-98, 754 A.2d 1188, 1189 (N.J. 2000); In Re Donahue Sec., Inc., No. 01-0127, 2004 Bankr. LEXIS 1955,

---

[19] Because many of the asserted state law claims have pleading requirements and elements similar to the federal securities claims, the discussion of these claims will be brief. Where applicable, citations are provided for Ohio, New Jersey, and New York, the respective residencies of Co-Lead Plaintiffs and MMC.

at *17 (Bankr. S.D. Ohio Nov. 23, 2004). As discussed in the context of Plaintiffs' Section 18 claims, see supra Part IV.C, the Complaint fails to adequately allege actual reliance on any of the narrow class of misrepresentations sustained by this Opinion. Accordingly, Plaintiffs' common law fraud claims are dismissed against all Defendants.

## 2. Negligent Misrepresentation

Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b). AIG Global Sec. Lending Corp. v. Banc of America Sec. LLC, 254 F. Supp. 2d 373, 389 (S.D.N.Y. 2003). As such, Plaintiffs must particularly allege the elements of their negligent misrepresentation claim in compliance with the specific requirements of state law.

For instance, a New Jersey claim for negligent misrepresentation requires that a plaintiff allege actual reliance. Kaufman, 754 A.2d at 1195 (establishing that the element of reliance is identical for negligent misrepresentation and common law fraud). Similarly, Ohio state law requires that a plaintiff plead actual reliance on an affirmative false statement. See Davis v. DCB Fin. Corp., 259 F. Supp. 2d 664, 672 (S.D. Ohio 2003); Flanagan Lieberman Hoffman & Swaim v. Transamerica Life and Annuity Co., 228 F. Supp. 2d 830, 851 (S.D. Ohio 2002) (requiring that a plaintiff plead reliance on "an affirmative false statement" because "a claim for negligent

misrepresentation does not apply to omissions"). Plaintiffs' failure to properly plead reliance has already been established in connection with their Section 18 claim. See supra Part IV.C. Therefore, Plaintiffs' negligent misrepresentation claims are dismissed for their failure to properly plead reliance in accordance with the specific standards of these jurisdictions.

Further, under New York law, negligent misrepresentation claims made in connection with the purchase or sale of securities are preempted by the Martin Act, N.Y. Gen. Bus. Law §§ 352 et seq. See Pro Bono Invs., Inc. v. Gerry, No. 03 Civ. 4347, 2005 WL 2429787, at *16 (S.D.N.Y. Sept. 30, 2005) (discussing and rejecting the opinions dissenting from the majority position regarding Martin Act preemption of negligent misrepresentation claims); Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 291-92 (S.D.N.Y. 1998). Consequently, Plaintiffs' negligent misrepresentation claim is dismissed in its entirety.

### 3. State Securities Laws

Finally, Count VIII alleges violations of state securities laws. Regardless of the state law applied, Plaintiffs' claims are defective. In New York, Plaintiffs' claims are once again barred by the Martin Act, which omits a private right of action for the violation of New York state securities laws. CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 275-76 (N.Y. 1987).

Meanwhile, in Ohio, securities plaintiffs must allege their reliance on false representations. Nickels v. Koehler Mgmt. Corp., 541 F.2d 611, 617 (6th Cir. 1976). The Court has already noted the Complaint's defects in this capacity. See supra Part IV.C. Finally, although New Jersey's Uniform Securities Law, N.J. Stat. Ann. §§ 49:3-47 et seq., does not require reliance, it "requires privity in securities-fraud actions and thus will not allow [Plaintiffs] to reach the issuer of [their] shares or its officers." Kaufman, 754 A.2d at 1197 (citing N.J. Stat. Ann. §§ 49:3-71). Consequently, Plaintiffs are unable to establish privity, and their state securities law claims must be dismissed under New Jersey law as well.[20]

## V.    CONCLUSION

As set forth above, Defendants' motions to dismiss are granted in part and denied in part. The Section 10(b) and 20(a) claims are dismissed against all Defendants with the exception of MMC, Marsh, Greenberg and Egan, while the Section 11 claim is

---

[20] Plaintiffs assert that their purchase of securities from the February 13, 2003 bond offering properly establishes their privity with MMC. As Defendants note, however, a firm commitment underwriting, as was utilized here (See Holton Decl. Ex. R at S-5), does not create privity between an issuer and its investors. See Akerman v. Oryx Comms., Inc., 810 F.2d 336, 344 (2d Cir. 1987). This is for the simple reason that investors do not acquire title directly from the issuer, but from the underwriters who have purchased the securities for sale to investors. Id.

dismissed against all Defendants with the exception of MMC. The remaining claims are dismissed against all Defendants.

As several of Plaintiffs' claims have been sustained and others merely suffer from pleading deficiencies, Plaintiffs may submit to the Court, no later than August 18, 2006, a proposed Second Amended Complaint. The Second Amended Complaint shall be accompanied by a Memorandum of Law indicating how the defects in the Complaint have been cured. Thereafter, the Court will either grant leave to amend, or enter an Order dismissing the still defective portions of the Complaint with prejudice.

SO ORDERED.

_____
SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           July 19, 2006

96