# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE MARSH & MCLENNAN COMPANIES, INC. SECURITIES LITIGATION | : : : : : | CIVIL ACTION<br><br>NO: 04-CV-08144 (SWK)<br><br>ELECTRONICALLY FILED |

## <u>SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer (JE-5503)
Sidney S. Liebesman (SL-8444)
45 Rockefeller Center, 15th Floor
630 Fifth Avenue
New York, NY 10111
Telephone: (212) 755-6501
Facsimile: (212) 307-3216

and

Geoffrey C. Jarvis (GJ-7040)
James P. McEvilly
Sharan Nirmul (SN-2075)
Naumon A. Amjed
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100

Co-Lead Counsel for the Class

BERNSTEIN LIEBHARD & LIFSHITZ, LLP
Keith M. Fleischman (KF-0199)
U. Seth Ottensoser (UO-9703)
Timothy J. MacFall (TM-8634)
Felecia L. Stern (FS-3431)
Gregory M. Egleston (GE-1932)
Stephanie M. Beige (SB-3590)
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

Co-Lead Counsel for the Class

TABLE OF CONTENTS

Page

I.    SUMMARY OF CLAIMS ............................................................................................1

    A.    Introduction ............................................................................................1

    B.    MMC's Securities Fraud ........................................................................2

    C.    The Truth Is Revealed ...........................................................................3

    D.    MMC's and Marsh Inc.'s Improper Activities and Defendants' Scienter .............4

    E.    MMC and Marsh Inc. Admit Their Wrongdoing ....................................7

II.    BASIS OF THE ALLEGATIONS ..........................................................................8

III.    JURISDICTION AND VENUE ............................................................................10

IV.    CLASS ACTION ALLEGATIONS ......................................................................10

V.    PARTIES ...............................................................................................................12

    A.    Lead Plaintiffs .....................................................................................12

    B.    Defendants ...........................................................................................13

        1.    MMC and Marsh Inc ...............................................................13

        2.    Senior Management Defendants ...............................................14

    C.    Relevant Non-Parties ...........................................................................17

VI.    CONFIDENTIAL WITNESSES ...........................................................................21

VII.    THE IMPACT OF CONTINGENT COMMISSIONS ON MMC'S BUSINESS ............26

    A.    Class Period Revenue and Earnings Growth ........................................26

    B.    MMC's Market Assurances ..................................................................28

    C.    The Magnitude of the Illicit Revenues and  the Vast Concealment to Deceive the Investing Public ................................................................29

    D.    The Adverse Effects of the Disclosure..................................................31

VIII.   MMC'S AND MARSH INC.'S FRAUDULENT SCHEME TO IMPROPERLY
MANIPULATE THE INSURANCE MARKET TO BOOST MMC'S
REVENUES..................................................................................................33

A.   An Overview of Marsh Inc.'s Role in the Insurance Market-Place:
Brokers, Clients, Insurers..................................................................33

B.   Marsh Inc.'s Role as a Broker..........................................................34

1.   Marsh Inc. Was Obligated to Act as A Fiduciary for Its Clients..............34

2.   Brokers' Relationship With Insurers and the Obligation to Disclose
Contingent Commissions.....................................................................36

3.   MMC and Marsh Inc. Form Global Broking to Control and
Maximize Contingent Commissions.....................................................39

C.   The Scheme -- MMC and Marsh Inc. Use Improper Business Practices to
Boost Revenue ......................................................................................41

1.   MMC's and Marsh Inc.'s Business Plan was to Increase Revenue
by Steering Business to the Insurance Companies Paying the
Highest Contingent Commissions.......................................................41

2.   The Scheme Continues – MMC and Marsh Inc. Rated Insurance
Companies Based on PSAs....................................................................45

3.   MMC's and Marsh Inc.'s "Pay-To-Play" System Pressures
Insurers to Enter Into PSAs/MSAs ....................................................47

4.   MMC and Marsh Inc. Encouraged Employees to Steer Business to
Insurance Carriers with the Most Lucrative PSAs..............................49

5.   Global Broking Uses its Leverage to Steer Business to Certain
Carriers Through A Fraudulent Bidding Process.................................51

a.   Global Broking Engineers an A, B, and C Quote System of
Fake Bids .........................................................................52

b.   Insurers Participate in the Fraudulent Bidding Process ................54

c.   MMC and Marsh Inc. also Scheme with Mid-Sized and
Smaller Insurers ...............................................................56

d.   Additional Examples of MMC's and Marsh Inc.'s Improper
and Fraudulent Conduct....................................................60

i.   Fortune Brands..................................................60

ii.     Brambles, USA ................................................................61

iii.    The Greenville Project .....................................................61

6.     Global Broking's Bid Manipulations Frustrated Marsh Inc.'s Local and Regional Offices................................................................62

D.     MMC's and Marsh Inc.'s Own Investigation and the Guilty Pleas of Marsh Inc.'s Employees Confirm MMC's and Marsh Inc.'s System of Manipulation ......................................................................................65

E.     Neither MMC nor Marsh Inc. Provided Services in Exchange For PSAs .............67

1.     MMC's Misleading Disclosures Failed to Disclose that No Services Were Provided in Exchange for PSAs .........................................67

F.     MMC Purposely Concealed the Importance and Amounts of its Contingency Commissions ......................................................................71

G.     MMC's Culture of Profit-Mongering was Rampant Throughout its Entire Business ..............................................................................................73

1.     Mercer's Contingent Commission Scheme ...............................74

2.     Mercer Conspires with Insurers to Conceal its Kickbacks .......................76

3.     Problems at Putnam ...................................................................79

4.     The Trident Funds, Owned and Operated by a MMC Subsidiary, MMC Capital, Created Enormous Conflicts of Interest ..........................80

IX.     THE TRUTH IS REVEALED AND SUBSEQUENT EVENTS ....................................82

X.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................................96

XI.    KNOWLEDGE OR RECKLESS DISREGARD OF MMC'S AND MARSH INC.'S FRAUD BY THE SENIOR MANAGEMENT DEFENDANTS.......................127

A.     General Allegations of Scienter .........................................................127

B.     Knowledge or Reckless Disregard by the Senior Management Defendants........128

1.     The Senior Management Defendants' Knowledge or Reckless Disregard that MMC's Contingent Commission Disclosures were Materially False and Misleading............................................................128

a.    The Magnitude of the Revenues Attributable to MMC's and Marsh Inc.'s Improper Steering Practices Confirms Senior Management Defendants' Scienter ...............................................129

b.      Marsh Inc.'s Improper Steering was Part of MMC's and Marsh Inc.'s Overall Business Protocol and Widely Known Throughout MMC and Marsh Inc. ................................................130

c.      The Senior Management Defendants had a Specific Duty to Monitor the Disclosure of Contingent Commission Agreements and Ignored Red Flags Alerting Them to the Need to Investigate ....................................................................136

d.      The Changes in MMC's Disclosure About MSA Revenue Indicate that Senior Management Defendants Knew and Sought to Conceal the True Nature of these Revenues...............139

e.      The Senior Management Defendants Ignored the Red Flags Signaling a Serious Lack of Internal Controls............................141

2.      MMC's Disclosure Concerning its Fiduciary Duties...............................142

C.      Additional Scienter Allegations for Each of the Senior Management Defendants ..........................................................................................................143

XII.    ADDITIONAL ALLEGATIONS EVIDENCING MMC'S AND MARSH INC.'S SCIENTER ................................................................................................................145

XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET...................................................................................................................148

XIV.   CAUSES OF ACTION ...............................................................................................149

COUNT I ...............................................................................................................................149

COUNT II ..............................................................................................................................152

COUNT III.............................................................................................................................154

PRAYER FOR RELIEF ........................................................................................................155

JURY TRIAL DEMANDED..................................................................................................156

This is a securities fraud class action brought by the Public Employees' Retirement System of Ohio, the State Teachers' Retirement System of Ohio, the Ohio Bureau of Workers' Compensation, and the State of New Jersey, Department of the Treasury, Division of Investment on behalf of itself and The Common Pension Fund A, the DCP Equity Fund, and the Supplemental Authority Fund (collectively, "Lead Plaintiffs"), on behalf of all persons and entities who purchased or otherwise acquired securities issued by Marsh & McLennan Companies, Inc. ("MMC"), between and including October 14, 1999 and October 13, 2004 (the "Class Period").  As a result of the wrongdoing alleged herein, the members of the Class (as defined below) collectively lost billions of dollars.[1]

## I.  SUMMARY OF CLAIMS

### A.  Introduction

1.  Throughout the Class Period, MMC through its subsidiaries and affiliates (including Marsh Inc.) was the world's largest insurance broker, and represented itself to the investing public as an honest, ethical company, whose primary goal was to protect the interests of its clients and shareholders.  After corporate scandals erupted elsewhere, MMC's CEO, Defendant Jeffrey W. Greenberg ("Greenberg"), was even so bold as to differentiate MMC from the Enrons of the world.  In MMC's 2002 Annual Report, Greenberg told shareholders that "[i]n a year when corporate scandals and allegations of accounting and financial abuses made headlines," he was "grateful for the strength of MMC's ethics, culture, and commitment to client service and professional standards.  These qualities serve our shareholders well."

---

[1]  Pursuant to the Court's July 19, 2006 Order, Lead Plaintiffs have attempted to distinguish between MMC and Marsh Inc. where feasible.  However, many of the publicly available documents Lead Plaintiffs relied upon to distinguish between MMC and Marsh Inc. themselves refer to both entities collectively as "Marsh."

2.      In truth, while Greenberg was assuring the investing public of MMC's ethical practices, MMC was engaged in the same type of misbehavior as Enron—a massive scheme to defraud its shareholders.  Indeed, the activities underlying the scheme led to Greenberg's resignation amidst public scandal about MMC's failure to live up to its fiduciary duties. Greenberg's successor, Michael G. Cherkasky ("Cherkasky"), described actions occurring while Greenberg was MMC's Chairman and CEO as "shameful" and "unlawful."

**B.      MMC's Securities Fraud**

3.      A key element of MMC's scheme to artificially inflate its share price was, *inter alia*, its material misrepresentations and its failure to disclose material information regarding a critical source of its revenues—"contingent commissions."  "Contingent commissions" are payments that brokers receive directly from insurance carriers in return for placing business with those insurance carriers.  MMC has always denied that contingent commissions have an effect on MMC's placement of insurance business for its customers.  MMC places insurance primarily through its subsidiary Marsh Inc.  MMC has unequivocally stated that "[o]ur guiding principle is to consider our client's best interest in all placements." It further stated, "[w]e are our clients' advocates, and we represent them in negotiations.  We don't represent the [insurance companies]."

4.      MMC's assurances that it was fulfilling its fiduciary duties to its clients, however, like Greenberg's statements about MMC's ethics, were simply lies designed to mislead its customers and the investing public.

5.      MMC and Marsh Inc. also obscured the significance of contingent commissions to MMC's profitability.  MMC dubbed them "placement service agreements ('PSAs')" and "market service agreements ('MSAs')," claimed they were received for valuable and legitimate services, and minimized their importance to MMC and Marsh Inc.  In fact, to inflate its revenues by any

means possible, MMC, through its subsidiary Marsh Inc., engaged in a systematic plan to increase its contingent commission payments by improper bid manipulation and illicit client steering.  Despite telling the market that MMC's revenues were based on sustainable and ethical business practices, MMC and Marsh Inc., in truth, shirked their fiduciary duties to their clients and made their insurance placement decisions based on the receipt of kick-backs and payoffs.

6.     MMC's and Marsh Inc.'s plan worked, and throughout the Class Period, MMC experienced consistent revenue growth and profitability, with annual revenues increasing from $9.2 billion in 1999 to $11.588 billion in 2003.  Net income increased from $959 million (before $337 million in special charges) in 1999 to $1.54 billion in 2003.  Quarter after quarter, this growth could be traced to the efforts of MMC's insurance broking division, Marsh Inc.  In fact, in 2003, Marsh Inc. obtained $845 million from contingent commissions, representing more than 50% of MMC's net income.

### C.     The Truth Is Revealed

7.     MMC's and Marsh Inc.'s improper business practices came to light on October 14, 2004, when New York State Attorney General Eliot Spitzer (the "NYAG") stunned Wall Street by revealing that MMC and Marsh Inc. were at the center of an industry-wide scandal involving improper steering and bid manipulation activities between MMC and Marsh Inc. and some of the biggest insurance carriers in the industry, including American International Group, Inc.  ("AIG") and ACE Ltd.  ("ACE") (which were headed by Defendant Greenberg's father and brother, respectively).  On that day, the NYAG filed a complaint against MMC and Marsh Inc. revealing that MMC's and Marsh Inc.'s clients had been duped into believing that MMC and Marsh Inc. were acting in their best interests.

8.     MMC's and Marsh Inc.'s clients were victimized by paying higher insurance premiums than they would have, had MMC and Marsh Inc. engaged in a genuine, competitive

bidding process on behalf of their clients.  Similarly, MMC's and Marsh Inc.'s clients did not

necessarily receive the best coverage for their needs.  Instead, clients received the coverage

offered by the insurer to which Marsh Inc. chose to steer them, whether or not that coverage met

their needs.  Marsh Inc. and MMC did so for a reason - - MMC and Marsh Inc. received billions

of dollars in additional revenues from these improper contingent commissions.

9.      The Class members herein, were equally victimized.  They were never told that

nearly 50% of MMC's profits were derived from contingent commissions.  They had no idea that

MMC's and Marsh Inc.'s business model was based on unsustainable and improper business

practices.  Consequently, they also had no idea that MMC was at risk of losing its most

profitable revenue stream –*i.e.*, the one based on the improper contingent commissions.

10.     Once the truth about MMC's and Marsh Inc.'s business model and concomitant

improper activity was revealed, the market's reaction was swift, decisive, and overwhelmingly

negative – MMC's stock declined nearly 50% in the five days following announcement of the

NYAG suit.  Specifically, on October 14, 2004, the day the NYAG's complaint was filed,

MMC's stock opened at $46.01 per share.  By the end of the day, it collapsed to $34.85 per

share, a one-day decline of 24.3%, representing a market loss of $5.9 billion in market

capitalization.  By October 19, 2004, MMC's stock had declined an additional 31% to $24.10.

Between October 14th and October 19th, MMC's stock declined 47.6% and shareholders lost an

astonishing $11.6 billion in market capitalization.

### D.      MMC's and Marsh Inc.'s Improper Activities and Defendants' Scienter

11.     At the center of MMC's scheme to defraud the investing public are the activities

of its insurance broking subsidiary Marsh Inc.  Almost $7 billion, or roughly 60% of MMC's

$11.5 billion in revenues for 2003, came from this division.  These revenues included standard

commissions that clients pay brokers for each insurance policy that a broker places.

12.     Unbeknownst to the investing public, however, a material portion of the revenues were comprised of contingent commissions.  Similarly hidden from the investing public, was the fact that these contingent commissions were payments in exchange for Marsh Inc.'s and MMC's improper steering of business to certain carriers that were willing to "pay to play."

13.     Detailed herein are numerous specific examples of MMC's and Marsh Inc.'s improper steering.  In a typical steering scenario, Marsh Inc. would solicit false bids (referred to as "B quotes") from a number of insurers to create the illusion of a competitive bidding process. In this way, MMC and Marsh Inc. were able to steer clients to the insurer who was willing to pay MMC and Marsh Inc. the highest contingent commission.  In some instances, Marsh Inc. went so far as to submit fictitious bids to convince its clients that it was engaging in a competitive process.  Marsh Inc. induced insurance companies to participate in this scheme by promising to protect them from competition and by threatening to harm the business of any insurance carrier who refused to cooperate.

14.     As described herein, one senior Marsh Inc. executive told his subordinates, the size of the contingent commission payments to Marsh Inc. determined "who [we] are steering business to and who we are steering business from."

15.     Neither MMC nor Marsh Inc. provided any legitimate services to the insurance companies under these contingent commission agreements.  The "services" performed by Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker.  The only thing "extra" Marsh Inc. provided was a guarantee that the designated insurer would get the business.  As such, these contingent commissions were pure profit for MMC because they involved virtually no cost to MMC or Marsh Inc .

16.     As described herein, despite the fact that Marsh Inc. was making its placement decisions based on which insurer paid the highest contingent commission, MMC repeatedly told the market in filings with the SEC that MMC was guided by its clients' best interests.

17.     MMC has now admitted, in a report prepared by MMC and Marsh Inc.'s outside counsel, Davis Polk & Wardwell LLP ("the DPW Report"), that the incentives created by contingent commissions guided Marsh Inc.'s placement of insurance.  Thus, the DPW Report states: "[the] prospect of MSA revenues was often a factor in discussions among brokers concerning the desirability of doing business with particular insurance carriers . . . ."  In the DPW Report, MMC also admits to the soliciting of false bids as part of its (and Marsh Inc.'s) steering scheme:  "'B quotes' were solicited in the course of 'bid rigging' discussions" and that "[i]t is clear that these 'B quote' communications were not typically disclosed to clients."

18.     Given that the revenues derived from contingent commissions constituted, according to the NYAG,  the "lifeblood" of MMC's and Marsh Inc.'s business, defendants knew or were reckless in not knowing everything about the source and sustainability of that revenue stream.  During a July 28, 2004 earnings conference call, Greenberg himself blatantly concealed the true nature of the contingent commissions while he admitted that contingent commissions were part of MMC's business model.  Greenberg told analysts: "We don't break out contingent commissions.  That is not separately enumerated because it is part of our business model and so I can't help you there."

19.     Everyone within MMC and Marsh Inc., from low-level employees to MMC's and Marsh Inc.'s senior management, was familiar with the improper steering, which served as a vehicle to increase Marsh Inc.'s contingent commissions.  Indeed, senior Marsh Inc. executives who have pleaded guilty to felony counts of scheming to defraud, have testified that steering was

part of Marsh Inc.'s regular practices and that Marsh Inc. had an official "protocol" regarding how to hide contingent commissions from its clients.

20.     Moreover, Marsh Global Broking ("MGB" or "Global Broking"), the division specifically created to centralize the procurement and administration of Marsh Inc.'s most lucrative contingent commissions, and the center of the steering activities, was located just a few floors away from Defendant Greenberg's office in New York City.  Indeed, Greenberg was actively involved in increasing Global Broking's reach to additional insurance lines. Furthermore, the President of Marsh Inc. (which includes Global Broking), Defendant Roger E. Egan ("Egan"), sat in the office next door to Greenberg.

21.     Tellingly, the NYAG refused to deal with Defendant Greenberg and other defendants once the scandal broke, noting that the management of MMC was not a management with whom he would speak.  He urged MMC's board to "look long and hard" at MMC's leadership.

### E.     MMC and Marsh Inc. Admit Their Wrongdoing

22.     On October 15, 2004, tacitly acknowledging their wrongdoing, MMC and Marsh Inc. issued a press release announcing that non-party Ray J. Groves ("Groves") was resigning as Marsh Inc.'s CEO and that MMC was suspending Marsh Inc.'s acceptance of contingent commissions.  Ten days later, MMC announced that Defendant Greenberg had resigned as MMC's Chairman and CEO.

23.     These swift resignations create a further inference of Groves's and Greenberg's concealment of and involvement in the scheme.  In addition, these resignations and others, coupled with the multiple criminal guilty pleas set forth in detail herein, further demonstrate the pervasiveness and magnitude of the improper steering underlying defendants' securities fraud.

24.     Shortly thereafter, on October 26, 2004, MMC issued a press release announcing that Marsh Inc. was implementing "a series of significant reforms to its business model that will ensure that the best interests of its clients are served and that every transaction is executed in accordance with the highest professional and ethical standards."  These immediate and radical company-wide reforms instituted in response to the public disclosure of MMC and Marsh Inc.'s steering activities are a stark acknowledgement of the illicit nature of MMC's and Marsh Inc.'s prior practices and the critical importance of immediate reform.  The release further stated:

> Accordingly, the following reforms will be initiated by January 1, 2005:
>
> Marsh has permanently eliminated the practice of receiving any form of contingent compensation from insurers.
>
> All revenue streams will be 100 percent transparent to clients.  Each client will receive a full accounting of all revenue earned by Marsh, including fees, retail commission, wholesale commission and premium finance compensation, if any.
>
> Marsh will insist that insurance companies show commission rates on all policies.
>
> Marsh will seek consistent commission rates so that insureds are better able to compare costs of alternative proposals.
>
> Marsh will provide transparency to its clients regarding its negotiations with insurers on their behalf.

25.     On January 31, 2005, MMC announced, as part of a settlement of the NYAG's action, that it would create an $850 million restitution fund for MMC and Marsh Inc. **insurance clients** that were harmed by MMC's and Marsh Inc.'s bid manipulation and improper steering. This fund, however, provided no relief for MMC's shareholders, who lost nearly $12 billion in market capitalization.

## II.     BASIS OF THE ALLEGATIONS

26.     Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.  Lead

Plaintiffs' information and belief is based upon, among other things, their investigation regarding MMC and its subsidiaries (including Marsh Inc.), including, without limitation: (a) review and analysis of filings made by MMC with the United States Securities and Exchange Commission ("SEC"); (b) in person and telephonic interviews with numerous former Marsh Inc. employees; (c) review and analysis of internal Marsh Inc. and MMC documents; (d) review and analysis of press releases, public statements, news articles and other publications disseminated by or concerning the insurance industry, MMC, Marsh Inc., Putnam LLC and its subsidiaries and affiliates ("Putnam"), Mercer Consulting, Inc.  ("Mercer"), MMC Capital, Inc. ("MMC Capital"), Trident I, Trident II and Trident III ("Trident Funds"), and other MMC and/or Marsh Inc. related individuals including, but not limited to, Defendants Greenberg and Egan and non-parties Mathis Cabiallavetta ("Cabiallavetta"), Oscar Fanjul ("Fanjul"), Groves, Stephen R. Hardis ("Hardis"), Gwendolyn S. King ("King"), Right Honorable Lord Ian Bruce Lang of Monkton ("Lang"), David A. Olsen ("Olsen"), Robert J. Rapport ("Rapport"), Adele Simmons ("Simmons"), John T.  Sinnott ("Sinnott"), A.J.C.  Smith ("Smith"), Sandra S.  Wijnberg ("Wijnberg"), Lewis W. Bernard ("Bernard"), Robert Erburu ("Erburu"), Lawrence Lasser ("Lasser"), and Peter Coster ("Coster"); (e) review and analysis of MMC's analyst conference calls; (f) review and analysis of securities analysts' reports concerning MMC; (g) review and analysis of complaints filed against MMC and Marsh Inc. by the NYAG and others; and (h) other publicly available information concerning MMC, Marsh Inc., Putnam, Mercer, MMC Capital, the Trident Funds and the defendants.

27.    Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Second Amended Consolidated Class Action Complaint (the "Complaint") after a reasonable opportunity for discovery.  Many of the facts supporting the allegations

contained herein are known only to the defendants or are exclusively within their custody and/or control.

## III.    JURISDICTION AND VENUE

28.    The claims asserted herein arise under and pursuant to Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. § 240.10b-5, and 15 U.S.C. § 78r.

29.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

30.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and transactions forming the basis for the claims in this action, including the preparation and dissemination of materially false and misleading information, and the failure to disclose material information, occurred in substantial part in this District. Additionally, MMC and Marsh Inc. maintain their principal executive offices in this District.

31.    In connection with the acts and omissions alleged in this Second Amended Consolidated Class Action Complaint, defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV.    CLASS ACTION ALLEGATIONS

32.    This is a class action on behalf of purchasers and acquirers of MMC securities between October 14, 1999 and October 13, 2004 pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased and/or

acquired MMC securities during the Class Period, and who suffered a loss as a result of said purchase or acquisition ("the "Class").

33.    Excluded from the Class are (a) MMC, and its officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which they have a controlling interest or of which they are a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

34.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MMC's common shares were traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MMC or its transfer agent and may be notified of the pendency of the action by mail, using the form of notice similar to that customarily used in securities class actions.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  The questions of law and fact common to the Class include whether defendants: (a) violated the Exchange Act; (b) violated the Securities Act; (c) omitted and/or misrepresented material facts; (d) knew or recklessly disregarded that their statements were false; (e) artificially inflated MMC's securities price; and (f) the extent of and appropriate measure of damages.

36.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as Lead Plaintiffs and members of the Class sustained damages arising out of Defendants' violations of federal law as complained of herein.

37.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the other Class members.

38.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     PARTIES

### A.     Lead Plaintiffs

39.     Lead Plaintiff Public Employees' Retirement System of Ohio ("PERS"), established in 1935, operates pursuant to Chapter 145 of the Ohio Revised Code as enacted by the Ohio General Assembly and provides for the retirement of state, county, municipal and certain other Ohio employees.  PERS has approximately 500,000 members and over 119,000 retirees and surviving beneficiaries.  PERS currently serves more than 3,700 public employees and has assets of approximately $50 billion.  During the Class Period, PERS purchased artificially inflated securities of MMC and has been damaged thereby.

40.     Lead Plaintiff State Teachers' Retirement System of Ohio ("STRS"), which operates pursuant to Chapter 3307 of the Ohio Revised Code as enacted by the Ohio General

Assembly, serves approximately 400,000 active, inactive and retired Ohio public educators. STRS has assets of approximately $53 billion. During the Class Period, STRS purchased artificially inflated securities of MMC and has been damaged thereby.

      41.    Lead Plaintiff Ohio Bureau of Workers' Compensation ("BWC") provides injured workers or their families with medical and wage-loss compensation for work-related injuries, occupational diseases and deaths. With more than $21 billion in assets, BWC is the largest exclusive state-fund workers' compensation system and the fifth largest underwriter of workers' compensation insurance in the nation. BWC provides insurance to approximately two-thirds of Ohio's work force. During the Class Period, BWC purchased artificially inflated securities of MMC and has been damaged thereby.

      42.    Lead Plaintiff State of New Jersey, Department of the Treasury, Division of Investment ("NJDOI") oversees three related Lead Plaintiff public pension funds: (i) Common Pension Fund A; (ii) the DCP Equity Fund; and (iii) the Supplemental Annuity Fund (the "New Jersey Funds"). With assets of approximately $75 billion, the New Jersey Funds purchase and sell hundreds of different securities during the course of any given year. During the Class Period, the New Jersey Funds purchased artificially inflated securities of MMC and have been damaged thereby.

    **B.**    **Defendants**

        **1.**    **MMC and Marsh Inc.**

      43.    Defendant MMC, and its wholly owned subsidiary, Defendant Marsh Inc., are both Delaware corporations, with their principal places of business at 1166 Avenue of the Americas, New York, NY. Operating through Marsh Inc. and numerous other direct and indirect subsidiaries in the United States and abroad, MMC is the largest insurance broker in the United States and one of the largest in the world. MMC has consolidated annual revenues

approximating $11 billion.  MMC's stock is publicly traded on the NYSE under the symbol "MMC."

### 2.    Senior Management Defendants

44.    Defendant Greenberg was CEO of MMC from November 18, 1999, until his resignation on October 25, 2004.  He also served as Chairman of the Board of MMC and Chairman of its Executive Committee, from May 18, 2000, until his resignation on October 25, 2004.  Greenberg served as a director of MMC from 1996 until his resignation.  During the Class Period, Greenberg issued various materially false and misleading statements that were quoted in the news media, press releases and other publicly disseminated materials and Greenberg signed SEC filings containing materially false and misleading statements.  Greenberg profited handsomely during the Class Period, earning over $19.1 million in salary and bonuses based on MMC's "performance": $2.3 million in 1999 ($1 million salary and $1.3 million bonus); $2.7 million in 2000 ($1.2 million salary and $1.5 million bonus); $3.7 million in 2001 ($1.2 million salary and $2.5 million bonus); $5.7 million in 2002 ($1.2 million salary and $4.5 million bonus); $4.7 million in 2003 ($1.2 million salary and $3.5 million bonus); and $1 million salary in 2004.

45.    Defendant Egan was President and Chief Operating Officer of Marsh Inc.  and served in that capacity from September 2003 until his "resignation" in November 2004.  During the Class Period, Egan issued materially false and misleading statements.

46.    Defendants Greenberg and Egan are hereafter collectively referred to as the "Senior Management Defendants."

47.    It is appropriate to treat the Senior Management Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the MMC's public filings, press releases, and other publications, as alleged herein,

are the collective actions of the narrowly defined group of defendants identified above.  Each of

the Senior Management Defendants, by virtue of their high-level positions with MMC or Marsh

Inc., directly participated in the management of the MMC and Marsh Inc., was directly involved

in the day-to-day operations of MMC and Marsh Inc. at the highest levels and was privy to

confidential proprietary information concerning MMC and its business, operations, products,

growth, financial statements, and financial condition, as alleged herein.  Said defendants were

involved in drafting, producing, reviewing and/or disseminating the false and misleading

statements and information alleged herein, were aware or recklessly disregarded that the false

and misleading statements were being issued regarding MMC and Marsh Inc., and approved or

ratified these statements, in violation of the federal securities laws.

48.     As officers and controlling persons of a publicly-held company whose common

stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE,

and governed by the provisions of the federal securities laws, the Senior Management

Defendants each had a duty to disseminate prompt, accurate and truthful information with

respect to MMC's and Marsh Inc.'s financial condition and performance, growth, operations,

financial statements, business, products, markets, management, earnings and present and future

business prospects, and to correct any previously-issued statements that had become materially

misleading or untrue, so that the market price of MMC's publicly-traded securities would be

based upon truthful and accurate information.  The Senior Management Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements

and obligations.

49.     The Senior Management Defendants participated in the drafting, preparation,

and/or approval of the various public and shareholder and investor reports and other

communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with MMC or Marsh Inc., each of the Senior Management Defendants had access to the adverse, undisclosed information about MMC and Marsh Inc.'s improper steering and bid manipulation practices, as well as the magnitude of the revenues generated by such practices during the Class Period as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MMC and Marsh Inc. and its risk and insurance business that were issued or adopted by MMC and Marsh Inc. materially false and misleading.

50.     The Senior Management Defendants, because of their positions of control and authority as officers and/or directors of MMC or Marsh Inc., were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to MMC and Marsh Inc. during the Class Period.  Each Senior Management Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Senior Management Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

51.     Because the Senior Management Defendants of both MMC and Marsh Inc. participated in the drafting, preparation and/or approval of the misstatements contained herein, and controlled the context of the various SEC filings alleged herein to be false and misleading,

these allegations are sufficient to attribute misstatements to Marsh Inc. and Egan who did not sign such filings.

52.     During the Class Period, Greenberg and Egan, as MMC's and Marsh Inc.'s officers and/or directors, were privy to confidential and proprietary information concerning MMC and Marsh Inc., their operations and business prospects and were responsible for the truthfulness and accuracy of MMC's public statements described herein.  By reason of their positions with MMC and Marsh Inc., Greenberg and Egan had access to internal MMC and Marsh Inc. documents, reports, and other information, including, among other things, material, adverse, non-public information concerning MMC's and Marsh Inc.'s revenues, business plans and contingency commissions.  These Defendants were also responsible for setting and establishing MMC's and Marsh Inc.'s protocol and MMC's and Marsh Inc.'s business model.

## C.     Relevant Non-Parties

53.     Non-party Cabiallavetta served as Vice Chairman of MMC, Chairman of MMC Global Development and as a member of MMC's International Advisory Board.  Cabiallevetta served as a director of MMC continuously from 2000 until his removal from the Board on November 18, 2004.  Cabiallavetta joined MMC in April 1999 as Vice Chairman and was subsequently appointed Vice Chairman of MMC Europe.  MMC announced Cabiallavetta's election as a Board member on May 18, 2000.  During the Class Period, Cabiallevetta signed SEC filings containing materially false and misleading statements.  Cabiallevetta profited handsomely during the Class Period, earning over $13.06 million in salary and bonuses based on MMC's "performance": $1.03 million in 1999 ($433,000 salary and $600,000 bonus); $1.5 million in 2000 ($700,000 salary and $800,000 bonus); $1.675 million in 2001 ($800,000 salary and $875,000 bonus); $2.85 million in 2002 ($850,000 salary and $2.0 million bonus); $3.28

million in 2003 ($982,000 salary and $2.3 million bonus); and $2.73 million in 2004 ($1.03 million salary and $1.7 million bonus).

54.     Non-party Bernard is a director of MMC and has served in that capacity since 1996.  He has also served as Chairman of MMC's Compensation Committee since 1997 and as a member of the Board's Executive Committee since 1998.  During the Class Period, Bernard signed SEC filings that contained materially false and misleading statements.

55.     Non-party Coster served as the President of Mercer and as a member of MMC's Board from 1998 until his resignation in November 2004.  During the Class Period, Coster signed SEC filings containing materially false and misleading statements.  Coster profited handsomely during the Class Period, earning over $11.95 million in salary and bonuses based on MMC's "performance": $1.5 million in 1999 ($850,000 salary and $650,000 bonus); $1.7 million in 2000 ($900,000 salary and $800,000 bonus); $1.7 million in 2001 ($950,000 salary and $750,000 bonus); $2.5 million in 2002 ($950,000 salary and $1.55 million bonus); $2.6 million in 2003 ($950,000 salary and $1.65 million bonus); and $1.95 million in 2004 ($950,000 salary and $1.0 million bonus).

56.     Non-party Erburu has been a director of MMC since 1996.  Erburu has served on MMC's Compensation Committee and, since 2003, has served as Chairman of MMC's Governance Committee.  During the Class Period, Erburu signed SEC filings that contained materially false and misleading statements.

57.     Non-party Lasser was President and CEO of Putnam and a Board member of MMC from 1987 until his resignation in November 2003.  During the Class Period, Lasser signed SEC filings that contained materially false and misleading statements.  Lasser profited handsomely during the Class Period, earning over $87 million in salary and bonuses based on

MMC's "performance": $27 million in 1999 ($1 million salary and $26 million bonus); $34 million in 2000 ($1 million salary and $33 million bonus); $18 million in 2001 ($1 million salary and $17 million bonus); and $8 million in 2002 ($1 million salary and $7 million bonus).

58.     Non-party Fanjul is a director of MMC and has served in that capacity since September 20, 2001.  Fanjul has been a member of MMC's Audit and Compensation Committees since 2001.  He also is a member of MMC's International Advisory Board and a director of Marsh, S.A., a Spanish subsidiary of MMC.  During the Class Period, Fanjul signed SEC filings containing materially false and misleading statements.

59.     Non-party Groves was Chairman and CEO of Marsh Inc. from 2003 until October 15, 2004, and has been an adviser to MMC since October 15, 2004.  Groves was a director of MMC from 1994, until his resignation on November 18, 2004.  Groves also served on MMC's Executive and Compensation Committees during the Class Period.  During the Class Period, Groves signed SEC filings containing materially false and misleading statements. Groves profited handsomely during the Class Period, earning over $5.28 million in salary and bonuses based on MMC's "performance": $583,333 in 2001 ($333,333 salary and $250,000 bonus); $1.8 million in 2002 ($850,000 salary and $950,000 bonus); and $2.9 million in 2003 ($900,000 salary and $2.0 million bonus).

60.     Non-party Hardis has been a member of the Board of MMC since 1998.  Hardis has been a member of the Board's Audit Committee since 1998, and has served as its Chairman since 2001.  During the Class Period, Hardis signed SEC filings containing materially false and misleading statements.

61.     Non-party King has been a director of MMC since 1998.  She is also a member of the Board's Audit and Governance Committees.  During the Class Period, King signed SEC filings containing materially false and misleading statements.

62.     Non-party Lang has been a director of MMC since 1997.  Lang was Chairman of MMC's Audit Committee between 1998 and 2001 and has also served on the Board's Executive, Compensation and Governance Committees.  During the Class Period, Lang signed SEC filings containing materially false and misleading statements.

63.     Non-party Olsen has been a director of MMC since 1997.  Olsen also served as Vice Chairman of MMC from May 1997 through December 1997.  Olsen also as a member of the Audit Committee since 2002.  During the Class Period, Olsen signed SEC filings containing materially false and misleading statements.

64.     Non-party Rapport served as MMC's Vice President, Chief Accounting Officer and Controller throughout the Class Period.  During the Class Period, Rapport signed SEC filings containing materially false and misleading statements.

65.     Non-party Schapiro began service as a director of MMC in 2002.  Since becoming a director, Schapiro served on MMC's Audit, Governance and Compensation Committees.  During the Class Period, Schapiro signed SEC filings containing materially false and misleading statements.

66.     Non-party Simmons has been a director of MMC, having served in that capacity continuously since 1978.  Simmons is a member of MMC's Executive and Audit Committees, having served on both those committees continuously throughout the Class Period.  During the Class Period, Simmons signed SEC filings containing materially false and misleading statements.

67.     Non-party Sinnott was a director of MMC from 1992 until April 2003.  Sinnott was Chairman and CEO of Marsh Inc.  from 1999 continuously through 2002.  Sinnott continued to serve on MMC's Board until his retirement in July 2003.  During the Class Period, Sinnott signed SEC filings containing materially false and misleading statements.  Sinnott profited handsomely during the Class Period, earning $8.75 million in salary and bonuses based on MMC's "performance": $1.4 million in 1999 ($850,000 salary and $550,000 bonus); $1.7 million in 2000 ($900,000 salary and $800,000 bonus); $2.1 million in 2001 ($900,000 salary and $1.2 million bonus); and $3.55 million in 2002 ($950,000 salary and $2.6 million bonus).

68.     Non-party Smith was a director of MMC from 1977 until his removal from the Board on November 18, 2004.  Smith was Chairman of MMC's Board from 1992 through 2000 and served as the Company's CEO from 1992 to 1999.  As a Board member, Smith served on MMC's Executive Committee throughout the Class Period until November 18, 2004.  In 1999, Smith received $6.5 million in salary and bonus compensation for serving as MMC's CEO.  During the Class Period, Smith signed SEC filings containing materially false and misleading statements.

69.     Non-party Wijnberg has been a Senior Vice President and Chief Financial Officer ("CFO") of MMC since January 2000.  In a December 20, 1999 press release announcing Wijnberg's appointment as Senior Vice President and CFO, MMC stated that "Ms.  Wijnberg will report to J.W.  Greenberg, president and chief executive officer of MMC." During the Class Period, Wijnberg signed SEC filings containing materially false and misleading statements.

## VI.    CONFIDENTIAL WITNESSES

70.     Numerous former Marsh Inc. employees have provided Lead Plaintiffs with information concerning Marsh Inc.'s and MMC's fraudulent scheme to improperly manipulate

the insurance market to boost MMC's revenues during the Class Period. These witnesses gave information on a confidential basis, and each is designated as CW__, as stated below.

71.     CW1 is a former Vice President/Client Executive of Marsh USA employed by Marsh USA at the time Marsh Global Broking was formed. CW1 provided information concerning the formation of Global Broking, Global Broking's control over contingent commissions, how Marsh Inc. used Global Broking to force insurers to enter into contingent commission agreements, and the effect Global Broking had on obtaining quotes for Marsh Inc.'s clients. CW1 also provided information as to meetings where Global Broking representatives communicated their desire to steer business to certain insurance companies based on the contingent commission agreements.

72.     CW2 is a former Insurance Services Manager for Marsh Inc. in one of the Marsh Inc.'s Northeast offices who was employed by Marsh Inc. from 1995 through 2002. CW2 was responsible for the solicitation and servicing of over 150 accounts and managed 35 Marsh Inc. employees who fully serviced Marsh Inc.'s Middle-Market accounts. CW2 provided information concerning Marsh Inc.'s consolidation of placements through Global Broking in 1999. CW2 further provided information concerning his/her office's relationship with Global Broking and problems he/she experienced when placing business through Global Broking. CW2 also provided information concerning complaints made to Marsh Inc.'s senior management concerning Global Broking.

73.     CW3 is a former Assistant Vice President in charge of Global Broking in one of Marsh Inc.'s local offices who was employed by Marsh Inc. from 2000 through 2003. CW3 provided information about how all matters regarding Global Broking were overseen by Marsh Inc.'s New York office.

74.     CW4 is a former Marsh Inc. Global Broking broker who was employed from 1996 through 2002.  CW4 worked in Global Broking's New York office and has first-hand knowledge of the creation and growth of Global Broking.  CW4 provided information concerning the creation of Global Broking and the move by Marsh Inc. in the late 1990s to have all placements go through Global Broking.  CW4 stated that Global Broking was able to use its power to dictate the amount of contingent commissions Marsh Inc. could demand from insurers.  CW4 also reported that Global Broking was able to force some of the Marsh Inc.'s local offices to go through Global Broking by sharing some of the contingent commission profits.  CW4 also reported that Marsh Inc.'s push to have all policy placements go through Global Broking on a nationwide business was orchestrated by the upper levels of Marsh Inc., including the CEO and President.  CW4 further provided information concerning Marsh Inc.'s encouraging employees to place business with carriers that had entered into contingent commission agreements with Marsh Inc.

75.     CW5 is a former Marsh Inc. Managing Director during the Class Period.  CW5 provided Lead Plaintiffs with first-hand knowledge of placements made through Global Broking.  CW5 provided information concerning Marsh Inc.'s and MMC's strong support for Global Broking.  CW5 also provided information regarding a memo that was sent to Defendant Egan and non-party Sinnott in June of 2003, outlining concerns over Global Broking's placement decisions.  CW5 also provided information concerning annual meetings held by Marsh Inc., including presentations that were made and Marsh Inc. employees in attendance.

76.     CW6 is a former Senior Client Representative/Assistant Vice President of Marsh Inc. employed from 1985 through 2003.  CW6 was responsible for medium-to-large accounts in Marsh Inc.'s Middle Market division.  CW6 assisted in preparing renewal submissions,

negotiating renewal premiums with Global Broking, preparing renewal proposals and reviewing policies. CW6 provided information concerning Global Broking's control over the placement of business and shared commissions between Global Broking and his/her local office. CW6 also provided information concerning his/her office's relationship with Global Broking and problems he/she experienced when placing business through Global Broking.

77.     CW7 is a former Marsh Inc. broker employed from 1990 through 2004. CW7 provided information concerning Marsh Inc.'s business practices of steering business to those carriers with whom it had contingent commission agreements. CW7 also provided information concerning Marsh Inc.'s encouragement of its brokers to place business with these favored carriers. CW7 also reported that Marsh Inc. held a company-wide Global Broking meeting in 2001/2002 in Las Vegas where steering business based on contingent commission agreements was discussed.

78.     CW8 is a former Senior Employee Benefits Client Executive employed by Marsh Inc. from 1993 through 2004. CW8 provided information concerning the practice of placing Marsh Inc.'s business with those companies that paid Marsh Inc. the most contingent commissions.

79.     CW9 is a former Client Service Representative employed by Marsh Inc. during 2004 in Marsh Inc.'s Phoenix office. CW9 has worked in the insurance industry for over 27 years. CW9 provided information concerning Marsh Inc.'s policy of steering business to certain companies based on contingent commissions. CW9 also provided information concerning Global Broking's manipulation of bids to ensure the placement of business with a certain carrier.

80.     CW10 is a former Employee Benefits Analyst for one of Marsh Inc.'s local offices in South Carolina, employed by Marsh Inc. from 2001 through 2004. CW10 was

responsible for soliciting bids from insurance companies involving medical, life, health, accident and dental insurance coverage. CW10 provided information concerning contingent commissions, and the incentive to place business with carriers paying these commissions. CW10 provided further information concerning the forwarding of all contingent commissions received from his/her office to Marsh Inc.'s New York office.

81.     CW11 is a former Vice President in Sales and Client Management in Marsh Inc.'s Middle Market division, employed by Marsh Inc. from 1999 through 2004. CW11 was responsible for overseeing all medical employee insurance placements and consulting for his/her office. CW11 provided information concerning the collection of contingent commissions and the forwarding of these commissions to Marsh Inc.'s New York office.

82.     CW12 is a former Marsh Inc. employee, employed from 1983 through 2004. CW12 was responsible for servicing Employee Benefit accounts for small companies. CW12 had knowledge concerning contingent commissions, and Global Broking's increasing control over the placement of business in the late 1990's.

83.     CW13 is a former Marsh Inc. employee, employed in Marsh Inc.'s New York office, from 1987 through 1994. CW13 specialized in selling professional liability insurance. CW13 had knowledge concerning contingent commission agreements and the inner-workings of MMC's New York office.

84.     CW14 is a former Marsh Inc. employee who worked as a Client Representative at Johnson & Higgins from 1990 through its acquisition by MMC in 1997, and was employed by Marsh Inc. from 1997 through 2003. CW14 provided information concerning the role of Global Broking and the frustrations felt by Marsh Inc.'s local offices due to Global Broking's control

over all placement negotiations.  CW14 also provided information concerning complaints about Global Broking made to Marsh Inc.'s senior management.

85.     CW15 is a former Marsh Inc. employee who was in charge of Marsh Inc.'s Middle-Market Employee Benefits Consulting and Property and Casualty divisions from 2001 through 2002.  CW15 provided information concerning complaints made to Marsh Inc.'s and MMC's senior management concerning Global Broking.

86.     CW16 is a former Marsh Inc. employee who worked in the commercial insurance sector of Marsh Inc.'s Washington, D.C. office from 2000 through 2003.  CW16 has personal knowledge regarding Donald Holmes' [Marsh Inc. Middle Market Practice Leader], concerns about Marsh Inc.'s collection of contingent commissions from insurers.  CW16 was present at a Marsh Inc. Middle Market conference held in New York in 2002, where Donald Holmes publicly spoke about these concerns.  CW16 has information concerning Holmes' conversations with Defendant Egan about his concerns regarding contingent commissions.

87.     CW17 is a former Marsh USA high level executive employed by Marsh Inc.'s broker/dealer business from 1995 through 2003.  CW17 provided information concerning Defendant Greenberg's pressure to increase revenues.

## VII.    THE IMPACT OF CONTINGENT COMMISSIONS ON MMC'S BUSINESS

### A.    Class Period Revenue and Earnings Growth

88.     Throughout the Class Period, MMC reported consistent revenue growth and profitability, with its reported annual revenues increasing from $9.2 billion in 1999 to $11.588 billion in 2003, and reported net income increasing from $959 million (before $337 million in special charges) in 1999 to $1.54 billion in 2003.

89.     Defendants publicly trumpeted these financial results, boasting that from 2000 through 2003, MMC had outperformed the S&P 500 and that the shareholder returns generated

by MMC had outperformed the market's "dividend aristocrats."  In a letter to shareholders

published in MMC's 2003 Annual Report, Defendant Greenberg wrote:

> Each of our principal subsidiaries -- Marsh Inc., Mercer Inc., and Putnam
> Investments -- has experienced good and bad operating conditions in the past
> decade, but **overall the company has delivered consistently strong results.**
> **Over the last three years, MMC's compound annual growth for earnings per**
> **share was 11 percent.  During that same period, EPS for the S&P 500**
> **declined 1 percent annually.  In 2003 MMC's consolidated revenues rose 11**
> **percent to $11.6 billion.  Net income grew 13 percent to $1.5 billion, and**
> **earnings per share increased 15 percent to $2.81.**
>
> MMC's cash flow is a great strength and provides financial flexibility for the
> company.  In 2003 we . . .  paid out $631 million in dividends.  **Standard &**
> **Poor's calls the 50 or so public companies with 25 consecutive years of**
> **increasing cash payments to shareholders "dividend aristocrats."  MMC's**
> **dividend has increased for 41 consecutive years, a record matched by only 12**
> **other companies traded publicly in the United States.**  [Emphasis added.]

90.    The engine driving MMC's revenue and earnings growth during the Class Period

was MMC's core business, Risk and Insurance Services (comprised of Marsh Inc.).  For

example, MMC's Risk and Insurance Services' 1999 revenues of $4.5 billion increased to $6.868

billion by 2003 – constituting roughly 60% of MMC's 2003 revenues.  The success of the Risk

and Insurance Services segment during the Class Period was, in turn, due to the success of Risk

Management and Insurance Broking, which generated approximately 75% of the revenues of

MMC's core business.

91.    The performance of MMC's Risk and Insurance Services segment was

consistently touted by defendants during the Class Period, even in the adverse industry

environment immediately following 9/11.  For example, in a research report dated December 19,

2001, Morgan Stanley Equity stated:

> Mr.  Greenberg appeared most optimistic about the near term outlook for the
> insurance brokerage unit, which we believe has not seen an environment as
> favorable as the current one since at least 15 years ago.

*        *        *

Changes in risk highlight the importance and the need for insurance brokers and risk managers.  In other words, risk management is a long-term sustainable business.

92.     Likewise, in a *Dow Jones Business News* article, dated October 22, 2002, entitled "Marsh & McLennan's 3rd Quarter Profit Jumped 78% on Strong Insurance Revenue," Defendant Greenberg stated that despite difficult market conditions, MMC's Risk and Insurance Services generated strong results:

> "The diversity of MMC's market-leading professional service businesses continues to benefit shareholders, even in the current environment," said Jeffrey W. Greenberg, Marsh & McLennan's chairman.  "**Risk and insurance services, our largest business, performed well for clients in a difficult market and generated excellent results for shareholders – strong revenue and earnings growth.**" [Emphasis added.]

93.     Indeed, the financial performance of MMC's Risk and Insurances Services business, especially insurance brokerage, was so strong that it offset the lackluster performance of MMC's non-core businesses, such as Putnam.  In a July 24, 2004 research report, for example, UBS Warburg rated MMC a "Strong Buy," stating:

> We were pleased with the brokerage results: accelerating revenue growth (16% organic growth vs. 12% in the first quarter) and pretax earnings growth (30% vs. 21% in the first quarter).
>
> *          *          *
>
> We believe **the strong results posted in the Insurance Services reflect trends that may extend into 2003 and more than compensate for the weakness at Putnam**.  We reiterate our Strong Buy rating on MMC.  [Emphasis added.]

## B.     MMC's Market Assurances

94.     Against this backdrop of revenue growth and increasing profits, Defendants repeatedly assured the investing public that MMC operated in accordance with all applicable laws, in a transparent manner that was in the best interests of its clients, and in strict adherence to a formal Code of Ethics.  That Code of Ethics, which was attached to MMC's 2002 Form 10-K,

stated that MMC and its operating companies "[are] committed to conducting . . . [their] business in accordance with applicable laws, rules and regulations, to the highest standards of business ethics and with full and accurate financial disclosure."

95.   Defendants knew that such assurances were critical to the market because MMC's core business and, therefore, a majority of MMC's revenues and profits, centered on its performance of fiduciary services as an insurance broker for its clients.  Any doubt cast on the integrity of MMC's (or its operating companies) dealings with those clients would – and, in fact, did – have enormous adverse repercussions for MMC and its shareholders.  Defendant Greenberg acknowledged the direct connection between MMC's purported ethical practices and shareholder value in his letter to MMC's shareholders in the 2003 Annual Report:

> In a year when corporate scandals and allegations of accounting and financial abuses made headlines, I am grateful for the strength of MMC's ethics, culture, and commitment to client service and professional standards.  **These qualities serve our shareholders well**.  [Emphasis added.]

96.   Based on Defendants' public Class Period statements, the investing public had no reason to suspect that the business model for MMC's largest and most significant segment, Marsh Inc., was the maximization of profits through the exploitation of MMC's fiduciary position and the betrayal of MMC's and Marsh Inc.'s clients' trust.  Far from conducting their business in accordance with "the highest standards of business ethics," MMC and Marsh Inc. engaged in a pervasive scheme to steer their clients to those insurance companies that paid the most in contingent commissions, irrespective of the best interests of those clients.

**C.   The Magnitude of the Illicit Revenues and
the Vast Concealment to Deceive the Investing Public**

97.   The scope of the improper scheme was so far-reaching that, by the end of 2003, more than 16%, or $845 million, of MMC's risk management and insurance broking revenues consisted of contingent commissions.  Moreover, because there were virtually no expenses

associated with contingent commissions, such revenues constituted more than 50% of MMC's

2003 profit.  In MMC's 2004 Form 10-K, filed on March 9, 2005 (after the Class Period), MMC

disclosed that it had generated $541 million in contingent commission revenue during the first

half of 2004, prior to the announcement of the NYAG Action.  Thus, before MMC's and Marsh

Inc.'s improper scheme was publicly exposed, in 2004 MMC was on pace to significantly exceed

the amount of contingent commission revenues it had generated in 2003.

98.     The investing public, however, was unaware of the magnitude of MMC's and

Marsh Inc.'s contingent commission revenues – let alone the existence of the illicit scheme –

because Defendants, *inter alia*, filed materially misleading false and misleading financial

statements; mischaracterized Marsh Inc.'s contingent commissions as consideration for non-

existent market services; and falsely represented that MMC's and Marsh Inc.'s clients were fully

apprised of any such commissions earned in connection with their policies.

99.     Thus, even after it was disclosed that MMC was subpoenaed in connection with

the NYAG's probe of contingent commissions, market professionals opined that this was not a

major issue for MMC.  For example, on May 20, 2004, William Blair & Company issued a

research report that, in relevant part, stated:

> In late April, a number of other insurance brokering firms including Marsh
> announced they had received subpoenas from the New York Attorney General
> seeking information regarding potential conflicts of interest within compensation
> agreements between insurance brokers and insurance companies. . . .  It remains
> difficult to handicap where these regulatory investigation might lead, **but the
> revenue under scrutiny is less than 5% of insurance brokerage revenue** –
> although it represents a greater percentage based upon earnings.  [Emphasis
> added.]

100.     On May 21, 2004, *The Wall Street Journal* published an article, entitled

"Tracking the Numbers/Outside Audit: Clash Over Insurance Brokers' Risks – No One Has A

Good Handle On Contingent Fees or Hit On Industry From Inquiry," in which even the "worst

case scenario" envisioned by some analysts – which ran counter to the market's conventional wisdom - grossly underestimated the percentage of MMC's brokerage revenues generated by contingent commissions:

> The lack of consensus suggests no one really has a good handle on the risks of the murky practice of "contingent commissions," the fees that insurers pay brokers to reward them for directing high-volume or profitable business their way. . . .

> Conventional wisdom among analysts holds that brokers adequately disclose the practices.  Besides, analysts add, echoing the brokers, **the commissions constitute only a small part of the brokers' revenue.  [Emphasis added.]**

In fact, Marsh Inc.'s contingent commissions constituted approximately 16% of MMC's 2003 brokerage revenues.

### D.    The Adverse Effects of the Disclosure

101.    Like the market professionals, Lead Plaintiffs and the members of the Class were unaware of either the extent to which MMC's Class Period financial success was due to the acceptance of contingent commissions, or the existence of the improper scheme perpetrated to maximize such revenues.  Instead, Lead Plaintiffs and the Class relied on Defendants' representations and the integrity of the market, in purchasing MMC's securities during the Class Period.  The price of those securities, however, was artificially inflated by Defendants' false and misleading statements throughout the Class Period.  Thus, upon revelation of the pervasive wrongdoing at MMC and Marsh Inc. and the magnitude of the revenues that were generated by that improper conduct, the price of MMC's common stock dropped by almost 50%, causing a loss of more than $12 billion in market value.

102.    MMC continues to struggle with the enormous adverse impact of the disclosure of the wrongdoing.  In November 2004, MMC announced that it was cutting 3,000 jobs, or 5% of its staff, and would incur $325 million in restructuring charges over the following six months.

On March 1, 2005, MMC announced fourth quarter and year-end 2004 results that were a far cry

from the dynamic revenue growth generated during the Class Period:

> In the fourth quarter, **consolidated revenues declined 1 percent** to $3 billion.
> After restructuring, regulatory settlements, and related expenses, the company
> reported a **net loss of $676 million in the fourth quarter**, or **a loss of $1.28 per
> share**.  Full-year consolidated revenues were $12.2 billion, up 5 percent over the
> prior year.  Net income for the full year was $180 million, or earnings per share of
> $.34.  MMC's Board of Directors has declared **a first quarter 2005 dividend of
> $.17, a 50 percent decline.**  [Emphasis added.]

**In addition, MMC has announced the elimination of an additional 2,500 jobs at Marsh Inc.,**

**resulting in an additional $337 million in restructuring expenses.**

103.    In its 2004 Form 10-K, MMC provided additional details concerning the negative

effects of the disclosure of its fraud:

> Operating income in 2004 declined 74% to $648 million, reflecting costs of
> regulatory settlements at Marsh and Putnam and costs related to restructuring
> MMC's businesses.  Results in risk and insurance services include an $850
> million charge related to the settlement agreement reached with the NYAG and
> NYSID, the impact of a $304 million decrease in MSA revenue, and $231 million
> of restructuring charges.

104.    In the Form 10-K, MMC further explained that it had changed its business model

to, *inter alia*, eliminate contingent commissions.  MMC, however, admitted that it had

experienced "credit rating downgrades and the inability to access commercial paper markets" as

a consequence of the "uncertainty regarding changes in Marsh's business model, the impact of

eliminating contingent compensation agreements and potential fines and/or penalties . . . ."

MMC also warned:

> there is no assurance that revenues under the new model will be sufficient to
> achieve operating margins and cash flows that are comparable to historical levels.
> In addition, client revenue may also be reduced due to negative reaction to the
> issues raised in the complaint.

## VIII.   MMC'S AND MARSH INC.'S FRAUDULENT SCHEME TO IMPROPERLY MANIPULATE THE INSURANCE MARKET TO BOOST MMC'S REVENUES

### A.   An Overview of Marsh Inc.'s Role in the Insurance Market-Place: Brokers, Clients, Insurers

105.   The insurance market consists of clients in need of insurance; risk managers who advise clients on the type of insurance needed; brokers who find the needed insurance; and insurance companies who provide the insurance.

106.   Clients themselves vary, consisting of businesses, public entities, professional services organizations, private clients and individuals seeking various types of liability and casualty insurance.

107.   Risk managers evaluate the client's exposure to loss and quantify it.  The risk manager determines how much and what coverage the client will need.  The risk manager then turns to the broker to find the needed insurance at the best rate.

108.   The insurance broker then analyzes various types of property and liability loss exposures, including large and complex risks that require access to global insurance markets.

109.   Brokers are supposed to be unbiased providers of services for the client.  They are responsible for a wide range of services including: (a) finding the best price; (b) finding the best policies; (c) advising the client; (d) acting on behalf of the clients in analyzing risk and insurance options; (e) procuring insurance; (f) interpreting insurance policies; (g) monitoring the insurance industry; (h) keeping clients informed as to developments in the insurance marketplace; and (i) assisting clients with the filing of claims against the policies they place.

110.   When obtaining insurance through a broker, clients are responsible for two types of payments.  First, the client pays the broker an advisory fee or a commission for locating the best insurer.  Second, the client pays the chosen insurance company a premium for the coverage. In most instances, the client pays the commission and the first premium payment in one check to

the broker.  The broker then deducts his/her commission and forwards the remaining premium amount to the insurance company.  In some cases, particularly with large commercial clients, the client will pay the broker's commission directly to the broker.

**B.**     **Marsh Inc.'s Role as a Broker**

**1.**     **Marsh Inc. Was Obligated to Act as A Fiduciary for Its Clients**

111.     MMC, through Marsh Inc., is the world's largest insurance broker, providing risk and insurance services to clients in 100 countries.  Almost $7 billion, or roughly 60 percent of MMC's $11.5 billion in revenue for 2003, came from brokering insurance to its clients.  Marsh Inc.'s brokerage services are provided to a predominately corporate clientele.

112.     Throughout the Class Period, MMC and Marsh Inc. held themselves out as trusted advisors that could help their clients assess their insurance needs and locate the best available insurance.  MMC and Marsh Inc. emphasized this point throughout the Class Period, repeatedly representing that they worked for their clients and not for the insurance companies with which they placed business.

113.     For example, some time between 2000 and 2002, MMC, through Marsh Inc., applied to be the insurance broker for the Greenville County School Project (the "Greenville Project") in Greenville, South Carolina.  As part of its application materials, Marsh Inc. submitted a response to a request for a proposal ("Response to RFP") wherein Marsh Inc. highlighted its allegiance to its clients.  Specifically, in Section 6.5.6 of the Response to RFP, under the title "Customer Support Capability and Philosophy," Marsh Inc. included what it referred to as a "Client Loyalty Pyramid," which stated that Marsh Inc. "builds long-term relationships of openness and trust" and "offers objective, relevant counsel."  Further, Marsh Inc. represented that its "approach to client service begins with establishing credibility and trust and referred to itself as a "trusted business partner" and "not simply an insurance agent."

114.   Marsh Inc. has consistently promoted itself as abiding by strict principles of fidelity to its clients and has instructed its employees to repeat this pledge to its clients.  In a 2004 Marsh Inc. document, Marsh Inc. instructed its employees to advise clients that:

> Our guiding principle is to consider our client's best interest in all placements. We are our clients' advocates and we represent them in negotiations.  We don't represent the [insurance companies].

115.   In addition, throughout the Class Period, MMC's web page contained the following statements concerning MMC's Code of Conduct:

> Code of Conduct for Insurance Transactions
>
> The following code of conduct with respect to insurance transactions applies to all Marsh colleagues.  This code of conduct codifies the principles the company follows in the execution of our responsibilities and augments our professional standards and MMC's (Marsh & McLennan Companies) Code of Business Conduct & Ethics.
>
> Clients First - Marsh represents our clients.  All decisions will be made or actions taken with the client's objectives or best interests in mind.
>
> **Level Playing Field** - Qualified insurers will be provided opportunities to offer an initial proposal if a client retains Marsh to obtain competitive alternatives, without regard to Marsh's revenue considerations.
>
> Bidding Integrity - The terms and conditions of competing quotations will not be shared among insurers.  It is understood that for layered or quota share placements, sharing of insurer terms may be necessary for completion of the placement.  Further, we expect all parties to the transaction to maintain the confidentiality of proprietary information.
>
> Completeness - All competitive and valid quotes will be presented to the client. Clients will also be advised of any carrier who received a submission and declined to provide a quote; did not offer competitive terms; or did not respond in a timely manner.
>
> No Inducements - Marsh colleagues will not seek entertainment or gifts for themselves or others from anyone with whom Marsh does business, and will not accept entertainment or gifts that could influence, or appear to influence, any Company decisions.  Unsolicited and infrequent gifts and business courtesies, including meals and entertainment, are permissible if they are: customary and commonly accepted, of minimal value, and accepted without an express or

implied understanding of obligations associated with the acceptance of the gift or courtesies.  Gifts of cash or cash equivalents are not permitted.

      **2.**     **Brokers' Relationship With Insurers and the Obligation to Disclose Contingent Commissions**

116.    Although MMC purports to act as a fiduciary for its clients, many brokers, including Marsh Inc., receive commissions directly from insurance companies.  These commissions are known as contingent commissions and are made pursuant to PSAs or MSAs.

117.    Contingent commission agreements required insurance companies to pay brokers based on one or more of the following: a) how much business the broker's clients place with the insurance company; b) how many of the broker's clients renew policies with the insurance company; and c) the profitability of the business placed by the broker.

118.    Due to the inherent conflict of interest in brokers accepting payments from insurers for placing business with them and the broker's fiduciary duty to serve its client's best interests, contingent commissions had been an issue within the insurance industry.  In 1998 risk managers and the Risk and Insurance Management Society Inc.  ("RIMS") complained about the lack of disclosure by insurance brokers to their clients about the acceptance of contingent commissions from insurers.

119.    As a result of RIMS' concerns, in 1998, the New York State Insurance Department ("NYSID") ordered brokers and insurers to disclose to policyholders all compensation agreements between brokers and insurers and to keep a record of these fees.  The regulatory order, known as Circular Letter 22 (1998) ("Circular Letter 22"), stated that a broker is a legal representative of the insured and that the undisclosed receipt of additional compensation from an insurer is sufficient to create the perception that brokers are conflicted in their loyalties.  The NYSID provided the following guidelines for brokers and insurers:

- all compensation agreements between an insurer and a broker should be reduced to writing and agreed to by both parties;

- all such compensation arrangements should be disclosed to insureds prior to the purchase so as to enable insureds to understand the costs of the coverage and the motivation of their broker in placing the business;

- all fees paid to brokers should be included as factors in the establishment of an insurer's premium rates;

- all fees paid to brokers (and reasons for such fee payments) should be included in a broker file maintained by the insurer; and

- the insurer's internal auditing procedures should include verification that all fees paid to brokers are proper and within the parameters of the NY Insurance Law and Department Regulations.

120.    Circular Letter 22 was based upon Section 2110 of the New York Insurance Law, which permits the NYSID to revoke, suspend or refuse to renew an insurance broker's license if, after a hearing, there is a finding that the broker has demonstrated his or her untrustworthiness to act in that capacity.  The NYSID has stated that the failure to disclose additional compensation received from an insurer may be considered "untrustworthiness" in violation of the Insurance Law.

121.    In response to RIMS' concerns over the disclosure of contingent commissions, MMC advised its clients and the investing public that MMC's brokers were unaware of the commission agreements and, therefore, did not base their placement recommendations on PSAs/MSAs.  MMC instructed its employees to advise clients that:

Our guiding principle is to consider our client's best interest in all placements. We are our clients' advocates and we represent them in negotiations.  We don't represent the markets.  In fact, clients are the only ones who have the authority to make the decisions on the terms and conditions of a program and the markets selected to handle the program.  In addition to client preferences, placement decisions typically take into account such complex factors as market financial strength, a market's expertise in the line of coverage needed by the client, its claims-paying history, client service requirements, breadth of coverage, pricing and other terms and conditions.  In all cases, clients make the final decision on the market chosen to handle their business.  **Our Client Executives and advisory**

**staff is unaware of our specific MSA arrangements, thereby further removing their ability to have these arrangements influence their recommendations**.  [Emphasis added.]

122.    In reality, nothing was further from the truth.  As fully explained below, Marsh

Inc.'s brokers and Client Executives were very much aware of the contingent commissions and

made placements based on these agreements.  In April 2004, MMC and Marsh Inc. retained

DPW to "represent the Company in the inquiry launched by Eliot Spitzer" and "investigate the

relevant facts."  DPW subsequently issued a report with its findings which states:

> The existence of MSA agreements was common knowledge among brokers in
> various product lines within Global Broking department.  In addition, brokers
> were often made aware of the terms of these agreements in discussions about the
> placement process.  As such, **the prospect of MSA revenues was often a factor
> in discussions among brokers concerning the desirability of doing business
> with particular insurance carriers, as well as a significant topic of discussion
> between placement brokers and the insurances carriers themselves.**
> [Emphasis added.]

123.    Not surprisingly, although New York law required the complete disclosure of any

contingent commission agreements to a broker's clients, MMC took great pains to avoid these

requirements.  As described below, MMC, through Marsh Inc., was using these agreements to

improperly boost its revenues by improperly steering clients to those insurers that would provide

the maximum contingent commissions to MMC.  According to a former Marsh USA Vice

President / Client Executive employed by Marsh USA at the time Global Broking was formed

("CW1"), while contingent commissions had always existed in the insurance industry, Marsh

Inc. pioneered their manipulation.  CW1 candidly acknowledged that the motivation underlying

Marsh Inc.'s improper practices was: "Just because of their lust for, that's a heavy word, but

income, income from every source."

### 3. MMC and Marsh Inc. Form Global Broking to Control and Maximize Contingent Commissions

124.    During the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation.  Through acquisitions and internal growth, Marsh Inc. became one of the world's dominant insurance brokers.

125.    Prior to this industry-wide consolidation, each of Marsh Inc.'s branch offices throughout the United States signed its own separate contingent commission agreements with insurance carriers.  However, beginning in the late 1990s, MMC and Marsh Inc. centralized the negotiation of contingent commission agreements into one unit known as Global Broking and assumed greater control over both business placement and contingent commission agreements.

126.    According to a former Insurance Services Manager employed at Marsh Inc. from 2000 through 2003 ("CW2"), Global Broking was created by MMC and Marsh Inc. enhance their ability to steer business to those insurance carriers that paid Marsh Inc. the largest contingent commissions.  CW2 stated that Global Broking kept tight control over the process of obtaining quotes and submissions for new and renewal policies and continuously tried to prevent Marsh Inc.'s local offices from contacting carriers directly.

127.    Global Broking itself is divided into four regions: North, South, East, and West.  There are Global Broking employees in charge of each of the four regions, an employee in charge of Global Broking North America, and one person who heads Global Broking Worldwide.  Global Broking also appointed sub-heads for each product line.

128.    In addition, Global Broking was further divided into teams based upon the broker's market expertise and by insurance company.  For example, there was a broker team for AIG/Excess Casualty which was comprised of brokers with knowledge of excess umbrella

coverage who worked exclusively with AIG underwriters.  Teams also existed for Zurich North America ("Zurich"), ACE and others.

129.    Despite these sub-divisions, according to a former Assistant Vice President in charge of Global Broking for one of Marsh Inc.'s local offices ("CW3"), "everything regarding Global Broking was overseen by New York."

130.    Following Defendant Greenberg's appointment as President of MMC in 1999, the influence Global Broking had on Marsh Inc.'s contingent commission agreements and its placement of insurance business became more prominent.  According to a former broker at Global Broking employed from 1996 through 2002, ("CW4"), through Global Broking, MMC and Marsh Inc. were able to use Marsh Inc.'s size as leverage to force insurance companies to pay more in contingent commissions in exchange for Marsh Inc. placing business with the carriers.  Headquartered in New York, Global Broking oversaw policy placement decisions in all of Marsh Inc.'s major business lines.

131.    For example, beginning in 1999, after Defendant Greenberg became MMC's President, Marsh Inc.'s Property and Casualty Middle-Market, Marsh Inc.'s largest growing segment, was mandated by MMC to go through Global Broking for all policy placements and the local and regional contingent commission agreements were replaced with large national agreements, called PSAs.

132.    According to CW4 and ("CW5") (a former Marsh Inc. Managing Director employed during the Class Period), Marsh Inc.'s push to consolidate all placements through Global Broking on a nationwide basis was orchestrated by the top levels of Marsh Inc. and MMC management, "the higher-ups, the CEOs and Presidents." CW4 similarly stated that Global Broking was able to convince the local and regional offices to place their business through

Global Broking by agreeing to share the profits received from contingent commissions. According to CW4, the decision to share commissions also came from the "higher-ups at Marsh."

133.    Similarly, according to CW2, the mandate to use Global Broking "came right from the top – from Greenberg and Egan."

C.    **The Scheme -- MMC and Marsh Inc. Use Improper Business Practices to Boost Revenue**

1.    **MMC's and Marsh Inc.'s Business Plan was to Increase Revenue by Steering Business to the Insurance Companies Paying the Highest Contingent Commissions**

134.    A central part of MMC's and Marsh Inc.'s business plan during the Class Period was to promote the interests of insurance companies with whom MMC (through Marsh Inc.) had contingent commission agreements.  When Marsh Inc. steered business to the favored insurance companies, those insurance companies, in turn, paid MMC higher fees.  When Marsh Inc. helped favored insurance companies retain their existing business at renewal time, those insurance companies paid MMC higher fees.  When Marsh Inc. steered more profitable business (policies with low claims ratios) to favored insurance companies, those insurance companies paid MMC higher fees.  And, when the clients paid higher premiums, volume and profitability rose - - again increasing MMC's fees.

135.    MMC's incentive to favor certain carriers and help them retain their business was clear.  MMC and Marsh Inc., through the DPW Report, have, as noted above, admitted that "the prospect of MSA revenues was often a factor in discussions among brokers concerning the desirability of doing business with particular insurance carriers. . . ." Thus, as one example of this practice, a "Placement Service Agreement" between Marsh Inc. and AIG, dated January 1, 2003, provided Marsh Inc. with a bonus of 1% of all renewal premiums if its clients renewed

with AIG at a rate of 85% or higher.  If the renewal rate was 90% or higher, Marsh Inc. received

2% of the renewal premium, and if the rate was 95% or higher, Marsh Inc. received 3%.

136.    Similarly, a former Senior Client Representative / Assistant Vice President,

employed from 1995 through 2003 ("CW6"), confirmed that it was the regular course of

business for Marsh Inc. to steer business to those carriers with whom it had PSAs and discussed

preferred insurance carriers during monthly staff and departmental meetings.  These meetings

were attended by all of Marsh Inc.'s Middle-Market employees, including management.

137.    Likewise, CW1 reported that representatives of Global Broking spoke at meetings

in Marsh Inc.'s regional offices and advised that, when possible, Global Broking would place

insurance with certain carriers because Marsh Inc. had a better contingent commission agreement

with them.  According to CW1, a list of favored carriers was circulated at one of these meetings.

Chubb and Kemper Insurance were two of the preferred carriers listed.

138.    According to a former Marsh Inc. broker who was assigned to the Global Broking

unit during the Class Period ("CW7"), in late 2001 or early 2002, Marsh Inc. held a company

wide Global Broking meeting at a resort (either Hilton or Marriot owned) in Las Vegas.  The

meeting was attended by everyone in the Global Broking unit, including Christopher M. Treanor,

the division's most senior executive who reported to Defendant Egan, and was chaired by

Alexandra Littlejohn.

139.    According to this former broker, attendees were told about the importance of

PSAs, and were specifically directed to steer clients to insurers paying the highest contingent

commissions.

140.    Marsh Inc. executives issued directions about specific companies as well.  For

example, in April 2001, a Global Broking Managing Director in the Excess Casualty group in

New York, wrote to the heads of Marsh Inc.'s regional centers.  The Marsh Inc. executive asked for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its contingent commission agreement and further warned, however, that "**You must make sure that you are not moving business from key [contingent commission companies]**." Highlighting the incentive represented by the directive, the executive concluded, "**This could mean a fantastic increase in our revenue**." (Emphasis added).

141.    Former Marsh Inc. employees further corroborate Marsh Inc.'s policy to use certain carriers based upon the amounts of their PSAs.  According to a former Senior Employee Benefits Client Executive employed by Marsh Inc. from 1993 through 2004 ("CW8"), the goal was to place the coverage with an underwriter who paid an extra-commission.  This was confirmed by a Client Service Representative who was employed in the insurance industry for over twenty-seven years and was employed by Marsh Inc. during 2004 ("CW9").  CW9 stated that emails, memos and other internal communications documented Marsh Inc.'s policy of instructing its employees to steer business to certain underwriters because of the contingent commissions Marsh Inc. received.

142.    MMC's and Marsh Inc.'s business protocol of placing business with preferred carriers extended across all lines of Marsh Inc.'s operations.  For example, according to a former Marsh Inc. employee who was employed from the summer of 2001 through the spring of 2004 in one of Marsh Inc.'s local offices as an Employee Benefits Specialist ("CW10"), the placement of employee-benefit insurance policies was directly related to incentive compensation received from certain insurance carriers.

143.    Although the placement of employee-benefit insurance did not go through Global Broking, the local office in which CW10 worked entered into its own contingent commission

agreements, in accordance with Marsh Inc.'s protocol, and favored carriers who paid the highest fees. CW10 personally maintained internal files of signed incentive compensation agreements between his/her office and various insurance carriers and stated that some of the major insurance companies offered his/her office a "tiered" plan, describing that the more business the office placed with that carrier, the higher percentage of incentive compensation the office would receive.

144.    According to CW10, the contingent commissions received from certain carriers, and the practice of placing business with these carriers, was discussed by the Senior Vice President of his/her office when placing insurance for a number of Marsh Inc.'s major clients, including Rauch Industries, Century Plastics, Inc., and Ryobi.

145.    CW10 was personally responsible for the handling and processing of the contingent commissions received from insurance carriers and stated that contingent commissions were mailed to a lock box in New York, with the word "corporate" written on the envelope. According to CW10, all checks were forwarded to Marsh Inc.'s New York office for processing.

146.    Similarly, a former Vice President in Sales and Client Management in Marsh Inc.'s Middle-Market division, responsible for oversight of policy placement and consulting from 1999 through 2004 ("CW11"), stated that Marsh Inc. collected "overrides" or contingent commissions from employee-benefit insurance providers for placing a certain amount of business with those insurers.

147.    According to CW11, Aetna and Blue Cross/Blue Shield were favored carriers that paid Marsh Inc. contingent commissions. For example, if Marsh Inc. placed ten different customers with Aetna, Aetna would pay a straight commission to Marsh Inc. on each of the ten

placements, averaging from one to five percent of the total premium value.  In addition, Aetna would pay an "override" of an extra $100,000 payment to Marsh Inc.

148.    CW11 further stated that Marsh Inc. would continually pressure these favored insurers to pay more in contingent commissions when Marsh Inc. was having trouble meeting its monthly and quarterly sales goals.  CW11 stated, "Marsh went back to them for more money because of [internal] budgets, and so forth and so on, that had to be met.  If the sales weren't there, they would go back to the carriers to try to gain more money, to tighten up the budget." According to CW11, the push for additional overrides took the form of phone calls to carriers by a "benefit leader" for each particular policy in each of Marsh Inc.'s offices.

149.    Global Broking's favoring of certain carriers is further evidenced by the fact that in April 2002, Marsh Inc. negotiated a $1 million "no shopping" agreement with Chubb, whereby Marsh Inc. agreed that it would recommend to its top clients that held Chubb policies that they should renew those policies.

### 2.    The Scheme Continues – MMC and Marsh Inc. Rated Insurance Companies Based on PSAs

150.    In furtherance of Marsh Inc.'s practice of favoring carriers based on lucrative PSAs, Marsh Inc. began internally rating the insurance companies based on how much they paid pursuant to their contingent commission agreements, rather than the quality of the company, their price competitiveness or their service.

151.    For example, in February 2002, a Marsh Inc. Global Broking Managing Director in the Healthcare Group provided nine of his/her colleagues with a list of the insurance companies that were paying Marsh Inc. pursuant to contingent commission agreements.  The Managing Director cautioned, however, that "Some [contingent commission agreements] are better than others," and said that soon Marsh Inc. would formally "tier" their insurance

companies.  This Marsh Inc. Director went on to say, "**I will give you clear direction on who [we] are steering business to and who we are steering business from.**" (Emphasis added).

152.    A "Tiering Report - 2003" was later circulated to Global Broking executives, listing insurance companies as belonging to tiers depending on how advantageous their contingent commission agreement was to Marsh Inc., and thereby MMC.  The instructions to managers who received the list included a direction that they were to "monitor premium placements" to assure that Marsh Inc. and MMC obtained "maximum concentration with Tier A&B" insurance companies -- those with contingent commission agreements most favorable to Marsh Inc.

153.    In addition, in an internal Marsh Inc. email dated September 15, 2003, Marsh Inc. employees discussed ongoing negotiations between Marsh Inc. and an insurance carrier regarding the carrier's 2004 PSA.  Discussing Marsh Inc.'s desire to increase the percentages in fees due Marsh Inc. in relation to certain premium growth targets for the insurance carrier, the email evidences Marsh Inc.'s steering criteria, stating: "I agree we should have another good year with .  .  . but that all depends on their appetite, coverage provided and how much they pay us.  We need to place our business in 2004 with those that have superior financials, broad coverage and pay us the most."

154.    The benefit of the steering system to the paying insurance companies was clear. For example, in July, 2000, an executive in Marsh Inc. Global Broking wrote to four colleagues to discuss "BUSINESS DEVELOPMENT STRATEGIES" with a particular "preferred" insurance company that had signed a contingent commission agreement with Marsh Inc.  In describing what Marsh Inc. had done for that company, the Marsh Inc. executive wrote, "**They**

have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair

'competitive advantage['] as our preferred [sic] [insurance company]."   (Emphasis added).

> **3.      MMC's and Marsh Inc.'s  "Pay-To-Play" System Pressures Insurers to Enter Into PSAs/MSAs**

155.     In addition to rating carriers based upon how lucrative their contracts were for

Marsh Inc., MMC through Marsh Inc., also instituted a "pay-to-play" system through which

Marsh Inc. pressured insurance companies to enter into contingent commission agreements if

they wanted to obtain business from Marsh Inc.  For example, in 2002, Marsh Inc. used the

Greenville Project to force Zurich to enter into a contingent commission agreement.

156.     During the bidding process, there were two serious bidders who competed for the

Greenville Project business: Zurich and ACE.  Unbeknownst to Greenville, however, while the

bidding process was ongoing, Marsh Inc. used the business to entice Zurich into signing a

contingent commission agreement.  As demonstrated in a December 12, 2002 email, Joan

Schneider, a Marsh Inc. Global Broking executive, explained to Zurich that they were "neck and

neck" with ACE, which had a contingent commission agreement with Marsh Inc.:

> [Y]ou are currently in the running on the Greenville Country [sic] School System
> (FIX cost near 3MM) . . . .  neck and neck with ACE who we have a PSA with .
> . . .  Will bind most likely after the first of the year . . . .  where are we on the
> [contingent commission] agreement . . . .  Left messages but haven't heard from
> you . . . .  hint hint.

157.     Between the December 12, 2002 email, and the award of the Greenville Project

contract on January 3, 2003, the contingent commission negotiations progressed and the project

was awarded to Zurich.  Although Zurich and Marsh Inc. never finalized a contingent

commission agreement, Marsh Inc. made clear its view of the linkage:

> [p]er our conversation today (sorry to call you during your vacation) the good
> news is that we are binding Greenville County School with you today!!!!!! We
> worked hard to get this to you and as we discussed expect it to be part of the
> [contingent commission] agreement.  On your return Monday, I hope you and

your regional folks can get this ironed out . . . . . . this is a great start to the New Year and would like to keep it going.

158.     Marsh Inc. similarly used its leverage to warn ACE that in order for ACE to reach its premium growth targets for the 2004 year, it would have to increase its PSAs with Marsh Inc. In a November 7, 2003 internal Marsh Inc. email, a Marsh Inc. employee stated, "I made it clear that if ACE wants us to meet significant premium growth targets then ACE will have to pay 'above market' for such stretch."  The email goes on to state: "We will be candid and absolutely honest about where their PSA stands relative to similar partners in terms of both %'s and growth thresholds.  **We will also be VERY CLEAR to the ACE product line managers what the impact will be if they are below market in terms of PSA**." (Emphasis added).

159.     That same month, Marsh Inc. attempted to force yet another insurance carrier to enter into a contingent commission agreement.  In a series of emails dated November 11 through November 15, 2003, Marsh Inc. employees discussed the Company's response to the insurance carrier's concerns over the agreement and Marsh Inc.'s ability to "demonstrate the control," stating: "**We need to work on moving the business to demonstrate the control we have in order to make a strong argument for PSA**." (Emphasis added).

160.     Tellingly, an internal AIG handwritten memo, dated December 2, states "**Per W. Gilman [Marsh Managing Director], get to the right number or 'we'll kill you.**'" (Emphasis added).

161.     Internal documents from The Munich Re Group ("Munich") and ACE further describe the impact on insurance companies when contingent commission agreements with Marsh Inc. were not reached.  For example, according to an internal Munich document, Munich was not being offered opportunities to quote excess liability on accounts where they were not

awarded the lead umbrella because "those layers are already destined for other PSA carriers . . . ."

162.     Similarly, internal ACE documents reveal that in 2003, ACE fell victim to the consequences of not entering into favorable contingent commission agreements with Marsh Inc. As evidenced by an ACE email, nine out of ten deals ACE lost during the month of July involved Marsh Inc. Global Broking.  According to the email, "9 out [sic] 10 dead items involved MMGB not soliciting a quote from us due to ACE not being on the 'game plan'."

### 4.     MMC and Marsh Inc. Encouraged Employees to Steer Business to Insurance Carriers with the Most Lucrative PSAs

163.     Throughout the Class Period, MMC and Marsh Inc. encouraged Marsh Inc.'s employees to place contracts with those insurance carriers with whom Marsh Inc. had entered into contingent commission agreements.  Employees were often praised and considered for promotions solely on account of placing business with favored carriers.

164.     For example, CW4, a former broker at Marsh Inc. Global Broking, reported that placing business with those carriers offering contingent commissions to Marsh Inc. was a definitive criterion factored into his/her performance reviews.  According to CW7, this definitive criterion was reported on a "Balanced Scorecard" which was used to monitor the productivity of Marsh Inc. employees.  According to this same former broker, this "Balanced Scorecard" was one of Defendant Egan's "pet things."

165.     Similarly, in February 2003, a Marsh Inc. Senior Vice President in the Global Broking Healthcare Group, nominated a subordinate to become a vice president.  On the nomination form, under the heading "Financial Success," he/she noted that the nominee had increased Marsh Inc.'s revenue "by moving" a renewing client to an insurance company with a

contingent commission agreement.  He concluded: "Neighborhood Health Partnership Estimated Revenue - $390,000."

166.    That nominee's 2002 performance review similarly noted that the nominee "was responsible for renewal of a large HMO in Miami and was successful with placing of this account with a [contingent commission insurance company] – increased revenue from $120,000 to $360,000 (estimated)."

167.    A 2003 self appraisal form by that same nominee - - now a vice president - - stated: "Renewed large account with [contingent commission insurance company] to demonstrate our willingness to continue our relationship.  Moved a number of accounts to [contingent commission agreement carriers] for the sole reason to demonstrate partnership." Other employees were similarly praised in performance evaluations for increasing Marsh Inc.'s contingent income from insurance companies "by achieving budgeted tiering goals."

168.    Similarly, in connection with the Greenville Project described above, even though Zurich never finalized a contingent commission agreement with Marsh Inc., the employee responsible for the negotiations, Glenn R.  Bosshardt ("Bosshardt"), was highly praised by Marsh Inc. management in his 2003 performance review.  Bosshardt had used the Greenville Project to try and negotiate a favorable PSA agreement with Zurich.  Bosshardt was praised for having "**assist[ed] in the implementation of MMGB's excess liability strategy to maximize contingent commission revenue**." (Emphasis added).

169.    In addition, according to CW10, employees at Marsh Inc.'s local office, who placed business with insurance companies offering contingent commissions, received bonuses specifically linked to the dollar amount of incentive compensation received from carriers. According to CW10, this created a conflict of interest because, as a broker, Marsh Inc.

represented the client, "which didn't make sense to me because it was the insurance company which pays us by way of commission for placing the business."

170.    In the same vein, Marsh Inc. employees were criticized for bucking the system. Initially, when Marsh Inc. began signing national contingent commission agreements, Global Broking not only negotiated all of the agreements, but also kept all of the revenue.  Many of Marsh Inc.'s local and regional offices, which had previously had their own contingent commission agreements with insurance carriers, resented the loss of revenue to the central Global Broking office and refused to have Global Broking pass on all of their placements. Eventually, Global Broking initiated a "revenue repatriation" program under which some of Global Broking's national contingent commissions were shared with local and regional offices.

171.    In June 2003, the head of Global Broking's Excess Casualty group wrote to an employee in Marsh Inc.'s Seattle office to chastise her for placing insurance directly with a carrier on behalf of a client, thus denying a contingent commission to Global Broking: "The GB repatriation dollars are no small component of your office's budget.  You have lowered that amount with this placement.  You may want to consider this in the future."

### 5.    Global Broking Uses its Leverage to Steer Business to Certain Carriers Through A Fraudulent Bidding Process

172.    In order to maximize MMC's revenues from contingent commissions by steering business to its preferred insurers, MMC and Marsh Inc. engineered a system of "fake bids." This enabled Marsh Inc. to steer business to certain carriers by creating a non-competitive environment in which Marsh Inc. obtained false bids from carriers to ensure control over business placement.

173.    While scheming with some insurance companies, and cajoling and intimidating others, Marsh Inc.'s system was designed to, and did, increase MMC's revenues by forcing

insurance companies to pay in order to receive Marsh Inc.'s business.  Unbeknownst to

investors, Marsh Inc.'s criteria for placing business was not based on the insurers' ability to

provide needed insurance at the best price, but rather, the dollar amount each insurer contributed

to MMC's revenues through contingent commissions.

<b>a.     Global Broking Engineers an A, B, and C Quote System of Fake Bids</b>

174.     As part of MMC's and Marsh Inc.'s protocol, in an effort to place more of its

clients' business with insurers with which Marsh Inc. had entered lucrative PSAs, Marsh Inc.

solicited artificially high bids from certain insurance companies so it could guarantee that the bid

of a preferred insurer on a given deal would secure the placement.

175.     Marsh Inc.'s system depended upon the use of three types of quotes, known as

"A," "B," and "C" quotes, depending upon the situation.  When an incumbent carrier's policy

was up for renewal, Marsh Inc. solicited what was called an "A Quote" from the incumbent

carrier, whereby Marsh Inc. provided the incumbent carrier with a target premium and the policy

terms for the quote.  If the incumbent carrier agreed to quote the target provided by Marsh Inc.,

the incumbent carrier kept the business, regardless of whether it could have quoted more

favorable terms or premium.

176.     In order to provide the appearance of competition and that Marsh Inc. was

actually obtaining competitive bids, Marsh Inc. would obtain a "B Quote" from another carrier.

This quote was also called a "backup quote" or "protective quote." A company providing a B

Quote would know that it was not getting the business before making its quote.  In many

instances, Marsh Inc. provided the carrier providing a B Quote with a target premium and the

policy terms for these quotes.  In these cases, it was understood that the target premium set by

Marsh Inc. was higher than the quote provided by the incumbent, and that the carrier should not

bid below the Marsh Inc. supplied target.

52

177.    For example, in October 2003, an underwriter at AIG, which was one of the main participants in Marsh Inc.'s phony bid process, described a particular quote that he had provided: "**This was not a real opportunity.  Incumbent Zurich did what they needed to do at renewal.  We were just there in case they defaulted.  Broker . . . said Zurich came in around $750K & wanted us to quote around $900K**." [Emphasis added.] Even when AIG or another carrier providing a B Quote could have quoted a premium lower than the target, it rarely did so.  Instead, the B Quote carrier would provide a quote consistent with the target premium set by Marsh Inc., thereby throwing the bid.

178.    In other instances, when Marsh Inc. asked a carrier to provide B Quotes where it was not supposed to get the business, Marsh Inc. did not set a particular premium target.  In these instances, the carrier looked at the expiring policy terms and premium and provided a quote high enough to ensure that: a) the quote would not be a winner; and b) in the rare case where it did get the business, it would make a comfortable profit.

179.    However, in B Quote situations, carriers did not do a complete underwriting analysis and in those situations when a carrier providing a B Quote inadvertently won the business (because the incumbent was not able or willing to meet Marsh Inc.'s target), the carrier's personnel would "back fill" the underwriting work on the file -- that is, prepare the necessary analysis after the fact.

180.    Finally, Marsh Inc. would come to carriers (often AIG) for a "C Quote" when there was no incumbent carrier to protect.  Although Marsh Inc. often provided premium targets in these situations, it was understood that there was the possibility of real competition.

181.    The "A, B, C" quote system was strictly enforced by Marsh Inc. through Bill Gilman, a Marsh Inc.  Managing Director ("Gilman").  Gilman refused to allow AIG to put in

competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh Inc. if it did not provide B Quotes.  Gilman likewise advised AIG of the benefits of the system.  For example, in an internal Marsh Inc. document, Gilman stated that Marsh Inc.: "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh Inc.  "protect" other incumbents by providing B Quotes.

**b.     Insurers Participate in the Fraudulent Bidding Process**

182.     AIG was among the most frequent accomplices in the phony bid scheme and was itself entirely complicit in arranging Marsh Inc.'s fake bids.  On February 15, 2005, Carlos Coello, an underwriter at AIG, pled guilty to participating in a scheme with Marsh Inc. employees to provide false quotes to Marsh Inc.'s clients, and swore under oath the following:

> During – from September of 2002 through September of 2004, I and others at AIG participated in a scheme with individuals at Marsh Inc., an insurance brokerage firm based in Manhattan.  I was employed as an underwriter at the time and this was done at the direction of others.
>
> *         *         *
>
> **During this time period Marsh and AIG periodically instructed me to submit specific quotes that I believed were higher than those of incumbent carriers and were designed to insure the incumbent carrier would win certain business and resulted in clients being tricked and deceived by a deceptive bidding process.**
>
> I complied with these requests and by doing so assisted Marsh to obtain property in the form of commissions and fees from policy holders.  And in turn AIG periodically benefited from this scheme when AIG was incumbent carrier in those cases.  I believe other carriers also submitted noncompetitive quotes that were higher thereby, allowing AIG to obtain property in the form of insurance premiums from more than one client.
>
> Pursuant to this scheme, I intentionally engaged in deception and intentionally conveyed quotes to Marsh under false and fraudulent pretenses.  [Emphasis added.]

183.     James Mohs, an assistant manager at AIG, also pled guilty to participating in the

improper bidding process.  In his plea, Mohs swore under oath the following:

> During my career at AIG, I and other employees participated in a scheme with
> individuals at Marsh Inc., also based in Manhattan.  The goals of this scheme
> included allowing Marsh to control the market and to protect incumbent insurance
> carriers including AIG when their bid was up for renewal.
>
> **During this time period, Marsh and AIG personnel periodically instructed
> me to submit specific quotes for insurance rates that I believed, [1], were
> higher than those of incumbent carriers; [2], were designed to insure that the
> incumbent carriers would win certain business; and [3] resulted in clients
> being tricked and deceived by their deceptive bidding practice.  On
> numerous occasions I and others complied with these requests by submitting
> such quotes.**  By doing so, we assisted Marsh to obtain property in the form of
> commissions and fees from policy holders and insurance companies.
>
> In turn AIG periodically benefited from this scheme when AIG was the
> incumbent carrier.  In those cases I believe the other carriers were submitting non
> competitive quotes specified by Marsh thereby allowing AIG to obtain property in
> the form of insure premiums in excess of $1,000 from policy holders.
>
> Pursuant to this scheme I intentionally engaged in deception and intentionally
> conveyed quotes to policy holders through Marsh under false and fraudulent
> pretenses.  [Emphasis added.]

184.     Along with AIG, which was run for many years by Defendant Greenberg's father,

Hank Greenberg, a number of other large insurers regularly worked with Marsh Inc. in

manufacturing fake bids.  ACE Ltd., run by Evan Greenberg, brother of MMC's CEO,

Defendant Greenberg, was one of these companies.  ACE signed a contingent commission

agreement with Marsh Inc. in order to gain access to the business Marsh Inc. controlled.  ACE

also repeatedly provided the same type of B Quotes that AIG provided.

185.     The B Quotes given to Marsh Inc. by ACE were often in amounts requested by

Marsh Inc., even though a lower quote would have been justified by an underwriting analysis.

According to internal ACE emails, ACE's President of Casualty Risk summarized:

> Marsh is consistently asking us to provide what they refer to as "B" quotes for a
> risk.  They openly acknowledge we will not bind these "B" quotes in the layers

we are be [sic] asked to quote but that they 'will work us into the program' at another attachment point.  So for example if we are asked for a "B" quote for a lead umbrella then they provide us with pricing targets for that "B" quote.  **It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing.**  [Emphasis added.]

186.     In this same email, the Casualty Risk President wrote that he "support[ed]" Marsh Inc.'s business model, which he described as "unique."

187.     CW9 described how Global Broking in New York used the phony bid process to ensure that the Phoenix office placed business with Marsh Inc.'s so-called "Preferred Marsh Underwriters." This preferred group included Travelers, AIG, ACE and CNA.  CW9 stated that Global Broking would falsify the bids by asking some insurance carriers to submit high bids.  He/she explained that if a fairly large account called for a premium of somewhere between $250,000 and $280,000, and Global Broking wanted to direct the account to a particular carrier, then the other carriers were told to bid above $280,000.  According to CW9, he/she recalled seeing at least one email from Global Broking directly instructing the Phoenix office to place business with CNA Group, a preferred carrier.

       c.     **MMC and Marsh Inc. also Scheme with Mid-Sized and Smaller Insurers**

188.     MMC and Marsh Inc. did not limit their phony bidding scheme to their large corporate clients.  According to the NYAG Action, Marsh Inc. and MMC also engaged in such conduct with The Hartford Financial Services Group ("Hartford") – a provider of group life benefits, auto, home ownership and business insurance – with respect to Marsh Inc.'s "Middle Market" and small business clients.

189.     Middle Market insurance provides coverage for companies where the annual premium ranges from tens of thousands of dollars to around $1 million.  Hartford became a "partner market" -- meaning it agreed to pay contingent commissions -- with Marsh Inc.'s so-

called "Advantage America" program in July 2003.  The Advantage America program was developed by Marsh Inc. to fold its small commercial property/casualty business into its Middle Market group.  With annual premiums in the range of $25,000 to $200,000, this program provided coverage to small businesses.  Marsh Inc. centralized its entire small business insurance placement in an office in Lake Mary, Florida.

190.    Hartford shared the Lake Mary office with Marsh Inc.  On numerous occasions during 2003 and 2004, Marsh Inc. employees asked the two Hartford underwriters assigned to this facility, either in person or by telephone, to provide an inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business.  Typically, Hartford's underwriters were told to price the quote or indication 25% above a particular number, and that by doing so Hartford need not worry that it would get the business.  Hartford colluded in the scheme.

191.    Marsh Inc. also ensured that its phony bidding practices would be used in connection with its larger Middle Market customers, *i.e.*, those with annual premiums between $200,000 and $1 million.  The Global Broking office for the Los Angeles area handled larger Middle Market risks with annual premiums reaching $1 million.  Like Marsh Inc.'s Florida office, the Los Angeles office is also shared with Hartford.

192.    Starting as far back as 2000, Marsh Inc. employees, on virtually a daily basis, asked Hartford for inflated quotes or indications in a manner similar to the process described above for the Florida facility.  In Los Angeles, however, Marsh Inc. often provided Hartford with a spreadsheet showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with other insurers' quotes.  Marsh Inc. instructed Hartford to quote some percentage, typically 25%, above the other insurers' quotes on the spreadsheet to ensure that

Hartford would not get the business.  These were referred to as "Throwaway Quotes," which Hartford consistently provided.

193.    On even larger risks in Southern California, those of over $1 million of annual premiums, Marsh Inc. similarly asked for inflated quotes or indications, also providing spreadsheets containing other insurers' quotes to Hartford.  Hartford provided these quotes as well.  Hartford provided these quotes and indications because Marsh Inc. was its biggest broker, and it felt that Marsh Inc. would limit its business opportunities if it refused.

194.    Similarly, as of 2001, Munich had entered into separate contingent commission agreements with Marsh Inc.'s Excess Casualty, Property, FINPRO (Financial Products) and Health Spectrum Groups.  Throughout 2001 and early 2002, the Marsh Inc. Global Broking Excess Casualty Group repeatedly requested that Munich provide "favors" designed to assist Marsh Inc. in its bid-manipulation process.

195.    For example, according to a December 6, 2001 email from a Marsh Inc. Senior Vice President to a Munich Regional Manager, Marsh Inc. requested that Munich not bid on certain renewals because Marsh Inc. owed the incumbent a favor and did not want to risk Munich providing the client with a lower quote.

196.    Additionally, in a December 18, 2001 email from a Marsh Inc. Senior Vice President to a Munich Regional Manager, Marsh Inc. requested that Munich either decline the risk altogether or submit a quote higher than the incumbent quote in order to ensure that the business stayed with the incumbent carrier.  Marsh Inc. would also routinely ask Munich for artificial quotes that could be "negotiated" down for the sole purpose of impressing Marsh Inc.'s clients.

197.    Marsh Inc. further misled its clients into staying with incumbent carriers by requesting that Munich act as "back-up or wait in the wings" at several client presentations throughout 2001. Marsh Inc. asked Munich to attend presentations for prospective clients with whom Munich was already out of the running. One Munich regional manager characterized these presentations as mere "Drive bys."

198.    For example, in 2001, Marsh Inc. sent Munich an email request explaining that it "needed to introduce competition" at a prospective client presentation and needed Munich to send a "live body." Frustrated with Marsh Inc.'s continuous requests for "live bodies," a Munich regional manager responded, "WE DON'T HAVE THE STAFF TO ATTEND MEETINGS JUST FOR THE SAKE OF BEING A 'BODY.' WHILE YOU MAY NEED 'A BODY," WE NEED A 'LIVE OPPORTUNITY.'"

199.    Marsh Inc.'s business practices were so well-known within its business circle that, in preparing for an April 2001 meeting with Marsh Inc., a Senior Vice President of Munich solicited reactions from his regional managers regarding their experiences with Marsh Inc. Global Broking. This Munich Senior Vice President then cut and pasted the managers' comments into a single document and circulated it to them for discussion. Complaints and reactions from the Munich regional managers included:

> I am not some Goody Two Shoes who believes that truth is absolute but I do feel I have a pretty strict ethical code about being truthful and honest with people. And when I told [sic] I have to say certain things I know to be untrue to people I respect and have known for a long time, it is not what I feel I should be asked to do of [sic] what this company stands for. Yet it has already happened several times and I have either had to dodge the client and broker on the issue, which won't always work, or risk making GB [Global Broking] angry by telling a carefully edited version of the truth, which was more than they wanted out but less than satisfying to the client or broker. **This idea of "throwing the quote" by quoting artificially high numbers in some predetermined arrangement for us to lose is repugnant to me, not so much because I hate to lose, but because it is basically dishonest. And I basically agree with the comments of others that**

**it comes awfully close to collusion or price fixing.  WHAT ARE THE RULES ON PRICING - ARE WE TO QUOTE OUR NUMBERS OR WHAT MGB [MARSH GLOBAL BROKING] WANTS US TO QUOTE - HOW DOES THEIR INTERNAL PREFERRED MARKET THING WORK?** [Emphasis added.]

### d.    Additional Examples of MMC's and Marsh Inc.'s Improper and Fraudulent Conduct

#### i.    Fortune Brands

200.    An example of the operation of MMC's and Marsh Inc.'s wrongful conduct is evident in the bidding for the excess casualty insurance business of Fortune Brands, Inc., a holding company engaged in the manufacture and sale of home products, office products, golf products, and distilled spirits and wine.  As evidenced by a December 17, 2002 email, an ACE Assistant Vice President of underwriting sent a fax to Greg Doherty ("Doherty"), a Senior Vice President in Marsh Inc. Global Broking's Excess Casualty division, quoting an annual premium of $990,000 for Fortune Brand's policy.  Later that day, ACE revised its bid upward to $1,100,000.  On the fax cover sheet with the revised bid, ACE's Assistant Vice President wrote: "Per our conversation attached is revised confirmation.  All terms & conditions remain unchanged."

201.    An email the following day from the ACE Assistant Vice President to a senior ACE executive explained the revision as follows: "**Original quote $990,000 . . . .  We were more competitive than AIG in price and terms.  MMGB requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business. . . .**" (Emphasis added).

202.    Thus, although ACE was able to provide a lower premium than AIG, Marsh Inc. requested that ACE trump up its bid to ensure that AIG got the policy.  However, this arrangement also benefited ACE even though it had to give up this business—the consideration

in participating in the scheme was future business.  As Doherty wrote in a June 20, 2003 email to the same ACE vice president: "**Currently, we have about $6M in new business [with ACE] which is the best in Marsh Global Broking so I do not want to hear that you are not doing 'B' quotes or we will not bind anything**." (Emphasis added).

### ii.    Brambles, USA

203.    The bidding process for excess casualty insurance for Brambles, USA, a manufacturer of commercial industrial pallets and containers (among other products), further demonstrates Marsh Inc.'s improper conduct.  In June of 2003, ACE learned that Brambles was unhappy with its incumbent carrier.  Nevertheless, Marsh Inc. asked ACE to refrain from submitting a competitive bid because Marsh Inc. wanted the incumbent, AIG, to keep the business.  An ACE Vice President wrote to the ACE President of Risk and Casualty: "**Our rating has a risk at $890,000 and I advised MMGB NY that we could get to $850,000 if needed.  Doherty gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing**." (Emphasis added).  ACE continued to provide Marsh Inc. with inflated quotes into 2004.

### iii.    The Greenville Project

204.    Marsh Inc.'s involvement with the Greenville Project further illustrates how Marsh Inc. abused its fiduciary role in an attempt to secure a contingent commission agreement with an insurance company by manipulating the bidding process.  Notably, Marsh Inc. was paid a handsome fee of $1.5 million for acting as the broker on the Greenville Project.

205.    As discussed above, there were two serious bidders who competed for the Greenville Project business: Zurich and ACE.  Unbeknownst to Greenville, however, while this bidding process was ongoing, Marsh Inc. held out the Greenville project as a "carrot" in its effort to entice Zurich to sign a contingent commission agreement.

206.    As part of its vigorous effort to steer the Greenville contract to Zurich, Marsh Inc. sought a false bid from a competing insurer and then, despite that insurer's refusal, submitted a wholly fictitious bid on that insurer's behalf.  On December 16, 2002, Bosshardt, the Global Broking Vice President assigned to the project, contacted an Assistant Vice President of underwriting at CNA, an individual with whom he had previously worked, and who had already told Bosshardt that CNA had no interest in bidding on the Greenville Project.  In the email Bosshardt stated:

> [P]er my voicemail, we need to show a CNA proposal.  I will outline below the leading programs (ACE & Zurich).  **I want to present a CNA program that is reasonably competitive, but will not be a winner**.  [Emphasis added].

207.    Bosshardt proceeded to reveal the ACE and Zurich quotes on the project and proposed numbers that CNA should quote in order to lose the bid, but still appear to have been competitive.  Although CNA never authorized Marsh to submit this bid, it was submitted to MMC's and Marsh Inc.'s client as a legitimate competing bid.

208.    Notably, Marsh Inc. -- at a time when the prospect for a contingent commission agreement with Zurich remained real -- advised MMC's and Marsh Inc.'s client that Zurich was a superior company and should be awarded the bid.  Neither MMC nor Marsh Inc. disclosed to their client that Marsh Inc. was seeking a contingent commission agreement from Zurich, or that Marsh Inc. had falsely submitted a bid under CNA's name.  The client ultimately followed Marsh Inc.'s recommendation and awarded the project to Zurich.

### 6.    Global Broking's Bid Manipulations Frustrated Marsh Inc.'s Local and Regional Offices

209.    Lead Plaintiffs' investigation into MMC's and Marsh Inc.'s business practices reveals that Global Broking's reputation for manufacturing bids to help its favored insurers retain

and/or obtain business was known throughout Marsh Inc. and was resented by many of Marsh Inc.'s local and regional offices.

210.    For example, CW2 (a former Insurance Services Manager in one of Marsh Inc.'s Northeast offices) reported that the relationship between his/her office and Global Broking was plagued with problems and frustrations.  CW2 stated that his/her office was required to submit all requests for new policies and renewals for its clients through Global Broking.  Global Broking was supposed to obtain various quotes from carriers and forward all of the results back to CW2's office.  However, according to CW2, many of the accounts put out to bid through Global Broking came back with "wrongful" declinations from carriers, thereby allowing the incumbent - - often AIG - - to retain the business.

211.    CW2 describes the declinations as "wrongful" because he/she later discovered that Global Broking had never contacted insurance companies to solicit competitive bids.  According to CW2, this was the usual result with submissions through Global Broking, "I would estimate that in at least 50 percent of the accounts there were a lot of declinations that were not warranted."

212.    For example, CW2, describes that in 1998 or 1999, he/she had an argument with a Managing Director of Global Broking.  CW2 had requested that Global Broking negotiate with a particular carrier rather than Global Broking's preferred carrier, AIG, to obtain excess capacity on an umbrella policy, covering a portion of professional liability.  CW2 was advised by Global Broking that the carrier CW2 requested was not interested and that this type of "integrated program" was impossible to accomplish.

213.    CW2 subsequently contacted the reinsurance company directly and was advised that Global Broking had vastly undersold the advantages of the deal.  The reinsurance company

then agreed to write a piece of the policy for CW2's client.  After binding the deal, CW2 was reprimanded for going around Global Broking and the incident was reported to CW2's supervisors.

214.    Likewise, CW2 recalls that in early-to-mid 2002, his/her office submitted a renewal of a Middle-Market Property and Casualty policy to Global Broking.  After receiving a number of declinations from Global Broking, and after Global Broking refused to allow CW2 to conduct a conference call with the various insurance companies, an account manager in CW2's office contacted the insurance carriers directly.  "We found out that the markets had never received the submission."

215.    Subsequently, no longer trusting Global Broking, CW2 demanded direct communication from the underwriters that had declined client accounts for his/her office.  In addition, CW2 often tried to circumvent Global Broking by calling local insurance carriers directly.  However, in most instances, CW2 was not successful because the local carriers were instructed only to deal with Global Broking and feared repercussions from Marsh Inc.

216.    In one instance, CW2 attempted to move a policy from an incumbent carrier without going through Global Broking.  As a result, CW2 received an email from Global Broking reprimanding him/her and was told: "You can't move business if we're not aware of it. We need to deal with senior management at the carrier on this issue before the business is moved."

217.    CW2 further described another instance where his/her office received a "terrible quote" from an incumbent carrier, via Global Broking, on an account for an assisted living facility.  As the policy moved toward expiration, the account manager in charge of the account unsuccessfully attempted to obtain more bids from Global Broking.  The account manager, while

on vacation, called three carriers that Global Broking had not contacted and obtained competitive

quotes.  These bids were used to negotiate the incumbent's pricing down and saved the client

$400,000.

218.     Internally, Global Broking came to be referred to amongst Marsh Inc. employees

as "the sacred cow." According to CW2, "we were constantly fighting issues where we didn't

think they were doing their job.  We constantly sent emails to Global Broking saying, 'You know

what? This is not the way things need to be done.'"

> **D.    MMC's and Marsh Inc.'s Own Investigation and the Guilty Pleas of Marsh Inc.'s Employees Confirm MMC's and Marsh Inc.'s System of Manipulation**

219.     The DPW Report confirms that MMC and Marsh Inc. were regularly engaged in

price manipulation.  According to the Report:

> Within the Excess Casualty group, we have seen - - in communications among
> brokers and between brokers and carrier representatives - - **widespread instances**
> in which Marsh Inc.  brokers solicited so-called "B quotes" from various
> insurance carriers.  These solicitations were made in situations where an
> incumbent carrier was expected to be awarded a policy renewal by the client, in
> which case the non-incumbents, in being asked for "B quotes," were provided
> with some indication that they were unlikely to win the bid.  (In the Excess
> Workers Compensation group, we have seen analogous types of communications,
> although none using the particular "B quote" nomenclature.) In a number of these
> instances, the solicitation of a "B quote" by the broker was accompanied by some
> disclosure of the amount of the incumbent's quote, the amounts of other quotes
> gathered to date, and/or other such information.  [Emphasis added.]

220.     The DPW Report further confirms that "In some cases, 'B quotes' were solicited

in the course of 'bid rigging' discussions" and that "It is clear that these 'B quote'

communications were not typically disclosed to clients."

221.     The DPW Report also concludes that Marsh Inc. employed the practice of

soliciting "Accommodation Quotes." According to the Report, brokers across various product

lines reported that it was common - - within Marsh Inc. and throughout the industry - - for

brokers to solicit quotes, however high, from carriers that otherwise were disinclined to bid on a

particular client's risk.  The brokers maintain that such quotes were provided by the disinclined

carriers as a favor or "accommodation" when a broker was unable to otherwise obtain a

complement of quotes that was extensive enough to satisfy a client's expectation.  As with the

"B quote" scenario discussed above, such "accommodation" requests were at times accompanied

by a disclosure by the broker to the carrier of information concerning other carriers' bids.  These

quotes were not disclosed to the client.

222.    The DPW Report also acknowledges that:

the individuals who have pleaded guilty to date have stated that such discussions
[regarding bid-rigging] took place regularly, and the relevant emails and other
communications that we have reviewed are not inconsistent with these statements.
**We anticipate that additional examples of this type of conduct may well be
identified in these and other product lines as the government investigations
continue**.  [Emphasis added.]

223.    According to certain Marsh Inc. employees who have pled guilty to scheming to

defraud in the first degree in violation of New York Penal Law Section 190.65 (an E Felony),

Marsh Inc. regularly engaged in improper bid manipulation throughout Class Period.  In his plea,

Bewlay swore under oath the following:

I have worked in Manhattan at Marsh Inc. or it subsidiaries from 1991 through
2004.  **Beginning in approximately 1998 and continuing through
approximately 2003, I along with others at Marsh directed the solicitation of
losing quotes from various** insurance companies or excess liability insurance for
Marsh clients.  I personally solicited losing quotes on a number of occasions.  The
losing bids or quotes were often referred to as B quotes.  B quotes were typically
solicited from and provided by the insurance company so the company would
retain the business when the client's existing coverage expired and that is, in fact,
what occurred on numerous occasions and to more than ten clients.

Unknown to [Marsh] clients I along with others at Marsh and others at the various
insurance companies who participated in this conduct, shared the common
purpose of insuring that the client would select the carrier, typically the
incumbent that Marsh had predetermined should win the business.

The B quotes were solicited and obtained related to and as part of this common
scheme caused more than one client, one Marsh client to obtain more expensive
and/or less favorable insurance coverage.  [Emphasis added.]

224.    Similarly, Winter stated:

From about 2001 to about 2004, I was a managing director in the Global Broking unit of Marsh Inc., an insurance brokerage in New York County.  In 2002, I was promoted to manager of the northeast region of Global Broking.  As managing director, I and others at Global participated in a scheme with individuals at various companies including AIG, ACE, Zurich.  The primary goal of this scheme was to maximize Marsh profits by controlling the market and protecting incumbent carriers when their business was up for renewal.  **During this period of time I and others at Marsh [Inc.] regularly instructed non-incumbent carriers to submit non-competitive bids for insurance business** that I believe:

Were higher than appropriate and more restrictive in coverage terms than bids provided by incumbent carriers;

Were designed to insure that the incumbent carriers would win certain business; and; resulted in clients being deceived by the bidding process.

**On numerous occasions non-incumbent insurance companies complied with these requests by submitting such quotes to Marsh which Marsh in turn showed to its clients.**  Pursuant to this scheme, I intentionally engaged in deception and intentionally caused non-competitive quotes to be conveyed to Marsh clients under false and fraudulent pretenses.  As a result, I and other Marsh employees obtained more than a thousand dollars from each of numerous clients and incumbent carriers in the form of premiums, commissions and fees. [Emphasis added.]

**E.    Neither MMC nor Marsh Inc. Provided Services in Exchange For PSAs**

**1.    MMC's Misleading Disclosures Failed to Disclose that No Services Were Provided in Exchange for PSAs**

225.    Prior to 1998, MMC did not disclose the existence of its contingent commission agreements.  In April 1999, as noted earlier, in response to a statement issued by RIMS regarding client concerns over contingent commissions, MMC and Marsh Inc. entered into an agreement with RIMS regarding disclosures of MMC and Marsh Inc.'s PSA/MSA agreements.  The agreement provided that MMC and Marsh Inc. would disclose to clients the existence of such arrangements, as well as certain information about the amount of contingent commission revenues MMC and Marsh Inc. received in accordance with Circular Letter 22, discussed above.

226.   Even when MMC began to disclose the existence of contingent commissions, it consistently concealed the true nature of these agreements, *i.e.*, that they were kick-backs for improper steering agreements.  Instead, MMC falsely told the market the revenues reflected payments for services provided to the market.

227.   For example, in MMC's 2000 Report on Form 10-K filed on March 29, 2001, MMC's disclosure read as follows:

> Contingent income for services provided includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed.  **This revenue reflects compensation for services provided by brokers to the insurance market.  These services include new product development, the development and provision of technology, administration, and the delivery of information on developments among broad client segments and the insurance markets**.  [Emphasis added.]

228.   MMC's disclosure regarding contingent commissions changed in its 2003 Report on Form 10-K which read as follows:

> Market services revenue is derived from agreements Marsh has with most of its principal insurance markets.  Under these agreements, **Marsh is paid for services provided to the market**, including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions and general information on emerging developments in the insurance marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services.  Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.  [Emphasis added.]

229.   Yet again, in 2004, MMC changed the description concerning contingent commissions.  MMC described on its website in 2004, contingent commission agreements as:

> Market Services Agreements (MSAs) are agreements that cover payment for the value brokers provide to insurance carriers and are based primarily on premium volume or growth.  Brokers principally provide insurers with distribution networks, which facilitate the delivery of business, and are uniquely positioned to provide insurers with intellectual capital, product development, technology, and

other administrative and information services.  **These capabilities make the overall marketplace more efficient and competitive, which, in turn, benefits Marsh's clients**.  [Emphasis added.]

230.    In truth, the services MMC claimed to provide (*i.e.*, new product development, the development of provision of technology), were illusory.  The services MMC cites are not services, but, rather a necessary concomitant of MMC and Marsh Inc. going to the market on behalf of their clients, something that Marsh Inc. was already duty bound to do since it is its clients' agent and fiduciary and is compensated through legitimate fees and commissions from its clients.

231.    This is further illustrated by Defendant Greenberg's statements concerning the role of contingent commissions in a July 28, 2004 analyst conference call, where Greenberg misleadingly stated that contingent commissions were representative of the services provided by Marsh Inc., rather than for the sole purpose of increasing MMC's reported earnings:

> **We think that the most important issue and I have said this before is that we provide services for which we expect to be compensated and there are various ways that one can be compensated.**  The way in which we handle it today is [contingent commissions] but if we found that we needed to change the method of compensation, we would do so.  The principle being that we are going to be compensated for our services.  [Emphasis added.]

232.    The actual "service" that Marsh Inc. provided pursuant to its contingent commission agreements was to steer business to the insurance carriers paying these fees, a fact that MMC has now admitted.  Thus, on October 27, 2004, Marsh held a conference call to discuss certain reforms it had announced in the wake of the NYAG's investigation.  During that call, the following colloquy took place in which Defendant Egan made clear that Marsh Inc. did not, in fact, provide services in exchange for contingent commissions:

> Unidentified Speaker: Good Morning.  A couple of questions – there's a lot of misunderstanding – (technical difficulty) – regarding contingent commission. Michael, you mentioned that this is not a fundamental crisis.  Could you expand a little bit more on that? Yesterday, on Chubb's conference call, I think things got

confused a little bit more, because what they said is they sometimes engage in PSA, engage in MSAs, which they suggested it is something bad, but to engage in contingent commission.  Could you (technical difficulty) – for us and what did Marsh do?

Roger Egan (Marsh Inc.  President):  You asked about clarification on the labels that are being used.  Contingent commission is the oldest and generic term for agreements like this.  You've heard placement service agreements, TSAs and more recently you've heard market service agreements.  At Marsh, what we had – (technical difficulty) – market service agreements.  **Our market service agreements were based on volume, based on a book of business, and they were payments from an insurance company to Marsh based on volume only and based on a book of business.  That process – that payment procedure – was that the Attorney General called an improper incentive for a broker to be paid from the market.**  [Emphasis added.]

233.    Thereafter, on November 9, 2004, MMC conducted a conference call to discuss MMC's third quarter 2004 results in which non-party Wijnberg, among others, participated. During the question and answer portion of the call, Ron Frank of Smith Barney asked:

The $.16 figure you gave for the impact of the contingent commission decline **suggests it's treated as basically pure profit in that analysis.**  Is that a fair assumption as well going forward, that there is no natural offset to that as those revenues go way beyond what you actively do on the cost side? [Emphasis added.]

234.    Wijnberg responded, making clear that there were no offsetting reductions in expenses resulting from the elimination of MSA revenues: "[b]eyond what we actively do, **there is no change unless we change the business model that would reduce the cost of delivery**." (Emphasis added).  Wijnberg's statement not only corroborated that the contingent commissions were "pure profit," but the lack of offsetting expenses upon elimination of those revenues also demonstrated that neither MMC nor Marsh Inc. provided any legitimate services to the insurers in exchange for contingent commissions because the elimination of those revenues did not reduce the "cost of delivery."

F.   **MMC Purposely Concealed the Importance and Amounts**
 **of its Contingency Commissions**

235.   Over and above its failure to provide information regarding the lack of services it provided in connection with its receipt of contingent commissions during the Class Period, MMC has never revealed to the investing public how important contingent commissions were to its revenues.  In addition, MMC and Marsh Inc. actively sought to prevent their clients from discovering how many contingent commissions were obtained.

236.   As noted above, in 1999, in response to client concerns about the role of contingent commissions, MMC announced an agreement with RIMS, pursuant to which RIMS approved a protocol by which Marsh Inc. would disclose to clients certain information about the amount of contingent commission revenues that Marsh Inc. received.  Pursuant to the RIMS agreement, Marsh Inc. was required to provide to its clients a calculation (called an "average contingency factor" or "ACF") that reflected the percentage amount that Marsh Inc. earned from contingent commissions, as compared to the overall amount of premiums placed by Marsh Inc. in a given calendar year.  In addition, clients who requested further information were to be provided with an additional calculation that provided an approximation of the amount of Marsh Inc.'s contingent commissions that would have been attributable to the particular client's placements.

237.   MMC and Marsh Inc. have now admitted, as set forth in the DPW Report, that they intentionally misled its clients regarding the amount of contingent commissions they were receiving.  The DPW Report states:

> **given the manner in which the calculations were performed pursuant to the protocol, the amounts conveyed to clients could be viewed by certain clients as inaccurate or misleading.**  First, in the initial years following the RIMS agreement, it appears that certain amounts were included in the calculation of Marsh Inc.'s premium revenue that were not relevant to the computation of the average contingency factor .  .  .  .

71

In addition, depending on the configuration of insurance products that a client purchased through Marsh Inc., the ACF and any additional approximation that was conveyed to the client could have been materially different than the amount of MSA revenue that was associated with the particular client's placements. That is because the RIMS protocol called for Marsh Inc. to disclose the magnitude of MSA revenues on a blended basis, across all product lines, without regard to the fact that, among different product lines, there were large variations in the contingent commission percentages that were paid by different carriers. The net result was that a client who, for example, purchased policies predominantly through Marsh Inc.'s Excess Casualty group (which had the most lucrative MSA agreements of any Global Broking product line) may have generated MSA revenues for Marsh Inc. in excess of ten or fifteen per cent of the client's overall premium. Upon inquiry, however, the same hypothetical client would have been told, depending on the year in question, that Marsh Inc.'s ACF, or "average" MSA revenue percentage, was in the range of two per cent or less. **In short, the calculations at issue would in some cases have produced responses that were technically accurate, but potentially misleading, as a result of the significant variations in the amount of MSA revenues that were paid among different product lines**. [Emphasis added.]

238. The findings of the DPW Report are fully confirmed by Bewlay. Bewlay testified that Marsh Inc.'s protocol was designed to discourage clients, and therefore investors, from discovering the true amounts and nature of the contingent commission agreements. In his allocution, Bewlay testified that during his employment, he:

was made aware of a Marsh protocol designed to prevent Marsh clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid. The protocol required multiple layers of inquiry to discourage the client from obtaining an answer. Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.

Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue earned with respect to a particular client. **In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client**.

When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries. [Emphasis added.]

239.    Exchanges between Marsh Inc. and the insurance carriers with which it had contingent commission agreements further support Bewlay's sworn testimony that Marsh Inc. had a protocol designed to discourage clients from learning about the true nature of contingent commissions.

240.    For example, in 2000, Munich disclosed the existence of its contingent commission agreement with Marsh Inc. to a significant client to explain the contingent commissions that were being passed on to the client.  Marsh Inc. was furious and chastised Munich.  A Senior Vice President at Munich apologized to Marsh Inc. in an email: "We acknowledge that this was inappropriate behavior . . . ." He told Marsh Inc. that Munich would: "**do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the [contingent commissions].  I apologize for the consternation that this has caused within the Marsh organization**." [Emphasis added.]

241.    Similarly, in an internal email generated from the American Re Insurance Company ("American Re"), an American Re employee refers to what the company can and cannot discuss concerning its agreements with Marsh Inc. Global Broking, referring to them as "**the 'third rail' of PSA commission**." [Emphasis added.]

242.    In addition, the "Placement Service Agreement" between Marsh Inc. and AIG dated January 1, 2003, contained a confidentiality clause prohibiting AIG from disclosing any of the terms of the agreement.

G.    **MMC's Culture of Profit-Mongering was Rampant
        Throughout its Entire Business**

243.    MMC's culture of profit-mongering was not limited to MMC's Insurance business but, instead, was rampant throughout MMC's various businesses.

244.     Mercer, MMC's business consulting division, was also poisoned by conflicts of interest which subverted its clients' best interests for kick-backs from vendors.

245.     At Putnam, MMC's mutual fund business, MMC engaged in illicit market-timing and late-trading activities that benefited Putnam's favored large investors over the majority of its other investors.

246.     Trident, an investment partnership in which MMC, together with its most senior officers and directors, jointly invested, is an egregious example of how MMC's leadership profited while MMC's shareholders subsidized their risks.

### 1.     Mercer's Contingent Commission Scheme

247.     Under the Mercer name, MMC provides consulting and human resource ("HR") outsourcing services to clients around the world.

248.     One of Mercer's specialties is providing consulting services to businesses seeking health insurance and group employee benefits.  In this business, Mercer provides consulting services to employers seeking to purchase group health, life, accident or disability insurance for their employees.

249.     Mercer holds itself out to its clients as a trusted expert in the analysis and placement of employee benefit insurance policies.  Municipalities, educational institutions, businesses and individuals who need insurance retain Mercer to help them design individualized insurance plans for their employees and negotiate with insurance companies and other vendors to get the best mix of coverage, service, financial security and price.  Thus, Mercer, in its capacity as a broker, is contracted to solicit requests for proposals from insurers, present the insurers' proposals to the employer, recommend the optimal proposal and represent the employer in negotiations with the insurer.

250.    However, like its parent MMC (through Marsh Inc.) Mercer entered into secret kick-back arrangements with vendors and insurers that it was supposed to be soliciting for competitive bids and steered its clients' business to those vendors and insurers that gave Mercer the most lucrative kickbacks.

251.    One example of Mercer's kick-back scheme involved the Houston Independent School District ("HISD") and other Texas school districts.  In 2000, Mercer was hired by HISD to assist it in privatizing its employee benefits plans.  Mercer's consulting arrangement with HISD was highly lucrative averaging more than $500,000 per month in consulting fees.

252.    Mercer's consulting contract with HISD provided that it would "provide 30 days prior written notice to Client detailing any arrangement or agreement between Consultant and any 3rd Party currently existing, where the arrangement or agreement is related to the Services under this Agreement and where such relationship creates or reasonably could be anticipated to create an opportunity for Consultant to benefit financially in any other material manner from the Client's contract with the 3rd party."  In addition, the contract required Mercer to immediately disclose any payments received from third-parties that could be construed as an inducement for Mercer to place business with that third-party.  Nevertheless, Mercer, consistent with its parent's business plan, ignored these contractual and fiduciary obligations.

253.    Unknown to HISD, rather than provide independent and unbiased brokerage services to HISD, Mercer secretly conspired with various insurers and vendors to steer the HISD business to vendors with which Mercer had secret kick-back arrangements.  Moreover, Mercer secretly acted as an agent for both the insurer and the school district.

254.    For example, in the Fall of 2000, Mercer caused HISD to put its disability, hospital indemnity, and cancer voluntary insurance policies out for a request for proposal prior to

the policies' renewal dates.  Unknown to HISD, Mercer entered into a secret agreement with

American Bankers, a cancer and hospital indemnity provider, to be American Banker's agent.  It

then advised HISD to place a health benefits insurance contract with American Bankers without

disclosing to HISD that Mercer was acting as American Banker's exclusive agent.

255.    Another example involved Mercer's renewal of HISD's life insurance benefits

contract with Hartford Life Insurance Company.  Unknown to HISD, at the time that Hartford

Life's insurance contract with HISD was up for renewal, Mercer was serving as Hartford Life's

exclusive agent.  While Mercer issued an RFP on HISD's behalf, rather than conduct a true

competitive bidding process to secure the most cost-effective bid for HISD, Mercer simply

renewed HISD's contract with Hartford Life.  According to a complaint filed by HISD, Mutual

of Omaha ("Mutual") was prepared to submit a competitive bid for this contract, but Mercer told

Mutual to submit a "less competitive watered down product" than it originally planned to submit.

256.    Mercer's conduct has not only exposed it to a class action suit in Texas which

seeks treble damages and injunctive relief, it has also drawn the scrutiny of the Texas

Department of Insurance.  According to the Department of Insurance website:

> The Texas Department of Insurance is aware of the developments in New York
> challenging improper pricing and sales practices by some brokers and insurers
> and is actively looking into the matter.  As always, we will vigorously enforce our
> laws and take whatever action is appropriate after our investigation is concluded.

### 2.    Mercer Conspires with Insurers to Conceal its Kickbacks

257.    Mercer's kick-back scheme with vendors and insurers was a well-entrenched

business practice and a significant source of its revenue.  It is apparent that Mercer undertook

extraordinary means to ensure that its clients would not discover these back-door payments

because these payments were increasing the premiums that the clients were paying.

258.     Yet, in hiding its scheme from its clients, Mercer faced a legal obstacle provided by federal law.  Federal law requires most private employers to disclose all compensation that they pay to brokers in connection with the purchase of ERISA-covered benefit insurance for their employees.  The employer must report this information to the U.S.  Department of Labor on a "Form 5500."

259.     Often the employer – Mercer's client – does not pay the broker's commission directly because the broking fee is bundled into the premium payment that the client pays to the insurer.  In these cases, the broker extracts its commission from the premium payment.  Thus, the insurer that receives the premium from the employer usually prepares a schedule for the Form 5500 ("Schedule A" or "Form 5500") on behalf of the employer, which reports the amount of compensation the insurer has paid to the employer's broker out of the premium payment.  Of course, the insurer, as part of its practice, would also include any other fees, including contingent fees, paid to the broker on the Form 5500.

260.     Because the Form 5500's reporting requirement threatened to expose Mercer's practice of receiving secret contingent commissions – styled as "override payments" or "bonuses" – from insurers, Mercer lobbied insurers to stop reporting these override payments on the Form 5500.  As early as 2001, an employee at one of Mercer's preferred insurers – Aetna – wrote to a fellow employee about the "big" issue of Mercer not wanting the insurer's "commissions" to Mercer "showing up" on a Form 5500:

> [A] BIG issue we will have with the [large brokers] is what do we do with those accounts where we are not currently paying any commissions (client is paying them directly) .  .  .  plus the issue of these monies now possibly showing up on a 5500.

261.     At a major conference with insurance brokers in September 2003, Mercer was reported to have indicated a preference that "the expenses/funding not appear on the 5500 form."

262.    Mercer's concern with insurers reporting kick-backs on the Form 5500s was obvious.  If the Form 5500 disclosed a higher commission paid to the broker than the commission that Mercer was supposed to receive from the client, Mercer would have to disclose its contingent fee agreements.  Mercer expressed this concern at the September 2003 conference.  Referring to the contingent fee payments from insurers as "overrides," Mercer stated that having these contingent commissions reported on the Form 5500 "is not ideal for us because overrides and regular commissions might be combined on one amount, raising questions from clients on why our commission disclosures are less than [Form 5500] commission."  Mercer then demanded that insurers not report these payments: "This could be a potential deal-breaker for us."

263.    As Mercer continued to press for the non-disclosure of contingent commissions on Form 5500s, Aetna and other insurers began to acquiesce in this scheme and style their payments to Mercer as something other than contingent payments.  For example, an internal Aetna email refers to characterizing a payment to Mercer as a "service fee" because Aetna otherwise did not have a "contractual vehicle" to pay Mercer a kick-back without disclosing it on the Form 5500: "Today, we do not have a contractual vehicle to pay 3%-5% of book of business premium, non-5500 disclosed.  Probably end of April timeframe . . .  until then, the only vehicle we have is service fee payments, either single case or aggregate production."

264.    To cooperate with Mercer, Aetna came up with other solutions to not report contingent commissions on the Form 5500.  In another email to Mercer, Aetna suggests "other alternative options" to structure its contingent fees so that they would not have to be disclosed: "The full amount will be 5500 reportable.  If this does not work, we can provide alternative options, such as a producer administrative agreement."

265.   These "alternative options" became quite popular.  In another internal Aetna email, an Aetna employee describes how Marsh was interested in structuring its contingent fees so that they would not be disclosed on the Form 5500:  "Marsh is interested in having most of their bonus off of the 5500." Other brokers copied Mercer to the point that an internal Aetna e-mail complained, "We are encouraging our Producers to be paid MORE off of the 5500.  I thought it was Aetna's position to have bonus reportable."

266.   Led by Mercer and other large brokers, the scheme to not report contingent agreements became a widespread practice in the industry.  As one insurance broker commented on the practice, "[o]ur ability to place business with Aetna . . . depends on your ability to address certain essential issues [including] . . . [a]n override agreement custom to our operations. . . ."  The broker insisted that any Form 5500 must be sent to it and that other carriers "do not disclose [override] fees on the Schedule A Form 5500."  The broker concluded that "[w]ith satisfactory resolution to the above issues, Aetna is immediately placed on a 'level playing field' with other carriers . . . ."

267.   Mercer's scheme of extracting improper kickbacks from insurers and pressuring these insurers not to reveal the scheme in documents required to be filed with the Department of Labor is just another example of the pervasive culture at MMC of concealing fraudulent activity and improperly inflating MMC's revenues.

### 3.   Problems at Putnam

268.   The problems at MMC were not limited to those lines of its business that brokered or consulted on insurance, but extended to all aspects of MMC's business.  The philosophy of promoting profits for MMC at the expense of customers and, ultimately, investors, extended also to MMC's mutual fund company – Putnam.

269.    Putnam engaged in a practice known as "market-timing," which allows certain favored investors in mutual funds to benefit at the expense of the rest of the investors.  Putnam's market-timing was the subject of an SEC complaint and settlement, dated April 8, 2004, pursuant to which Putnam paid a fine of $50 million and disgorged $5 million in profits from this wrongful activity.  An identical fine and disgorgement was also required by the terms of Putnam's settlement with the State of Massachusetts.  Thus, Putnam paid a total of $111 million to settle regulatory actions arising out its market-timing activities.

### 4.    The Trident Funds, Owned and Operated by a MMC Subsidiary, MMC Capital, Created Enormous Conflicts of Interest

270.    In addition to illicit business practices in MMC's brokerage business and in Mercer and Putnam, MMC's subsidiary, MMC Capital, is under investigation by the SEC in connection with three investment funds, known as Trident I, Trident II and Trident III (the "Trident Funds"), which MMC Capital created and operates.  According to MMC's Form 8-K dated December 22, 2004:

> On December 21, 2004, Marsh & McLennan Companies, Inc.  ("MMC") received a request for information pursuant to a formal investigation commenced by the Securities and Exchange Commission.  The request for information seeks documents and other information concerning related-party transactions in which a director, executive officer or 5% stockholder of MMC had a direct or indirect material interest, including transactions with the Trident funds.

271.    The Trident funds are a set of three investment partnerships that MMC's MMC Capital subsidiary set up beginning in 1994 to invest in insurance-related businesses.  The initial fund, Trident, was very successful, leading to the formation of a second fund, Trident II, in 1999.  Trident III was founded in 2003 and was closed to further investment in July 2004.  According to their website:

> The Trident Funds make private equity and equity-related investments in the global insurance and financial services industries including investments in the property & casualty, life, health, reinsurance, insurance distribution, insurance

services, insurance and financial services related technology, human resources
and employee benefits industries.  The Trident Funds target investments with
aggregate commitments in excess of $25 million.

272.    Since 1994, the Trident Funds have raised more than $3 billion from investors.
The Funds have invested in at least twelve insurers, including Ace Ltd., a company run by Evan
Greenberg, a brother of Defendant Greenberg, XL Capital Ltd., and Axis, all publicly traded.
Lesser-known companies financed by MMC include Danish Re, a Lloyd's of London syndicate
formed in 1999 that operates in Europe; James River Specialty, an insurer in Richmond, Va., that
began underwriting property and casualty insurance in July 2003; and the Gulf Insurance Group,
a provider of specialty business insurance coverage.

273.    MMC has invested in all three Trident Funds, with investments in each fund of
approximately $300 million.  MMC officers and Board members also have invested in the funds.
Defendant Greenberg, who "resigned" from MMC on Oct. 25, 2004, as MMC's CEO, and non-
party Davis, the chief executive of MMC Capital, were among the largest individual investors in
the partnerships.  *The New York Times* reported that Defendant Greenberg's stake in the
partnerships had a future payout value of $2.8 million at the end of 2003 and Davis' investments
in the partnerships were valued at $4.9 million.

274.    According to an article in *The New York Times* on October 27, 2004, while it is
not unusual for financial and insurance companies and their executives to invest together in
partnerships created by the companies, it is rare for directors of a company, whose duty is to
protect the interest of shareholders, to do so.  Indeed, the Trident III fund excluded directors
from investing.

275.    Part of the reason for such limitations on investors is the potential for conflicts of
interest.  Despite the concerns about possible conflicts, Trident and MMC conducted several

deals together.  In June 2002, Trident bought 43 percent of a small insurance broker called the

Arc Group from MMC for $23.6 million.  The purchase resulted in a $9 million profit for MMC.

276.     The SEC, in its pending investigation into the Trident Funds, apparently is

examining these potential areas of conflict between MMC and the funds.  In addition, according

to a *Forbes* December 23, 2004 article, Standard & Poor's Equity Research reiterated a "hold"

rating on MMC, citing the SEC investigation.  "We believe the Trident Funds have held

investments in several reinsurers and property and casualty insurers," S&P Equity Research said,

adding that the probe might be part of an industry-wide probe into possible abuses of financial

insurance and reinsurance transactions in order to manipulate accounting and earnings.

## IX.     THE TRUTH IS REVEALED AND SUBSEQUENT EVENTS

277.     On October 14, 2004, the pervasive wrongdoing at MMC and Marsh Inc. was

publicly revealed when New York State Attorney General Eliot Spitzer ("NYAG") announced

that his office had filed suit against both companies.  A press release describing the allegations of

that suit stated that Marsh Inc. "steered unsuspecting clients to insurers with whom it had

lucrative payoff agreements, and that the firm solicited rigged bids for insurance contracts."  It

was also announced that "two insurance company executives have pleaded guilty to criminal

charges in connection with the scheme."

278.     Those insurance company executives were Jean-Baptiste Tateossian and Karen

Radke, two former mid-level managers at AIG, who on October 14, 2004, each pleaded guilty to

one count of violating section 190.65 of the NY Penal Law: Scheme to Defraud 1st Degree (E

Felony), for their participation in the improper scheme involving AIG, MMC and Marsh Inc.

279.     MMC issued a press release on October 14, 2004, concerning the allegations

made in the NYAG Action:

> We take very seriously the allegations made public by Attorney General Spitzer today.  We have been cooperating with the Attorney General's investigation since it began in the spring but have not been made aware of the charges until now.
>
> We are committed to getting all the facts, determining any incidence of improper behavior, and dealing appropriately with any wrongdoing.  This is our highest priority.  Marsh is committed to serving its clients to the highest professional and ethical standards as demonstrated by its long history as the industry's leader.

280.    The independent directors of MMC, in an apparent bid to distance themselves from the alleged wrongdoing at MMC, and allay investor concern, issued a separate statement on October 14, 2004:

> The Board of Directors of Marsh & McLennan Companies, Inc. has learned of the lawsuit brought against Marsh & McLennan by the Attorney General of New York.  An independent review is underway.  The review will be thorough, prompt and efficient.  Pending the results of the review, we will not draw any conclusions.  We have full confidence in the company's leadership.  When the review has been concluded, the Board will take all appropriate action in the interests of our shareholders, employees and our clients.

281.    The Board's efforts fell woefully short, however, as the price of MMC's common stock fell sharply.  MMC's stock, which had closed at $46.13 per share (on trading volume of approximately 1.355 million shares) on October 13, 2004, the day before the disclosure, dropped to a close of $34.85 per share (on trading volume of 44.415 million shares) on October 14, 2004, the day that MMC's and Marsh Inc.'s fraudulent activities became public.

282.    In tacit acknowledgement of the truth of the allegations of the pervasive wrongdoing by MMC, on October 15, 2004, MMC announced that it was suspending its market services agreements:

> Marsh & McLennan Companies, Inc. (MMC) announced today that Marsh Inc., its risk and insurance services subsidiary, will immediately suspend its practice of market services agreements (MSA) with insurance carriers.
>
> Today's decision was made in light of the serious allegations and questions that have been raised about this long standing industry practice.

Jeffrey W. Greenberg, chairman and chief executive officer of MMC, said today: "We are greatly disturbed by the allegations of wrongdoing. We take them very seriously, and we are conducting a thorough investigation of these allegations. As the facts are being reviewed, we believe it is in the best interest of our clients to suspend MSAs immediately."

283.    On October 15, 2004, the fallout from the public disclosure of MMC's and Marsh

Inc.'s illicit schemes continued as MMC issued a press release announcing that Groves was

resigning as the CEO of Marsh Inc.  The press release stated, in pertinent part, that:

Marsh & McLennan Companies, Inc. (MMC) today announced a change in the management of Marsh Inc., its risk and insurance services subsidiary.

Michael G. Cherkasky has been named chairman and chief executive officer of Marsh Inc. effective immediately . . . .

Mr. Cherkasky succeeds Ray J. Groves, who has served as chairman and chief executive officer of Marsh since 2003.  Mr. Groves will become senior advisor to Marsh.  Roger E. Egan will continue as president and chief operating officer of Marsh Inc.

Jeffrey W. Greenberg, chairman and chief executive officer of MMC, said:

"Since learning about the Attorney General's allegations, we have taken strong and immediate action.  We are committed to determining the facts, and we will take all appropriate action to deal with any incidence of wrongdoing and assure we are serving the best interests of our clients.  Mike's appointment as chairman and chief executive officer of Marsh recognizes the new additional priorities that the company faces.  At the same time, this change will allow Roger Egan to support that effort and devote his time to managing the business and serving clients."

"Pending completion of the investigation, we have suspended market services agreements (MSAs), and we are actively reviewing every aspect of Marsh's business to identify and stop any practices that might encourage behavior that is inconsistent with our values and commitment to the highest professional and ethical standards."

284.    Despite MMC's efforts at damage control, the market's negative reaction

continued due, in large measure, to the uncertainty surrounding the magnitude of the MSA

revenues at MMC and the impact of the suspension of the contingent commission agreements.

Thus, on October 15, 2004, Bear Stearns issued a research report stating:

News of a civil suit filed against Marsh & McLennan's insurance brokerage operations by the NY State Attorney General Eliot Spitzer, sends the market into a tail spin.

The markets reacted negatively yesterday to New York Attorney General Eliot Spitzer's filing with the New York State Supreme Court which alleges that Marsh & McLennan's insurance brokerage operations did not: 1) sufficiently disclose placement contingent commission arrangements with insurers to their clients, 2) engaged in anti-competitive practices, and 3) did not act in its clients' best interest as a fiduciary representative.  The language of the filing is in our opinion very negative and implies evidence of industry price-fixing.  Although the use of contingent commissions has been a known industry issue, and in some cases has been disclosed by some insurance brokers, the percentage of revenues derived from this type of commission structure above and beyond the standard commission compensation structure has not been disclosed by the insurance brokerage industry.  This suit serves to increase the scrutiny on such business practices, and raises questions which could have a long term implications for Marsh's margins, and by extension, the industry's business practices in general.

285.    On October 15, 2004, Legg Mason downgraded MMC to a "Sell," characterizing the allegations of bid-rigging as a "smoking-gun," noting that questions about MMC's management were substantial in light of the kick-back scheme:

Having read the official complaint, we believe that the issues involved are greater than just the practice of contingent commissions, and, therefore, we believe that there may be additional charges and negative headlines that will weigh on the stock for the foreseeable future.  It is our belief that this complaint, in one form or another, will expand to include most of the publicly traded brokers and additional carriers.  While we had felt that this issue was riskier than the Street consensus, we did not believe that a "smoking gun" existed.  (A smoking gun being direct evidence that a client was placed in an appropriate insurance policy solely to collect a contingent commission).  **If the allegations of false bids are substantiated then this is the smoking gun.**  [Emphasis added.]

*       *       *

Prior to last year, Marsh and McLennan had been viewed as one of the best-managed companies in the insurance industry.  With the issues at Putnam over the last year, this reputation took a hit; however, the company had begun to restore credibility through changing the management at Putnam and improving investor communications (such as beginning to host quarterly conference calls and scheduled analyst day for next month).  Yesterday's allegations, by being so company-specific, raise additional concern regarding management. . . . therefore, we believe a Sell rating is most appropriate on the shares.

286.    MMC's common stock further dropped from a close of $34.85 per share on

October 14, 2004 to close at $29.20 per share on October 15, 2004, on trading volume of

approximately 96.325 million shares – more than double the volume on October 14, 2004.

287.    On October 18, 2004, MMC purported to provide information to the market

concerning its MSA revenue.  In a press release entitled "MMC Provides MSA Information,"

MMC stated:

> The company announced today that in 2003, revenue from MSAs recorded by
> Marsh amounted to $845 million, representing 12 percent of MMC's risk and
> insurance services revenue of $6.9 billion and 7 percent of MMC's total
> consolidated revenue of $11.6 billion.
>
> For the six months ended June 30, 2004, MSA revenue was approximately $420
> million, which was 11 percent of risk and insurance services revenue and 7
> percent of MMC's total consolidated revenue.
>
> MSA revenue has been part of overall compensation for Marsh's services.  The
> suspension of MSAs will negatively impact near-term operating income.  The
> expenses directly associated with Marsh's global distribution activities amounted
> to approximately $340 million for 2003.  This amount excludes embedded local
> office expenses that support placement activities.  Therefore, it is not possible to
> calculate a specific operating income margin for MSA revenue.

288.    That press release, however, was itself misleading because it implied that some

portion of the $340 million in global distribution costs was tied to the receipt of the contingent

commissions.  Thus, in attempting to blunt the adverse effects of MMC's and Marsh Inc.'s

suspension of MSAs, MMC falsely represented that it was "not possible to calculate a specific

operating income margin for MSA revenue." As alleged herein, however, there were no costs or

expenses associated with MSA revenue because neither MMC nor Marsh Inc. provided any

actual services in exchange for the contingent commissions.

289.    On October 18, 2004, *The Wall Street Journal Online* published an article

concerning the NYAG Action against MMC and Marsh Inc.  In that article, it reported that

Spitzer privately told his top officials that the wrongdoing at MMC and Marsh Inc. was "the

same kind of cartel-like behavior carried out by organized crime." The article reported that Peter

Pope, the Deputy Attorney General for the Criminal Division, stated that "[i]t's like the Mafia's

'Cement Club.' . . . . referring to construction projects in which a corrupt contractor rotated

cement companies into jobs based on kickbacks."

290.    *The Wall Street Journal Online* article further reported that "[t]he fees are so

profitable that Prudential Securities Insurance analyst Jay Gelb estimates their absence is likely

to put Marsh's earnings per share in the neighborhood of $2.25 instead of $3.45 as previously

estimated." The article also noted that MMC's stock had been "pummeled by the scandal, losing

$9 billion in market capitalization last Thursday [Oct. 14, 2004] and Friday [Oct. 15, 2004]."

291.    On October 19, 2004, William Blair & Company issued a research report that

exemplified the market's surprise at MMC's illicit practices:

> Suspension of MSA Represents Major Indictment
>
> The company announced last Friday that it was "suspending" the use of MSAs,
> which we believe is a major indictment against the use of such practices for all
> insurance brokers – including Aon – and represents aggressive action by Marsh &
> McLennan to help stem client defections and pacify regulators. This indictment is
> particularly serious – in our opinion – given that the company and the industry
> vehemently defended such compensation practices when it was announced earlier
> this year that regulators were scrutinizing the appropriateness of these practices.

292.    On October 20, 2004, Deutsche Bank-North America issued a research report

describing the market repercussions of the disclosure of MMC's wrongdoing:

> Significant value lost. Over the past four trading days, Marsh & McLennan has
> lost $11 billion of market capitalization. The shares have declined 48%,
> compared with a 1% decline for the S&P 500. The New York Attorney General
> Eliot Spitzer's civil suit against Marsh & McLennan regarding contingent
> commissions and bid rigging prompted this reaction.

293.    On October 21, 2004, the New York State Insurance Department issued a citation

ordering MMC, Marsh Inc. and a number of MCC's and Marsh Inc.'s affiliates which hold

87

insurance licenses in New York State, to appear at a November 23, 2004 hearing to show cause

why regulatory action should not be taken against them.

294.    On October 25, 2004, eleven days after the revelation of wrongdoing at the

Company, MMC issued a press release announcing that Defendant Greenberg had resigned:

> The Board of Directors of Marsh & McLennan Companies, Inc. (MMC) today
> took a series of actions designed to enable the company to resolve its legal and
> regulatory issues while continuing to provide high-quality service to its clients.
>
> The MMC Board of Directors has accepted the resignation of chairman and chief
> executive officer Jeffrey W. Greenberg.
>
> The Board has named Michael G. Cherkasky as president and chief executive
> officer of the company and elected him to the Board of Directors.  Mr. Cherkasky
> will also continue in his current role as chairman and chief executive officer of the
> company's risk and insurance services subsidiary Marsh Inc.
>
> The Company also announced the formation of a special committee of outside
> directors "to spearhead the company's activities in resolving its legal and
> regulatory matters."

295.    On October 26, 2004, MMC issued a press release announcing that MMC was

implementing "a series of significant reforms to its business model that will ensure that the best

interests of its clients are served and that every transaction is executed in accordance with the

highest professional and ethical standards."  In announcing these reforms, MMC in essence

admitted, among other things, that the contingent commissions were **not** disclosed to clients as

had been previously represented.  The release further stated:

> Accordingly, the following reforms will be initiated by January 1, 2005:
>
> Marsh has permanently eliminated the practice of receiving any form of
> contingent compensation from insurers.
>
> All revenue streams will be 100 percent transparent to clients.  Each client will
> receive a full accounting of all revenue earned by Marsh, including fees, retail
> commission, wholesale commission and premium finance compensation, if any.
>
> Marsh will insist that insurance companies show commission rates on all policies.

Marsh will seek consistent commission rates so that insureds are better able to compare costs of alternative proposals.

Marsh will provide transparency to its clients regarding its negotiations with insurers on their behalf.

296.    On October 26, 2004, Smith Barney Citigroup issued a research report that questioned the impact of the reforms on MMC's profitability going forward.  The report stated in relevant part:

It remains to be seen how potent or profitable Marsh's new model will be, and what franchise damage will occur as a result of the scandal.  Clearly the new business model is not the result of extended strategic deliberations, but rather a response to a crisis.  **Marsh has already foregone a highly-profitable revenue stream (contingent commissions), and we think it will be quite challenging to replace this lost revenue from other sources.**  If anything, it seems more logical to us that Marsh's clients (regardless of the actual payment mechanism) will negotiate aggressively with the company vis-à-vis its compensation.  **Also, in a business predicated on client trust, Mr.  Greenberg's departure will not likely eliminate loss of credibility with clients, leaving Marsh, the world's largest insurance broker with approximately 41% of the global market, vulnerable to loss of business**.  .  .  .  [Emphasis added.]

297.    On November 1, 2004, MMC issued a press release announcing that it (through Marsh Inc.) was attempting to collect contingent commission receivables for MSAs in effect prior to October 15, 2004 to partially fund a restitution fund created by MMC in response to this crisis.  That press release gave further insight into the magnitude of the revenue loss to MMC caused by the elimination of the contingent commissions:

Marsh & McLennan Companies, Inc. (MMC) announced today that Marsh Inc., its risk and insurance services subsidiary, is taking steps to collect all amounts owed to it by insurance markets under market services agreements (MSAs) that were in effect prior to October 15, 2004, when Marsh announced it was terminating the practice.  The company said it will place amounts collected into a segregated account to be used in connection with any restitution agreement it may reach with the Attorney General of the State of New York.  As of September 30, 2004, such amounts were approximately $230 million.

298.    On November 8, 2004, MMC issued a press release announcing that Defendant Egan and Christopher Treanor had been asked to step down from their positions, and that

MMC's General Counsel William L. Rossoff was resigning, as the effects of the disclosure of the fraudulent conduct continued:

> Marsh & McLennan Companies, Inc. (MMC) reported today that Roger E. Egan, president and chief operating officer of Marsh Inc., its risk and insurance services subsidiary, and Christopher M. Treanor, Marsh Inc.'s chairman and chief executive officer of Global Placement, have been asked to step down from their positions but will help with transition.

> \*       \*       \*

> Michael G.  Cherkasky, president and chief executive officer of MMC and chairman and chief executive officer of Marsh Inc., said: "These management decisions were difficult and were not based on any suggestion of culpability. However, at the end of the day, Mr. Egan and Mr. Treanor were accountable for the areas of the business that have been the focus of investigations by the New York Attorney General's office, and therefore, we thought it was appropriate to make these changes.  .  .  ."

> Separately, William L. Rosoff has stepped down as senior vice president and general counsel of MMC.  .  .  .

299.    On November 9, 2004, MMC conducted a conference call to discuss MMC's third quarter 2004 results in which Wijnberg, among others, participated.  During that call, Wijnberg stated that "market service revenue declined approximately $131 million and lowered EPS by $.16 cents."

300.    On November 16, 2004, Edward Coughlin and John Keenan, Senior Underwriters at Zurich, and Patricia Abrams, an Assistant Vice President at ACE, each pleaded guilty to misdemeanors in the Supreme Court of the State of New York, in connection with the criminal charges filed by the NYAG arising from the MMC and Marsh Inc. scandal.  Each was originally charged with one count of violating General Business Law section 3400 – conspiracy to form a monopoly – an E Felony.

301.    On November 18, 2004, MMC issued a press release entitled: "Management Directors Step Down From MMC Board; Directors Delay Decision On First Quarter 2005

Dividend Payment." In that release, MMC announced that public disclosure of the wrongdoing had caused MMC to restructure the composition of its board of directors:

> [f]ive members of its Board of Directors, who are also executives of the company, have stepped down from their positions on the Board.
>
> Those leaving the Board include Mathis Cabiallavetta, vice chairman, MMC; Peter Coster, president, Mercer Inc.; Charles A. Davis, vice chairman, MMC and chairman and chief executive officer, MMC Capital, Inc.; Ray J. Groves, senior advisor, Marsh Inc.; and A.J.C. Smith, chairman, Putnam Investments and former chairman, MMC.
>
> Robert Erburu, lead director of MMC's Board of Directors, said: "This step is in keeping with the company's commitment to adhering to corporate governance best practices. The Board appreciates the services of these executives."
>
> The company's Board of Directors now consists of Michael G. Cherkasky, the company's president and chief executive officer, and ten outside members of the Board.

302.    On January 6, 2005, Robert J. Stearns, a broker and Senior Vice President of Marsh Inc., pleaded guilty to one count of violating section 190.65 of the NY Penal Law: Scheme to Defraud 1st Degree (an E Felony), in connection with the scheme at Marsh Inc. In a press release on that same date, the NYAG's office stated: "In his guilty plea, the Marsh executive admitted that during a period from 2002 to 2004, he instructed insurance companies to submit noncompetitive bids for insurance business, and conveyed these bids to Marsh clients under false and fraudulent pretenses. These noncompetitive bids allowed Marsh to control the market, to protect incumbent insurance carriers when their business was up for renewal, and to maximize Marsh's profits."

303.    On January 21, 2005, the State of Connecticut filed a complaint against MMC and Marsh USA Risk Services, Inc. and ACE Financial Solutions, Inc. in the Superior Court for the Judicial District of Hartford for Unfair Trade Practices in connection with Connecticut's purchase of insurance through MMC and its subsidiary.

304.     On January 31, 2005, both the NYAG office and MMC issued press releases announcing MMC's settlement of the actions filed by the NYAG.  The press releases announced the creation of an $850 million restitution fund for MMC's and Marsh Inc.'s clients that were harmed by MMC's and Marsh Inc.'s bid-rigging and improper steering, as well as the adoption of corporate reforms by MMC.  The NYAG press release stated, in pertinent part:

> Marsh also issued a public statement in which it apologized for "unlawful" and "shameful" conduct, and promised to adopt reforms.
>
> To its credit, Marsh is not disputing the problems identified in our original complaint," Spitzer said.  "Instead, the company has embraced restitution and reform as a way of making a clean break from the practices that misled and harmed its clients in the past.

305.     The MMC press release quoted MMC President and CEO, Michael G. Cherkasky:

> For over 130 years, Marsh has earned its clients' trust by providing the highest quality insurance brokerage service.  We deeply regret that certain of our people failed to live up to our history of dedicated client service.  The acts of these employees were inconsistent with the integrity and ethics on which this company was founded and which guide our tens of thousands of other employees every day.  We thank our thousands of clients who have permitted us to continue providing them high quality insurance brokerage service, and we humbly ask our existing and future clients for the opportunity to continue demonstrating our long-standing commitment to providing value and service.

306.     In addition, the press release provided details concerning the settlement:

> Under the settlement agreement, MMC will establish an $850 million fund to compensate clients nationwide.  No portion of this fund represents a fine or penalty.
>
> The fund will compensate U.S. policyholder clients who retained Marsh to place insurance with inception dates between January 1, 2001 and December 31, 2004, where such placements resulted in contingent commissions or overrides recorded by Marsh between January 1, 2001 and December 31, 2004.  These clients will be eligible to receive a pro rata portion of the fund based on the premium and the amount of estimated Market Service Agreement revenue recorded by Marsh between January 1, 2001 and December 31, 2004.  These clients will be eligible to receive a payment without having to prove fault, harm, or wrongdoing.

MMC will pay the total amount of the fund in four annual installments.  On June 1, 2005 and 2006, respectively, MMC will pay $255 million into the fund.  On June 1, 2007 and 2008, respectively, MMC will pay $170 million into the fund.

In addition to the $232 million reserve established in the third quarter of 2004, MMC said it will take a pre-tax charge to fourth quarter 2004 earnings of $618 million to reflect the impact of the settlement.

As part of the agreement and in keeping with the company's commitment to be a leader in establishing and maintaining the highest standards in its industry for the benefit of clients and shareholders, the company has established the following reforms in its U.S. brokerage business:

MMC has discontinued the practice of receiving contingent compensation from insurance carriers.  The company adopted this new policy effective October 1, 2004.

The company will provide clients with a comprehensive disclosure of all forms of compensation received from insurers.

The company will adopt and implement company-wide, written standards of conduct for the placement of insurance.

The company will provide all quotes and terms as received from insurance companies to enable clients to make informed insurance coverage decisions.

MMC will establish a Compliance Committee of the MMC Board of Directors and has appointed a chief compliance officer.

307.    Since the filing of the NYAG's complaint in October 2004, MMC has restructured its Board of Directors so that the Board now consists of ten outside directors, in addition to its newly appointed president and CEO, Mr. Cherkasky, who serves as the single management director.

308.    The MMC press release also appended a summary of the factual observations made by DPW, MMC's and Marsh Inc.'s outside counsel, which had been retained to conduct an investigation of the allegations of bid-rigging and steering.  As described above, DPW's report essentially admitted that Marsh Inc. steered customers, engaged in a process of fake bids and actively hid its contingent commission revenues from its clients and the investing public.

309.     On February 15, 2005, Joshua Bewlay, a Managing Director at Marsh Inc., John Mohs, a vice president at AIG, and Carlos Coello, an underwriter at AIG, each pleaded guilty to one count of violating section 190.65 of the NY Penal Law: Scheme to Defraud 1st Degree (E Felony).

310.     According to MMC, as of February 15, 2005, offices of attorneys general in 18 jurisdictions have issued one or more requests for information or subpoenas calling for the production of documents or witnesses to provide testimony.  In addition, MMC and certain subsidiaries have received subpoenas, letters of inquiry and other information requests from other departments of insurance or other state agencies in 29 jurisdictions.

311.     On February 24, 2005, Kathryn Winter, a broker and Managing Director at Marsh Inc., pleaded guilty to one count of violating section 190.65 of the NY Penal Law: Scheme to Defraud 1st Degree (E Felony).

312.     The effects of the public disclosure of MMC's and Marsh Inc.'s fraud have been disastrous for MMC.  In November 2004, MMC announced that it was cutting 3,000 jobs, or 5% of its staff, and would incur $325 million in restructuring charges over the following six months. On March 1, 2005, MMC announced fourth quarter and year-end 2004 results that were a far cry from the dynamic revenue growth generated during the Class Period:

> In the fourth quarter, consolidated revenues declined 1 percent to $3 billion. After restructuring, regulatory settlements, and related expenses, the company reported a net loss of $676 million in the fourth quarter, or a loss of $1.28 per share.  Full-year consolidated revenues were $12.2 billion, up 5 percent over the prior year.  Net income for the full year was $180 million, or earnings per share of $.34.  MMC's Board of Directors has declared a first quarter 2005 dividend of $.17, a 50 percent decline.

**MMC subsequently announced the elimination of an additional 2,500 jobs, resulting in an additional $337 million in restructuring expenses.**

313.    In its 2004 Form 10-K, MMC provided additional details concerning the negative

effects of the disclosure of its fraud and the elimination of contingent commission revenues:

> **Operating income in 2004 declined 74%** to $648 million, reflecting costs of
> regulatory settlements at Marsh and Putnam and costs related to restructuring
> MMC's businesses.  Results in risk and insurance services include **an $850
> million charge related to the settlement agreement reached with the NYAG
> and NYSID, the impact of a $304 million decrease in MSA revenue, and $231
> million of restructuring charges.**  [Emphasis added.]

314.    In the Form 10-K, MMC further explained that it had changed its business model

to, *inter alia*, eliminate contingent commission revenues.  MMC, however, admitted that it had

experienced "credit rating downgrades and the inability to access commercial paper markets" as

a consequence of the "uncertainty regarding changes in Marsh's business model, the impact of

eliminating contingent compensation agreements and potential fines and/or penalties . . . ."

MMC also warned:

> [T]here is no assurance that revenues under the new model will be sufficient to
> achieve operating margins and cash flows that are comparable to historical levels.
> In addition, client revenue may also be reduced due to negative reaction to the
> issues raised in the complaint.

315.    On March 31, 2005, MMC filed a definitive proxy with the SEC on Form 14A.

In that proxy, MMC disclosed that it may take the position that Defendant Greenberg's

resignation from MMC was involuntary.  Accordingly, Greenberg may be required to forfeit

more than 760,000 shares of restricted MMC stock as a consequence of his termination of

employment stemming from the wrongful steering:

> At the time of his termination of employment in October 2004, Mr. Greenberg
> held restricted stock or restricted stock units representing 762,603 shares of MMC
> stock.  Except as noted below, all of Mr. Greenberg's restricted stock and
> restricted stock units, including those granted to him in 2004, were forfeited in
> connection with his termination of employment.  Absent such forfeiture, the
> restricted stock and restricted stock units would have had a value on
> December 31, 2004 of $25,089,639.  Following his termination of employment,
> MMC entered into a letter of understanding with Mr. Greenberg (described on
> page 21 of this proxy statement) under which, in the absence of an agreement,

both MMC and Mr. Greenberg are free to maintain their respective positions with regard to the characterization of Mr. Greenberg's termination of employment. **MMC has not yet made a determination as to the characterization of Mr. Greenberg's termination of employment.  As a result, a portion of Mr. Greenberg's forfeited restricted stock and restricted stock units may be eligible for reinstatement, depending on the resolution of the characterization of his termination of employment.**  [Emphasis added.]

## X.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

316.    Prior to, and during the Class Period, Defendants made numerous public statements omitting material facts and deliberately misrepresenting MMC's business model.  As a result, MMC's public statements disseminated during the Class Period were materially false and misleading and the price of MMC's securities was artificially inflated throughout the Class Period.  When the truth about Defendant's unlawful scheme was finally disclosed, investors in MMC lost billions of dollars as the price of MMC's shares collapsed.

**MMC States Clients Are "Well Informed" About Its Contingent Commissions and Clients are No. 1 Focus**

317.    On February 14, 2000, *Business Insurance* published a story about a lawsuit filed against Marsh Inc. and other companies, which sought, among other things, better disclosure of contingent commission practices.  The article quoted an MMC spokeswoman that described the lawsuit as "unfounded." The spokeswoman stated, "'Marsh has made considerable effort to ensure its clients are well informed about these agreements.  .  .  .  The latest example is last year we worked closely with RIMS and our clients to reach an agreement over disclosure.'"

318.    On February 17, 2000, *Bestwire Service* published a similar article about the lawsuits concerning MMC's contingent commissions.  The *Bestwire Service* article specifically identified the MMC spokeswoman by name.  According to the article, "Marsh spokesperson Barbara Perlmutter" said that "Marsh has made considerable effort to ensure its clients are well-informed about these agreements."  In further explaining that the company collects commissions

based on the total volume of business it does with specific insurers, Perlmutter made assurances that the commissions do not affect the kind of coverage MMC seeks for its clients.  Specifically, Perlmutter stated "We work for our clients . . . . We get the best coverage for them.  That's our No. 1 focus."

319.    Defendants knew or recklessly disregarded, that the statements made by Ms. Perlmutter on behalf of MMC concerning MMC's "considerable effort to ensure its clients are well- informed" about contingent commission agreements were materially false and misleading. As alleged at ¶¶238- 242, employees of Marsh Inc. engaged in considerable effort to ensure the opposite—that clients were prevented from obtaining accurate information about contingent commissions.  Bewlay, a former Marsh Inc. Senior Vice President and Managing Director in its Excess Casualty Group, testified that during his employment, Marsh Inc. had a "protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect to a particular client in addition to any fee or commission paid."   ¶238.  Bewlay further testified that "[t]he protocol required multiple layers of inquiry to discourage the client from obtaining an answer,"  and that "Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client."  ¶238.  Exchanges between Marsh Inc. and various insurance carriers with which it had contingent commission agreements further support Bewlay's sworn testimony that Marsh Inc. had a protocol designed to discourage clients from being "well-informed" about contingent commissions.  ¶¶239-242.  *See also* ¶24 (MMC's post-revelation of the fraud institution of revised client disclosure requirements is a "stark acknowledgment of the illicit nature of Marsh's prior practices.").

320.    Defendants also knew, or recklessly disregarded, that the statements made by Ms. Perlmutter on behalf of MMC that MMC's "No. 1 focus" was to get the best coverage for its clients was false and misleading because in fact MMC directed clients to insurers to maximize MMC's revenues under contingent commission agreements, rather than to serve the client's best interests or obtain the most cost-effective coverage options.  MMC's and Marsh Inc.'s improper steering of clients in order to maximize contingent commissions caused many of MMC's and Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on behalf of their clients.

**The 2000 10-K**

321.    On March 29, 2001, MMC filed its annual report on Form 10-K (the "2000 10-K"), which was signed by Greenberg, Wijnberg, Rapport, Cabiallavetta, Groves, Hardis, King, Lang, Olsen, Simmons, Sinnott and Smith.

322.    In the MD&A Section of the 2000 10-K, MMC stated:

Revenue generated by the risk and insurance services segment is fundamentally derived from the value of the services provided to clients and insurance markets. These revenues may be affected by premium rate levels in the property and casualty and employee benefits insurance markets and available insurance capacity, since compensation is frequently related to the premiums paid by insureds.  In many cases, compensation may be negotiated in advance based upon the estimated value of the services to be performed.  Revenue is also affected by fluctuations in the amount of risk retained by insurance and reinsurance clients themselves and by insured values, the development of new products, markets and services, new and lost business, merging of clients and the volume of business from new and existing clients, as well as by interest rates for fiduciary funds. Revenue and fees also may be received from originating, structuring and managing investments in insurance, financial services and other industry-focused investments, as well as income derived from investments made by MMC. Contingent income for services provided includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed.  **This revenue reflects compensation for services**

**provided by brokers to the insurance market. These services include new product development, the development and provision of technology, administration, and the delivery of information on developments among broad client segments and the insurance markets.** [Emphasis added.]

323.     Defendants knew, or recklessly disregarded, that MMC's description of "contingent income" as compensation for services provided to the insurance market was materially false and misleading. MMC provided no legitimate services to the insurance companies under the contingent commission agreements. The "services" performed by MMC and Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker. Further, the "factors" cited in the foregoing statement – "overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed" – were, in fact, the only consideration for the contingent commissions under the agreements between MMC and Marsh Inc. and the insurance companies.

**The First Quarter 2001 Press Release**

324.     On April 19, 2001, MMC issued a press release announcing its results for the first quarter of 2001. In the first quarter 2001 press release, MMC stated, "Compared to the first quarter 2000, consolidated revenues declined 3 percent to $2.6 billion." In commenting on the risk and insurance sector's performance, MMC stated:

> Revenues from Marsh's risk and insurance services business rose 5 percent to $1.4 billion. Underlying revenue (which excludes such items as foreign exchange, acquisitions, and dispositions) grew 9 percent, a reflection of net new business in each major operating territory around the world. Margins improved 3 percentage points, and operating income increased 18 percent to $381 million. **In a market where insurance rates are rising and coverage is more difficult to obtain, Marsh provides value to clients by developing the most cost-effective responses to the risks they face.** [Emphasis added.]

325.    Defendants knew, or recklessly disregarded, that the statement concerning MMC's and Marsh Inc.'s providing value to clients by developing the most cost-effective responses to the risks they face was materially false and misleading.  MMC's and Marsh Inc.'s improper steering of clients in order to maximize MMC's commissions caused many of MMC's and Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on behalf of their clients.

**The 2001 10-K**

326.    On March 29, 2002, MMC filed its annual report on Form 10-K (the "2001 10-K"), which was signed by Greenberg, Wijnberg, Rapport, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Simmons, Sinnott and Smith.

327.    In the MD&A Section of the 2001 10-K, discussing the Risk and Insurance segment, MMC stated:

> Revenue attributable to the risk and insurance services segment consists primarily of fees paid by clients; commissions and fees paid by insurance and reinsurance companies; compensation for billing and related services, in the form of interest income on funds held in a fiduciary capacity for others, such as premiums and claims proceeds; contingent income for services provided to insurers; and compensation for services provided in connection with the organization, structuring and management of insurance, financial services and other industry-focused investments, including fees and dividends, as well as appreciation or depreciation that has been realized on sales of holdings in such entities.
>
> Revenue generated by the risk and insurance services segment is fundamentally derived from the value of the services provided to clients and insurance markets. These revenues may be affected by premium rate levels in the property and casualty and employee benefits insurance markets and available insurance capacity, since compensation is frequently related to the premiums paid by insureds.  In many cases, compensation may be negotiated in advance based upon the estimated value of the services to be performed.  Revenue is also affected by fluctuations in the amount of risk retained by insurance and reinsurance clients themselves and by insured values, the development of new products, markets and services, new and lost business, merging of clients and the volume of business from new and existing clients, as well as by the level of interest realized on the

investment of fiduciary funds.  Revenue and fees also may be received from originating, structuring and managing investments in insurance, financial services and other industry-focused investments, as well as income derived from investments made by MMC.  Contingent income for services provided includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed.  **This revenue reflects compensation for services provided by brokers to the insurance market. These services include new product development, the development and provision of technology, administration, and the delivery of information on developments among broad client segments and the insurance markets.** [Emphasis added.]

328.    Defendants knew, or recklessly disregarded, that MMC's description of "contingent income" as compensation for services provided to the insurance market was materially false and misleading.  Neither MMC nor Marsh Inc. provided legitimate services to the insurance companies under the contingent commission agreements.  The "services" performed by MMC and Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker.  Further, the "factors" cited in the foregoing statement – "overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed" – were, in fact, the only consideration for the contingent commissions under the agreements between MMC and Marsh Inc. and the insurance companies.

**The May 3, 2002 Registration Statement**

329.    On May 3, 2002, MMC filed a registration statement with the SEC on Form S-4, signed by Greenberg, Wijnberg, Rapport, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Simmons, Sinnott, and Smith, in which MMC offered to exchange up to $500,000,000 of its new 5.375% Senior Notes due 2007 for up to $500,000,000 of its existing 5.375% Senior Notes due 2007, and up to $250,000,000 of its new 6.25% Senior Notes due 2012 for up to

101

$250,000,000 of its existing 6.25% Senior Notes due 2012.  These notes were originally issued by MMC in a restricted offering on March 19, 2002.  In this registration statement, MMC specifically incorporated by reference the information contained in its 2001 10-K.

330.    Defendants knew, or recklessly disregarded, that the information incorporated by reference from the 2001 10-K was materially false and misleading for the reasons alleged in ¶328 above.

331.    In connection with MMC's risk and insurance services, the registration statement stated that:

> Once client risks are identified, MMC provides advice on addressing the exposures.  This includes structuring programs for retaining, mitigating, financing, and transferring the risks in combinations **that vary according to the risk profiles, requirements and preferences of clients**.  Specific professional functions provided in this process include loss-control services, the placement of client risks with the worldwide insurance and capital markets (risk transfer), the development of alternative risk financing methods, establishment and management of specialized insurance companies owned by clients ("captive insurance companies"); claims collection, injury management, and other insurance and risk related services.  [Emphasis added.]

332.    Defendants knew, or recklessly disregarded, that the statements concerning the structuring of risk transfer programs and the placement of client risks with the worldwide insurance and capital markets based on the "risk profiles, requirements and preferences of the clients," were materially false and misleading.  The primary consideration for MMC and Marsh Inc. in the structuring of its clients' risk transfer programs, as well as the placement of client risk, was the existence of a contingent commission agreement between MMC and Marsh Inc. and the insurer, and not the risk profile, requirements or preferences of MMC's and Marsh Inc.'s clients.

**The May 23, 2002 Prospectus**

333.    On May 23, 2002, MMC filed a prospectus with the SEC on Form 424(b)(3) in connection with MMC's offer to exchange up to $500,000,000 of its new 5.375% Senior Notes

due 2007 for up to $500,000,000 of its existing 5.375% Senior Notes due 2007 and up to

$250,000,000 of its new 6.25% Senior Notes due 2012 for up to $250,000,000 of MMC's

existing 6.25% Senior Notes due 2012.  In that prospectus, MMC specifically incorporated by

reference the information from its 2001 10-K.

334.    Defendants knew, or recklessly disregarded, that certain of the information

incorporated by reference from the 2001 10-K was materially false and misleading for the

reasons alleged in ¶328 above.

335.    In connection with MMC's risk and insurance services, the May 23, 2002

prospectus stated that:

> Once client risks are identified, MMC provides advice on addressing the
> exposures.  This includes structuring programs for retaining, mitigating,
> financing, and transferring the risks in combinations **that vary according to the
> risk profiles, requirements and preferences of clients.  Specific professional
> functions provided in this process include loss-control services, the placement
> of client risks with the worldwide insurance and capital markets (risk
> transfer),** the development of alternative risk financing methods, establishment
> and management of specialized insurance companies owned by clients ("captive
> insurance companies"); claims collection, injury management, and other
> insurance and risk related services.  [Emphasis added.]

336.    Defendants knew, or recklessly disregarded, that the foregoing statements

concerning the structuring of risk transfer programs and the placement of client risks based on

the "risk profiles, requirements and preferences of the clients," were materially false and

misleading.  The primary consideration for MMC and Marsh Inc. in the structuring of their

clients' risk transfer programs, as well as the placement of client risk, was the existence of a

contingent commission agreement between MMC and Marsh Inc. and the insurer, and not the

risk profile, requirements or preferences of MMC's and Marsh Inc.'s clients.

**The August 7, 2002 Certifications of Greenberg and Wijnberg**

337.    On August 7, 2002, MMC filed a Form 8-K with the SEC incorporating by reference the sworn statements of Defendant Greenberg and non-party Wijnberg, pursuant to SEC Order No. 4-460, attached thereto as exhibits 99.1 and 99.2, respectively. Both sworn statements contained the following attestations:

(1)    To the best of my knowledge, based upon a review of the covered reports of Marsh & McLennan Companies, Inc., and, except as corrected or supplemented in a subsequent covered report:

- no covered report contained an untrue statement of a material fact as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed); and

- no covered report omitted to state a material fact necessary to make the statements in the covered report, in light of the circumstances under which they were made, not misleading as of the end of the period covered by such report (or in the case of a report on Form 8-K or definitive proxy materials, as of the date on which it was filed).

(2)    I have reviewed the contents of this statement with the Company's audit committee.

(3)    In this statement under oath, each of the following, if filed on or before the date of this statement, is a "covered report":

- Annual Report for the year ended December 31, 2001 on Form 10-K of Marsh & McLennan Companies, Inc.;

- all reports on Form 10-Q, all reports on Form 8-K and all definitive proxy materials of Marsh & McLennan Companies, Inc. filed with the Commission subsequent to the filing of the Form 10-K identified above; and

- any amendments to any of the foregoing.

338.    Defendants knew, or recklessly disregarded, that the sworn statements concerning the absence of any untrue statement or omission of material fact in MMC's 2001 Form 10-K were materially false and misleading. As alleged in ¶328, MMC's 2001 Form 10-K contained

materially false and misleading statements and/or material omissions concerning, among other things, MMC's reported financial results, the contingent commissions, and the risks related to MMC's and Marsh Inc.'s steering practices.

**The October 22, 2002 Press Release**

339.   On October 22, 2002, MMC issued a press release announcing its third quarter 2002 financial results.  In that press release, MMC reported "[c]onsolidated revenues for the quarter increased 6 percent to $2.6 billion from the third quarter of 2001." Defendant Greenberg was quoted in the press release as stating, "[t]he diversity of MMC's market-leading professional services businesses continues to benefit shareholders, even in the current environment.  **Risk and insurance services, our largest business, performed well for clients in a difficult insurance market and generated excellent results for shareholders - strong revenue and earnings growth**." [Emphasis added.]

340.   Defendants knew, or recklessly disregarded, that this statement that risk and insurance services had "performed well for clients in a difficult insurance market," was materially false and misleading.  The improper steering of clients in order to maximize contingent commissions, caused many of MMC's and Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had Marsh Inc. conducted a genuine competitive bidding process on behalf of its clients.

**The November 11, 2002 Sinnott Interview**

341.   On November 11, 2002, *The Wall Street Transcript* interviewed Sinnott:

**TWST:** When you look at the current environment from the client side, they're being asked to shoulder more risk and to be more creative in the way they address risk within their own organization.  That can lead to their saying, "If I have to take on more risk, I also have to reduce my costs for the insurance I am providing or obtaining.  Therefore, I really have to be more competitive in bidding out and

getting pricing on the policies that I do end up with." What does that say about the overall competitive landscape when you look at the advantages that Marsh Inc. has and when you look at the requirement that the clients now have on their cost side?

**Mr.  Sinnott:** […] We endeavor to meet their [the clients] capacity requirements and **their scope of coverage requirements** and **structure the program in a way that, relative to current market conditions, gives them the best possible cost equation.**  [Emphasis added.]

342.     Defendants knew, or recklessly disregarded, that the statement that Marsh Inc. endeavored to structure client's risk programs "that .  .  .  gives them the best possible cost equation," was materially false and misleading.  The improper steering of clients to certain insurance companies in order to maximize contingent commissions, caused many of MMC's and Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on behalf of their clients.

## The February 13, 2003 Prospectus Supplement

343.     On February 13, 2003, MMC filed a supplement to a prospectus dated March 30, 1999, with the SEC on Form 424(b)(2) in connection with MMC's 3.625% senior notes due 2008 and its 4.850% senior notes due 2013.  In that prospectus, MMC specifically incorporated by reference the information from its 2001 10-K.  The issuance of the prospectus supplement and the offering of the notes pursuant thereto was authorized by the MMC Board in effect at the time.

344.     Defendants knew, or recklessly disregarded, that certain of the information incorporated by reference from the 2001 10-K was materially false and misleading for the reasons alleged in ¶328 above.

## The 2002 10-K

345.     On March 26, 2003, MMC filed with the SEC its 2002 Form 10-K, which was signed by Greenberg, Wijnberg, Rapport, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang,

Olsen, Schapiro, Simmons, Sinnott, and Smith.  In the description of MMC's risk and insurance

services business in that Form 10-K, MMC stated:

> Once client risks are identified, MMC provides advice on addressing client exposures, including structuring programs for retaining, mitigating, financing, and transferring the risks in combinations that **vary according to the risk profiles, requirements and preferences of clients.  Specific professional functions provided in this process include loss-control services, the placement of client risks with the worldwide insurance** and capital markets (risk transfer), the development of alternative risk financing methods, establishment and management of specialized insurance companies owned by clients ("captive insurance companies"); claims collection, injury management, and other insurance and risk related services.  [Emphasis added.]

346.    Defendants knew, or recklessly disregarded, that the foregoing statements

concerning the structuring of risk transfer programs and the placement of client risks based on

the "risk profiles, requirements and preferences of the clients," were materially false and

misleading.  The primary consideration for MMC and Marsh Inc. in the structuring of their

clients' risk transfer programs, as well as the placement of client risk, was the existence of a

contingent commission agreement between Marsh Inc. and the insurer, and not the risk profile,

requirements or preferences of MMC's or Marsh Inc.'s or clients.

347.    MMC also stated:

> Revenue generated by risk and insurance services is fundamentally derived from the value of the services provided to clients and insurance markets.  These revenues may be affected by premium rate levels in the property and casualty and employee benefits insurance markets and available insurance capacity, since compensation is frequently related to the premiums paid by insureds.  In many cases, compensation may be negotiated in advance based upon the estimated value of the services to be performed.  Revenue is also affected by fluctuations in the amount of risk retained by insurance and reinsurance clients themselves and by insured values, the development of new products, markets and services, new and lost business, merging of clients (including insurance companies that are clients in the reinsurance intermediary business) and the volume of business from new and existing clients, as well as by the level of interest realized on the investment of fiduciary funds.

> Revenue and fees also may be received from originating, structuring and managing investments in insurance, financial services and other industry-focused

107

investments, as well as income derived from investments made by MMC. Placement service revenue includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed. **This revenue reflects compensation for services provided by brokers to the insurance market. These services include new product development, the development and provision of technology, administration, and the delivery of information on developments among broad client segments and the insurance markets.** [Emphasis added.]

348.    Defendants knew, or recklessly disregarded, that this description of "placement service revenue" as compensation for services provided to the insurance market was materially false and misleading. Neither MMC nor Marsh Inc. provided any legitimate services to the insurance companies under the contingent commission agreements. The "services" performed by MMC and Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker. Further, the "factors" cited in the foregoing statement – "overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed" – were, in fact, the only consideration for the contingent commissions under the agreements between MMC and Marsh Inc. and the insurance companies.

**The 2002 Annual Report**

349.    Attached to the 2002 Form 10-K were several documents, including the MMC 2002 annual report to its shareholders, in which it reported earnings of $1.365 billion.

350.    The 2002 annual report also contained a letter from Defendant Greenberg to MMC's shareholders, dated March 3, 2002. In that letter, Defendant Greenberg stated:

MMC had excellent results. Revenues from risk and insurance services increased 15 percent to $5.9 billion. Operating income rose 31 percent to $1.5 billion. **MMC responded to the needs of clients, who faced new risks, more complex exposures, and an insurance market characterized by reduced underwriting**

**capacity, higher rates, and restricted terms and conditions.  In this environment, MMC's specialized expertise in risk consulting and risk transfer and its longstanding relationships with global insurance and reinsurance markets are a great competitive advantage.**  [Emphasis added.]

351.    Defendants knew, or recklessly disregarded, that this statement that MMC responded to the needs of clients who faced new risks, more complex exposures, higher rates and more restrictive terms, was materially false and misleading.  The improper steering of clients to certain insurance companies in order to maximize contingent commissions and the artificial bid process, caused many of MMC's and Marsh Inc.'s  clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC or Marsh Inc. engaged in a genuine competitive bidding process on behalf of its clients.  In addition, the statements concerning MMC's  competitive advantage due to its expertise in risk consulting and risk transfer and its longstanding relationships with global insurance and reinsurance markets were materially false  and misleading.  MMC's great competitive advantage was due to Marsh Inc. engaging in improper steering and bid rigging.

352.    The 2002 annual report also contained a section entitled "Risk And Insurance Services - A conversation with John T.  Sinnott, chairman, and Ray J.  Groves, president and chief executive officer, of Marsh Inc."  In that section, Sinnott and Groves stated:

> The specialists in our **Global Broking practice** concentrate on insurance placements by industry, line of insurance coverage, and specific insurance companies.  These brokers know the global insurance markets well and have relationships with the senior decision makers in insurance companies around the world.  **This approach makes risk transfer more efficient and less costly for all the participants in the process.  It gives our clients unique access to the insurance markets and underwriters the opportunity to work with brokers who understand their individual requirements and risk tolerance.**  [Emphasis added.]

353.    Defendants knew, or recklessly disregarded, that the statement that specialization by Global Broking made risk transfer more efficient and less costly for all participants in the

process, was materially false and misleading.  The improper bidding scheme, as well as the

improper steering of clients, caused many of MMC's and Marsh Inc.'s clients to pay more in

insurance premiums and/or obtain insurance coverage with more restrictive terms than they

would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on

behalf of their clients.  In addition, Defendants knew, or recklessly disregarded, that their

description of the purported benefits inuring to MMC and Marsh Inc. clients as a result of Global

Broking's specialization failed to disclose that Global Broking engaged in a phony bid process

and steered clients in order to maximize contingent commissions, rather than acting in the best

interests of MMC's and Marsh Inc.'s clients.

354.    With respect to risk and insurance services, the 2002 annual report stated:

> Once client risks are identified, Marsh provides advice on addressing client
> exposures, including structuring programs for retaining, mitigating, financing, and
> transferring the risks in combinations that **vary according to the risk profiles,
> requirements and preferences of clients.  Specific professional functions
> provided in this process include loss-control services, the placement of client
> risks with the worldwide insurance** and capital markets (risk transfer), the
> development of alternative risk financing methods, establishment and
> management of specialized insurance companies owned by clients ("captive
> insurance companies"); claims collection, injury management, and other
> insurance and risk related services.  [Emphasis added.]

355.    Defendants knew, or recklessly disregarded, that the foregoing statements

concerning the structuring of risk transfer programs and the placement of client risks with the

worldwide insurance and capital markets based on the "risk profiles, requirements and

preferences of the clients," were materially false and misleading.  The primary consideration for

MMC and Marsh Inc. in the structuring of their clients' risk transfer programs, as well as the

placement of client risk with a particular insurance company, was whether MMC (through Marsh

Inc.) received a kickback pursuant to a contingent commission agreement, and not the risk

profile, requirements or preferences of MMC's and Marsh Inc.'s. clients.

356.    In addition, the 2002 annual report stated:

Placement service revenue includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed.  **This revenue reflects compensation for services provided by brokers to the insurance market.  These services include new product development, the development and provision of technology, administration, and the delivery of information on developments among broad client segments and the insurance markets**.  [Emphasis added.]

357.    Defendants knew, or recklessly disregarded, that MMC's description of the "placement service revenue" as compensation for services provided to the insurance market was materially false and misleading.  Neither MMC nor Marsh Inc. provided any legitimate services to the insurance companies under the contingent commission agreements.  The "services" performed by MMC and Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker.  Further, the "factors" cited in the foregoing statement – "overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed" – were, in fact, the only consideration for the contingent commissions under the agreements between MMC and Marsh Inc. and the insurance companies.

**MMC's  "Code of Ethics for Chief Executive and Senior Financial Officers"**

358.    Also attached to the MMC's 2002 Form 10-K was a document entitled "Code Of Ethics For Chief Executive And Senior Financial Officers."  In that code of ethics, MMC represented:

DISCLOSURES

As a public company, MMC is required to file various periodic and other reports with the Securities and Exchange Commission ("SEC").  It is Company policy to make full, fair, accurate, timely and understandable disclosure in compliance with

all applicable laws and regulations in all reports and documents that the Company files with, or submits to, the SEC and in all other public communications made by the Company. Senior Officers are required to promote compliance with this policy in their area of responsibility and amongst their colleagues and to abide by all Company standards, policies and procedures designed to promote compliance with this policy.

359. Defendants knew, or recklessly disregarded, that the statement concerning MMC's purported policy to make "full, fair, accurate, timely, and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents" filed with the SEC, was materially false and misleading. As alleged herein, Defendants filed annual reports, as well as prospectuses, throughout the Class Period that they knew, or recklessly disregarded, contained materially false and misleading statements and/or material omissions concerning, among other things, MMC's and Marsh Inc.'s contingent commissions and the true facts and risks related to MMC's steering practices.

360. The 2002 Form 10-K contained the certifications from Defendant Greenberg and non-party Wijnberg in which each certified that they had:

1. reviewed the Form 10-K;

2. based on their knowledge, the annual report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the annual report;

3. based on their knowledge, the financial statements, and other financial information included in the annual report, fairly presented in all material respects the financial condition, results of operations and cash flows of MMC as of, and for, the periods presented in the annual report;

4. MMC's certifying officers were responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for MMC and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the Company, including its consolidated subsidiaries, was made known to them by others within those entities, particularly during the period in which the annual report was being prepared;

b) evaluated the effectiveness of MMC's disclosure controls and procedures as of a date within 90 days prior to the filing date of the annual report (the "Evaluation Date"); and

c) presented in the annual report their conclusions about the effectiveness of the disclosure controls and procedures based on their evaluation as of the Evaluation Date;

5.      the Company's certifying officers had disclosed, based on their most recent evaluation, to the Company's auditors and the audit committee of MMC's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and have identified for MMC's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involved management or other employees who had a significant role in the registrant's internal controls; and

6.      the Company's certifying officers had indicated in the annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

361.    Defendants knew, or recklessly disregarded, that the statements concerning the absence of any untrue statement or omission of material fact in MMC's 2002 Form 10-K were materially false and misleading.  As alleged in ¶¶246, 248 above, MMC's 2002 Form 10-K contained materially false and misleading statements.

362.    Defendants also knew, or recklessly disregarded, that their statements concerning the disclosure of the existence of fraud was materially false and misleading because Defendants failed to report the existence of the wrongful steering and bidding scheme.  Likewise, Defendants knew, or recklessly disregarded, that their statements concerning the reporting of internal control deficiencies were materially false and misleading because Defendants failed to report the existence of any of the internal control deficiencies that enabled the steering and artificial bid system to be perpetrated.

**The July 25, 2003 Prospectus Supplement**

363.    On July 25, 2003, MMC filed a supplement to a prospectus dated March 30, 1999 with the SEC on Form 424(b)(2) in connection with MMC's 5.875% senior notes due 2033.  In that prospectus, MMC specifically incorporated by reference the information from its 2002 10-K.

364.    Defendants knew, or recklessly disregarded, that certain of the information incorporated by reference from its 2002 10-K was materially false and misleading for the reasons alleged above.

**The September 5, 2003 Registration Statement**

365.    On September 5, 2003, MMC filed a registration statement and prospectus signed by Greenberg, Wijnberg, Rapport, Bernard, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Schapiro, Simmons, and Smith, with the SEC on Form S-3 in connection with a shelf registration of $3 billion in common stock, preferred stock, or debt securities (the "September 5, 2003 registration").  In the September 5, 2003 registration, MMC expressly incorporated by reference MMC's 2002 10-K.

366.    Defendants knew, or recklessly disregarded, that the information incorporated by reference from the 2002 10-K was materially false and misleading for the reasons alleged above.

**The 2003 10-K**

367.    On March 15, 2004, MMC filed its annual report on Form 10-K (the "2003 10-K") for the year ended December 31, 2003, signed by Greenberg, Wijnberg, Rapport, Cabiallavetta, Fanjul, Groves, Hardis, King, Lang, Olsen, Schapiro, Simmons, and Smith.  In the description of MMC's risk and insurance services business in that Form 10-K, MMC stated:

> **Once client risks are identified, Marsh provides advice on addressing . . . exposures, including structuring programs for retaining, mitigating, financing, and transferring the risks in combinations that vary according to the risk profiles, requirements and preferences of clients.**  Specific professional functions provided in this process include loss-control services, the

placement of client risks with the worldwide insurance and capital markets (risk transfer), the development of alternative risk financing methods, establishment and management of specialized insurance companies owned by clients ("captive insurance companies"); claims collection, injury management, and other insurance and risk related services.  [Emphasis added.]

368.    Defendants knew, or recklessly disregarded, that the foregoing statements concerning the structuring of risk transfer programs and the placement of client risks with the worldwide insurance and capital markets based on the "risk profiles, requirements and preferences of the clients," were materially false and misleading.  The primary consideration for MMC and Marsh Inc. in the structuring of their clients' risk transfer programs, as well as the placement of client risk, was whether MMC (through Marsh Inc.) received a kickback pursuant to a contingent commission agreement, and not the risk profile, requirements or preferences of MMC's and Marsh Inc.'s clients.

369.    The 2003 10-K also stated:

Revenue generated by risk and insurance services is fundamentally derived from the value of the services provided to clients and insurance markets.

*        *        *

**Market services revenue is derived from agreements that Marsh has with most of its principal insurance markets.  Under these agreements, Marsh is paid for services provided to the markets, including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions and general information on emerging developments in the insurance marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services.**  Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.  [Emphasis added.]

370.    Defendants knew, or recklessly disregarded, that MMC's description of the "market services revenue" (previously referred to as "placement services revenue") as compensation for services provided to the insurance market was materially false and misleading.

115

Neither MMC nor Marsh Inc. provided any legitimate services to the insurance companies under the contingent commission agreements.  The "services" performed by Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker.  Further, the "factors" cited in the foregoing statement – "overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed" – were, in fact, the only consideration for the contingent commissions under the agreements between MMC and Marsh Inc. and the insurance companies.

**The 2003 Annual Report**

371.    Attached to the 2003 Form 10-K were several documents, including the MMC 2003 annual report to its shareholders.  The annual report contained a letter from Defendant Greenberg to MMC's shareholders, dated March 5, 2004.  In that letter, Defendant Greenberg stated:

> Marsh had another great year in 2003, extending to seven years its record of double-digit earnings growth, the longest in MMC's history as a public company. Revenues rose 16 percent to $6.9 billion, and operating income increased 18 percent to $1.8 billion.
>
> *          *          *
>
> Marsh serves clients--and creates value for MMC shareholders—through its global presence, specialized expertise, and market knowledge and access.  Around the world, clients have a growing appreciation of the value of the insurance broker, as exemplified by Marsh.  **Its services do not simply lower the cost of premiums and effect the transfer of risk in a time of turmoil in insurance markets.  They help manage and reduce risk, thereby lowering its total cost.** [Emphasis added.]

372.    Defendants knew, or recklessly disregarded, that this statement that MMC's risk and insurance services "do not simply lower the cost of premiums and effect the transfer of risk

in a time of turmoil in insurance markets," but "help manage and reduce risk, thereby lowering

its total cost," was materially false and misleading.  The improper steering of clients to certain

insurance companies in order to maximize contingent commissions caused many of MMC's and

Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with

more restrictive terms than they would have had MMC and Marsh Inc. engaged in a genuine

competitive bidding process on behalf of their clients.

     373.    The 2003 annual report also contained a section entitled "A Conversation with

Ray J. Groves, Chairman and Chief Executive Officer and Roger E. Egan, President of Marsh

Inc."  That section stated:

> **Marsh's experience in the global insurance and reinsurance markets gives us the ability to arrange and place the complex insurance coverages clients need.  We reach across markets to tap into risk capital wherever it exists, seeking the best terms, conditions, and prices.  Our brokers' knowledge of the interests of insurers for different types of risk and their relationships with senior underwriters are an advantage for clients as well as underwriters.**  [Emphasis added.]

*    *    *

> Marsh's ability to identify, analyze, mitigate, and transfer risk will be a critical factor in driving revenue growth, particularly as businesses develop globally and risks grow more complex.  Evidence of expanding risks is visible in the demand for worldwide property and casualty insurance, which produced over $1 trillion in premiums in 2003.  The insurance broker offers the most efficient distribution system through which clients purchase commercial insurance.  **Brokers provide increased access to the global insurance marketplace, more and better insurance products at competitive prices,** and greater knowledge and professional risk management expertise.  [Emphasis added.]

     374.    Defendants knew, or recklessly disregarded, that the statement concerning MMC's

efforts to seek "the best terms, conditions, and prices" on behalf of its clients was materially false

and misleading.  The improper steering of clients to certain insurance companies in order to

maximize contingent commissions caused many of MMC's and Marsh Inc.'s clients to pay more

in insurance premiums and/or obtain insurance coverage with more restrictive terms than they

117

would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on behalf of their clients.

375.    Similarly, Defendants knew, or recklessly disregarded, that the statement concerning the broker's ability to provide "more and better insurance products at competitive prices," was materially false and misleading because it failed to disclose that MMC and Marsh Inc. engaged in a phony bid scheme, as well as the improper steering of clients to certain insurance companies, in order to maximize contingent commissions, which caused many of MMC's and Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on behalf of their clients.

376.    The 2003 annual report further stated:

Market services revenue is derived from agreements that Marsh has with most of its principal insurance markets. **Under these agreements, Marsh is paid for services provided to the markets including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions, and general information on emerging developments in the insurance marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services.** Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.  [Emphasis added.]

377.    Defendants knew, or recklessly disregarded, that MMC's description of the market service revenue as compensation for services provided to the insurance market was materially false and misleading.  Neither MMC nor Marsh Inc. provided any legitimate services to the insurance companies under the contingent commission agreements.  The "services" performed by MMC and Marsh Inc. on behalf of the insurance companies were, in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the ordinary course of its business as an insurance broker.  The "factors" cited in the foregoing statement – "overall

volume, growth, and in limited cases profitability, of the total business placed by Marsh with a

given insurer" – were, in fact, the only consideration for the contingent commissions under the

agreements between MMC and Marsh Inc. and the insurance companies.

378.    The 2003 Form 10-K contained the certifications from Defendant Greenberg and

non-party Wijnberg in which each certified that they had:

1.    reviewed the Form 10-K;

2.    based on their knowledge, the annual report did not contain any untrue
statement of a material fact or omit to state a material fact necessary to make the
statements made, in light of the circumstances under which such statements were
made, not misleading with respect to the period covered by the annual report;

3.    based on their knowledge, the financial statements, and other financial
information included in the annual report, fairly presented in all material respects
the financial condition, results of operations and cash flows of MMC as of, and
for, the periods presented in the annual report;

4.    MMC's certifying officers were responsible for establishing and
maintaining disclosure controls and procedures (as defined in Exchange Act Rules
13a-14 and 15d-14) for MMC and have:

a) designed such disclosure controls and procedures to ensure that material
information relating to the Company, including its consolidated
subsidiaries, was made known to them by others within those entities,
particularly during the period in which the annual report was being
prepared;

b) evaluated the effectiveness of MMC's disclosure controls and
procedures as of a date within 90 days prior to the filing date of the annual
report (the "Evaluation Date"); and

c) presented in the annual report their conclusions about the effectiveness
of the disclosure controls and procedures based on their evaluation as of
the Evaluation Date;

5.    the Company's certifying officers disclosed, based on their most recent
evaluation, to the Company's auditors and the audit committee of MMC's board
of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls
which could adversely affect the Company's ability to record, process,
summarize and report financial data and have identified for MMC's
auditors any material weaknesses in internal controls; and

119

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.       the Company's certifying officers have indicated in the annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

379.       Defendants knew, or recklessly disregarded, that the statements concerning the absence of any untrue statement or omission of material fact in MMC's 2003 Form 10-K were materially false and misleading.  As alleged above, MMC's 2003 Form 10-K contained materially false and misleading statements concerning, among other things, the criteria for structuring risk programs for MMC's and Marsh Inc.'s clients.

380.       Defendants also knew, or recklessly disregarded, that their statements concerning the disclosure of existence of fraud was materially false and misleading because Defendants failed to report the existence of the illicit scheme described above.  Likewise, Defendants knew, or recklessly disregarded, that their statements concerning the reporting of internal control deficiencies were materially false and misleading because Defendants failed to report the existence of any of the internal control deficiencies that enabled the illicit scheme to be perpetrated.

**The First Quarter 2004 Form 10-Q**

381.       On May 10, 2004, MMC filed its quarterly report for the quarter ended March 31, 2004 with the SEC on a Form 10-Q.

382.       In the section entitled "Other Industry Inquiries," the Form 10-Q stated:

The New York Attorney General has issued subpoenas to numerous insurance brokers related to an inquiry into market service agreements and other similar agreements which compensate brokers for distribution and other services provided to insurance carriers.  The Company has received such a subpoena and is cooperating fully in the investigation.

120

383.    Defendants knew, or recklessly disregarded, that the foregoing statement concerning the inquiry into market service agreements was materially false and misleading because MMC did not disclose the existence of the unlawful bid-rigging and kickback scheme undertaken by MMC and Marsh Inc. to maximize revenues under such market service agreements.  Furthermore, Defendant Greenberg did not cooperate fully with the investigation, therefore, MMC's statement that it was "cooperating fully" with the investigation was materially false and misleading.

**The June 24, 2004 Conference**

384.    On June 24, 2004, Defendant Greenberg appeared at the Sanford C.  Bernstein & Co.  20th Annual Strategic Decisions Conference 2004.  During his remarks, Greenberg stated:

> **Centralized placement increases the number of insurance companies that can compete for clients' risks** because an insurance company doesn't need a branch system when we centralize placement.  So there's a level playing filed compared to scattered specialists that require the insurance company to match up a branch.  Through more concentrated contact with carriers we gain advantage.  We can assess the risk appetite of each insurance company more accurately, we can submit risks that each wants – and they're all different – and we can submit risks in the form that each insurance company wants, and those are all different.  So there's really not a standardization in a lot of our business, and so this concentration of specialization by risk, by risk type, and often by insurance carrier, has led to much improved results over the years.  It's required considerable investment on our part, large-scale reorganization of the company over the last years, but **it's produced better placement for clients.  So it works.** [Emphasis added.]

385.    Defendant Greenberg knew, or recklessly disregarded, that the statements about increased competition amongst insurance companies and better placement for clients resulting from MMC's centralized placement, were materially false and misleading.  Centralized placement through Marsh Inc.'s Global Insurance Broking enabled MMC and Marsh Inc. to engage in an improper steering and bid manipulation scheme that eliminated the competitive bidding process for insurance companies, enabling them to secure client placement by MMC

(through Marsh Inc.) in exchange for contingent commission kickbacks, while engaging in sham competitive bidding for that business.  MMC and Marsh Inc. improperly steered clients to those insurance companies that paid MMC contingent commissions, irrespective of the adequacy of the coverage or the cost to MMC's and Marsh Inc.'s clients.

386.    During a question and answer session, Greenberg was asked, "There are several questions relating to the current issue on contingent commissions, various issues.  How big a magnitude is it for Marsh? How do you see disclosure changing the future? How do you think it will affect your businesses, your brokerage businesses going forward?" Greenberg responded:

> Unsurprising that there would be a level of interest.  Of course these are an industry-wide subject of regulatory reviews right now, so there's a lot I cannot say.
>
> *      *      *
>
> But I think what is missing – at least I can speak about Marsh better than I can about anybody else, but I think holds true for many of the competitors of Marsh – is that the nature of placement is not simple.  It's complex work.  The risks of the clients are very complex and always changing.  The limits of liability are huge.  The need to strategize and structure first and then to think about where the market exists is very important in negotiating skills.  And insurance carriers like any other people who negotiate will negotiate more effectively with people who they know and have come level of trust with.  **So relationship building has worked well for clients as well.**
>
> In the mix don't forget the fact that clients have claims that are often complex and difficult and don't get settled right away – long tailed liability, for example.  So continuity with carriers can become an issue, either having it or what do you do if you don't have it.  If you need to move business for one reason or another – there's a lot that goes behind placement.  The need for databases today globally to track carriers, to track placement.
>
> I guess what all this adds up to me is that the nature of placement in our organization is not a simple subject; it isn't a commodity.  Every risk is difference [sic] and has to be thought of that way.  **And so one way or another Marsh will be compensated for its services, whether it's through one arrangement – but if those are thought to be deficient by the industry, by clients, then we will have to consider what shifts to make.**  But I think the important thing is to focus on the nature of placement, rather than the particular form of compensation. [Emphasis added.]

387.    Greenberg knew, or recklessly disregarded, that his statements concerning MMC's "relationship building" working well for clients were materially false and misleading because the improper steering of clients and bid manipulation in order to maximize revenues caused clients to pay more in premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC and Marsh Inc. conducted a genuinely competitive bidding process. Furthermore, his statements concerning the nature of "placement" and MMC's compensation for its services, were materially false and misleading.  As alleged herein, neither MMC nor Marsh Inc. provided any services to insurance companies in exchange for contingent commissions, but instead, the contingent commissions were based on the volume of business placed with the insurance company or, to a lesser degree, the profitability of the insurance carrier.  Moreover, the primary consideration in client placement was whether MMC (through Marsh Inc.) received kickbacks under a contingent commission agreement, and not the nature or complexity of the risk presented by the client, as alleged herein.

**The July 8, 2004 Prospectus Supplement**

388.    On July 8, 2004, MMC filed a prospectus supplement with the SEC on Form 424(b)(3) in connection with MMC offering $650 million in 5.375% Notes due 2014 and $500 million in floating rate senior Notes due 2007.  That prospectus supplement was issued in connection with a MMC $3 billion shelf registration, and incorporated by reference the information from its annual report for the year ended December 31, 2003 and the quarterly report on Form 10-Q for the quarter ended March 31, 2004.

389.    Defendants knew, or recklessly disregarded, that certain of the information incorporated by reference from the 2003 annual report and the Form 10-Q for the quarter ended March 31, 2004 was materially false and misleading for the reasons alleged above.

**The July 28, 2004 Analysts Call**

390.    On July 28, 2004, MMC conducted a conference call with analysts regarding the first quarter 2004 results.  During that call, Tom Cholnoky of Goldman Sachs asked Greenberg about margins in the insurance services area, as well as "the issue of contingent commissions." In response, Greenberg stated, "As I have said for some years now, we don't run our business to optimize margin.  What we do is run our business to build long term shareholder value and serve clients better."

391.    Defendant Greenberg knew, or recklessly disregarded, that his statement that Defendants ran MMC to build long term shareholder value, was materially false and misleading. MMC (through Marsh Inc.) engaged in unlawful conduct to improperly generate revenues.  As a consequence of that conduct, MMC and Marsh Inc. were subjected to investigation by various regulatory agencies, incurring substantial costs, including the creation of an $850 million restitution fund for their clients.  Moreover, as a result of the regulatory action in connection with Defendants' unlawful scheme, MMC and Marsh Inc. have ceased accepting contingent commissions, thereby eliminating substantial revenues that MMC had publicly and falsely represented was proper throughout the Class Period.

392.    Likewise, Greenberg knew, or recklessly disregarded, that his statement that MMC was run "to . . .  serve clients better," was materially false and misleading.  MMC's and Marsh Inc.'s improper steering and bid manipulation practices defrauded MMC's and Marsh Inc.'s clients to enable MMC to maximize contingent commissions, in violation of criminal law. In addition, MMC's and Marsh Inc.'s improper steering of clients in order to maximize contingent commissions caused many of MMC's and Marsh Inc.'s clients to pay more in insurance premiums and/or obtain insurance coverage with more restrictive terms than they would have had MMC and Marsh Inc. engaged in a genuine competitive bidding process on

124

behalf of their clients.  Similarly, according to Bewlay, Marsh Inc. had a protocol of misleading

its clients with respect to the amount of contingent commissions earned in connection with their

insurance coverage.

393.    Cholnoky followed-up by asking, "what the markets seem to be struggling with is,

let's say there is a change in the way contingent commissions are, how companies approach that,

if there was a drastic change in the way you could receive them or what not, would that have a

meaningful impact on your revenues? Do you think you could make it up elsewhere?" Greenberg

responded:

> We think that the most important issue and I have said this before is that **we
> provide services for which we expect to be compensated** and there are various
> ways that one can be compensated.  The way in which we handle it today is
> MSAs but if we found that we needed to change the method of compensation, we
> would do so.  The principal [sic] being that we are going to be compensated for
> our services.  It is not something we spend a lot of time worrying about.  We are
> dealing with regulators a step at a time, and knowledgeable about how our
> business works, what our model is, and what values we provide, and expecting to
> continue to be compensated for what we do.  [Emphasis added.]

394.    Defendant Greenberg knew, or recklessly disregarded, that his statement that

contingent commissions paid pursuant to MSAs were compensation for services provided by

MMC and Marsh Inc., was materially false and misleading.  Neither MMC nor Marsh provided

any legitimate services to the insurance companies under the contingent commission agreements.

The "services" performed by MMC and Marsh Inc. on behalf of the insurance companies were,

in fact, the same activities that Marsh Inc. necessarily performed on behalf of its clients in the

ordinary course of its business as an insurance broker.  Instead, the contingent commissions

were, in reality, nothing more than kickbacks from the insurance companies based on the volume

of business placed by Marsh Inc. or, to a lesser extent, the profitability of the insurer.

395.    During that same conference call, Jay Cohen of Merrill Lynch asked if there had

been any change in the behavior of carriers in "how they set these things up, how they react

going forward given the scrutiny? Have they changed their behavior regarding these arrangements at all?" After Greenberg stated that his relationships with the carriers had not changed, Defendant Egan stated:

> We haven't noticed any material change in the market's attitude. We are most concerned about our client's attitude given the press on this issue. **In speaking to clients, it is a matter of disclosure. Marsh has led the industry in terms of disclosure, and we think we will continue to lead the industry in terms of disclosure.** [Emphasis added.]

396.   Defendant Egan knew, or recklessly disregarded, that his statement that "Marsh has led the industry in terms of disclosure, and we think we will continue to lead the industry in terms of disclosure," was materially false and misleading. According to Bewlay, Marsh Inc. had a protocol of misleading its clients with respect to the amount of contingent commissions earned in connection with their insurance coverage.

397.   During the July 28, 2004 conference call, Mark Lane of William Blair & Company asked, "On the contingent commission, someone had asked a question about have insurers changed their behavior. But have you broadly, since this issue came out formally, have you broadly changed your disclosure that you are providing to your clients?" Defendant Egan responded:

> First of all, you should know that the issue has surfaced recently, but it actually was a fairly well known issue and discussed heavily in the press and public forums in the late 1990's. **During that time, Marsh took initiative to develop a protocol with respect to disclosure, and agreed to that protocol with the buyer organization, the Insurance Management Society [indiscernible]. We have continued to abide by that protocol that was established and continued to disclose to clients when they ask as much information as they need to know about these agreements.** [Emphasis added.]

398.   Defendant Egan knew, or recklessly disregarded, that his statements concerning the disclosure protocol used by Marsh Inc. in connection with client inquiries regarding contingent commissions, was materially false and misleading because Egan failed to disclose

that Marsh Inc.'s protocol was to mislead clients by understating the amount of contingent

commissions earned in connection with the client's insurance placement for the reasons stated in

¶¶235-242 above.

**The Second Quarter 2004 Form 10-Q**

399.    On August 3, 2004, MMC filed its quarterly report for the quarter ended June 30,

2004 with the SEC on a Form 10-Q signed by Wijnberg.

400.    In the section entitled "Other Industry Inquiries," the Form 10-Q stated:

> The New York Attorney General has issued subpoenas to numerous insurance
> brokers related to an inquiry into market service agreements and other similar
> agreements which compensate brokers for distribution and other services
> provided to insurance carriers.  The Company has received such a subpoena and is
> cooperating fully in the investigation.

401.    Defendants knew, or recklessly disregarded, that the foregoing statement

concerning the inquiry into market service agreements was materially false and misleading

because neither MMC nor Marsh Inc. disclosed the existence of the improper steering and bid

manipulation practices undertaken by MMC and Marsh Inc. to maximize revenues under such

market service agreements.  Furthermore, as alleged herein, Defendants were not, in fact,

cooperating fully with the investigation.

**XI.    KNOWLEDGE OR RECKLESS DISREGARD OF MMC'S AND MARSH INC.'S
FRAUD BY THE SENIOR MANAGEMENT DEFENDANTS**

**A.    General Allegations of Scienter**

402.    The Senior Management Defendants, by virtue of their receipt of information

reflecting the improper and fraudulent behavior described above and/or their failure to review

information they had a duty to monitor, their actual issuance of and control over MMC's and

Marsh Inc.'s materially false and misleading statements, and their association with MMC and

Marsh Inc. which made them privy to confidential proprietary information concerning MMC and

Marsh Inc., were active, culpable, and primary participants in the fraudulent scheme alleged herein.  The Senior Management Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public.

403.    The Senior Management Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in MMC's public statements would adversely affect the integrity of the market for MMC's common stock and would cause the price of MMC's common stock to be artificially inflated.  The Senior Management Defendants acted knowingly or in such reckless manner as to constitute a fraud and deceit upon Lead Plaintiffs and other members of the Class.

404.    In addition to the foregoing and other acts alleged herein, the following facts provide compelling evidence that the Senior Management Defendants acted with actual knowledge, or, at the very least with recklessness.

**B.      Knowledge or Reckless Disregard by the Senior Management Defendants**

**1.      The Senior Management Defendants' Knowledge or Reckless Disregard that MMC's Contingent Commission Disclosures were Materially False and Misleading**

405.    A key element of the Senior Management Defendants' securities fraud is their materially false and misleading disclosures and material omissions regarding MMC's contingent commissions.  Revenue from contingent commissions accounted for a huge percentage of MMC's net income.  For example, in 2003, it consisted of approximately 50% of MMC's net income.

406.    By virtue of the magnitude and the importance to MMC's bottom line of the contingent commissions, as described below, the Senior Management Defendants must have known or were reckless in not knowing everything about the source and sustainability of those revenues.  Consequently, the Senior Management Defendants knew or were reckless in not

knowing that their disclosures regarding contingent commissions were materially false and misleading.

407.　When the size of the revenue stream at the heart of the wrongdoing is coupled with the following additional facts, among others as described herein, the strong inference that the Senior Management Defendants acted with scienter is undeniable:

(a)　the improper activities engaged in by MMC and Marsh Inc. employees that generated MMC's (through Marsh Inc.) high contingent commission revenue stream were widespread and part of MMC's overall business strategy;

(b)　the Senior Management Defendants actively concealed their improper activities;

(c)　the Senior Management Defendants had a specific duty to monitor contingent commission revenues and ignored red flags indicating problems with the propriety of Global Broking's procurement of insurance quotes;

(d)　the changes in MMC's disclosures about contingent commission revenue indicate that Senior Management Defendants knew and sought to conceal the true nature of these revenues; and

(e)　the Senior Management Defendants were on notice of a lack of internal controls throughout MMC's business divisions.

**a.　The Magnitude of the Revenues Attributable to MMC's and Marsh Inc.'s Improper Steering Practices Confirms Senior Management Defendants' Scienter**

408.　MMC (through Marsh Inc.) received billions of dollars in contingent commissions during the Class Period, including more than $845 million in 2003 alone, or about half of MMC's 2003 net income.  Thus, MMC's revenue from contingent commissions was critical to MMC's overall performance and prospects.

409.　As detailed below in ¶¶465-71, the Senior Management Defendants, by virtue of their managerial positions, were aware of the magnitude of this revenue stream.

410.　Given the importance of contingent commissions to MMC's financial well-being (its "lifeblood"), and the direct knowledge by the Senior Management Defendants of this

importance, even if the Senior Management Defendants were not themselves involved in negotiating improper steering agreements with insurers and reinsurers, they were aware of these agreements (or were reckless if they were not aware). Without these improper steering arrangements, MMC (with Marsh Inc.) would have been unable to increase its contingent commission revenues to the levels they greedily sought.

411.    Indeed, as noted earlier, according to CW2, Global Broking was a "cash cow." As this former employee recognized, "when you have a group of people that are producing that kind of revenue, rest assured that Greenberg, *et al*. know what's going on."

412.    Accordingly, the Senior Management Defendants knew or were reckless in not knowing that their disclosures regarding contingent commissions were materially false and misleading.

> **b.    Marsh Inc.'s Improper Steering was Part of MMC's and Marsh Inc.'s Overall Business Protocol and Widely Known Throughout MMC and Marsh Inc.**

413.    The myriad examples of improper steering described herein were not isolated incidents. They were part of a carefully-planned and well-supervised scheme to inflate MMC's revenues of which the Senior Management Defendants were aware and/or recklessly disregarded. According to CW7, Marsh Inc.'s practice of steering business to a carrier with a favorable contingent commission agreement was "rampant." Specifically, as set forth below and detailed above, Marsh Inc. employees were regularly directed by senior management to steer business to those carriers that were willing to pay the largest contingent commissions.

414.    As described herein, according to Bewlay's plea allocution, the practice of obtaining B quotes to steer business was widespread in Marsh Inc., and was not just the effort of a few employees. Bewlay went so far as to say that Marsh Inc. had an official "protocol" regarding these unethical practices. Bewlay himself pled guilty to a scheme to defraud.

415.     Other high level Marsh Inc. executives, including non-party Winter, a former

manager of the northeast region of Global Broking, and non-party Stearns, a Senior Vice

President of Marsh Inc., have similarly pled guilty to this same scheme to defraud, admitting that

they "regularly" instructed non-incumbent carriers to submit non-competitive bids in order to

steer the business to certain incumbent carriers.

416.     According to the findings of the DPW Report, the relevant emails and other

communications reviewed by DPW are consistent with statements that discussions of bid

manipulation "took place regularly."  Indeed, DPW reported that it "anticipated that additional

examples of this type of conduct may well be identified in [the Excess Casualty and Excess

Workers Compensation] and other product lines as the government investigation continues."

417.     An April 2, 2001 e-mail from the Managing Director in Marsh Inc.'s Excess

Casualty group, exemplifies these official directives from managing directors to engage in

improper steering to inflate revenues.  The Managing Director wrote (via email) to the heads of

regional centers asking for "twenty accounts that you can move from an incumbent [insurance

company]" to a company that had just extended its contingent commission agreement, stating

that '[t]his could mean a fantastic increase in our revenues."  *See* ¶140.

418.     Statements by former employees further echo this official directive to increase

revenues by any means possible.  According to CW6, the preferred insurance carriers who Marsh

Inc. sought to steer business to were also discussed at monthly staff and department meetings

which were attended by all of the Middle Market employees in the office, including

management.  *See* ¶136.

419.     The existence of the Global Broking division further supports this strong

inference that the Senior Management Defendants had direct knowledge of the improper

steering.  This special business unit was created to centralize MMC's and Marsh Inc.'s control over the most lucrative contingent commissions.  *See* ¶¶124-33.  Through the operations of this unit, MMC and Marsh Inc. were able to protect its systematic steering of business to insurance carriers that paid them the highest contingent commissions.

420.    While this division was formed shortly before Greenberg's appointment as President, it became much more active in 1999 when Greenberg became CEO of MMC.  At that time, the senior management of Marsh Inc. mandated that all of Marsh Inc.'s Property & Casualty Middle-Market divisions, located throughout the country, had to submit their clients' requests for bids on insurance policies to Global Broking, situated in New York City.  *See* ¶¶130-31.

421.    According to CW2, the mandate to use Global Broking "came right from the top—from Greenberg and Egan."  *See* ¶133; *see also* ¶132.  Since Middle Market was the largest growing segment in Marsh Inc., Greenberg and Egan recognized the opportunity to capture more contingent commissions from that segment.

422.    According to a former Marsh Inc. employee who worked as a client executive during the Class Period and was familiar with the formation of Global Broking CW1, Global Broking was set up as a "profit center." According to this former employee, "[t]here is only one way the broking unit could make a profit and this is to rig the contingency commission system because that was the only source of income they controlled." This employee was present at formal meetings where managers of Global Broking admitted that Global Broking would try, whenever possible, to place insurance with certain carriers because Marsh Inc. had better placement services agreements with those insurers.  CW6, similarly referred to Global Broking as a "profit center."

423.     According to CW2, Global Broking kept tight control over the process and would try to prevent the broking field office from directly contacting the insurers.  *See* ¶126. Specifically, according to numerous confidential witnesses, Gilman, who was Executive Director of Marketing at Global Broking and a Managing Director of Marsh Inc. during the Class Period, sternly enforced the routing of placement decisions through Global Broking.  For example, Gilman issued the following warning to ACE in a June 20, 2003 email: "Currently we have about $6 million in new business [with ACE] which is the best in Marsh Global Broking so I do not want to hear that you are not doing 'B' quotes or we will not bind anything."

424.     CW12, a former Vice President of Seabury & Smith, a division of Marsh Inc., described the widespread acknowledgment within Marsh Inc. that Global Broking was engaged in improper practices.  From this witness's experience, Global Broking began increasing its revenue by employing questionable practices and procedures in the late 1990s -- the time Greenberg became CEO of MMC.  According to CW12, people were saying that "Global Broking was out of control."

425.     The senior management of Marsh Inc. further reinforced MMC's and Marsh Inc.'s steering system by giving employees who moved business to contingent fee payers positive performance reviews.  Conversely, employees were criticized for placing business with non-preferred carriers who did not pay contingent commissions or who did not pay enough in contingent commissions.  *See* ¶¶163-71.

426.     MMC's and Marsh Inc.'s. steering scheme was so formalized, and so integral to MMC's and Marsh Inc.'s business plan, that Global Broking prepared a "Tiering Report," which was distributed to senior executives that classified the insurance companies based on their contingent commission agreements with Marsh Inc.   Marsh Inc.'s Managing Directors then

instructed their subordinates that, based on this report, they would receive "clear direction on who [we] are steering business to and who we are steering business from." *See* ¶151.

427.    Even those outside of MMC and Marsh Inc. recognized that the steering was integral to MMC's and Marsh Inc.'s business plan.  For example, in a November 3, 2003 email regarding "MMG Model Concerns," marked confidential, ACE executives wrote about their concerns with being asked to provide a B quote.  ACE repeatedly refers to this system as "MMGB's business model."

428.    The business model was still further officially enforced by a system of internal accounting wherein branch offices and divisions that placed business with preferred carriers got credit for "revenue repatriation."  *See* ¶¶170-71.

429.    Given that bid manipulation and steering were part of MMC's and Marsh Inc.'s official protocol, the Senior Management Defendants were aware of these improper practices by virtue of their supervisory and controlling positions within MMC and Marsh Inc.  Defendant Egan was a senior executive of Marsh Inc., the subsidiary that was the locus of the illicit steering activities.

430.    Defendant Greenberg was actively involved with the operations and business model of this subdivision, which was so critical to MMC's success.  According to CW5, on several occasions Greenberg attended the annual meetings of Marsh Inc.'s Managing Directors and other senior officials held at the Greenbrier, in West Virginia.  At these meetings, the management of Global Broking made presentations about what Global Broking was doing, how they were doing it, and the revenues they were generating from it.  Furthermore, as noted above, Greenberg spearheaded the effort to have Middle Market placements done through Global Broking.  According to an article circulated in April 2000 by The McCarthy Companies, a

property/casualty carrier, six weeks into his job as CEO of MMC, Greenberg even attended Marsh Inc.'s annual Middle-Market Conference.

431.   Moreover, according to CW13, Greenberg sat on the same floor as the senior executives of Marsh Inc., including Defendant Egan, in the very same building that housed Global Broking.  According to CW13, "you would have a hard time proving to me that Jeffrey didn't know everything about it [Global Broking], because, first of all he was the CEO of the company that did it and he is on the floor with the people that do it and the people that are in charge of it, I mean their offices are in shouting distance of each other and they all talk to each other all day long . . . How could he not know!"

432.   Similarly, when CW7 explained that his/her performance reviews specifically acknowledged his/her efforts in steering business to markets where Marsh Inc. had contingent commission agreements, CW7 stated:  "I can assure you that throughout the Global Broking enterprise, from the top down, people were substantially rewarded for doing business with PSA markets and were criticized if they did a non-PSA placement, so there is no question that it goes at least as high as Egan and I'm assuming that when it's 800 plus million dollars, that it would have gotten everyone's attention, all the way to the top.  They knew what was going on and they encouraged it."

433.   Eliot Spitzer recognized the same inevitable inference.  In negotiating a settlement of this action against MMC and Marsh Inc., the NYAG demanded that Greenberg, Davis, Cabiallavetta, Groves, and Smith resign from their positions as officers and directors of MMC and Marsh Inc. as a condition of any settlement negotiation.  According to a Bear Stearns report issued on Friday, October 15, 2004, the NYAG indicated that his department was misled by "the

highest senior management level at Marsh and called for the board of directors to 're-evaluate the leadership of the company.'"

> ### c. The Senior Management Defendants had a Specific Duty to Monitor the Disclosure of Contingent Commission Agreements and Ignored Red Flags Alerting Them to the Need to Investigate

434.    Given that the receipt and disclosure of contingent commissions was an issue within the industry, the Senior Management Defendants were reckless in not monitoring the source of MMC's and Marsh Inc.'s contingent commission revenue and MMC's disclosure of these agreements both to its clients and to its shareholders.

435.    Specifically, in 1998, the New York State Insurance Department ordered brokers and insurers to disclose to policyholders all compensation agreements between brokers and insurers and to keep a record of these fees.  The regulatory order, known as Circular Letter No. 22, even warned that the department would inquire about these agreements in future market conduct exams.

436.    In addition, as discussed above, in 1999, MMC announced an agreement with RIMS (the risk managers trade association) in which RIMS approved a protocol by which MMC and Marsh Inc. would disclose to clients the existence of such arrangements, as well as certain information about the amount of contingent commission revenues that Marsh Inc.  received. Notably, RIMS' concerns were prompted by a 1997 internal Marsh Inc. memo written by Robert J. Newhouse, III, Executive Vice-President and Chairman of the U.S. operations at the time, discussing a policy by Marsh Inc. to place some Chubb corporate business through regional Global Broking offices rather than through Marsh Inc.'s local offices.

437.    Given Circular Letter No. 22 and the RIMS agreement, the Senior Management Defendants had an affirmative duty to monitor the issue of contingent commissions and their disclosure.

438.    Moreover, the Senior Management Defendants were aware of the great potential for these contingent commission agreements to create an enormous incentive for Marsh Inc.'s employees to improperly steer business to those insurance carriers who were willing to pay the highest contingent commissions.  These incentives were particularly strong given MMC's intense emphasis on generating revenues.  Even Cherkasky, new to the insurance broking industry, quickly recognized the faults of this system and publicly acknowledged in a March 3, 2005 article in the *Pioneer Press*, that the contingency fee agreements "provide the wrong incentives."

439.    MMC's Code of Ethics further emphasized the point that the Senior Management Defendants had a duty to monitor these innately questionable agreements.  According to the Code, MMC's CEO (Greenberg), CFO (Wijnberg) and Controller (Rapport) "have leadership responsibilities that include creating a culture of high ethical standards and commitment to compliance, and maintaining a work environment that deters wrongdoing, encourages employees to raise concerns, and promptly addresses employee compliance concerns."

440.    Indeed, in direct contradiction of MMC's Code of Ethics, the Senior Management Defendants ignored specific complaints raised by Marsh Inc. employees relating to Global Broking – the division in which the procurement of contingent commissions was centralized. According to numerous confidential witnesses, employees regularly complained that when they were forced to use Global Broking, they did not believe clients were receiving accurate information regarding the most competitive bids.  *See* ¶¶209-18.  For example, as discussed at ¶¶210-214, employees were falsely told by Global Broking that certain carriers declined to submit a bid, when in truth, Global Broking had never even requested bids from these carriers.

441.    According to "CW14" (a former Marsh Inc. client representative employed from 1990 through 2003), similar concerns were raised by high level executives Kevin Youngs, Jim Meathe and Donald Holmes, all managers in the property/casualty arena.  According to multiple former employees, CW2, CW3, CW5, CW14, "CW15" (a former Marsh Inc. employee in charge of Middle-Market Employee Benefits consulting and Property divisions from 2001 through 2002) and "CW16" (a former Marsh Inc. employee from 2000-2003, who was present at a Marsh Inc. Middle-Market Conference in 2002),  Holmes, Middle-Market Practice leader for Marsh Inc. nationwide, during the Class Period, openly criticized Global Broking for not necessarily fulfilling its  fiduciary duties to obtain the best results for Marsh Inc.'s clients.  According to CW16, Holmes publicly spoke about his concerns with Global Broking before a 2002 Middle Market conference in New York, attended by all Middle-Market practice leaders throughout the country.

442.    According to CW3 and CW5, over the years, Holmes voiced these concerns directly to Defendant Egan.  According to these same witnesses, his complaints culminated in a memo to Defendant Egan and non-party Sinnott and all the other senior leaders of Marsh Inc. in June 2003.  According to CW5, Holmes's complaints were ignored.  Indeed, according to a November 2004 press report, Holmes told a reporter at Reuters that he had gone above Gilman's head at Global Broking and contacted Christopher Treanor to criticize the structure and amount of PSA.  Holmes further told the reporter that Treanor responded by threatening Holmes' job. Accordingly, the Senior Management Defendants were at least reckless in not monitoring and reviewing more closely Marsh Inc.'s policies regarding the procurement of contingent commissions and the operations of Global Broking.

443.    In its settlement agreement with the NYAG, MMC went so far as to tacitly admit its failure to properly monitor the disclosure of contingent commission agreements.  As part of that settlement, MMC agreed to establish a Compliance Committee to monitor all issues relating to any compensation received by Marsh Inc. from each insurer with which it placed insurance.

444.    Defendant Greenberg and non-party Wijnberg had a separate statutory duty, pursuant to Sarbanes-Oxley, to monitor MMC's disclosure and its "disclosure controls and procedures."  They each specifically signed sworn certifications that they implemented proper disclosure controls and procedures and evaluated their effectiveness.

> **d.    The Changes in MMC's Disclosure About MSA Revenue Indicate that Senior Management Defendants Knew and Sought to Conceal the True Nature of these Revenues**

445.    The pattern of disclosures in MMC's filings with the SEC regarding the nature of contingent commissions demonstrate that the Senior Management Defendants knew or were reckless in not knowing that these payments were simply illicit kick-backs.  In MMC's 1999 Report on Form 10-K filed with the SEC on or about March 29, 2000, MMC disclosed the following information regarding its placement service revenue:

> Placement service revenue and contingent fees includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specified periods, or the loss performance to the insurer of that business.

446.    The following year, in the 2000 Report on Form 10-K filed with the SEC on or about March 29, 2001, MMC changed its disclosure to read as follows:

> Contingent income for services provided includes payments or allowances by insurance companies based upon such factors as the overall volume of business placed by the broker with that insurer, the aggregate commissions paid by the insurer for that business during specific periods, or the profitability or loss to the insurer of the risks placed.  **This revenue reflects compensation for services provided by brokers to the insurance market.  These services include new product development, the development and provision of technology,**

**administration, and the delivery of information on developments among broad client segments and the insurance markets.** [Emphasis added.]

447.    MMC's disclosure regarding the MSAs was changed yet again on or about March 15, 2004.  MMC's 2003 Report on 10-K with the SEC reads as follows:

Market services revenue is derived from agreements Marsh has with most of its principal insurance markets.  **Under these agreements, Marsh is paid for services provided to the market, including: access to a global distribution network that fosters revenue generation and operating efficiencies; intellectual capital in the form of new products, solutions and general information on emerging developments in the insurance marketplace; the development and provision of technology systems and services that create efficiencies in doing business; and a wide range of administrative services.** Payments under market service agreements are based upon such factors as the overall volume, growth, and in limited cases profitability, of the total business placed by Marsh with a given insurer.  [Emphasis added.]

448.    Before such significant changes could be made in MMC's disclosure, the Senior Management Defendants were duty bound to review and approve the new disclosures.  Furthermore, the signatories to these SEC filings were required to assure their accuracy.  Indeed, Defendant Greenberg and non-party Wijnberg signed certifications attesting to the accuracy of the disclosures.  Specifically, they swore that they reviewed MMC's 10-Ks and they were not materially false or misleading.

449.    If indeed, the PSAs were payments for new product development, including the development of technology, there would need to be costs associated with these services.  There were none.  According to statements made by non-party Wijnberg, there was no offsetting expense savings as a result of Marsh Inc.'s decision to stop accepting contingent commissions.  *See* ¶234.  In other words, there were no services being eliminated as a result of the elimination of contingent commissions.

450.    Wijnberg's statement acknowledges that she knew of the misleading nature of MMC's disclosure *i.e.* – that Marsh Inc. was **not** in fact being paid for its services to the market.

Her knowledge can be imputed to Jeffrey Greenberg, her immediate supervisor, who, as noted above had an obligation to verify the accuracy of MMC's disclosures.

451. Defendant Egan made similar statements acknowledging his awareness that the payments Marsh Inc. received were not really for any "services provided by brokers to the insurance market." In an October 27, 2004 investor conference call (after the Class Period), Egan, President and COO of Marsh Inc., clearly explained that the payments Marsh Inc. received pursuant to the market service agreements were "payments from an insurance company to Marsh based on volume only and based on book of business."

452. Accordingly, given the changes in the disclosures regarding contingent commissions which were intended to hide the true nature of these revenues, the Senior Management Defendants knew or were reckless in not knowing that their public statements concerning contingent commissions and MMC's business practices were materially false and misleading.

> **e.     The Senior Management Defendants Ignored the Red Flags Signaling a Serious Lack of Internal Controls**

453. Given the similar problems in MMC's other business units, the Senior Management Defendants knew or recklessly disregarded that MMC did not have proper internal controls. Specifically, the following facts served as red flags that the Senior Management Defendants needed to carefully monitor the disclosure of contingent commissions because of the innately improper incentives these agreements provided.

454. As described herein, the investment management business at Putnam was enmeshed in numerous scandals. On October 28, 2003, the SEC commenced a major suit against Putnam. MMC eventually agreed to an order finding that many of Putnam's investment managers engaged in excessive short-term trading in their personal accounts and that at least four

had engaged in insider trading on accounts in which they had investment responsibilities.  Other investigations, including the investigation by the NYAG, focused on illegal market-timing and late trading.  Ten securities class actions and fifty-six individual actions were filed.

455.     Similarly, Mercer is under investigation by the SEC for conflicts of interest at its pension-consulting division, including alleged illicit payments to consultants who provide advice to pension funds regarding the selection of investment advisors to manage plan assets. Separately, in a matter unrelated to the SEC pension investigation, Mercer was an advisor to the NYSE when its ex-chairman, Richard Grasso, secured an infamous $187 million pay package. Mercer, which admitted when it settled, that it had provided information to the board that was inaccurate and incomplete, agreed to return the fees that it charged NYSE.

456.     Further, as explained herein, Mercer engaged in very similar kick-back conduct with its preferred insurers.  This demonstrated that the improper practices must have been imposed and/or known by MMC management, the common point of contact between Mercer & Marsh Inc.

### 2.     MMC's Disclosure Concerning its Fiduciary Duties

457.     Another key element of MMC's securities fraud is its materially false statements to the market that it was an ethical company acting in its clients' best interests.  The Senior Management Defendants signed SEC filings and/or made public statements containing these materially false representations.  The Senior Management Defendants knew or recklessly disregarded that those statements were not true.  Specifically, as discussed herein, among other things, the Senior Management Defendants knew or recklessly disregarded that: (1) MMC's and Marsh Inc.'s model was based on steering clients to the carriers that paid the highest contingent commissions; (2) MMC and Marsh Inc. had a protocol of hiding the amount it received in contingent commissions from its clients despite regulations requiring full disclosure; and (3)

numerous employees had raised concerns about Marsh Inc.'s failure to keep its clients properly informed.

458.    Accordingly, at the time the Senior Management Defendants were assuring the market that MMC (including subsidiaries) was acting in its clients' best interests, the Senior Management Defendants were aware of, or were reckless in disregarding, the material fact that MMC and Marsh Inc. were guided by their own financial interest, rather than that of their clients. At the very least, the Senior Management Defendants were reckless in failing to monitor the proper disclosure of these agreements to MMC's (and Marsh Inc.'s) clients, as they were required to do.  Had the Senior Management Defendants properly monitored the disclosure of these agreements, the Senior Management Defendants would have known that, in direct contradiction of MMC's (and Marsh Inc.'s) clients' interests, MMC and Marsh Inc. were failing to give their clients required and material information necessary for their decision making.  As such, the Senior Management Defendants were reckless in telling investors that MMC was acting in its clients' best interests.

C.    **Additional Scienter Allegations for Each of the Senior Management Defendants**

459.    In addition to the allegations asserted above, in light of Defendants' either actual knowledge or reckless disregard of the facts, Defendants signed the false and misleading statements complained of herein.

460.    Defendant Greenberg: As Chairman and CEO of  MMC, the parent company of Marsh Inc., Greenberg had access to all significant corporate information possessed by Marsh Inc., including all information about the magnitude of the revenues from contingent commissions.  Furthermore, according to CW5, Greenberg attended several annual meetings of the Managing Directors and senior leaders of Marsh Inc. held at the Greenbrier, in West

Virginia, wherein management of Global Broking made presentations about the size and source of the contingent commissions. According to CW5, through the use of PowerPoint presentations, Global Broking highlighted the stream of contingent commissions. Furthermore, CW5 stated that "there was an overall recognition in their presentation that contingent income was where their revenue was coming from and that was supporting their placement activities."

461.     Greenberg was a major force in instilling the MMC's corporate directive to increase revenues at all costs. According to a former Marsh Inc. high-level executive in Marsh Inc.'s broker\dealer business ("CW17"), Greenberg "was only concerned with Marsh making their numbers." Furthermore, Greenberg admitted that he was well aware of the importance of contingent commission revenues to MMC's financial success when he told analysts during a July 28, 2004 conference call that MSA revenues were part of MMC's business model.

462.     Finally, Greenberg is an insurance industry insider with a long history in the insurance business. Greenberg is the son of Hank Greenberg, the CEO of AIG until his abrupt resignation in March 2005. Prior to joining  MMC, Greenberg spent seventeen years at AIG. Greenberg's brother is Evan Greenberg, the CEO of ACE Insurance. Both AIG and ACE were among the insurers who benefited the most from Marsh Inc.'s steering practices and who provided fake bids to Marsh Inc.

463.     Based on the above allegations and the reasons stated above, Greenberg acted intentionally or with reckless disregard in making false and misleading statements to the market regarding MMC's and Marsh Inc.'s contingent commissions and their commitment to serve their clients' best interests.

464.     <u>Defendant Egan</u>: Defendant Egan was President and COO of Marsh Inc.  until he was forced to resign by MMC in November 2004 in connection with the NYAG's investigation.

Prior to his departure, Egan had spent over thirty years with Marsh Inc., and also served as head of Marsh Inc.'s Northeast operations, President and CEO of North American operations, and immediately preceding his appointment as President, Vice-Chairman of Marsh Inc.  When Egan was ordered to step down from his position, Michael Cherkasky, Greenberg's replacement, noted that Egan was "accountable for the areas of the business that have been the focus of investigations by the New York attorney general's office." As such, Egan was aware of the magnitude of the revenues derived from contingent commissions.  Indeed, as the immediate head of the division of MMC in which all of the improper steering practices occurred, Egan was also directly aware or was reckless in not knowing that the revenues were the result of improper activities.  Moreover, as noted above, Egan was directly alerted to the fact that Global Broking was not necessarily acting in the clients' best interest in procuring insurance.  For these reasons and the reasons above, Egan acted intentionally or with reckless disregard in making false and misleading statements to the market regarding MMC's contingent commissions and its commitment to serve its clients' best interests.

465.    The swift resignations of Greenberg, Davis, Cabiallavetta, Groves, Smith and Egan, following the public disclosure of MMC's and Marsh Inc.'s improper activities, further supports a strong inference of these individuals' knowledge of the fraud described herein.

## XII.    ADDITIONAL ALLEGATIONS EVIDENCING MMC'S AND MARSH INC.'S SCIENTER

466.    The extensive efforts by MMC and Marsh Inc. employees to conceal MMC's and Marsh Inc.'s unethical plans are yet further evidence of MMC's and Marsh Inc.'s knowledge of the improper activities that helped sustain MMC's enormous contingent commission revenue stream.  MMC and Marsh Inc. employees at every level were involved in making sure that

information about the improper steering and contingent commissions was kept from clients and the public.

467.    According to Bewlay's plea allocution, Marsh Inc. had a specific "protocol" designed to prevent Marsh Inc.'s clients from obtaining information concerning the amount of contingent commission revenue Marsh Inc. earned from carriers.  The protocol required multiple layers of inquiry to discourage the client from obtaining the answer.  The Marsh Inc. protocol also required that all inquiries be channeled through a single Marsh Inc. employee who directed the answer to the inquiry.  Even when Marsh Inc. eventually responded to the request, according to Bewlay, they lied.  Specifically, they "significantly understated the amount of PSA or MSA revenue earned with respect to a particular client."

468.    An email from insurer Munich further demonstrates the efforts by Marsh Inc. to keep the contingent commissions hidden.  In 2000, Munich told a client about its contingent commission agreement with Marsh Inc. in order to explain the contingent commissions that were being passed on to the client.  According to a March 14, 2000 e-mail, a senior vice president apologized to Marsh Inc. in an e-mail: "We acknowledge that this was inappropriate behavior . . ." He told Marsh Inc.: "[Munich would] eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the [contingent commissions].  I apologize for the consternation that this had caused within the **Marsh organization**."  (Emphasis added).

469.    As revealed by DPW's internal investigation, even when Marsh Inc. did disclose to its clients the amount of contingent commission revenues that it received, Marsh Inc. manipulated its calculations with the result that they "could be viewed by certain clients as inaccurate or misleading." According to the report:

> In 1999, in response to client concerns about the role of contingent commissions, Marsh Inc.  announced an agreement with RIMS . . .  in which RIMS approved a

protocol by which Marsh Inc. would disclose to clients the existence of such arrangements, as well as certain information about the amount of contingent commission revenues that Marsh Inc. received. Pursuant to this protocol . . . Marsh Inc. has provided to clients upon request a calculation (called an "average contingency factor" or "ACF") that reflected the percentage amount that Marsh Inc. earned globally from MSA revenue, as compared to the overall amount of premiums placed by Marsh Inc., in a given calendar year . . . given the manner in which the calculations were performed pursuant to the protocol, the amounts conveyed to clients could be viewed by certain clients as inaccurate or misleading. . . . First, in the initial years following the RIMS agreement, it appears that certain amounts were included in the calculation of Marsh Inc.'s premium revenue that were not relevant to the computation of the average contingency factor. . . . In addition, depending on the configuration of insurance products that a client purchased through Marsh Inc., the ACF and any additional approximation that was conveyed to the client could have been materially different than the amount of MSA revenue that was associated with the particular client's placements.

470.     Once MMC and Marsh Inc. employees were notified that the NYAG was investigating MMC's and Marsh Inc.'s steering and bid manipulation, they dramatically increased MMC's and Marsh Inc.'s concealment efforts. The NYAG's office began serving subpoenas upon MMC and Marsh Inc. in or around April, 2004. Upon receipt of these subpoenas, MMC and Marsh Inc. employees attempted to impede the investigation. The NYAG described Defendant Greenberg's response as "unhelpful, distortive and unresponsive." At about the same time, Defendants Greenberg and Egan, and non-parties Groves and Smith began negotiating in earnest to purchase Kroll. Sensing an imminent threat and the possibility of prosecutions, MMC purchased Kroll to help try to shield it from liability for its improper business plan. Specifically, by purchasing Kroll, MMC and Marsh Inc. employees hoped to cash in on Kroll's investigatory expertise and to obtain the services of Cherkasky, a friend and former boss of Eliot Spitzer, to try to negotiate MMC's and Marsh Inc.'s way out of the regulatory action by the NYAG.

471.     MMC's and Marsh Inc.'s concealment efforts continue to this day. According to numerous former employees who were recently terminated, anyone laid off in 2004 was offered

a severance "package" if they signed a confidentiality agreement.  These efforts at concealment support the inference that improper steering was part of Marsh Inc.'s protocol and was known and sanctioned by the highest levels of MMC's and Marsh Inc.'s management.  Accordingly, MMC and Marsh Inc. knew or were reckless in not knowing that MMC's disclosures were materially misleading.

## XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

472.   Lead Plaintiffs are entitled to a presumption of reliance on the Defendants' material misrepresentations and omissions for the following reasons:

473.   MMC's publicly-traded securities were actively traded in an efficient market on the NYSE during the period in which Lead Plaintiffs bought and/or sold MMC securities.  The average daily trading volume of MMC's shares was more than 1,447,699 shares traded.  The total number of shares traded during the Class Period was 1,818,310,400 shares.

474.   As a regulated issuer, MMC filed periodic public reports with the SEC.

475.   MMC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

476.   The market reacted to public information disseminated by MMC.

477.   MMC was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace.

478.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the MMC's shares.

479.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased MMC's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

480.    In addition to the foregoing, Lead Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding MMC's business practices and operations throughout the Class Period.

## XIV.  CAUSES OF ACTION

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5 Promulgated Thereunder Against
Defendants MMC, Marsh Inc., Greenberg and Egan**

481.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

482.    Throughout the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Lead Plaintiffs and the other class members, as alleged herein; (ii) artificially inflate and maintain the market price of MMC's securities; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase MMC's securities at artificially inflated prices.  In furtherance of this unlawful scheme and course of conduct, Defendants took the actions set forth herein.

483.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of MMC's securities in an effort to maintain artificially high market prices for MMC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

484.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R.§ 210.01 et seq.) and Regulation S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to MMC's operations, financial condition, and earnings so that the market price of MMC's securities would be based on truthful, complete, and accurate information.

485.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material, adverse information about the business, operations, and future prospects of MMC as specified herein.

486.    Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MMC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about MMC and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of MMC's securities during the Class Period.

487.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants also engaged in a scheme or artifice to defraud the public regarding MMC.  Defendants' material misrepresentations and/or omissions and the scheme to defraud were done knowingly or recklessly and for the purpose and effect of inflating MMC's operating results and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' false and misleading statements concerning MMC's (and Marsh Inc.'s) business practices and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

488.   As a result of the fraudulent scheme complained of herein, the dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MMC's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of MMC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the

absence of material, adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired MMC securities during the Class Period at artificially high prices and were damaged thereby.

489.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  They also were unaware of Defendants' scheme and artifice.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true business practices and operations and business prospects of  MMC, which were not disclosed by Defendants, Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their MMC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

490.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder.

491.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of MMC's securities during the Class Period.

## COUNT II

### Violation Of Section 20(a)
### Of The Exchange Act Against Defendants
### MMC, Marsh Inc., Greenberg and Egan

492.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

493.    During the Class Period, Defendant Egan, acted as a controlling person of Defendant Marsh Inc.  Further, MMC controlled Marsh Inc. at all relevant times. Defendant Greenberg controlled Defendant MMC and, by virtue of MMC's control of Marsh Inc., acted as controlling person of Marsh Inc.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of MMC's and Marsh Inc.'s operations and/or intimate knowledge of the statements filed by MMC with the SEC and disseminated to the investing public, these 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of MMC and Marsh Inc., including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.  The controlling persons were provided with or had unlimited access to copies of MMC's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

494.    In particular, the 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the MMC and Marsh Inc. and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

495.    As set forth in detail above, the 20(a) Defendants acted with scienter in issuing materially false and misleading statements to the public, and they culpably participated in the fraud.

496.    As set forth above, Defendants each violated Section 10(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as controlling persons, the 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange

Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and

the other members of the Class suffered damages in connection with their purchases of the

Company's securities during the Class Period.

**COUNT III**

**Violations of Section 11 of the Securities Act Against Defendant MMC**

497.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

498.    This count is asserted against MMC for violations of Section 11 of the Securities

Act, 15 U.S.C.  §77k, on behalf of all members of the Class who purchased or otherwise

acquired securities in connection with MMC's 4.850% debt offering (as defined herein).

499.    The supplement to the prospectus relating to MMC's $250 million offering of

4.850% senior notes due 2013 (the "4.850% debt offering"), filed February 13, 2003 with the

SEC (the "Registration Statement/Prospectus"), was inaccurate and misleading, contained untrue

statements of material fact and omitted other facts necessary to make the statements made not

misleading, and failed to disclose material facts as described above.

500.    MMC is the registrant for MMC's 4.850% debt offering.  As issuer of the

securities that were registered, MMC is strictly liable to Lead Plaintiffs and members of the

Class who purchased or otherwise acquired MMC's securities in connection with MMC's

4.850% debt offering and pursuant to the Registration Statement/Prospectus for the

misstatements and omissions contained therein.

501.    At the time Lead Plaintiffs and other members of the Class acquired the securities

in MMC's 4.850% debt offering pursuant to the Registration Statement/Prospectus, they did not

know of the wrongful conduct alleged herein or of the facts concerning the untrue and

misleading statements and omissions alleged herein, and could not have reasonably discovered

such facts or wrongful conduct.  Less than one year has elapsed from the time that Lead

Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is

based to the time that Lead Plaintiffs first filed their first complaint.  Less than three years

elapsed from the time that the securities upon which this count is brought were bona fide offered

to the public to the time Lead Plaintiffs first filed their first complaint.

502.    Lead Plaintiffs and the other members of the Class have sustained damages.  The

value of MMC's securities sold in Marsh's 4.850% debt offering has declined substantially

subsequent to, and due to MMC's violations.

503.    By reason of the foregoing, MMC is liable for violations of Section 11 of the

Securities Act to Lead Plaintiffs and the other members of the Class who purchased securities in

MMC's 4.850% debt offering pursuant to the Registration Statement/Prospectus.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and the other

members of the Class against all Defendants for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: October 13, 2006                    Respectfully submitted,

GRANT & EISENHOFER P.A.                    BERNSTEIN LIEBHARD & LIFSHITZ, LLP


By: _____                  By: _____
Jay W. Eisenhofer (JE-5503)                Keith M. Fleischman (KF-0199)
Sidney S. Liebesman                        U. Seth Ottensoser
445 Park Avenue, 9th Floor                 Timothy J. MacFall
New York, NY 10022                         Felecia L. Stern
Telephone: (212) 307-3245                  Gregory M. Egleston
Facsimile: (212) 307-3216                  Stephanie M. Beige
                                           10 East 40th Street, 22nd Floor
         and                               New York, NY 10016
                                           Telephone: (212) 779-1414
Geoffrey C. Jarvis                         Facsimile: (212) 779-3218
James P. McEvilly
Sharan Nirmul                              Co-Lead Counsel for the Class
Naumon A. Amjed
1201 North Market Street                   KROLL HEINEMAN GIBLIN
Chase Manhattan Centre                     Vincent M. Giblin
Wilmington, DE 19801                       Metro Corporate Campus I
Telephone: (302) 622-7000                  99 Wood Avenue South, Suite 307
Facsimile: (302) 622-7100                  Iselin, NJ 08830
                                           Telephone: (732) 491-2100
Co-Lead Counsel for the Class              Facsimile: (732) 491-2120

                                           Co-Counsel for New Jersey

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| : | CIVIL ACTION |
| IN RE MARSH & MCLENNAN : | NO: 04-CV-08144 (SWK) |
| COMPANIES, INC. SECURITIES LITIGATION : |  |
| : | ELECTRONICALLY FILED |
| : |  |

## CERTIFICATE OF SERVICE

I, Sharan Nirmul, hereby certify that I caused the *Second Amended Consolidated Class Action Complaint* to be served by overnight delivery on the following defense counsel:

Mark B. Holton, Esquire
**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, NY 10166-0193
*Attorneys for Defendants Marsh & McLennan Companies, Inc., Marsh Inc., Mathis Cabiallavetta, J. Michael Bischoff, Peter Coster, Sandra S Wijnberg, Robert J. Rappaport, and A.J.C. Smith*

Michael Feldberg, Esquire
**Allen & Overy LLP**
1221 Avenue of the Americas
New York, NY 10020
*Attorneys for Defendant Jeffrey W. Greenberg*

Scott A. Edelman, Esquire
Douglas W. Henkin, Esquire
Daniel M Perry, Esquire
**Milbank Tweed Hadley
 & McCloy LLP**
1 Chase Manhattan Plaza
New York, NY 10005
*Attorneys for Defendant John T. Sinnott*

Fred Fielding, Esquire
Todd A Bromberg, Esquire
**Wiley Rein & Fielding LLP**
1776 K Street, NW
Washington, DC 20006
*Attorneys for Defendant Ray J. Groves*

Cyrus Vance, Esquire
**Morvillo Abramowitz Grand
Iason & Silberberg, P.C.**
565 Fifth Avenue
New York, NY 10017
*Attorneys for Defendant Roger E. Egan*

Jeff Hammel, Esquire
Seth L. Friedman, Esquire
**Latham & Watkins**
885 Third Avenue
New York, NY 10022
*Attorneys for Defendant Deloitte & Touche LLP*

John S. Siffert Esquire
**Lankler Siffert & Wohl LLP**
500 Fifth Avenue
New York, NY  100110-3398

*Attorneys for Defendants Lewis W. Bernard,*
*Robert Erburu, Oscar Fanjul, Stephen R.*
*Hardis, Gwendolyn S.King, Right Honorable*
*Lord Ian Bruce Lang of Monkton, David A.*
*Olsen, Morton O. Schapiro, and Adele*
*Simmons*

Sharan Nirmul (SN-2075)