USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/23/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

IN RE MARSH & McLENNAN COMPANIES,        04 Civ. 8144 (CM)
INC. SECURITIES LITIGATION

————————————————————————x

DECISION AND ORDER APPROVING THE SETTLEMENT, CERTIFYING
THE CLASS FOR SETTLEMENT PURPOSES, APPROVING THE PLAN OF
ALLOCATION OF THE SETTLEMENT FUND, AWARDING ATTORNEYS'
FEES, AND REJECTING THE OBJECTIONS

McMahon, J.:

## INTRODUCTION

Lead Plaintiffs the Public Employees Retirement System of Ohio, the State Teachers

Retirement System of Ohio and the Ohio Bureau of Workers' Compensation (collectively, the

"Ohio Plaintiffs"), and the State of New Jersey, Department of the Treasury, Division of

Investment, on behalf of itself and the Common Pension Fund A, the DCP Equity Fund and the

Supplemental Annuity Collective Trust Fund (collectively, the "New Jersey Plaintiffs" and,

together with the Ohio Plaintiffs, "Lead Plaintiffs"), on behalf of themselves and the Class (as

defined herein), move for final approval of a proposed settlement of $400 million (the

"Settlement") with Defendants Marsh & McLennan Companies, Inc. ("MMC"), Marsh, Inc.

("Marsh"), Jeffrey Greenberg ("Greenberg") and Roger Egan ("Egan") (collectively,

"Defendants"). The Court preliminarily approved the Settlement in its Preliminary Approval

Order of November 10, 2009 (Docket No. 301.) Only a handful of Class members have offered

any objection to the Settlement. Not one potential Class member has objected to the amount of

the Settlement, or to any of the substantive terms of the Settlement. For the reasons stated

below, the Court approves the Settlement, concluding that it is fair, reasonable and adequate.

With the approval of Lead Plaintiffs, the law firms of Grant & Eisenhofer, P.A. and Bernstein Liebhard LLP (together, "Lead Counsel"), move for (1) an award of attorneys' fees in the amount of 13.5% of the Settlement amount (the "Fee Application"); (2) reimbursement of $7,848,411.84 of expenses incurred by Lead Counsel in litigating this action; and (3) reimbursement of $214,657.14 of expenses incurred by Lead Plaintiffs ($70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs) in representing the Class (the "PSLRA Award Request").[1] For the reasons stated below, the Court grants all three requests.

## BACKGROUND

### I.    Lead Plaintiffs' Allegations and Claims

Lead Plaintiffs allege that Defendants engaged in a systematic plan to increase insurance placement revenues through improper bid manipulation and illicit client steering, all designed to generate a critical source of income known as "contingent commissions." Lead Plaintiffs further allege that Defendants violated federal securities laws by making materially false and misleading statements about their contingent commission practices, which caused the price of MMC stock to be artificially inflated during the Class Period (as defined herein), and to drop precipitously when the truth about the scheme was finally revealed, causing massive losses to investors.

Lead Plaintiffs brought claims against all Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Lead Plaintiffs also brought a claim against MMC under Section 11 of the Securities Act of 1933. Specifically, Lead Plaintiffs' Second Amended Consolidated Class Action Complaint (the "Amended Complaint") alleges, inter alia, that

---

[1] In their brief submitted in support of their request for fees and expenses, Lead Counsel first request an award of $320,000 for Lead Plaintiffs. (Mem. in Supp. of Lead Counsel's App. for an Award of Attorneys' Fees, Reimbursement of Expenses for Lead Counsel, and an Award of Expenses to Lead Pls., Dec. 18, 2009 ("Fees Br."), at 1.) However, Lead Counsel then state: "Pursuant to the PSLRA, Ohio Plaintiffs and the New Jersey Plaintiffs request an award totaling $214,657.14 to compensate them for their reasonable costs and expenses incurred in managing this litigation and representing the Class," and "request[] that the Court award the Ohio Plaintiffs $70,000 and the New Jersey Plaintiffs $144,657.14." (Id. at 23-25.) Thus, the Court construes the PSLRA Award Request as a request for $214,657.14.

Defendants lied to the investing public by misrepresenting that: (1) contingent commission payments played no role in Marsh's recommendations to its clients about which carrier to choose for insurance coverage; (2) contingent commissions were paid in exchange for "services" provided by Marsh to the insurance carriers; and (3) Marsh fully disclosed contingent commissions to its clients. Lead Plaintiffs further allege that when the scheme ultimately was revealed in late 2004, following a suit brought by the New York Attorney General ("NYAG"), and the truth about Defendants' misstatements began to come out, MMC's stock price collapsed and investors suffered billions of dollars in damages.

## II. Procedural Background

This Settlement comes about after more than five years of hard-fought litigation. The litigation began on October 15, 2004, when the first of several class-action complaints was filed in the Southern District of New York against MMC, its subsidiary, Marsh, and others, including Greenberg, the former CEO of MMC, and Egan, the former President of Marsh. The complaints were assigned to the late Judge Kram for consolidated pretrial proceedings and the action was styled In re Marsh & McLennan Companies, Inc. Securities Litigation, No. 04 Civ. 8144. By Order dated January 26, 2005, Judge Kram appointed the Ohio Plaintiffs and the New Jersey Plaintiffs as Lead Plaintiffs, and Grant & Eisenhofer and Bernstein Liebhard as Lead Counsel.

Lead Plaintiffs filed their Consolidated Class Action Complaint on April 19, 2005. All Defendants moved to dismiss all claims asserted against them. On July 19, 2006, Judge Kram granted in part and denied in part the motions to dismiss. Judge Kram's decision substantially narrowed the claims and allegations asserted against Defendants and dismissed all of the state-law claims. See In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144, 2006 WL 2057194 (S.D.N.Y. July 19, 2006). Lead Plaintiffs filed the Amended Complaint on October 13,

2006, asserting only the claims and allegations that Judge Kram had not dismissed. Defendants answered the Amended Complaint on December 12, 2006.

With the discovery stay lifted, the parties proceeded to conduct extensive and vigorously contested fact discovery. Given the intensity of discovery, Judge Kram appointed a Special Master, L. Peter Parcher, to hear and rule on disputed discovery issues. Lead Plaintiffs brought twenty such motions to the Special Master and Defendants brought five, on which the Special Master issued twenty opinions. (Fees Br. at 6.)

Lead Plaintiffs and Defendants each retained an expert to address Lead Plaintiffs' motion for class certification, with each side filing detailed initial and rebuttal expert witness submissions. As discovery continued, Lead Plaintiffs retained six experts to address liability, damages and causation issues, and Defendants retained two experts. The parties exchanged lengthy, detailed initial reports from all of the experts, and rebuttal reports from four experts. By the time the parties had agreed in principle to settle, both Lead Plaintiffs and Defendants had already deposed one of the other side's expert witnesses. Both sides were preparing their other expert witnesses for depositions, which were set to continue the same week the parties reached their agreement to settle.

Lead Plaintiffs moved for certification of a class of purchasers of MMC securities from October 14, 1999 through October 13, 2004. Defendants opposed that motion. The class certification issues were hotly contested, and numerous briefs were filed on the certification question. At the time the parties agreed to settle, the Court had not yet ruled on Lead Plaintiffs' class certification motion. On November 10, 2009, at the request of Lead Plaintiffs and Defendants, the Court certified the Class for settlement purposes only in the Preliminary Approval Order.

4

At all times, the parties sharply disputed the merits of the case, class certification and damages. Defendants denied, and still deny, each claim alleged against them. Defendants asserted, and still assert, that they made no material misrepresentations or omissions and that, even if they did, they did so without intent such that they are not liable under the federal securities laws. Further, Defendants maintain that, even if they were found liable, the amount of the damages suffered by the Class is negligible or nonexistent.

Through an experienced mediator, the Honorable Daniel Weinstein (the "Mediator")—a retired Judge of the Superior Court of California—Lead Counsel engaged in intensive, arm's-length negotiations with Defendants over a one-and-a-half year period, with the aim of settling the issues in dispute and achieving the best relief possible consistent with the interests of the Class. Formal mediation sessions were held on April 7, 2008, February 4, 2009 and October 14-15, 2009. The mediation sessions involved sophisticated demonstrative aides and written and oral presentations to Judge Weinstein, as well as separate sessions with an independent damages expert retained for the sole purpose of advising the Mediator. On November 10, 2009, a settlement was reached.

## III. Summary of the Settlement

The Settlement is the result of several rounds of mediation between Lead Plaintiffs and Defendants, conducted before the Mediator. Judge Weinstein has submitted a declaration attesting to his belief that the Settlement is a fair and reasonable resolution of this matter, taking into account the complexities of the issues involved, the strengths and weaknesses of each side's position and the uncertainty of continued litigation. (See Decl. of Judge Weinstein, Dec. 18, 2009, ¶ 14.)

The Settlement provides for the payment of $400 million for the benefit of Lead Plaintiffs

and the Class into a settlement fund (the "Settlement Fund"). Additionally, the Stipulation and

Agreement of Settlement, dated November 10, 2009 (Docket No. 300) (the "Stipulation") allows

Lead Counsel to request an attorneys' fee of up to 13.5% of the Settlement Fund and

reimbursement of expenses of up to $13 million, as well as to request reimbursement for class

representative expenses incurred by Lead Plaintiffs.

## IV.    Notice of Settlement

Pursuant to the Preliminary Approval Order, Lead Plaintiffs provided notice of the

Settlement to Class members in several significant ways: (1) Lead Plaintiffs, through their claims

agent, caused the Court-approved Notice of Proposed Settlement (the "Notice") to be mailed by

first-class mail, postage prepaid, to all reasonably identifiable Class members and their nominees

(Joint Decl. of Keith M. Fleischman & Stanley D. Bernstein, Dec. 18, 2009 ("Joint Decl."), ¶ 96;

Aff. of Charlene Young, Dec. 18, 2009 ("Young Aff."), ¶ 11); (2) Lead Plaintiffs caused a copy

of the Summary Notice of Proposed Settlement (the "Summary Notice") to be published in the

national edition of *The Wall Street Journal* (Joint Decl. ¶ 97; Young Aff. ¶ 6); (3) Lead Plaintiffs

caused a copy of the Notice to be transmitted over *Business Wire* (Joint Decl. ¶ 98; Young Aff. ¶

6); and (4) Lead Plaintiffs established the website www.MMCSecuritiesLitigation.com, on

which was published the Notice, the Proof of Claim and Release Form (the "Proof of Claim"),

various Court documents and additional information regarding the Settlement (Joint Decl. ¶ 99;

Young Aff. ¶ 7). The Notice described the terms of the Settlement; explained the claims and

defenses in the lawsuit; provided instructions for Class members to exclude themselves from the

Settlement or to object to any part of the Settlement; provided detailed information about the

final Settlement fairness hearing on December 23, 2009 (the "Settlement Fairness Hearing"); and

6

provided contact information for the claims agent and Lead Plaintiffs' counsel, among other things.

## V.    Objections Received

Lead Plaintiffs have received only seven objections from potential Class members. (Joint Decl. ¶ 115.) In addition, twenty potential Class members have asked to be excluded from the Settlement. (Id. ¶ 113; Young Aff. ¶ 14.)

## DISCUSSION

### I.    The Settlement Is Fair, Reasonable and Adequate

There is a "strong judicial policy in favor of settlements, particularly in the class action context." In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998). "Settlement approval is within the Court's discretion, which should be exercised in light of the general judicial policy favoring settlement." In re Sumitomo Copper Litig., 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (internal quotations omitted). In a class-action settlement, there is a presumption of fairness, reasonableness and adequacy when the settlement is the product of "arms-length negotiations between experienced, capable counsel after meaningful discovery." Id. at 280 (citing Manual for Complex Litigation (Third) § 30.42 (1995)).

#### A.    Standards for Approval of a Class-Action Settlement

In evaluating a proposed settlement under Federal Rule of Civil Procedure 23, the Court must determine whether the settlement, taken as a whole, is fair, reasonable and adequate. Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1079 (2d Cir. 1995); see In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288, 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004). It is well-established that courts in this Circuit examine the fairness, adequacy and reasonableness of a class-action settlement according to the "Grinnell factors":

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; and (9) the range of reasonableness of the
> settlement fund in light of all the attendant risks of litigation.

City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted). "In

finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the

court should consider the totality of these factors in light of the particular circumstances.'" In re

Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (quoting Thompson

v. Metro. Life Ins. Co., 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). In deciding whether to approve a

settlement, a court "should not attempt to approximate a litigated determination of the merits of

the case lest the process of determining whether to approve a settlement simply substitute one

complex, time consuming and expensive litigation for another." White v. First Am. Registry,

Inc., No. 04 Civ. 1611, 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007).

## B. Application of the Grinnell Factors Supports Approval of the Settlement

### 1. The Complexity, Expense and Likely Duration of the Litigation

"[I]n evaluating the settlement of a *securities* class action, federal courts, including this

Court, have long recognized that such litigation is notably difficult and notoriously uncertain."

In re Sumitomo, 189 F.R.D. at 281 (emphasis in original) (internal quotations omitted). This is

certainly true with respect to the claims in this case.

This litigation involved not only complex issues of securities law, but also specific issues

involving the highly regulated insurance industry and its use and understanding of contingent

commissions. These industry-specific issues were complex enough to require Lead Plaintiffs to

hire two industry experts, at significant expense, to assist Lead Counsel during most of the five years of the litigation. (See Joint Decl. ¶ 74.)

This case would have been extremely complicated to bring to trial, with the prospects for Lead Plaintiffs and the Class being highly uncertain. Even the most optimistic estimates did not have trial commencing until early 2011, with the Class not receiving any recovery until at least 2013. There would have been significant additional resources and costs expended to litigate the case through trial and through the inevitable appeals of any judgment that might have been entered against Marsh. The Settlement, by contrast, provides certain and substantial recompense to Class members now, and avoids their having to await the uncertain outcome of what would have been a lengthy trial and appeals process.

Thus, the complexity, expense and uncertainty of the litigation supports approval of the Settlement.

### 2. The Reaction of the Class to the Settlement

The Class's reaction to the Settlement also supports approval. Lead Counsel provided Notice by mail and by publication to all ascertainable Class members, and a website was established to handle inquiries. As the Court remarked at the preliminary approval hearing on November 10, 2009, the quality of the Notice provided by Lead Counsel is exceptionally high. Lead Counsel have received only seven purported objections and twenty requests for exclusion. This is an extremely strong indication of the fairness of the Settlement.[2]

---

[2] Counsel disagree over whether the requests for exclusion (which come from a group of entities represented by the same lawyer) were great enough to trigger Marsh's right to walk away from the Settlement. But in exchange for an opportunity to convince these opt-outs of the error of their ways, Marsh has decided not to exercise any right it might have to walk away, and has asked the Court to approve the Settlement. The Court has today signed an order giving these twenty opt-outs additional time to rethink their position.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

At the time of the Settlement, the parties had just completed merits discovery and were in the process of conducting expert depositions. (Joint Decl. ¶ 76.) The parties had already exchanged expert reports and rebuttal reports. (Id. ¶ 74.) By this time, Lead Plaintiffs had, inter alia, (1) inspected, reviewed and analyzed over thirty-four million pages of documents produced by Defendants; (2) subpoenaed 100 non-parties and inspected, reviewed and analyzed over two million pages produced by non-parties; (3) taken and defended over 100 depositions; and (4) researched the applicable law concerning Lead Plaintiffs' claims and potential defenses thereto, as well as numerous pretrial issues.

The advanced stage of the litigation and extensive amount of discovery completed weigh heavily in favor of approval. The parties' counsel were clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and to evaluate the fairness of the proposed Settlement. See In re Lloyd's Am. Trust Fund. Litig., No. 96 Civ. 1262, 2002 WL 31663577, at *15 (S.D.N.Y. Nov. 26, 2002); see also In re Sumitomo, 189 F.R.D. at 281-82 (finding that the stage of the proceedings "strongly" favored approval of settlement reached after "[p]laintiffs had conducted extensive discovery, investigation and analyses, and the proceedings were in the advanced stage of pointing or preparing for trial"). This is not a case where the parties engaged only in "settlement discovery." Thus, this Grinnell factor strongly supports approval.

### 4. The Risks of Establishing Liability

There is some risk that Lead Plaintiffs ultimately might have failed to establish Defendants' liability. Courts have acknowledged that "the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages." In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., No. 02

10

Civ. 5575, 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) (citations omitted). For example, with respect to the Rule 10b-5 claims, Lead Plaintiffs may have had difficulty proving that Defendants acted with scienter, or that the alleged decline in MMC's stock price was due entirely to the conduct alleged in the Amended Complaint and not to other unrelated factors.

### 5. The Risks of Establishing Damages

If there is anything in the world that is uncertain when a case like this one is taken to trial, it is what the jury will come up with as a number for damages. On damages, this case would have ended up as a classic "battle of the experts." There is the undeniable risk that a "jury could be swayed by experts for the Defendants, who [c]ould minimize the amount of Plaintiffs' losses." Maley v. Del Global Tech. Corp., 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002); see Strougo v. Bassini, 258 F. Supp. 2d 254, 259 (S.D.N.Y. 2003); In re Lloyd's, 2002 WL 31663577, at *21. The risk that Lead Plaintiffs would be unable to establish damages exceeding the $400 million that the Settlement provides to the Class supports approval of the Settlement. Even if Lead Plaintiffs were successful in establishing liability, they have avoided substantial risks in proving damages by virtue of this proposed Class Settlement.

### 6. The Risk of Maintaining the Class Action Through Trial

There is also the risk that the Court might have denied Lead Plaintiffs' motion for class certification, and thereby precluded any recovery for the Class whatsoever. At the time of the Settlement, the class certification motion was pending before the Court. Defendants had vigorously contested class certification, arguing, inter alia, that Lead Plaintiffs are not entitled to the "fraud-on-the-market" presumption. The briefing was voluminous, intense and complex. Had the Court rejected Lead Plaintiff's motion, no class action could have been maintained. Although Defendants have stipulated to certification of the Class for purposes of the Settlement,

11

there would have been no such stipulation had Lead Plaintiffs brought this case to trial. Thus, the uncertainty surrounding class certification supports approval of the Settlement. See In re AOL, 2006 WL 903236, at *12 (finding that risk of plaintiffs' not succeeding in certifying class supported approval of settlement); In re Global Crossing, 225 F.R.D. at 460 (same).

### 7. The Ability of Defendants to Withstand a Greater Judgment

It is undeniable that the current economic climate is not strong. Marsh's financial condition undoubtedly has been adversely affected by the economic turmoil of the past year. Moreover, the value of MMC stock has not recovered since the alleged wrongdoing giving rise to this litigation. In October 2004, during the five days following the announcement of the NYAG's lawsuit, the value of MMC stock dropped from $46.01 per share to $24.10. (Am. Compl. ¶ 10.) MMC stock is currently trading even lower, at approximately $22 per share. There exists the legitimate concern that Defendants might not be able to pay an award higher than the Settlement, even if Lead Plaintiffs were to prevail at trial. Accordingly, this factor supports approval of the Settlement.

### 8. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

The determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." In re Michael Milken & Assocs. Sec. Litig., 150 F.R.D. 57, 66 (S.D.N.Y. 1993); In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989). Rather, "in any case there is a range of reasonableness with respect to a settlement." Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972) "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." Grinnell, 495 F.2d at 455 & n.2 ("In fact there is no reason, at least in theory, why a satisfactory

12

settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.")

The Settlement is well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation. A recovery totaling $400 million is an excellent result when success on the claims asserted is uncertain, class certification is being vigorously challenged, and the condition of the economy and of MMC in particular is questionable. Accordingly, the eighth and ninth Grinnell factors support approval of the Settlement.

## C. The Proposed Settlement Is Procedurally Fair

"In addition to ensuring the substantive fairness of the settlement through full consideration of the Grinnell factors, the Court must also 'ensure that the settlement is not the product of collusion.'" In re Global Crossing, 225 F.R.D. at 461 (quoting In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 474 (S.D.N.Y. 1998)). However, "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." Banyai v. Mazur, No. 00 Civ. 9806, 2007 WL 927583, at *12 (S.D.N.Y. Mar. 27, 2007) (approving settlement reached after months of good-faith, arm's-length negotiations) (quoting In re PaineWebber Ltd. P'Ships Litig., 171 F.R.D. 104, 132 (S.D.N.Y. 1997)).

Where, as here, "the settlement is the result of arm's length negotiations conducted by experienced counsel after adequate discovery and the settlement provokes only minimal objections, then it is entitled to '[a] strong initial presumption of fairness.'" In re Global Crossing, 225 F.R.D. at 461 (citation omitted). As set forth in Lead Counsel's Joint Declaration, Lead Counsel entered into this Settlement after conducting extensive discovery and arm's-length negotiations, based on their good-faith belief that the Settlement is in the best interests of the

13

Class. The Settlement was the result of protracted, difficult negotiations that stretched out over a year and a half. Moreover, those negotiations were conducted with the assistance of Judge Weinstein, a highly regarded mediator with extensive experience in securities litigation, who has submitted a declaration in support of the Settlement. There is no reason to doubt that the Settlement is procedurally fair.

## II.    Certification of a Settlement Class Is Appropriate Under Rule 23

The Preliminary Approval Order certified the Class pursuant to Rules 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired MMC securities between October 14, 1999 and October 13, 2004 (the "Class Period"), and that claim to have suffered losses as a result of such purchase or acquisition. The Class excludes the following: (1) MMC, Marsh and their officers, directors, employees, affiliates, parents, subsidiaries, representatives, predecessors and assigns; (2) Greenberg and Egan and their immediate families, employees, affiliates, representatives, heirs, predecessors, successors and assigns, as well as any entity in which either Greenberg or Egan has a controlling interest; and (3) those persons that would otherwise be members of the Class but that submit valid and timely requests for exclusion in accordance with the Preliminary Approval Order. The Court also certified Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, for purposes of Settlement only, pursuant to Rule 23.

The Second Circuit has long acknowledged the propriety of certifying a class solely for purposes of a class-action settlement. See Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982). Classes certified for settlement purposes, like all other classes, must meet the requirements of Rule 23(a) and at least one of three requirements set forth in Rule 23(b). See In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 205-10 (S.D.N.Y. 1995).

## A.     The Requirements of Rule 23(a) Are Satisfied

Certification under Rule 23(a) is proper if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately protect the interests of the class.

### 1.     The Settlement Class Is Sufficiently Numerous

Rule 23(a)(1) requires a showing that the Class is so numerous that joinder of all members is impracticable. Numerosity is generally presumed when a class consists of forty or more members. See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." In re Vivendi Universal, S.A. Sec. Litig., 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (quoting Teachers Ret. Sys. v. ACLN Ltd., No. 01 Civ. 11814, 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004)).

At the time of the Amended Complaint, MMC was the largest insurance broker in the United States, and one of the largest in the world, with approximately $11 billion in annual revenues. (Am. Compl. ¶ 43.) MMC has traded on the NYSE during all relevant times, and undoubtedly has had millions of shares outstanding at any given time. Further, Lead Plaintiffs have caused the Notice to be mailed to thousands of potential Class members or nominees, and there have been over 7,000 viewers at the Settlement website. (Young Aff. ¶ 8.) In short, the numerosity of the Class cannot seriously be disputed.

## 2. There Are Questions of Law or Fact Common to the Class

Rule 23(a)(2) requires a showing that common issues of fact or law affect all Class members. "The commonality requirement, particularly in securities fraud litigation, is generally considered a low hurdle easily surmounted. Commonality does not demand that every question of law or fact be common to every class member, but instead merely requires that the claims arise from a common nucleus of operative facts. In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483, 2007 WL 1300781, at *3 (S.D.N.Y. Apr. 30, 2007) (internal quotations and citations omitted); In re Vivendi, 242 F.R.D. at 84 (stating that commonality requirement is applied "permissively" in securities litigation). In fact, a single common question may be sufficient to satisfy the commonality requirement. See, e.g., German v. Fed. Home Mortgage Loan Corp., 885 F. Supp. 537, 553 (S.D.N.Y. 1995). Where, as here, plaintiffs allege that class members have been injured by the same fraudulent scheme, the commonality requirement is satisfied. See, e.g., Berwecky v. Bear, Stearns & Co., 197 F.R.D. 65, 68-69 (S.D.N.Y. 2000); In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y. 1997).

Here, Lead Plaintiffs allege that they and all Class members were injured by a fraudulent scheme to artificially inflate and maintain the price of MMC securities, and that Defendants engaged in manipulative and deceptive acts in furtherance of that scheme by, among other things, making false and misleading statements about the nature of their contingent commission practices and revenues. Common questions include (1) whether Defendants engaged in a fraudulent scheme; (2) whether Defendants acted with scienter; (3) whether Defendants' acts affected the market for MMC securities; and (4) whether Defendants' conduct had the effect of concealing the circumstances that bore on the ultimate loss. There are clearly sufficient common questions to satisfy Rule 23(a)(2).

### 3. Lead Plaintiffs' Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that Lead Plaintiffs' claims be "typical" of those of the Class.
Lead plaintiffs' claims are typical where, as here, they "arise from the same practice or course of
conduct that gives rise to the claims of the proposed class members." In re Vivendi, 242 F.R.D.
at 85 (quoting Marisol A. v. Giuliani, 929 F. Supp. 662, 691 (S.D.N.Y. 1996)). Typicality thus
embraces the principle that class representatives "have the incentive to prove all the elements of
the cause of action which would be presented by the individual members of the class were they
initiating individual actions." In re NASDAQ, 172 F.R.D. at 126 (internal quotations and
citation omitted).

"Typical" does not mean "identical." See In re Omnicom, 2007 WL 1300781, at *4;
Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 200 (S.D.N.Y. 1992). Accordingly, the
"typicality requirement is not defeated by minor variations in the fact patterns of individual class
member[s'] claims." Abdul-Malik v. Coombe, No. 96 Civ. 1021, 1996 WL 706914, at *3
(S.D.N.Y. Dec. 6, 1996). Factual differences involving the date of acquisition, type of securities
purchased and manner by which the investor acquired the securities will not destroy typicality if
each class member was the victim of the same material misstatements and the same fraudulent
course of conduct. See, e.g., In re Baldwin-United Corp. Litig., 122 F.R.D. 424, 428 (S.D.N.Y.
1986); Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 99 (S.D.N.Y. 1981).

Lead Plaintiffs' claims are typical of those of the Class because their claims arise out of
the same course of conduct—Defendants' alleged participation in the fraudulent scheme to
artificially inflate and maintain the price of MMC securities. Lead Plaintiffs, like the members
of the Class they represent, purchased MMC securities during the Class Period and suffered
significant losses as a result of the violations of the federal securities laws alleged in the

17

Amended Complaint. Lead Plaintiffs stand in the same position as other investors who purchased MMC securities during the Class Period, having suffered the same type of injury (purchasing MMC securities at artificially inflated prices and suffering losses when the fraud was revealed) as a result of Defendants' conduct. Such a showing is sufficient to meet the typicality requirement of Rule 23(a)(3).

### 4. Lead Plaintiffs Have Fairly and Adequately Protected the Interests of the Class

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Courts consider two factors in measuring adequacy of representation: (1) whether the claims of the lead plaintiffs conflict with those of the class; and (2) whether the lead plaintiffs' counsel is qualified, experienced and generally able to conduct the litigation. See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992); In re Oxford Health Plans, 191 F.R.D. 369, 376 (S.D.N.Y. 2000). As many courts have observed, "the issues of typicality and adequacy tend to merge because they 'serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" In re Vivendi, 242 F.R.D. at 85 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).

As discussed above, Lead Plaintiffs and the members of the Class they represent were injured by the same wrongful course of conduct. Accordingly, it is in Lead Plaintiffs' interest to vigorously prosecute this action on behalf of the Class. Lead Counsel are experienced securities class action law firms and they have more than adequately represented the interests of the Class. Accordingly, Lead Plaintiffs and Lead Counsel meet the requirements of Rule 23(a)(4).

## B. The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Both requirements are satisfied here.

### 1. Common Questions of Law or Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002). "Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." In re Prudential, 163 F.R.D. at 206 (quoting Dura-Bilt, 89 F.R.D. at 93). Accordingly, as the Supreme Court has noted, "Predominance is a test readily met in certain cases alleging . . . securities fraud." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997).

Here, the critical issues for establishing Defendants' liability include whether the Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. Each of these issues is susceptible of generalized proof and, accordingly, the predominance requirement of Rule 23(b)(3) is satisfied. See, e.g., In re Salomon Analyst Metromedia, 236 F.R.D. 208, 218 (S.D.N.Y. 2006).

## 2.    A Class Action Is the Superior Method of Adjudication

The last prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. A class action is particularly appropriate for addressing the claims at issue in this case. Lead Plaintiffs represent a Class consisting of a large number of investors in MMC securities whose individual damages are likely small enough to render individual litigation prohibitively expensive. Superiority is readily found where, as here, "the alternatives [to a class action] are either no recourse for thousands of stockholders . . . or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968).

Rule 23(b)(3) specifies four factors that a court should consider in determining whether a class action is superior to other methods of adjudication: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Each of these factors weighs in favor of certification of the Settlement Class.

Class members have limited interest in individually controlling the prosecution or defense of separate actions given the prohibitive cost of instituting individual actions for securities fraud. Accordingly, the courts recognize that a class action is uniquely suited to resolving securities claims. See In re Vivendi, 242 F.R.D. at 91; see also Green, 406 F.2d at 296. This point is underscored by the fact that, to date, only a small number of Class members have opted out of this class action. Further, concentrating litigation in a single forum plainly has a number of benefits, including eliminating the risk of inconsistent adjudications and promoting

20

the fair and efficient use of the judicial system, and "the Southern District of New York is well known to have expertise in securities law." Albert Fadem Trust v. Duke Energy Corp., 214 F. Supp. 2d 341, 344 (S.D.N.Y. 2002). Finally, in determining whether a class action is a superior method of adjudication, a court must also consider "the management difficulties likely to be encountered if the action is continued as a class suit, such as the burden of complying with Rule 23's notice requirements." In re Vivendi, 242 F.R.D. at 107. Securities class actions are routinely certified and raise no unusual manageability issues. Indeed, as shown below, the streamlined and timely manner by which Lead Plaintiffs identified and notified Class members of the Settlement demonstrates that class treatment here is manageable and efficient.

## III. Transmission of the Notice to the Class Satisfied Both the Preliminary Approval Order and Applicable Law

Rule 23(c)(2)(B) requires that notice of class certification must be served on all class members who can be identified through reasonable efforts. Further, Rule 23(e)(1) instructs courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Such notice to class members need only be reasonably calculated under the circumstances to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections. See Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 67 (S.D.N.Y. 2003) ("Although no rigid standards govern the contents of notice to class members, the notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." (internal quotations and citations omitted)).

As with the notice approved by the court in Thompson, the Notice provided to Class members here provided, "in language easily understandable to a layperson, the essential terms of the settlement, including the claims asserted; who would be covered by the settlement; how to

21

participate in or opt-out of the settlement; the settlement benefits; the contact information of the lawyers representing the class members and the amount sought for named Class members; how to object to the settlement and the time and place of the Court's scheduled fairness hearing if an objector or his counsel wished to appear; and who to contact if further information is sought." Id. at 68 (citations omitted). Indeed, as the Court stated at the preliminary approval hearing, the Notice provided by Lead Counsel was among the best the Court has encountered.

The Preliminary Approval Order authorized Lead Plaintiffs to retain Rust Consulting, Inc. as the Claims Administrator, and directed the Claims Administrator to (1) cause the Notice and Proof of Claim to be mailed, by first-class mail, postage prepaid, by November 13, 2009, to all reasonably identifiable Class members; and (2) cause the Summary Notice to be published in the *Wall Street Journal* and transmitted over *Business Wire*. In addition, the Preliminary Approval Order directed Lead Counsel to file proof of the publication of the Summary Notice and mailing of the Notice with the Court at least three days before the Settlement Fairness Hearing. Lead Plaintiffs have fully complied with these requirements. (Joint Decl. ¶¶ 96-98; Young Aff. ¶¶ 6, 7, 11.) This is sufficient to satisfy Rule 23. Accordingly, the form and manner of Notice provided to Class members satisfies both the Preliminary Approval Order and Rule 23.

## IV.    The Plan of Allocation Is Reasonable, Fair and Equitable

"When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational basis.'" In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (quoting In re Am. Bank Note Holographics, Inc. Sec. Litig., 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001)). In determining whether a plan of allocation is fair, courts look largely to the opinion of counsel. See In re Painewebber Ltd. P'shps. Litig., 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

The Plan of Allocation (the "Plan") in this case meets these standards of rationality and reasonableness. As set forth in the Joint Declaration, the Plan is the product of Lead Counsel's investigation, discovery and consultation with their damages expert. In developing the Plan, Lead Counsel and their experts considered numerous factors, including (1) the volume of publicly traded MMC securities purchased, acquired or sold during the Class Period; (2) the time period in which an MMC security was purchased or acquired, or an MMC put option was sold; (3) whether the security was held until after the end of the Class Period or whether it was sold during the Class Period, and if so, when it was sold and at what price; (4) the artificial inflation in the price of MMC securities (or "artificial deflation" for put options) allegedly attributable to Defendants' misstatements; and (5) the type of security involved. The Court concludes that the Plan is rational and reasonable.

## V.     Attorneys' Fees

Lead Counsel (1) submit their Fee Application for an award of attorneys' fees in the amount of 13.5% of the Settlement Fund; (2) petition for reimbursement of litigation expenses in the amount of $7,848,411.84; and (3) make, on behalf of Lead Plaintiffs, a PSLRA Award Request for reimbursement of class representative expenses totaling $214,657.14—$70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs. For the reasons stated below, the Court grants these requests.

### A.     Lead Counsel Are Entitled to an Award of Attorneys' Fees and Reimbursement of Expenses from the Settlement Fund

Pursuant to the "equitable" or "common fund" doctrine, established more than a century ago in Trustees v. Greenough, 105 U.S. 527, 532-33 (1881), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work. In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 584-85 (S.D.N.Y.

23

2008). The Supreme Court has recognized that a lawyer who recovers a common fund for the benefit of persons other than his client is entitled to a reasonable attorney's fee from the fund as a whole. Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). Fees and expenses are paid from the common fund so that all class members contribute equally toward the costs associated with litigation pursued on their behalf. See Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47 (2d Cir. 2000).

Courts traditionally have used two methods to calculate reasonable attorneys' fees in common fund cases: the "percentage method" and the "lodestar method." Id. The percentage method is the simpler method of the two and involves awarding counsel a percentage of the recovery as a fee. Id. The lodestar method requires the court to scrutinize the fee petition to ascertain the number of hours reasonably billed, then multiply that figure by an appropriate hourly rate. Id.

Although district courts may use both methods when approving an award of attorneys' fees, the Second Circuit encourages using the lodestar method only as a cross-check for the percentage method. Id. at 50; see Strougo v. Bassini, 258 F. Supp. 2d 254, 263 (S.D.N.Y. 2003). Indeed, the percentage method continues to be the trend of district courts in this Circuit and has been expressly adopted in the vast majority of circuits. See In re Telik, 576 F. Supp. 2d at 586 & n.6 (collecting cases). Further, the percentage method comports with the PSLRA, which provides that "attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable *percentage* of the amount of any damages and prejudgment interest actually paid to the class." See 15 U.S.C. § 78u-4(a)(6) (emphasis added).

Whether determined by lodestar or percentage, the fees awarded in common fund cases must be "reasonable" under the circumstances. Goldberger, 209 F.3d at 47. "What constitutes a

reasonable fee is properly committed to the sound discretion of the district court, and will not be

overturned absent an abuse of discretion." Id. (internal citation omitted). The Second Circuit

has instructed that, in exercising their discretion:

> [D]istrict courts should continue to be guided by the traditional
> criteria in determining a reasonable common fund fee, including:
> "(1) the time and labor expended by counsel; (2) the magnitude
> and complexities of the litigation; (3) the risk of the litigation . . .;
> (4) the quality of the representation; (5) the requested fee in
> relation to the settlement; and (6) public policy considerations."

Id. at 50 (quoting In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 724 F. Supp. 160,

163 (S.D.N.Y. 1989)). In applying these criteria, "a Court essentially makes no more than a

qualitative assessment of a fair legal fee under all the circumstances of the case." See In re

Union Carbide, 724 F. Supp. at 166. In this case, the fee requested by Lead Counsel is warranted

under either the percentage or lodestar method.

## B. The Requested Attorneys' Fees Are Reasonable Under the Percentage of the Fund Method

The requested fee of 13.5% of the Settlement Fund is reasonable. Lead Counsel

vigorously pursued this litigation over the course of five years. The requested fee represents

only 0.44% of the total value of Lead Counsel's lodestar. When considering percentage fee

awards in securities class actions settled in the $100-$600 million range, Lead Counsel's request

for 13.5% of the $400 million Settlement Fund is at the low end of the spectrum in this Circuit

and elsewhere. See, e.g., In re Initial Pub. Offering Sec. Litig., Master File No. 21 MC 92, 2009

WL 3397238 (S.D.N.Y. Oct. 5, 2009) ($586 million; 33.33%); In re Adelphia Commc'ns Corp.

Sec. & Derivative Litig., No. 03 MDL 1529, 2006 U.S. Dist. LEXIS 84621 (S.D.N.Y. Nov. 16,

2006) ($455 million; 21.4%); In re Qwest Commc'ns Int'l, Inc. Sec. Litig., No. 01 Civ. 01451,

2006 U.S. Dist. LEXIS 71267 (D. Colo. Sept. 28, 2006) ($400 million; 15%); In re Lucent

Techs., Inc. Sec. Litig., 327 F. Supp. 2d 426 (D.N.J. 2004) ($517 million; 17%); In re

BankAmerica Corp. Sec. Litig., 228 F. Supp. 2d 1061 (E.D. Mo. 2002) ($490 million; 18%); In

re Prison Realty Sec. Litig., No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9,

2001) ($104 million; 30%); In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166 (E.D.

Pa. 2000) ($111 million; 30%); Kurzweil v. Philip Morris Cos., Inc., Nos. 94 Civ. 2373, 2546,

1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) ($124 million; 30%); In re Prudential Sec. Inc. Ltd.

P'ships Litig., 912 F. Supp. 97 (S.D.N.Y. 1996) ($110 million; 27%).

Further, Lead Counsel have based their fee request on the percentage method because

Lead Plaintiffs chose the percentage method for determining the fees that Lead Counsel could

seek. (Decl. of Carol G. Jacobson, Dec. 18, 2009, ¶ 22; Decl. of Dennis P. Smith, Dec. 18, 2009,

¶ 16.) Since the passage of the PSLRA, courts have found such an agreement between fully

informed lead plaintiffs and their counsel to be presumptively reasonable. See In re Cendant

Corp. Litig., 264 F.3d 201, 282 (3d Cir. 2001); In re Lucent, 327 F. Supp. 2d at 433-34; In re

Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 466 (S.D.N.Y. 2004) (citing In re

Cendant for proposition that "in class action cases under the PSLRA, courts presume fee requests

submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and

lead counsel are reasonable").

Indeed, public policy considerations support fee awards where, as here, large public

pension funds, serving as lead plaintiffs, conscientiously supervised the work of lead counsel,

and gave their endorsement to lead counsel's fee request. See In re WorldCom, Inc. Sec. Litig.,

388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005) (finding that when "class counsel in a securities

lawsuit have negotiated an arm's length agreement with a sophisticated lead plaintiff possessing

a large stake in the litigation, and when that lead plaintiff endorses the application following

close supervision of the litigation, the court should give the terms of that agreement great weight").

Moreover, the requested fee award is plainly warranted and reasonable in light of the six Goldberger criteria.

### C. The Fee Application Is Reasonable Under the Goldberger Factors

#### 1. Lead Counsel's Time, Labor and Lodestar Are Reasonable

The first Goldberger factor for determining a fee's reasonableness is "the time and labor expended by counsel." 209 F.3d at 50. Similarly, the first step of the lodestar analysis is to multiply the number of hours reasonably expended in the litigation by each attorney by the appropriate hourly rate for that attorney. Strougo, 258 F. Supp. 2d at 263. Lead Counsel have unquestionably expended an enormous amount of time over the course of five years to bring this case to a resolution. As set forth in the Joint Declaration, through November 2009, Lead Counsel have collectively spent 309,537.80 hours of attorney and litigation support time valued at $119,556,484.25, and have advanced or incurred $7,848,411.84 in expenses to litigate this case. The requested 13.5% fee represents a multiplier of 0.44—in other words, a negative multiplier—that is amply justified by application of the relevant factors.

#### (a) Lead Counsel's Hours Are Reasonable

Where the lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." Goldberger, 209 F.3d at 50. The Court concludes that the hours Lead Counsel expended in litigating this action are plainly reasonable given the magnitude and complexity of the case, the fierce defenses mounted and the relatively late stage at which the Settlement was reached.

27

The extensive history of this litigation, the nature of the services performed, and the time expended by each attorney or other professional, are set forth in depth in the Joint Declaration and other papers submitted by Lead Counsel. All of merits discovery has been completed, including the production, review and analysis of over thirty-six million pages produced by Defendants and third parties, as well as the taking of ninety and defending of twenty depositions. Numerous procedural and substantive motions were fully briefed and argued. A substantial portion of complex expert discovery has been completed. (Joint Decl. ¶¶ 44, 68, 70, 73-76.) Lead Counsel supervised and managed every aspect of this litigation. (Id. ¶ 131.) They in turn were supervised closely by Lead Plaintiffs—in effect, by the Attorneys General of Ohio and New Jersey—who exercised their oversight responsibilities zealously and with an eye to keeping fees as low as possible, given the nature and duration of this action.

Given the five years over which this case has been pending, Lead Counsel's zealous prosecution of the litigation, Lead Counsel's success in overcoming Defendants' motions to dismiss, the briefing and affidavits submitted regarding class certification, and the expansive nature of discovery, with the corresponding intense and lengthy disputes that arose and required resolution by the Court-appointed Special Master, the Court concludes that the total hours billed by Lead Counsel are reasonable.

### (b)    Lead Counsel's Hourly Rates Are Reasonable

In a lodestar analysis, the appropriate hourly rates are those rates that are normally charged in the community where counsel practices—that is, the market rate. Luciano v. Olsten Corp., 109 F.3d 111, 115-16 (2d. Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984))).

Thus, awards in comparable cases are an appropriate measure of the market value of counsel's time. Courts in this Circuit and around the country have repeatedly found rates similar to those charged by Lead Counsel to be reasonable in other securities class actions. In short, a market check and substantial precedent demonstrates that the rates used by Lead Counsel in calculating their lodestars are reasonable.

## 2. The Magnitude and Complexity of the Litigation Support the Requested Fee

The second Goldberger factor—the magnitude and complexity of the case—also supports the requested fee award. A securities fraud class action's magnitude and complexity must be evaluated in comparison to similarly complex cases. See In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005). Shareholder class actions are notoriously complex and difficult to prove.

This action is an example of large-scale, highly complex litigation. At $400 million, the Settlement is one of the top twenty-five recoveries for shareholders in lawsuits of this nature in American history. Complex, fact-intensive pleadings were prepared and filed; multiple motions to dismiss were filed and opposed; Lead Counsel reviewed more than thirty-six million pages in electronic and paper discovery produced by Defendants; over 100 third parties were subpoenaed; 110 depositions were taken and defended; and Lead Counsel pursued class certification and engaged in attendant fact and expert discovery, which included reports and testimony from multiple experts concerning complex damage and loss causation theories and analyses. (Joint Decl. ¶¶ 31-34, 44, 70.)

In addition, throughout the course of the litigation, many disputes among the parties have required judicial interaction and resolution. Numerous hearings were conducted before the Special Master, either in person or telephonically. The negotiations relating to this Settlement

29

spanned one and a half years, and included three sessions with the Mediator and countless phone conferences and meetings. In sum, considering the magnitude and complexity of this case, the 13.5% Fee Application is reasonable.

### 3. The Risks of the Litigation Support the Requested Fee

The Second Circuit has identified "the risk of success as perhaps the foremost factor to be considered in determining [a reasonable award of attorneys' fees]." See Goldberger, 209 F.3d at 54 (internal quotations omitted). While risk is measured as of when the case is filed, id. at 55, changes in the law during the course of litigation can increase those risks considerably. During the course of this litigation, significant changes occurred in the well-established standards governing the critical issue of class certification. See, e.g., Miles v. Merrill Lynch & Co., 471 F.3d 24 (2d Cir. 2006).

Courts in this Circuit have long recognized that the risk associated with a case bears heavily upon the determination of an appropriate fee award. See In re Am. Bank Note Holographics, Inc. Sec. Litig., 127 F. Supp. 2d 418, 432-33 (S.D.N.Y. 2001) ("[It is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award."); In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 747 (S.D.N.Y. 1985), aff'd, 798 F.2d 35 (2d Cir. 1986) ("Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award.").

Enormous risk is inherent in massive and highly complex cases like this one. As noted above, there is great uncertainty in taking a case such as this to a jury trial in what would have been a battle of the experts.

## (a)     Risk of Non-Payment

Lead Counsel pursued this case for five years on an entirely contingent basis, without receiving any reimbursement and with the ever-present and substantial risk of non-payment. In numerous class actions, including complex securities cases, plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever. See, e.g., State Univs. Ret. Sys. of Ill. v. AstraZeneca PLC, No. 08 Civ. 3185, 2009 U.S. App. LEXIS 13674 (2d Cir. June 25, 2009) (affirming district court's dismissal of securities class action); Freedman v. Value Health, Inc., 34 F. App'x 408 (2d Cir. 2002) (affirming district court's grant of summary judgment in favor of defendants in securities class action); Steinberg v. Ericsson LM Tel. Co., No. 07 Civ. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) (dismissing securities class action). Here, Lead Counsel worked for five years on this large, complex case on a wholly contingent fee basis, facing the real and heightened risk that they would receive nothing for their efforts. Accordingly, the Court finds that the risk of non-payment weighs in favor of granting Lead Counsel's Fee Application.

## (b)     Risks of Establishing Liability and Maintaining the Class Action Through Trial

In assessing the risk of establishing liability, the Court must balance the benefits afforded to the Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation. Courts have recognized the considerable risks of failing to recover anything in securities class actions. See In re AOL Time Warner, Inc., No. 02 Civ. 5575, 2006 WL 903236, at *11-12 (S.D.N.Y. Apr. 6, 2006).

Throughout the course of this litigation, Lead Counsel encountered the risks of developing law in the areas of loss causation, pleading requirements and class certification

jurisprudence. See, e.g., Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005); Miles, 471 F.3d 24. The risks of this case for Lead Counsel increased with those legal developments.

In sum, the risks associated with this litigation support the reasonableness of Lead Counsel's Fee Applicartion.

### 4. The Quality of Lead Counsel's Representation of the Class Supports the Fee Application

The fourth Goldberger factor is the "quality of representation" delivered in the litigation. 209 F.3d at 50. To evaluate the quality of representation, courts in the Second Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 141 (S.D.N.Y. 2008).

There is no doubt that Lead Counsel has immense experience in complex federal civil litigation, particularly the litigation of securities and other class actions. Both Grant & Eisenhofer and Bernstein Liebhard have received significant recognition for their work in these areas.

Another consideration for assessing the quality of services rendered by Lead Counsel is the quality of opposing counsel. Here, all Defendants were represented by first-rate attorneys who vigorously contested Lead Plaintiffs' claims and allegations. Accordingly, the Court concludes that the quality of Lead Counsel's representation of the Class supports the Fee Application.

### 5. The Fee Request Is Fair and Reasonable in Relation to the Settlement Amount

In determining whether the Fee Application is reasonable in relation to the settlement amount, the Court compares the Fee Application to fees awarded in similar securities class-action settlements of comparable value. As demonstrated above, when compared with fee

requests in securities class-action settlements ranging from $100-$600 million, Lead Counsel's requested fee of 13.5% of the $400 million Settlement Fund is at the low end of the spectrum. See supra Discussion V.B.; In re Ikon, 194 F.R.D. at 194 ("Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent."). Thus, the Court finds that Lead Counsel's fee request is fair and reasonable in relation to the $400 million Settlement.

### 6. Public Policy Considerations Support the Requested Fee

Public policy is the sixth factor a court considers in determining the reasonableness of a fee request. Goldberger, 209 F.3d at 50. "Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." In re Merrill Lynch, 249 F.R.D. at 141-42; see In re WorldCom, 388 F. Supp. 2d at 359 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.") Moreover, "public policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." In re Bristol-Myers, 361 F. Supp. 2d at 236.

Here, Lead Counsel's willingness to assume the risks of this litigation resulted in a substantial benefit to a large Class of purchasers of MMC securities, and Lead Counsel must be adequately compensated for their efforts. Further, Lead Counsel seek a fee that is substantially less than their accrued lodestar. Public policy considerations favor granting the Fee Application.

### D. A "Cross-Check" of Lead Counsel's Lodestar Demonstrates the Reasonableness of the Requested Fee

In Goldberger, the Second Circuit held that even in cases in which the percentage method is chosen, "documentation of hours" remains "a [useful] 'cross-check' on the reasonableness of

the requested percentage." 209 F.3d at 50. However, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court . . . . Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case . . . ." Id. (internal citation omitted).

Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. See id. at 47; Savoie v. Merchs. Bank, 166 F.3d 456, 460 (2d Cir. 1999). In this case, the cumulative lodestar reported by Lead Counsel is $119,556,484.25. (Fees Br. at 22.) The percentage fee requested represents a negative multiplier of 0.44 to the lodestar. Thus, not only are Lead Counsel not receiving a premium on their lodestar, their fee request amounts to a deep discount from their lodestar. The lodestar "cross-check" therefore unquestionably supports the requested percentage fee award of 13.5%.

**E.      The Expenses Incurred by Lead Counsel Were Reasonable and Necessary to the Effective Prosecution of this Action**

Counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class. Lead Counsel requests reimbursement of $7,848,411.84 in expenses advanced or incurred by Lead Counsel while litigating this action. Those expenses relate principally to electronic document hosting, retention of a battery of highly regarded and experienced experts, legal research and photocopying services, deposition expenses, as well as travel expenses related to extensive discovery, settlement negotiations and mediations, court appearances and depositions. (See Decl. of Stanley D. Bernstein, Dec. 18, 2009 (summarizing and categorizing Lead Counsel's expenses); Decl. of Keith M. Fleischman, Dec. 18, 2009 (same).)

After reviewing the requested expenses, the Court finds that they were necessary litigation expenses that were reasonably incurred, reasonably related to the interests of the members of the Class, and adequately documented. The fact that Lead Plaintiffs, who have reviewed the requested expenses, believe that this payment represents fair and reasonable compensation to Lead Counsel, further supports the reasonableness of Lead Counsel's request for reimbursement. Accordingly, the Court grants Lead Counsel's petition for reimbursement of expenses in the amount of $7,848,411.84.

### F.     Lead Plaintiffs Are Entitled to an Award of Reasonable Costs and Expenses

The PSLRA states that "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4); see Hicks v. Stanley, No. 01 Civ. 10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005) ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.").

Here, the Ohio Plaintiffs and the New Jersey Plaintiffs have been actively involved in this action since its inception. Pursuant to the PSLRA, the Ohio Plaintiffs and the New Jersey Plaintiffs request an award totaling $214,657.14—$70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs—to compensate them for their reasonable costs and expenses incurred in managing this litigation and representing the Class. (Fees Br. at 23-25.)

Lead Plaintiffs have pursued their claims against Defendants for five years. These large institutional investors have actively and effectively fulfilled their obligations as representatives

of the Class. As set forth in the Joint Declaration and in the other papers submitted by Lead Plaintiffs, they (1) reviewed and approved the complaints and other pleadings filed in this action; (2) had extensive and regular telephonic, email, and in-person communications with Lead Counsel regarding strategy and developments in the case; (3) reviewed and commented on Lead Counsel's submissions to the Court, the Special Master and the Mediator; (4) oversaw and assisted their own personnel in responding to discovery requests, including requests for production of documents and interrogatories; (5) reviewed and approved responses and objections to discovery requests drafted by Lead Counsel; (6) proffered several representatives to give deposition testimony; (7) reviewed and approved the retention of experts and consultants; and (8) fully participated in all mediation sessions and settlement discussions on behalf of the Class. These are precisely the types of activities that support awarding reimbursement of expenses to class representatives.

The Notice provided to Class members stated that Lead Plaintiffs would apply to the Court for approval of their PSLRA Award Request. To date, only one objection to this request has been received. (Fees Br. at 25) The Court thus awards the Ohio Plaintiffs $70,000 and the New Jersey Plaintiffs $144,657.14 as compensation for their reasonable costs and expenses incurred in representing the Class.

## VI. Objections Received

Pursuant to the Preliminary Approval Order, Rust Consulting, Inc., the Claims Administrator, implemented an extensive notice program to potential Class members. The Claims Administrator mailed a total of 596,517 copies of the Notice and Proof of Claim (together, the "Notice Packet") to potential Class Members. (Young Aff. ¶ 11.) The Claims

Administrator also had the Summary Notice published in the national edition of *The Wall Street Journal* and had a copy of the Summary Notice transmitted over *Business Wire*. (Id. Ex. B.)

Through these efforts, the Claims Administrator reached hundreds of thousands of Class members, fully informing them of the Settlement terms and their rights, including the right to object to the Settlement or any part of it (including the Plan of Allocation, Lead Counsel's application for attorneys' fees and reimbursement of expenses, and reimbursement of costs and expenses for Lead Plaintiffs). Only *seven* potential Class members have objected. (Lead Pls.' Mem. in Resp. to Objections, Dec. 18, 2009, at 1.) These seven objections represent a mere 0.0012% of the Notices mailed to potential Class members.

Of these seven objectors, only one complied with the Notice's clearly stated procedures for filing a proper objection. That single objection was filed by Edward F. Siegel, Esq. ("Siegel") on behalf of purported Class member Hermine Union ("Ms. Union" or "Objector Union"). (Objection of Hermine Union, Dec. 14, 2009 ("Union Objection") (Docket No. 303).) That objection has been withdrawn. (Docket No. 330.)

## A. Any Suggestion That the Requested Fee Award Is "Unreasonable" and "Excessive" Is Meritless

One objector, James M. McCague, asserts that the requested fee award is unreasonable. (See Decl. of Brian S. Cohen, Dec. 18, 2009 ("Cohen Decl."), Ex. 10 (McCague objection).) That is simply not so. The law in this Circuit is clear: a district court must consider several specific factors in determining the reasonableness of a fee award for class counsel. See Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000). After considering those factors, the Court has little trouble rejecting McCague's objection. Cf. In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 378 (D.D.C. 2002) (rejecting broad, unsupported

objections because "[they] are of little aid to the Court in determining whether these settlements are fair, adequate, and reasonable."

The Court-approved Notice clearly describes the massive efforts engaged in by Lead Counsel in litigating the action. The Notice explains, inter alia, the extensive and vigorously contested fact discovery (including the review of over thirty-six million pages of documents), the huge number of depositions taken and defended, the intensive class certification motion practice, and the thorough expert witness work.

Mr. McCague acknowledges these efforts, but complains that he does not understand why counsel needed to take all the actions listed. (Id.) The Court easily concludes that Lead Counsel's efforts were necessary for the zealous and effective prosecution of this action on behalf of the Class.

That only two objections to the fee request were received, and just one continues to be pressed, is powerful evidence that the requested fee is fair and reasonable. See In re Prudential Sec. Inc. Ltd. P'ships Litig., 912 F. Supp. 97, 103 (S.D.N.Y. 1996) (concluding that a single "isolated expression of opinion" should be considered "in the context of thousands of class members who have not expressed themselves similarly"); In re Crazy Eddie Sec. Litig., 824 F. Supp. 320, 327 (E.D.N.Y. 1993) (finding fact that "only one person has opposed the fee" to support its reasonableness). The reaction by members of the Class is entitled to great weight by the Court. The Notice was sent to hundreds of thousands of prospective Class members. Only two objections relating to the Fee Application were submitted. That strongly supports a finding that the request is fair and reasonable.

## B.    The Remaining Objections to the Notice Program Are Meritless

Six people challenge the Notice on the ground that it was not "timely received." None of these individuals filed proper objections. Both the Notice and Summary Notice informed the Class that any objection to the Settlement must be filed with the Court and served on Lead Counsel no later than December 14, 2009. The Notice states that an objector must "include . . . proof of the number of MMC securities . . . purchased and sold during the Class Period." (Notice at 19.) Objectors William N. Weld ("Weld"), John F. Mencer ("Mencer"), Robert G. Coplin ("Coplin"), McCague, Thomas and Carolynn Kane ("the Kanes"), and an unidentified individual claiming via email that he/she did not receive the Notice until December 14, 2009 ("Anonymous"), failed to include this information. (See Cohen Decl. Exs. 7-12 (copies of objections of Weld, Mencer, Coplin, McCague, the Kanes, and Anonymous).)

Even if their objections had been proper, however, they are meritless. As the Court recognized in the Preliminary Approval Order, the Notice plan satisfied due process. Notice was first mailed on November 13, 2009. Objections were due thirty days later on December 14, 2009. Courts have repeatedly found such a time period to constitute sufficient notice. See, e.g., Miller v. Republic Nat'l Life Ins. Co., 559 F.2d 426, 429-30 (5th Cir. 1977) (concluding, in securities fraud class action, that a period of "almost four weeks between the mailing of the notices and the settlement hearing" was adequate time, particularly when only one class member objected to the timing); In re BankAmerica Corp. Sec. Litig., 210 F.R.D. 694, 707-08 (E.D. Mo. 2002) (finding that timing of notice comported with due process where "[t]here were three to four weeks between the mailing of class notice and the last date to object") (citing Grunin v. Int'l House of Pancakes, 513 F.2d 114, 120-21 (8th Cir. 1975) (finding nineteen-day notice period sufficient, particularly when case had been ongoing for two years)); see also Torrisi v. Tucson

Elec. Power Co., 8 F.3d 1370, 1374-75 (9th Cir. 1993) (holding that initial notice sent thirty-one days before deadline for written objections was adequate); In re AOL Time Warner S'holder Derivative Litig., No. 02 Civ. 6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) (finding distribution of notice thirty-four days before the deadline for objections was adequate).

It is well-established class-action jurisprudence in this Circuit that courts focus the due process lens on the notice efforts made by counsel, not whether class members actually received notice. See In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 168 (2d Cir. 1987) (determining that class notice was adequate and rejecting the proposition that actual notice had to be given to each and every class member); see also Buxbaum v. Deutsche Bank AG, 216 F.R.D 72, 80 (S.D.N.Y. 2003) ("It is widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected.") (internal quotations and citation omitted). As the Second Circuit recently held:

> Because notice of the settlement was reasonably provided through individually mailed notice to all known and reasonably identifiable class members, publication in several major newspapers, and entered on the district court's docket sheet, actual notice was not necessary and the notice provided here was sufficient. It is clear that for due process to be satisfied, not every class member need receive actual notice, as long as class counsel "acted reasonably in selecting means likely to inform persons affected."

In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 271 F. App'x 41, 44 (2d Cir. 2008) (quoting Weigner v. City of N.Y., 852 F.2d 646, 649 (2d Cir. 1988)).

In this case, a total of 596,517 Notice Packets were mailed to potential Class members. (Young Aff. ¶¶ 5, 9-10.) In addition, Summary Notice was transmitted over *Business Wire* on November 16, 2009, and a copy of the Summary Notice was published in the national edition of

*The Wall Street Journal* the next day. (Id. ¶ 6.) The Court easily concludes that the Class as a whole had adequate notice.

It must be noted that certain objectors received Notice later than others because they held their shares in "street name"—i.e., in the name of a nominee/brokerage house. Pursuant to the Preliminary Approval Order, the Claims Administrator used "reasonable efforts to give notice to nominee purchasers such as brokerage firms and other Persons that purchased or otherwise acquired MMC securities during the Class Period as record owners but not as beneficial owners." (Preliminary Approval Order at 4; see Young Aff. ¶¶ 3-4, 10.) In addition, the Preliminary Approval Order provides that "Such nominee purchasers are directed within seven (7) days of their receipt of the Notice to forward copies of the Notice and Proof of Claim to their beneficiaries that are Members of the Class." (Preliminary Approval Order at 4-5.)

That certain objectors' brokers failed to comply with the Preliminary Approval Order and forward their clients the necessary paperwork in a timely fashion is no fault of Lead Counsel. That is the risk a shareholder takes in registering his or her securities in street name. Moreover, "notice provided to the class members' nominees—i.e., the brokerage houses—has been deemed sufficient even if brokerage houses failed to timely forward the notice to the beneficial owners." Fidel v. Farley, 534 F.3d 508, 514 (6th Cir. 2008) (citing DeJulius v. New England Health Care Employees Pension Fund, 429 F.3d 935, 936, 945-47 (10th Cir. 2005) (finding notice sufficient where two beneficial owners received notice of class settlement two weeks after deadline for filing objections and on the same day as the final fairness hearing); Silber v. Mabon, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (finding notice adequate where 1,000 beneficial owners received notice after the opt-out deadline as a result of late response of brokerage house); Torrisi, 8 F.3d

at 1374-75 (concluding notice was sufficient where notice was mailed to some beneficial owners after deadline for filing objections had passed).

Accordingly, the Court rejects the remaining objections to the timeliness of the Notice program.

### C.    The Single Objection to the Format of the Claim Form Is Meritless

Only one objector challenges the Proof of Claim form, arguing that it is unreasonably burdensome and complex, and should be filled out by the lawyers and not the potential Class members. (See Cohen Decl. Ex. 11 (objection of the Kanes).) The Proof of Claim form simply asks Class members to list purchases, sales and holdings of MMC stock within the Class Period. Without that necessary information, the Claims Administrator could not calculate claimants' distributions. The single objector's claim that the lawyers should fill out the Proof of Claim form and that potential Class members should simply verify the information does not comport with the long-approved procedures for the efficient management of class-action settlement distributions. See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288, 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (holding that "[t]he [one] objection to the length and complexity of the proof of claim form is . . . meritless," as "the information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds").

### D.    The Single Objection to the Exclusion of Former Employees Is Meritless

One objector claims that it is "unfair" to exclude former employees from the Settlement Class. (See Cohen Decl. Ex. 7 (Weld objection).) Yet Lead Plaintiffs have always asserted—in the Amended Complaint, Lead Plaintiffs' class certification motion and the Stipulation of Settlement—that the wrongful conduct underlying their claims against Defendants were engaged in on a company-wide basis and ingrained in Marsh's business model. Accordingly, the Class

42

definition has always excluded MMC and Marsh employees, and the sole objection to the definition's exclusion of former employees is rejected.

## CONCLUSION

For the reasons stated above, the Court (1) approves the Settlement; (2) grants Lead Counsel's Fee Application of 13.5% of the Settlement Fund; (3) grants Lead Counsel's request for reimbursement of expenses in the amount of $7,848,411.84; and (4) grants Lead Plaintiffs' PSLRA Award Request for expenses totaling $214,657.14 ($70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs).

Dated: December 23, 2009

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

43