**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE MARSH & MCLENNAN COMPANIES, INC. SECURITIES LITIGATION | : : : : : | CIVIL ACTION NO: 04-CV-08144 (CM) |

**JOINT DECLARATION OF U. SETH OTTENSOSER AND MARY S. THOMAS**
**IN SUPPORT OF CO-LEAD PLAINTIFFS' MOTION**
**FOR DISTRIBUTION OF THE SETTLEMENT FUND AND**
**PAYMENT OF SETTLEMENT ADMINISTRATOR'S COSTS**

U. Seth Ottensoser, admitted to practice law in the State of New York and this Court, and Mary S. Thomas, admitted to practice law in the State of Delaware, the State of California, and the District of Columbia, and admitted *pro hac vice* in this Court, do hereby declare under the penalties of perjury that:

1.      I, U. Seth Ottensoser, am a member of the firm Bernstein Liebhard LLP and I, Mary S. Thomas, am a director of the firm Grant & Eisenhofer, P.A., Co-Lead Counsel for the Class ("Co-Lead Counsel") and for Co-Lead Plaintiffs the Public Employees Retirement System of Ohio; the State Teachers Retirement System of Ohio; the Ohio Bureau of Workers' Compensation; and the State of New Jersey, Department of the Treasury, Division of Investment ("Co-Lead Plaintiffs"), in the above-captioned action (the "Action"). We are responsible for the prosecution of this securities fraud class action against Defendants Marsh & McLennan Companies, Inc. ("MMC"), Marsh Inc. ("Marsh"), Jeffrey W. Greenberg, and Roger E. Egan (collectively "Defendants").

## A.    PROCEDURAL HISTORY

2.    On November 13, 2009, Co-Lead Plaintiffs (on behalf of the Class) and the Defendants (together, the "Parties") entered into a Stipulation and Agreement of Settlement (the "Stipulation"), wherein the Parties agreed, in substance, that in exchange for the payment of $400 million, plus interest (the "Settlement Fund"), there would be a full and complete settlement of all class claims against the Defendants.[1] The Stipulation was filed with the Court on November 10, 2009 in conjunction with Co-Lead Plaintiffs' Motion for Preliminary Approval of Settlement.

3.    On November 10, 2009, the Court granted Co-Lead Plaintiffs' Motion for Preliminary Approval of the Settlement and issued a Preliminary Approval Order (Docket No. 301), approving the proposed notice program and directing that the Notice of Proposed Settlement of the Class Action (the "Notice") be mailed to all Class Members. The mailing of the Notice was conducted in accordance with the Preliminary Approval Order.

4.    On December 18, 2009, Co-Lead Plaintiffs filed:  (i) Co-Lead Plaintiffs' Motion for Final Approval of Settlement (the "Final Settlement Motion"); and (ii) Co-Lead Plaintiffs' Motion for Approval of Co-Lead Counsel's Application for an Award of Attorneys' Fees, Reimbursement of Expenses for Co-Lead Counsel, and an Award of Expenses for Co-Lead Plaintiffs (the "Fee Petition").

5.    On December 23, 2009, a hearing was held before this Court regarding Co-Lead Plaintiffs' Final Settlement Motion and Fee Petition. Notice of the Final Settlement Motion, Fee

---

[1] The Settlement Fund, including interest earned thereon and net of any taxes on the income thereof, and net of any funds used to pay Court-awarded attorneys' fees and expenses and other costs, including notice and administrative costs and escrow fees, is referred to as the "Net Settlement Fund."

Petition, and hearing thereon, had been previously sent to Class Members, along with a proof of claim form to be completed by Class Members seeking to share in the Net Settlement Fund.

6.    On December 23, 2009, the Court issued a Decision and Order Approving the Settlement, Certifying the Class for Settlement Purposes, Approving the Plan of Allocation of the Settlement Fund, Awarding Attorneys' Fees, and Rejecting Objections (the "Final Approval Decision and Order") (Docket No. 333) and a Final Approval Order and Judgment of Dismissal with Prejudice (Docket No. 335), approving the Settlement as fair, reasonable, and adequate and dismissing the Action with prejudice.   A Corrected Final Approval Order and Judgment of Dismissal with Prejudice (the "Corrected Final Judgment") (Docket No. 338) was entered on January 26, 2010.  Among other things, the Court:  (i) approved the Stipulation in all respects, including the provisions concerning distribution of the Settlement Funds (*see* Corrected Final Judgment ¶ 11); (ii) certified the class for settlement purposes pursuant to Rule 23 of the Federal Rules of Civil Procedure (*Id.* ¶ 4); (iii) approved the Plan of Allocation as fair, reasonable and adequate (*Id.* ¶ 12); and (iv) authorized the Court to retain jurisdiction over distribution of the Settlement Fund (*Id.* ¶¶ 21, 22).

7.    Pursuant to the Preliminary Approval Order (¶ 9), Co-Lead Counsel retained Rust Consulting, Inc. ("Rust" or the "Claims Administrator") as the Claims Administrator to complete notification to the Class, to process the Proof of Claim and Release forms ("Proofs of Claim") submitted by Class Members, to perform all analyses and accounting procedures in connection with the claims filed, and to effectuate the distribution of the Settlement Fund.

8.    Filed concurrently herewith is the Affidavit of Eric J. Miller, Managing Senior Project Administrator for Rust ("Miller Affidavit"), regarding Processing of Proof of Claim and Release Forms and Calculation of Net Recognized Losses.  Attached as Exhibit M to the Miller

Affidavit is a Settlement Fund Analysis prepared by Rust, summarizing the deposits into, income earned on, and expenditures from the Settlement Fund. As of February 28, 2011, the amount of cash in the Settlement Fund was $339,265,945.33. If the Court approves payment of Rust's settlement administration fees and costs of $2,564,916.44 for which reimbursement is sought (this includes Rust's estimated costs associated with completing the distribution of the Settlement Fund), the amount available in the Net Settlement Fund would be reduced to $336,701,028.89. At the time of the anticipated distribution (at least 30 days after entry of the proposed Distribution Order), the Net Settlement Fund will be slightly greater than $336,701,028.89 because it will remain in an interest-bearing account until the date of distribution.

9.      Plaintiffs' Co-Lead Counsel now seek Court approval to distribute the Net Settlement Fund.

**B.      CLAIMS PROCESSING AND DETERMINATIONS**

10.      As of March 16, 2011, Rust has disseminated over 738,864 copies of the Notice and Proof of Claim to potential Class Members. *See* Miller Affidavit ¶ 4. As stated in the Notice, all Proofs of Claim were to be postmarked on or before February 22, 2010; however, Rust continued processing claims received through March 16, 2011, subject to the Court approving these late, but otherwise valid claims. Miller Affidavit ¶¶ 5, 6. To date, Rust has received and processed over 165,497 Proofs of Claim. Miller Affidavit ¶ 6.

11.      Employees of Rust regularly reviewed each submitted claim as it was received to determine its eligibility to participate in the Settlement. Miller Affidavit ¶ 8. As detailed in the Miller Affidavit, the processing of Proofs of Claim has required a significant amount of time. Rust has encountered a significant number of deficient claims during its administration, which has added to the time involved in processing Class Members' claims. Miller Affidavit ¶¶ 8-10.

4

12.    Of the 165,497 total claims received on or before March 16, 2011, Rust has determined 54,311 claims (including 1,821 late, but otherwise valid claims) to be acceptable in whole or in part. Miller Affidavit ¶ 23. Attached as Exhibit K to the Miller Affidavit is a list of Authorized Claimants eligible to receive a distribution from the Net Settlement Fund. Included in the Authorized Claimants are 1,821 claimants whose claims were postmarked after the February 22, 2010 deadline, but who would otherwise be eligible to receive a distribution from the Net Settlement Fund. Miller Affidavit ¶ 24. A list of the late, but otherwise valid, claims is attached to the Miller Affidavit as Exhibit L.

13.    The approved Recognized Losses claimed for the Authorized Claimants total $3,404,316,370.74, calculated in accordance with the Plan of Allocation as approved by the Court in its Final Judgment. *See* Miller Affidavit ¶ 23. Co-Lead Counsel request that the Court approve the pending 54,311 fully or partially valid claims, as payable, in whole or in part, and as eligible to be included in the distribution of the Net Settlement Fund.

14.    Of the 165,497 claims received to date, 111,186 claims have been designated by Rust as totally deficient or are recommended to be rejected in their entirety. *See* Miller Affidavit ¶ 13. Of this amount, 30,556 claimant's claims are ineligible, and 80,630 claims have no Recognized Loss pursuant to the Plan of Allocation. *Id.* Attached as Exhibit E to the Miller Affidavit is Rust's list of Ineligible Claims, as of March 16, 2011, which includes all applicable claimant's names, the assigned claim numbers, and the reason for each rejection.

15.    As indicated in Exhibit E of the Miller Affidavit, the Ineligible Claims were disallowed because, among other things: (i) claimants failed to provide transaction information and/or documentation of their class transactions; (ii) claimants were employees of MMC, Marsh

or other MMC subsidiary, and thus, are excluded from the Class; or (iii) claimants filed duplicate Proof of Claim and Release forms.

16.    For all submitted claims that, *inter alia*: (i) lacked the required documentation to support the entire claim; (ii) were not signed or did not provide enough information to calculate the claim; or (iii) were determined to have no Net Recognized Loss pursuant to the Plan Allocation, Rust sent a Deficiency Letter and/or a Notice of Ineligibility to the Claimant advising him, her, or it of the deficiency(s) and requesting submission of the required documentary evidence to correct the defect(s). *See* Miller Affidavit ¶¶ 8, 9.

17.    Rust mailed 7,600 Deficiency Letters and 10,125 Notices of Ineligibility. These letters advised claimants of their right to contest Rust's administrative determination rejecting his, her or its claim, and to request a hearing before the Court. *See* Miller Affidavit ¶ 10. Sample Deficiency Letters and Notices of Ineligibility are attached to the Miller Affidavit as Exhibits B and C, respectively.

## C.    DISPUTED CLAIMS

18.    Rust has received 49 letters from claimants seeking the Court's review (the "Disputed Rejected Claims") of Rust's administrative decisions regarding their claims. *See* Exhibit J to the Miller Affidavit. Among these claims, 41 claims were rejected because the claimants were employees of MMC or Marsh or some other MMC subsidiary (the "MMC Employees") and therefore, are excluded from the Class; one claim was rejected because of Rust's determination regarding the authenticity of the supporting documentation; and seven claims were rejected because the claimants had no eligible purchases of MMC securities during the Class Period. *See* Exhibit J of the Miller Affidavit. Rust, along with Co-Lead Counsel, maintains that the rejection of these claims was proper.

### (1)    Rejection of MMC Employee Claims

19.    As to the 41 Disputed Rejected Claims that were rejected because the claimants were MMC Employees, and therefore excluded from the Class, two claimants, Stephen Caflisch, Deputy General Counsel of Fiduciary Counselors on behalf of the Marsh & McLennan Companies 401(k) Savings & Investment Plan (the "Plan") (Claim No: 50091456), and Gordon Hall (Claim Nos. 35282 and 35283), a former employee of MMC subsidiary Mercer Human Resource Consulting ("Mercer"), submitted correspondence to Rust and/or Co-Lead Counsel concerning their disputed claims.    Relevant correspondence between Rust and the Plan concerning Rust's rejection of its claim is attached as Exhibits 1A-D.    Relevant correspondence between Rust and Co-Lead Counsel and Mr. Hall concerning Rust's rejection of his claim is attached as Exhibits 2A-D.[2]

20.    The Plan asserts three arguments as to why its claim should not be rejected:  (1) the definition of the Class does not exclude the Plan because it is a legal entity separate from the employees of MMC and Marsh; (2) the Class definition only excludes employees of MMC, Marsh, and any of their affiliates or subsidiaries but not the employees of their affiliates or subsidiaries; and (3) no attempt is being made by Rust to identify and deny claims by employees, expect in their capacity as participants in an MMC plan. *See* Exhibits 1B and 1C.  However, a review of each of these arguments demonstrates that Rust's rejection of the Plan's claim was proper.

21.    The Class, as certified, is defined as:

all persons who purchased or otherwise acquired MMC securities between October 14, 1999 and October 13, 2004 (the "Class Period"), and that claim to have suffered losses as a result of such purchase or acquisition.  Excluded from

---

[2] Correspondence concerning Mr. Hall's claims has been redacted to protect his privacy. Unredacted versions of Exhibits 2A-D will be provided to the Court under separate cover.

the Class are: (1) MMC, Marsh, and their officers, directors, employees, affiliates, parents, subsidiaries, representatives, predecessors and assigns; (2) Greenberg and Egan and their immediate families, employees, affiliates, representatives, heirs predecessors, successors and assigns, as well as any entity in which Greenberg or Egan has a controlling interest.

*See* Corrected Final Judgment at ¶ 4. On its face, the Class definition excludes employees of MMC, Marsh and its subsidiaries and affiliates.

22.    Further, the Court has already reviewed the issue of whether MMC Employees were properly excluded from the Class, and held that such exclusions were proper. *See* Final Approval Order and Decision at 42-43. Rejecting an objection to the settlement filed by William Weld, an employee of MMC who argued that he would not recover from the settlement because he was an employee of MMC, even though he owned stock outside the 401(k) plan, the Court emphasized that:

the wrongful conduct underlying [Lead Plaintiffs'] claims against Defendants were engaged in on a company-wide basis and ingrained in Marsh's business model. Accordingly, the Class definition has always excluded MMC and Marsh employees, and the sole objection to the definition's exclusion of former employees is rejected.

*Id.*

23.    In addition, the Plan itself defines an employee of MMC as including employees of MMC or any subsidiary of affiliate of MMC. The Plan's eligibility requirements state that all persons that are "classified on payroll as a U.S. salaried employee of MMC or any subsidiary or affiliate of MMC" are eligible for the Plan, and defines MMC to mean "Marsh & McLennan Companies, Inc. and its subsidiaries and affiliates other than Kroll Inc. and its subsidiaries and affiliates." *See* Exhibit 3 (the Plan's eligibility requirements as set forth on MMC's website). Thus, Rust and Co-Lead Counsel determined that the Plan's participants are ineligible to take part in the Settlement because by the Plan's own definition, all of its participants are employees of MMC. As the Plan is made up of employees of MMC and its subsidiaries, the Plan is

excluded from the Class, regardless of the fact that the Plan itself is an entity separate from the employees that contribute to it.

24.    Importantly, while the Plan is excluded from the Class in this Action, its participants are not without remedy.  The settlement obtained in the *In re Marsh ERISA Litigation*, No. 04 Civ. 8157 (CM), provides for a distribution to the Plan.  *See* Exhibit 4 at 2, 4 (Stipulation and Agreement of Settlement entered into between named plaintiffs Donald Hundley, Conrad Simon, Leticia Hernandez and MMC dated November 9, 2009).

25.    Lastly, contrary to the Plan's assertion, Rust is not arbitrarily identifying only Plan participants as former employees of MMC.  *See* Exhibit 1B.  The Proof and Claim Form require claimants to certify that they believe themselves to be members of the Class and not excluded from the Class.  Rust has reviewed each claim form submitted to determine whether claimants are excluded from the Class.

26.    Mr. Hall, a former employee of Mercer, contests Rust's rejection of his claim, asserting that he was employee of Mercer, not MMC, and that he retired before the end of the Class Period.  *See* Exhibits 2B, 2C.  Since Mr. Hall was an employee of Mercer, a subsidiary of MMC, he is an employee of MMC and his claim was properly rejected.  Co-Lead Plaintiffs have always asserted that the wrongful conduct was wide-spread at MMC and its subsidiaries.  The Second Amended Consolidated Class Action Complaint (Docket No. 142) alleged that MMC's wrongful conduct was not limited to Marsh, but was rampant throughout MMC's various businesses, including Mercer and Putnam Investments.

27.    Accordingly, for the reasons set forth above, the 41 claims rejected by Rust because the claimants were MMC Employees, and therefore excluded from the Class, including Rust's rejections of the Plan's and Mr. Hall's claims, are proper.

### (2)   Rejection of Questionable Claim

28.   Rust has also recommended the rejection of Valiant Investment, LLC's ("Valiant") claim (Claim No. 30867) as Questionable based on Rust's claim confirmation procedures. *See* Miller Affidavit ¶¶ 14-17. Rust's determination is based on Rust's knowledge of previous questionable filings by Valiant in other settlements administered by Rust and Rust's knowledge that the claimant is suspected of providing falsified documentation in connection with other settlements. *See* Miller Affidavit ¶ 15.

29.   Upon identifying Valiant's claim as a Questionable Claim, Rust sent Valiant a Notice of Ineligibility, advising Valiant to notify Rust within twenty (20) days if it disagreed with Rust's determination. Correspondence between Rust and Valiant concerning Rust's rejection of its claim is attached as Exhibits 5A-C.[3] The correspondence Rust received from Valiant in response to the Notice of Ineligibility contained alterations to the original documentation submitted by Valiant, further raising doubt as to its authenticity. *See* Miller Affidavit ¶ 18. Accordingly, for the reasons set forth herein and in the Miller Affidavit (¶¶ 14-19), Rust's rejection of Valiant's claim is proper.

### (3)   Rejection of Claims Due to No Eligible Purchases During the Class Period

30.   Lastly, as to the seven claims Rust rejected because the claimants did not have an Eligible Purchase of MMC Securities during the Class Period (*see* Miller Exhibit J), these rejections are based on the "Class" definition as certified by the Court in the Preliminary

---

[3] Valiant's claim form, correspondence, and trading confirmations have been redacted to protect its privacy. Unredacted versions of Exhibits 5A-C will be provided to the Court under separate cover.

Approval Order (¶ 3) and set forth in the Notice.  Accordingly, Rust's rejections of these claims are proper.

**D.    FILED CLAIMS AND REQUEST FOR APPROVAL OF PAYMENT OF CLAIMS, INCLUDING LATE-REJECTION OF INELIGIBLE CLAIMS**

31.    As indicated in Exhibit K of the Miller Affidavit, 54,311 claims were submitted properly and were determined by the Claims Administrator to be valid.  *See also* Miller Affidavit ¶ 23.  Of those claims, 1,821 otherwise valid, but late-postmarked claims that were received after the original February 22, 2010 submission deadline stated in the Notice, were processed through March 16, 2011.  *See* Miller Affidavit ¶ 24.  Co-Lead Counsel believe that it would be fair, reasonable, and in the interest of justice to allow Proofs of Claim received by Rust through March 16, 2011, which are otherwise valid, to share in the Net Settlement Fund.  Co-Lead Counsel request that these claimants who submitted otherwise valid, but late postmarked claims, be allowed to participate in the Net Settlement Fund as if their claims had been timely submitted.

32.    Co-Lead Plaintiffs respectfully request that the Court approve the administrative determination of Co-Lead Counsel and Rust to approve all valid claims listed on Exhibit K with a total Recognizable Claim amount of $3,404,316,370.74.  *See also* Miller Affidavit ¶¶ 23.

33.    Co-Lead Plaintiffs also respectfully request that the Court approve the administrative determinations of Co-Lead Counsel and Rust and reject the claims identified in ¶¶ 18 through 30, that were either submitted by claimants that are excluded from the Class, are deficient and never cured, are duplicates, or do not result in a Recognizable Claim pursuant to the Plan of Allocation.

**E.    TAXES AND EXPENSES**

34.    Pursuant to the Stipulation, the Settlement Fund was deposited into a segregated interest-bearing escrow account established pursuant to the terms of an executed escrow

agreement and invested principally in short-term instruments backed by full faith and credit of the United States Government or fully insured by the United States Government. The total interest earned on the Settlement Fund through February 28, 2011 is $707,598.42.

35.    Under the provisions of § 1.46B of the Internal Revenue Code, taxes must be paid on the Settlement Fund. To date, no taxes have been paid on the Settlement Fund, however, any monies payable to the Internal Revenue Service at the time of initial distribution, if any, on the interest earned on the Settlement Fund will be withheld from payment to the Class and paid to the Internal Revenue Service.

36.    In connection with its administration of the Settlement Fund, Rust has incurred fees and expenses totaling $2,438,396.44. *See* Miller Affidavit ¶ 30; *see also* Exhibit N of the Miller Affidavit (attaching a copy of Rust's invoice reflecting work performed on behalf of the Class through March 11, 2011). Rust will continue to submit invoices to Co-Lead Counsel for its efforts in processing claims received after March 16, 2011, and for work related to subsequent distributions to the Class.

## F.    REQUEST FOR REDISTRIBUTION OF REMAINING NET SETTLEMENT FUND IF NECESSARY

37.    Pursuant to paragraph K.1 of the Stipulation, if, after the initial distribution, any funds remain in the Net Settlement Fund by reason of uncashed checks or otherwise, and, after the Claims Administrator has made reasonable and diligent efforts to have Authorized Claimants cash their distribution checks, any balance remaining in the Net Settlement Fund on year after initial distribution of such funds shall be redistributed, after payment of unpaid costs or fees incurred in administering the Net Settlement Fund for such redistribution, to Authorized Claimants who have cashed their original distribution checks and who would receive at least $20 from such redistribution. If, after six months following such redistribution, any funds remain in

the Net Settlement fund, then such balance shall be contributed to a non-sectarian, not-for-profit, 501(c)(3) organization(s) designated by Plaintiffs' Co-Lead Counsel, subject to Court approval. Co-Lead Counsel request that the court approve the re-distribution procedures.

## G.    REQUEST FOR DISPOSITION OF CLAIMS ADMINISTRATOR'S RECORDS

38.    Co-Lead Counsel also request that the Distribution Order provide that one year after the final distribution of the Net Settlement Fund to the Authorized Claimants, Rust may destroy all claim forms and related correspondence.    Rust would, however, retain electronic copies of claims records for a period of three years after the final distribution of the Net Settlement Fund to the Authorized Claimants.

WHEREFORE, Plaintiffs' Co-Lead Counsel respectfully request that the Court enter the proposed Distribution Order.

Dated:  April 5, 2011

_____
U. Seth Ottensoser

_____
Mary S. Thomas